# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

J.W., a minor, by and through Amanda Williams, Guardian and Next Friend,

    *Plaintiff*,

v.

The City of Jackson, Mississippi; Chockwe A. Lumumba, Jr.; Tony Yarber; Kishia Powell; Robert Miller; Jerriot Smash; The Mississippi State Department of Health; Jim Craig; Trilogy Engineering Services, LLC; and John Does 1-40

    *Defendants*.

Case No. 3:21-cv-00663-CWR-LGI

Hon. Carlton W. Reeves
Mag. LaKeysha Greer Isaac

---

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS MISSISSIPPI DEPARTMENT OF HEALTH AND JIM CRAIG

---

Plaintiff, J.W., a minor, by and through Amanda Williams, Guardian and Next Friend, by and through undersigned counsel, files this Memorandum in Support of Plaintiff's Response in Opposition to the Motion to Dismiss of Defendants Mississippi State Department of Health ("MSDH") and Jim Craig ("Craig") and in support thereof would show the following:

### INTRODUCTION

This case arises out of a tragic and widespread public health crisis in the city of Jackson, Mississippi. This crisis was caused by conscious shocking and deliberately indifferent government mismanagement, deception, and ineptitude in the management and oversight of the city's public water system causing the citizens of Jackson to be poisoned by lead in their drinking water. Plaintiffs are hundreds of water users and/or citizens of Jackson, all of whom

1

were children when the crisis began. They instituted the present suit asserting constitutional and state law claims against several governmental actors, private engineering firms, and their officials and employees for their roles in the crisis. Two of these Defendants, MSDH and Jim Craig, a senior official with MSDH, have moved to dismiss Plaintiffs' claims against them. Plaintiffs' claims against Defendants MSDH and Craig arise out of actions they took during this crisis which caused, prolonged, and worsened the Plaintiffs' exposure to lead. Defendants Motion to Dismiss these claims is without merit and should be denied. Plaintiffs have asserted a clearly established right to bodily integrity that is not barred by qualified immunity against Defendant Craig. Further, Plaintiffs' negligence claim against Defendants is not subject to discretionary immunity and Plaintiffs served Defendants with adequate pre-suit notice of their claims as required by statute.

## FACTUAL BACKGROUND

Lead poisoning poses indisputable and tragic health effects—and children are particularly susceptible to its effects. (Doc. 51; ¶347). In children, even "low levels of exposure to lead have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells." *Id*. Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death." (Doc. 51; ¶350).

According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavior changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment." (Doc. 51; ¶348). "Lead exposure also causes anemia, hypertension renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be

irreversible." *Id*. Children exposed to lead suffer catastrophic lost opportunity costs—inhibited development and diminished intelligence leading to lower economic productivity–over the course of their lives. (Doc. 51; ¶357-361).

Lead can enter the public water supply if a public water system has lead pipes and if the water going through the pipes is corrosive. (Doc. 51, ¶93). The Plaintiff receives his drinking water through an aging public system that is substantially made up of old lead pipes and lead solder connections. (Doc. 51, ¶¶76-77 and 85-90). Jackson's source water has been flagged as impaired for its corrosivity and the city has not had the ability to treat the corrosive water for years. (Doc. 51, ¶¶103, 112, and 170).

While the City of Jackson owns and operates its public water system, Defendants MSDH and Craig are responsible for regulating how Mississippi municipalities provide safe drinking water to the public by enforcing drinking water standards consistent with federal and state law. (Doc. 51, ¶¶70-71 and 192); *see also* Miss. Code Ann. § 41-26-2(a). MSDH is a state agency that regulates public health for Mississippi. (Doc. 51, ¶70). It has been delegated as Mississippi's Primacy Agency under the Safe Drinking Water Act ("SDWA") and thus assumes primary responsibility for protecting the safety of public drinking water statewide. *Id*. Defendant Jim Craig is an MSDH employee and has served as the agency's Director of Health Protection for nearly twenty years—since 2004. (Doc. 51, ¶71). Additionally, Craig serves as Senior Deputy and Emergency Planning Coordinator for the agency. *Id*. In this capacity at MSDH, Defendant Craig is responsible for enforcing the state's drinking water safety standards, crafting and authorizing water testing methods, and directing employees to use these methods. (Doc. 51, ¶¶70, 207, and 217).

Craig and MSDH's authority and duties with relation to water safety are governed by United States and Mississippi legislation enacted to ensure that the public has adequate access to safe drinking water. 42 U.S.C. §300f et seq. (1974), Miss. Code Ann. § 41-26-6 (1997). Congress enacted the Safe Drinking Water Act ("SDWA") in 1974 to assure the quality of drinking water across the country and authorized the Environmental Protection Agency ("EPA") to set national standards for drinking water to protect public health. 42 U.S.C. §300f et seq. (1974).

In addition to the EPA's regulations, the State of Mississippi implemented its own Safe Drinking Water Act ("SDWA") of 1997. (Miss. Code Ann. § 41-26-1 et seq.). The SDWA provides in relevant part:

"(2) The purposes of this chapter shall be:

(a) To establish a state program to assure provision of safe drinking water to the public by establishing drinking water standards consistent with the federal act and developing a state program to implement and enforce the standards. The standards shall protect the public health and welfare to the extent feasible using technology, treatment techniques and other means which are generally available.

(b) To develop a process for implementing plans for the provision of safe drinking water in emergencies;

(c) To provide public notice of potentially hazardous conditions that may exist in a water supply[…]"

Miss. Code Ann. § 41-26-2. Under state law, the MSDH State Health Officer may delegate their authority to a designee. Miss. Code Ann. §§ 41-26-3(h) and 41-26-7(1)(j). In this instance, the State Health Officer delegated their authority to Defendant Craig as Director of the Health Protection Division. (Doc. 51, ¶71). Director Craig is responsible for the administration of Mississippi's SDWA and enforces "the laws, rules, and regulations governing the safe drinking water act." Miss. Code Ann. §§ 41-26-7(1)(a) and 41-26-7(1)(h). Therefore, Defendant MSDH and Defendant Craig must perform certain duties under state and federal law. "[T]he director shall

have the following powers and duties concerning safe drinking water: … (b) to make inspections and investigations, collect samples and carry-on research and analyses as may be necessary to carry out this chapter and applicable rules and regulations." Miss. Code Ann. § 41-26-7(1)(b).

One hazard that MSDH and Craig are each charged with carefully monitoring, treating, and preventing under these laws is lead. 40 C.F.R. 141.80-91. Under these laws and regulations, Defendants MSDH and Craig must coordinate and regulate the triennially water testing for lead and copper as required by the federal government. *Id*. If testing results return a result for lead in the water at or exceeding 15 parts per billion ("ppb") at the 90th percentile of testing sites, additional regulatory requirements are triggered for municipalities and State Primacy Agencies, including Defendants MSDH and Craig. *Id*.

Defendant Craig and the MSDH implemented testing procedures that were intended to and succeeded in concealing the full extent of the lead contamination throughout Jackson's public water system. (Doc. 51, ¶¶207-212). MSDH and Craig trained their employees in "pre-flushing stagnation" techniques and instructed their employees to run the tap water at slow speeds which were atypical from normal use. *Id*. These employees were authorized and directed by Defendant Craig to utilize these practices while testing Jackson's water for lead. *Id*.

The EPA has advised against pre-flushing stagnation during lead and copper testing since at least 2008, and Plaintiff alleges Defendant Craig knew this. (Doc. 51, ¶¶204-206). This practice immediately flushes all lead that accumulated in the pipes while the water in the line was stagnant for several hours—which is when lead typically leaches into the water. *Id*. Pre-flushing is well-known for artificially lowering lead levels in testing samples which, in turn, skews results. *Id*. (Doc. 51-4, Exhibit 4). This methodology has been used by water officials in around the country precisely to lower lead results and at least three officials were criminally indicted for using a

similar testing methodology during the Flint, Michigan water crisis. (Doc. 51, ¶¶208-209). In February 2016, the EPA sent correspondence to water authorities reminding them that such misleading testing techniques do not comply with federal law and EPA guideline. (Doc. 51, ¶¶213-214; Doc. 51-4, Exhibit 4).

Plaintiff alleges that Craig crafted the MSDH's directions on testing methodology to yield generally lower results and ensure broader "compliance" with the LCR. (Doc. 51, ¶207). Such compliance, brought about by using a testing method that skews the results lower than they should be, results in the under detection of the real amount of lead in the water, thereby causing, exacerbating, and/or prolonging the Plaintiff's exposure to lead in Jackson's drinking water. (Doc. 51, ¶¶215-216).

While MSDH and Craig were using this testing technique that artificially lowered lead levels in testing results, they were aware that the City of Jackson was at risk for elevated lead and had a problem with corrosion control. In 2011, the MSDH identified Hinds County, where Jackson is located, as "high risk for lead poisoning" and recognized that "children are especially at risk since their bodies absorb lead more easily than adults. (Doc. 51, ¶91). Further, according to Defendant MSDH's own data, the City of Jackson saw a jump in lead from under 5 ppb to 13.7 ppb during the 2010-2012 triennial testing period. (Doc. 51, ¶92). While these results did not exceed federal and state regulations to trigger mandatory actions, the results were high enough to alert officials to potentially severe health risks to children drinking Jackson's water. *Id*. After those results, city officials started investigating the problem and discovered that the system's corrosion control treatment had not been functioning for years, allowing acidic water to run through and corrode lead pipes in Jackson's public water system. (Doc. 51, ¶114). When Jackson's mayoral

administration changed in 2014, all efforts to prevent more lead from leaching ceased. (Doc. 51, ¶¶139-147).

In June 2015, MSDH's triennial testing showed that lead levels in Jackson had jumped again—this time far exceeding the lead regulatory limit at 28 ppb. (Doc. 51, ¶¶195 and 221-225). The lead levels were likely much higher than the 28.4 ppb result due to improper testing methods that Defendant Craig authorized and directed MSDH employees to use. (Doc. 51, ¶¶196-220). The lead exceedance finding triggered mandatory actions for Defendants MSDH and Craig, including public notification of the present dangers and associated risks as well as increased frequency of lead testing. *See* Miss. Code. Ann. §41-26-13.

Mississippi requires the water system to send a public notice of a lead exceedance to MSDH "and that public notice shall be published by the department on its Web site." Miss. Code. Ann. §41-26-13(2); *see also* Miss. Primary Drinking Water Regs. R. 1.2.2; 40 C.F.R. §141.80. The system is then required to place notices in the newspaper that included the MSDH website address at which the public notices is posted. Miss. Code. Ann. §41-26-13(2). EPA guidelines also encourage the public being informed of lead exceedances as soon as practicable. (Doc. 51, ¶228); *see also* 40 C.F.R. §141.85(d)(2). Instead of informing water users and residents about the dangerous levels of lead present in their drinking water, Defendant Craig recklessly disregarded the risk to Plaintiff's and concealed this information from the public for six months. (Doc. 51, ¶¶221-225).

When Craig did issue the public notice, he downplayed the crisis and blamed the delay of warning on an unacceptable excuse that he relied on EPA guidance. (Doc. 51, ¶¶226-235). Defendants characterize this as "an allegedly erroneous misinterpretation of an EPA regulation." (JW Doc. 61 at p. 14). At a press conference on January 29, 2016, Craig blamed his failure to

promptly alert the citizens of Jackson to the high presence of lead in their water on EPA guidelines – this claim was similar to excuses made by city and state officials in Flint Michigan. (Doc. 51, ¶227). Plaintiff pleads that in making this claim, Craig "grossly distorts the EPA guidelines, which in no way prohibit entities like the MSDH from notifying municipalities of threats to public health." (Doc. 51, ¶223). Plaintiff alleges that "Craig did not rely upon any reasoned analysis of the LCR or the EPA's guidelines. In other words, the explanation he gave on January 29, 2016 was either unacceptably ignorant or knowingly false." (Doc. 51, ¶231). Plaintiff further pleads that not only do EPA regulations not prohibit warning the public about lead exceedances, but Defendants also had a duty under common law and the Fourteenth Amendment to notify Jackson residents. (Doc. 51, ¶229). Plaintiff also pleads that no reasonable person—let alone a reasonable public health officer in charge of safe drinking water standards—would believe it was appropriate to or defensible to delay public notice of lead contamination, especially given the near certainty of permanent and life-altering harm to children. (Doc. 51, ¶232). Finally, Plaintiff pleads that "Craig's decision to intentionally withhold critical public health information demonstrates a shocking and reckless disregard for the health and safety of the people of Jackson." (Doc. 51, ¶¶226-235). Thus, while Defendants characterize Craig's excuse that he relied on EPA guidance in delaying notifying Plaintiff of the toxic levels of lead in their water as a misinterpretation of EPA guidelines, Plaintiff's Amended Complaint in no way credits that explanation, but instead alleges that Craig's failure to warn was intentional and shockingly indifferent to Plaintiff's health and rights. As a result, Jackson residents and water users had no public information about lead in their water nor the dangers associated with it, prolonging their exposure to lead. (Doc. 51, ¶¶242-243).

In February 2016, Craig issued an advisement that small children and pregnant women only consume tap water if they boiled it first. (Doc. 51, ¶289). Likewise, Defendants MSDH and Craig were aware that Jackson was issuing similar instructions through several boil water notices from the spring of 2016 to 2020. (Doc. 51, ¶290). This advice was dangerous because boiling water causes water molecules to evaporate and creates a higher concentration of toxic lead in the drinking water as a result. (Doc. 51, ¶291).

Plaintiff filed his Amended Complaint against several governmental entities, private engineering firms, and their officials and employees asserting various claims for violations of their constitutional and state law rights arising out of his exposure to lead tainted water in Jackson. (Doc. 51). Pertinent to the present motion, Plaintiff filed suit against Defendant Jim Craig in his personal capacity for violation of his Fourteenth Amendment right to bodily integrity and to be free from state created danger under 42 U.S.C. § 1983. (Doc. 51, ¶¶375-393). Plaintiff also asserted a negligence claim against both Defendants Craig and MSDH. (Doc. 51, ¶¶394-412).

Pursuant to Miss. Code Ann. § 11-46-11(3), prior to filing suit against Defendants, Plaintiff delivered a notice of claim letter to Defendants Craig and MSDH. (Doc. 51, ¶412). The notice explained that Defendant MSDH brought about Plaintiff's injuries because MSDH was aware of the elevated lead levels in Jackson by June 2015 and MSDH officials decided to withhold that information from the public for six months—thereby allowing Plaintiff to consume poisonous water for six months. (Doc. 60-1, Exhibit 1). The notice also identifies that Plaintiff has suffered permanent damages—including cognitive deficits, behavioral changes, learning impairments, and more injuries that the full extent has yet to be discovered. *Id*. The notice clearly states that the Plaintiff, who was a minor at first exposure and enjoys a tolling period for the statue to limitations to his 18th birthday plus three years, was first injured during the first testing period of elevated lead

levels. *Id*. Each notice seeks $500,000, the limit of any applicable insurance, or whichever is greater. *Id*. Each notice includes the personal address for the Plaintiff both at the time of initial injury and at the time of filing. *Id*.

Defendants move to dismiss Plaintiff's §1983 claims against Defendant Craig and Plaintiff's state law negligence claim against Defendant Craig and Defendant MSDH. (Doc. 60-61). Plaintiff respectfully submits this Memorandum of Law in support of his opposition to that motion.

## ARGUMENT

### I. Defendant Craig is Not Entitled to Dismissal of Plaintiffs' 42 U.S.C. §1983 Claims

Plaintiffs assert two claims against Defendant Craig under 42 U.S.C. §1983 for violations of their 14th Amendment rights to bodily integrity and to be free from state created danger arising out of their exposure to lead in the City of Jackson's public water.[1]

> 'Section 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws."' A § 1983 lawsuit may be brought against state actors in their personal or official capacity.

---

[1] Under the facts asserted against Defendant Craig in this case, the contours of the right to be free from state created danger are the same as Plaintiffs' right to bodily integrity. *See Hernandez* 380 F.3d at 880 n.1 (5th Cir. 2004) ("In order to recover under the state-created danger theory, we assume that at a minimum, a plaintiff must demonstrate that (1) the state actors created or increased the danger to the plaintiff, and (2) the state actors acted with deliberate indifference."; *McClendon v. City of Columbia*, 305 F.3d 314, 325-326 (5th Cir. 2002) ("[C]ourts applying … the "state-created danger" exception to the DeShaney rule have generally required plaintiffs to demonstrate (or at the motion-to-dismiss stage, to allege) that the defendant state official at a minimum acted with deliberate indifference toward the plaintiff.") (emphasis in *McClendon*). Plaintiffs' bodily injury claim against Craig is based on actions he took that put Plaintiffs' in danger with deliberate indifference towards that danger, just as Plaintiffs would have to prove on a state-created danger theory. Given that Plaintiffs' two claims against Craig are based on the same actions and injuries, and the Fifth Circuit's clear precedence for Plaintiffs' claim to bodily integrity and ambivalence to the state created danger theory, Plaintiffs focus on the right to bodily integrity in opposition to Defendants' motion.

*Hitt v. McLane*, 854 Fed. Appx. 591, 594 (5th Cir. 2021) (quoting *Goodman v. Harris Cnty.*, 571

F.3d 388, 394-95 (5th Cir. 2009)). Plaintiffs sued Defendant Craig in his personal capacity.[2] As

such, to establish personal liability on the merits of Plaintiffs' claims against Craig, "it is enough

to show that [Craig], acting under color of state law, caused the deprivation of a federal right."

*Goodman*, 571 F.3d at 395 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (citation

omitted); *see also Hitt*, 854 Fed. Appx. at 594; *Whitley*, 726 F.3d at 638.

Craig argues Plaintiffs' §1983 claims must be dismissed because he is entitled to qualified

immunity. The qualified immunity defense "shields government officials acting within their

discretionary authority from liability when their conduct does not violate clearly established

statutory or constitutional law of which a reasonable person would have known." *Goodman*, F.3d

at 395 (quoting *Wallace v. Cty of Comal*, 400 F.3d 284, 289 (5th Cir. 2005)). Evaluating qualified

immunity is a two-step process:

> "[t]he first step is to determine whether plaintiff alleged a violation of a clearly
> established constitutional right" and "[t]he second step requires determining
> whether …the official's conduct was *objectively* reasonable under clearly
> established law existing *at the time of the incident*."

*Id*. at 395 (quoting *Bazan ex rel. Bazan v. Hidalgo Cty*, 246 F.3d 481, 490 (5th Cir. 2001)

(emphasis in *Bazan*)); *see also, e.g., Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir.

2005); *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir.

2004) (internal citations omitted).

"Although qualified immunity is a two-step analysis, the threshold issue presented by any

case arising under Section 1983 is whether a plaintiff has sufficiently alleged a deprivation of a

right secured by the Constitution." *Hernandez*, 380 F.3d at 879; *see also Hope v. Pelzer*, 536 U.S.

---

[2] Plaintiffs' 2nd Amended Complaint, Doc. 41, at Counts I and II/Plaintiff's Amended Complaint, Doc. 51 at Counts I and II.

730, 736 (2002); *Lytle v. Bexar Cty Tex.*, 560 F.3d 404, 409-410 (5th Cir. 2009) ("If we determine that the alleged conduct did not violate a constitutional right, our inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity.").

Plaintiffs allege Craig violated their right to be free from government interference with their bodily integrity. Plaintiffs have plead sufficient facts to establish that Craig violated this right

## A. Craig Violated Plaintiffs' Rights to Bodily Integrity and to Be Free from State-Created Danger

The Fourteenth Amendment's due process guarantee "denotes not merely freedom from bodily restraint but also … generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). As such, the Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994) ("The Supreme Court has expanded the definition of 'liberty … to include…the fundamental rights implicit in the concept of ordered liberty' and 'deeply rooted in this Nation's history and tradition' under the Due Process Clause.'") (quoting *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990)).

Under these principles, the Supreme Court has long recognized that the Fourteenth Amendment protects the right to bodily integrity. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. California*, 342 U.S. 165 (1952); *see also Missouri v. McNeely*, 569 U.S. 141, 159 (2013) ("We have never retreated, however, from our recognition that any

compelled intrusion into the human body implicates significant, constitutionally protected privacy interests."). Indeed,

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union P.R. Co. v. Botsford*, 141 U.S. 250, 251 (1891); *U.S. v. Berry*, 670 F.2d 583, 590 (5th Cir. 1982); *Schmerber v. Cal.*, 384 U.S. 757, 772 (1966) ("[t]he integrity of an individual's person is a cherished value of our society.").

The Fifth Circuit has also repeatedly reiterated "that 'the right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process.'" *Jefferson on behalf of Jefferson v. Ysleta Independent School Dist.*, 817 F.2d 303, 305 (5th Cir. 1987) (quoting *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981); *see also, e.g., Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 365 n.67 (5th Cir. 2020); *Priester v. Lowndes Cty*, 354 F.3d 414, 421 (5th Cir. 2004); *Alton v. Texas A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450-51 (5th Cir. 1994).

State officials violate a person's constitutional rights "when their conduct is 'arbitrary, or conscience shocking, in a constitutional sense.'" *Hitt v. McLane*, 854 Fed. Appx. 591, 596 (5th Cir. 2021) (quoting *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012)); *see also, e.g., Cty of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957); *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *U.S. v. Salerno*, 481 U.S. 739, 746 (1987); *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004). For their behavior to be conscience shocking, officials must have acted with deliberate indifference toward the plaintiff's rights. *See, e.g., Cty of Sacramento*,

523 U.S. at 849-850; *Alton v. Texas A&M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999); *Hare v. City of Corinth*, 74 F.3d 633, 647-648 (5th Cir. 1996).

Plaintiffs allege that their rights to bodily integrity were violated when they unwittingly ingested water contaminated with lead as a result of Craig's deliberate indifference in knowingly causing the MSDH to conduct testing in a manner intended to artificially lower the testing results of lead in Jackson's water, by deliberately failing to provide them with notice of that there was excessive lead in Jackson's drinking water, and in dangerously advising that pregnant women and children in Jackson should drink boiled tap water, which concentrates lead in water. These allegations, when taken as true as they must be on this motion to dismiss, show a conscious shocking level of disregard for Plaintiffs' right to be free from government caused injury to their bodies. As such, Plaintiffs have sufficiently plead a claim against Defendant Craig pursuant to 42 U.S.C. §1983 for violating their right to bodily integrity.

Courts have held that the right to bodily integrity may encompass a variety of rights to be free from intrusions on one's body by the government, including: a competent adult's right to refuse lifesaving hydration and nutrition, *see Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278-279 (1990); a student's right not to be subject to physical sexual abuse by school employees, *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 445 (5th Cir. 1994); a prisoner's right to access to bathing facilities, *Bradley v. Puckett*, 157 F.3d 1022, 1025-1026 (5th Cir. 1998); a patient's right to refuse life-saving treatment, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); and a student's right to be free from bodily restraint unrelated to any justification, such as, punishment or discipline, *Jefferson on behalf of Jefferson v. Ysleta Independent School Dist.*, 817 F.2d 303, 305 (5th Cir. 1987).

Further, in a case arising out of the Flint water crisis, i.e. a situation very similar to what happened to the Plaintiffs here, the Court of Appeals for the Sixth Circuit specifically held that the right to bodily integrity is violated when government actors cause individuals to unknowingly consume lead, a toxin with no known benefit. *Guertin v. Michigan*, 912 F.3d 907, 934 (6th Cir. 2019). The Sixth Circuit's holding was grounded in the Supreme Court's long line of cases recognizing that "an individual's right to bodily integrity is sacred, founded upon informed consent, and may be invaded only upon showing of a government interest." *Id*. at 933-934. These cases led the court to conclude that "[i]nvoluntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value – often under false pretenses and with deceptive practices hiding the nature of the interference – is a classing example of invading the core of the bodily integrity protection." *Id.* at 920-921. The Sixth Circuit persuasively showed that the right Plaintiffs assert here is one to bodily integrity and that the conduct of Defendant Craig in violating that right shocks the conscience.

Defendants characterize the right Plaintiffs assert as one "to be protected from exposure to contaminated water" and argue that no such right exists. Doc. 51 at p. 9. This argument misrepresents Plaintiffs' claim and misapprehends the case law governing the right to bodily integrity. Plaintiffs' do not claim that Craig had a duty to protect them from contaminated water, but rather, that he violated their rights to bodily integrity when he made decisions and took actions that caused, contributed to, exacerbated, and/or prolonged their ingestion of lead contaminated water. Precedent makes clear that Craig's deliberate indifference to a significant risk of bodily harm to Plaintiffs, resulting in severe injury, is a violation of their right to bodily integrity.

In support of their argument that Plaintiffs have not asserted recognized constitutional rights Defendants cite four cases they claim demonstrate that under Supreme Court and Fifth

Circuit precedent the right to bodily integrity does not encompass "a right to contaminant-water." PR Doc. 51/JW Doc. 61 at p. 9-10 n.5. A review of these cases makes it clear that they do not exclude a right to be free from state intrusions on bodily integrity that arises from the government causing exposure to a toxin in drinking water.

For instance, the Defendants cite Fifth Circuit cases in which property owners asserted a right to obtain water service. These cases, *L & F Homes & Dev., L.L.C. v. City of Gulfport*, 538 Fed. Appx. 395 (5th Cir. 2013) and *Kaplan v. Clear Lake City Water Authority*, 794 F.2d 1059 (5th Cir. 1986), do not pertain to the right to bodily integrity nor do they involve state actors taking actions which caused and prolonged exposure to toxic water.

In *L & F Homes & Dev., L.L.C.*, the court analyzed whether the developer of a subdivision had a property interest in "new, as opposed to continued, water service." *L & F Homes & Dev., L.L.C.*, 538 Fed. Appx. at 406. Unlike Plaintiffs' Section 1983 claims against Craig, involving to be free from government caused bodily injury, property interests "are matters of state law, and they 'stem from independent sources such as state statutes, local ordinances, existing rules, contractual provisions, or mutually explicit understandings.'" *Id.* at 407 (quoting *Blackburn v. City of Marshall*, 42 F.3d 925, 936-37 (5th Cir. 1995)). In determining that the developer had not shown it was deprived of a property interest in obtaining new water service, the court noted that "Mississippi has recognized a property interest in the continuation of existing electrical service." *Id*. (citing *Tucker v. Hinds Cnty.*, 558 So. 2d 869, 874 (Miss. 1990)). The court declined to expand this authority to find a "property right exists in obtaining water service, not just continuing service in place." *Id*.

Thus, not only did *L&F Homes & Dev., L.L.C.* deal with the totally distinct issue of whether a subdivision has a property interest under state law in obtaining water service, but to the extent

its holding is relevant to the issues in this matter, the court's recognition of a property interest in continuing electrical and water services, actually supports Plaintiffs' interest to be free from the bodily intrusion of ingesting lead tainted water from the public water system. Since Mississippi recognizes an interest in continuing water service, it follows that Plaintiffs' right to bodily integrity was violated when the government caused that water service to be contaminated and hid the contamination from the public through intentionally inadequate testing, failing to alert the public to elevated lead levels, and issuing a dangerous boil water notice.

The *Kaplan* case also involved a property owner's assertion he had been denied a "property right in obtaining utility service from the Water Authority *in the amount he requested*." *Kaplan*, 794 F.2d at 1063-1064 (emphasis in original). The court did not hold that such a right did not exist. Rather, it "assumed, without deciding," that the landowner's "interest in obtaining water and sewer service for his property *in the amount requested* rose to the level of a protectable property interest." *Kaplan*, 794 F.2d at 1066 (emphasis in original). Thus, the court's holding that the landowner's due process rights were not violated did not turn on the existence of a right to water service, but rather on the court's holding that the Water Authority's decision to deny the plaintiff this property interest was a quasi-legislative decision that only violated the plaintiff's rights if the "governmental body could have had no legitimate reason for its decision." *Id.* at 1064-1065. This holding does not support the Defendants' argument that Plaintiffs have not asserted recognized constitutional rights.

Neither does the Magistrate Judge's report and recommendation in *Jones v. City of Picayune*, support the Defendants' argument that the Plaintiffs' asserted rights do not exist. In *Jones*, the Magistrate noted that as a pretrial detainee, the plaintiff had to offer proof that the conditions he complained of at the jail, including inadequate drinking water, were imposed as a

form of punishment. *Jones*, 2010 U.S. Dist. LEXIS 122687 at *15-16 (S.D. Miss. June 1, 2010). Thus, the Magistrate did not hold that the plaintiff did not have a right to uncontaminated water, but rather that he "offered no evidence or even made an allegation that the food and water at the PCJ is served in the alleged manner as a form of punishment." *Id*. at *17.

Finally, although Defendants cite the Supreme Court's holding in *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), for the proposition that there is "no Constitutional right to live in a contaminant-free environment" (Doc. 61 at p. 10 n. 5), the case involved a claim that a municipal employer violated the decedent's substantive due process rights by failing to provide him with a reasonably safe workplace. *Collins*, 503 U.S. at 125-126. The Court explained why this claim did not rise to the level of a constitutional violation:

> Petitioner does not claim that the city or any of its agents deliberately harmed her husband. In fact, she does not even allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured. Instead, she makes the more general allegation that the city deprived him of life and liberty by failing to provide a reasonably safe work environment

*Id*. at 125-126. Unlike the petitioner in *Collins*, Plaintiffs do not merely rely upon a general assertion that Defendants owed them a safe environment. Rather, Plaintiffs do what the petitioner did not in *Collins* – they allege that Craig knowingly exposed them to a significant risk. Thus, the Court's holding in *Collins* that the Due Process Clause "does not guarantee municipal employees a workplace that is free of unreasonable risks of harm," *id*. at 129, does not bar Plaintiffs' claims against Defendant Craig for violating their rights to bodily integrity.

Similarly unavailing are the three cases the Defendants cite to support their argument that "courts across the country have also held that there is no right to contaminant-free or safe-drinking water." PR Doc. 51/JW Doc. 61 at p. 9-10 n.6. For instance, the court in *Brown v. Detroit Pub. Sch. Cmty. Dist.*, 763 Fed. Appx. 497 (6th Cir. 2019), relied on the Supreme Court's holding in

*Collins* that "[n]either the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Brown*, 763 Fed. Appx. 497 (6th Cir. 2019) (quoting *Collins*, 503 U.S. at 126). These rulings related to safe working environments are irrelevant to the analysis here. Of course, much more pertinent to the issues at hand is the Sixth Circuit's determination under the similar factual circumstances of the Flint water crisis that:

> If ever there was an egregious violation of the right to bodily integrity, this is the case; the "affront to human dignity in this case is compelling," and the defendants' "conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe … [their conduct] is constitutionally permissible under the Due Process Clause."

*Guertin*, 912 F.3d at 935 (quoting *Doe v Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir. 1996)).

Defendants' reliance on the First Circuit's holding in *Mattoon v. City of Pittsfield*, 980 F.2d 1 (1st Cir. 1992), is also unpersuasive. In *Mattoon*, the court upheld the District Court's grant of summary judgment on the grounds that the Safe Water Drinking Act preempted the plaintiffs' claims. *Mattoon*, 980 F.2d at 6. In making this preemption holding, the court did not reject a right to safe public drinking water, it assumed the right for the purposes of the analysis. *Id*. ("even assuming a 'fundamental constitutional right' to safe public drinking water…").[3]

---

[3] Defendants do not argue that Plaintiffs' claims are preempted in their motion to dismiss. Indeed, such a defense would be without merit for the reasons articulated by the Sixth Circuit in a well-reasoned opinion extensively analyzing the issue and concluding that the SDWA does not preclude §1983 claims for violations of public water users' rights to bodily integrity and to be free from state created danger. *See Boler v. Early*, 865 F.3d 391, 401-409 (6th Cir. 2017). As the court pointed out in *Boler*, the First Department's decision in *Mattoon* "predated *Fitzgerald*, where the Supreme Court explained that when reviewing cases in which the § 1983 claim alleges a constitutional violation, the appropriate framework is to seek to infer congressional intent from the text and legislative history of the statute, review the nature and extent of the remedial scheme, and compare the rights and protections of the statute with those found in the Constitution." *Boler*, 865 F.3d at 405–06 (citing *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 252 (2009)). Further, *Mattoon* was recently distinguished even *within* the First Circuit. *See Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 3d 94, 107–109 (D. Mass. 2019).

Neither is the Ninth Circuit's holding in *Foli v. Metro. Water Dist. of S. Cal.*, relevant to Plaintiffs' claim that Craig violated their constitutional rights. The court's opinion finding that fluoridating public drinking water with HFSA does not violate any fundamental right was short and the court relied on the analysis of the issue set forth by the California Court of Appeal is *Coshow v. City of Escondido*. *Foli v. Metro. Water Dist. of S. Cal.*, 592 F. App'x 634, 635 (9th Cir. 2015). The facts of *Coshow* were almost the opposite of the facts here. Rather than claiming injury from unknowing exposure to lead – a dangerous toxin that the SWDA seeks to protect the public from – the plaintiff in *Coshow* claimed he would be injured if the water was fluoridated as mandated by the SDWA for the benefit of public health. *Coshow v. City of Escondido*, 132 Cal. App. 4th 687, 698-699 (Ct. App. 2005). In addition to fluoridation being mandated by the SDWA, the *Coshow* court noted that courts "have uniformly held that fluoridation of water is a reasonable and proper exercise of the police power in the interest of public health." *Id*. at 705. Additionally, the court noted that the plaintiff's "freedom to choose not to ingest the [the fluoridating chemical] HFSA remains intact." *Id*. at 710. The Plaintiffs allege their freedom not to ingest lead tainted water was taken away by Craig's failure to warn them of the elevated lead in Jackson's water. Thus, a finding that the plaintiff did not have a right to stop the government from adding a helpful substance to water, as it was required to do under the SWDA, does not mean that the government did not violate the Plaintiffs' constitutional rights when it subjected them to unknowing exposure to a toxin the SWDA seeks to eliminate from drinking water.

Thus, Plaintiffs have sufficiently plead their constitutional right to bodily integrity.

## B. Plaintiffs' Right to Bodily Integrity Was Clearly Established at the Time of Craig's Misconduct

Defendants argue that what they characterize as Plaintiffs' "asserted right to contaminant-free water," was not clearly established at the time that Craig's conduct caused, prolonged, and

worsened their exposure to lead-contaminated water. The level of specificity that Defendants imply is necessary to show that a constitutional right was clearly established is not what the law requires Plaintiffs to show.

"The term 'clearly established' does not necessarily refer to 'commanding precedent' that is 'factually on all-fours with the case at bar,' or that holds the 'very action in question' unlawful." *Doe*, 15 F.3d at 455 (quoting *Jefferson v. Ysleta Independent School District*, 817 F.2d 303, 305 (5th Cir. 1987)); *see also Atteberry v. Nocona Gen. Hosp.*, 430 F. 3d 245, 256-257 (5th Cir. 2005); *Morris v. Dearborne*, 181 F.3d 657, 665 (5th Cir. 1999). Rather, "a constitutional right is clearly established if 'in the light of pre-existing law the unlawfulness [is] apparent.'" *Doe*, 15 F.3d at 455 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also McClendon v. City of Columbia*, 305 F.3d 314, 332 (5ᵗʰ Cir. 2002); *Morris*, 181 F.3d at 665; *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004).

Thus, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 343 (5th Cir. 2001); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454-455 (5th Cir. 1994). Put more simply, officials must observe 'general, well-developed legal principles.'" *Doe*, 15 F.3d at 455 (quoting *Jefferson*, 817 F.2d at 305)).

In summary, a "rigid gloss on the qualified immunity standard" that requires the facts of previous cases to be "materially similar" to the facts of the case before the court, "is not consistent with" Supreme Court cases. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Instead, "the constitutional

right is clearly established if the unlawfulness of the conduct would be apparent to a reasonably competent official." *Morris v. Dearborne*, 181 F.3d 657, 666 (5th Cir. 1999).

Fifth Circuit precedent established that the right to bodily integrity includes the right to clean water long before the conduct at issue in this case. In *Bradley v. Puckett*, the court found that a disabled prisoner's allegations that while on lockdown for possession of a weapon he was deprived access to a shower chair to prevent him from falling in the shower, and therefore could not bathe for months, stated a claim for cruel and unusual punishment under the 8th Amendment. 157 F.3d 1022, 1025-1026 (5th Cir. 1998). The Court found that the plaintiff had "a valid claim to the extent that he complains of unsanitary conditions that deprived him of basic human needs and exposed him to health risks." *Id.* at 1025. The court explained why the plaintiff adequately stated a claim for a violation of his recognized constitutional rights:

> Bradley asserts that he was unable to bathe for several months, that prison officials were aware of his special needs but deliberately ignored them, that he was therefore forced to clean himself using toilet water, and that the unhygienic conditions resulted in a fungal infection which required medical attention. Therefore, Bradley alleges that the unsanitary conditions violated contemporary standards of decency which threatened his physical and mental well-being, resulting in the unnecessary infliction of pain and exposure to egregious physical condition.

*Id.* at 1025-1026. Thus, as early as 1998, precedent of this jurisdiction existed which put any reasonable water official on notice that conduct such as Plaintiffs allege in their Complaint put violated Plaintiffs' right to bodily integrity.

Because materially similar precedent is not a requirement, "[s]tate officials can still be on notice that their conduct violates established law, even in novel factual circumstances." *McClendon v. City of Columbia*, 305 F.3d 314, 332 (5th Cir. 2002); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As several courts have noted in driving home the principle that there does not have to be a specific case on point for a right to clearly established, "[t]here has never been a

section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability." *Doe*, 15 F.3d at 455 (quoting *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990)); *see also U.S. v. Lanier*, 520 U.S. 259, 271 (1997). Or, as the court explained in *Guertin*, "[t]he lack of a comparable government-created public health disaster precedent does not grant defendants a qualified immunity shield. Rather, it showcases the grievousness of their alleged conduct: 'The easiest cases don't even arise.'" *Guertin*, 912 F.3d at 933 (quoting *U.S. v. Lanier*, 520 U.S. 259, 271 (1997)).

While the Defendants are correct that the Sixth Circuit's decision in *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019), coming after the conduct alleged in Plaintiffs' Complaint, cannot itself be the holding that clearly established Plaintiffs' rights, the reasoning of *Guertin* makes clear that Plaintiffs' right to be free from state actors exposing them to lead in their drinking water was clearly established long ago.

Comparing the situation of the Flint water crisis to the right to refuse hydration articulated by the Supreme Court in *Cruzan*, the 6th Circuit explained:

> [I]f an individual has a right to refuse the consumption of beneficial water, then certainly any reasonable official would understand that an individual has a right to refuse the consumption of water known to be lead-contaminated, especially when those individuals involved in tainting the water simultaneously vouched for its safety.

*Guertin v. Michigan*, 912 F.3d 907, 934 (6th Cir. 2019). The circuit court noted that even though before *Cruzan*, a factually identical case had not been decided, "the Supreme Court held that the right to bodily integrity claim there was compelled by the logic and reasonable inferences of its prior decisions." *Id.*;

Thus, Plaintiffs have established the first prong of the showing necessary to defeat Defendant Craig's qualified immunity defense by showing that Craig violated their clearly established constitutional rights to bodily integrity.

### C. Defendant Craig's Conduct Was Objectively Unreasonable in Light of Clearly Established Law

Plaintiffs are also able to satisfy the second prong of the test to overcome qualified immunity because Craig's conduct was objectively unreasonable in light of clearly established law. As set forth in the previous section, Plaintiffs' right to be free from state actions that caused them to drink lead contaminated water was clearly established at the time that Craig violated their rights. Next the Court must determine, if taking the facts in the light most favorable to Plaintiffs, Craig's behavior was objectively unreasonable.

The standard to determine whether Craig's conduct was objectively unreasonable is a deliberate indifference standard:

> At the second part of the qualified immunity analysis, "we are only to determine, whether, in light of the facts viewed in the light most favorable to the plaintiffs, the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard."

*Hernandez*, 380 F.3d at 882 (quoting *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 394 (5th Cir. 2000)); *see also Cty of Sacramento v. Lewis*, 523 U.S. 833, 850-851 (1998); *McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002).

"To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Hernandez*, 380 F.3d at 880; *see also Whitley v. Hanna*, 726 F.3d 631, 641 (5th Cir. 2013); *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254 (5th Cir. 2005) ("'[A]cting or failure to act with deliberate indifference to a substantial risk of serious harm …is the equivalent of recklessly disregarding that risk.'") (quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 835 (1994)); *McClendon v. City of Columbia*, 305 F.3d 314, 326 n.8 (5th Cir. 2002).

"[D]eliberate indifference is determined by a subjective standard of recklessness." *Hernandez*, 380 F.3d at 881. The Fifth Circuit explains:

> The test for deliberate indifference is subjective, rather than objective, in nature because "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause of commendation, cannot under our cases be condemned as the infliction of punishment."

*Atteberry*, 430 F.3d at 255 (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). Courts 'may infer the existence of this subjective state of mind from the fact that *the risk of harm is obvious*.'" *Atteberry*, 430 F.3d at 255 (quoting *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004) (emphasis in *Hernandez*)). Under these standards, "a state official will be denied qualified immunity 'if the evidence showed that [she] merely refused to verify underlying facts that [she] strongly suspected to be true, or declined to confirm inferences of risk the he strongly suspected to exist.'" *Hernandez*, 380 F.3d at 884 (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994) (alterations in *Hernandez*)).

Plaintiffs allegations in the Complaint, when taken as true and read in a light most favorable to Plaintiffs, sufficiently plead that Defendant Craig acted with deliberate indifference by knowingly and intentionally using a testing method that underreported lead in Jackson's water, intentionally and knowingly failing to inform the citizens of Jackson of the high levels of lead in Jackson's water, and issuing a boil water notice containing dangerous advice that increases lead concentrations in water. Craig knew the children of Jackson, such as Plaintiffs, were at high risk of harm from the lead in the water, yet he disregarded this risk, thereby causing and prolonging Plaintiffs' exposure to hazardous levels of lead. As such, Defendants' motion to dismiss Plaintiffs' §1983 claim should be denied.

## II. Defendants Craig and MSDH Are Not Entitled to Dismissal of Plaintiffs' Negligence Claims Against Them

Count III of Plaintiffs' Complaint asserts a negligence claim against Defendants Craig and MSDH pursuant to Mississippi state law. Defendants move to dismiss this claim on two grounds, asserting they are entitled to discretionary function immunity and that Plaintiffs failed to comply with pre-suit notice requirements. Defendants' arguments on each of these grounds for dismissal are without merit. Defendants are not entitled to discretionary function immunity on Plaintiffs' negligence claim because their actions which Plaintiffs' claim caused, exacerbated, and prolonged their exposure to lead were not discretionary, nor were they policy decisions. Further, Plaintiffs' notice of claim letters substantially complied with the MTCA and provided Defendants with the information required. As they cannot show that they are entitled to discretionary function immunity nor that Plaintiffs' notice of claim letters are deficient, Defendants' motion to dismiss Plaintiffs' negligence claim against Defendants Craig and MSDH should be denied.

### A. Defendants are not entitled to discretionary function immunity

#### i. Mississippi's public policy test for discretionary function immunity

Defendants correctly note that Plaintiffs' negligence claims against Craig and MSDH are governed by the Mississippi Tort Claims Act ("MTCA"). "Under the MTCA, the default rule is that political subdivisions…are not immune from tort claims." *Wilcher v. Lincoln Cty. Bd. of Supervisors*, 243 So.3d 177, 181 (Miss. 2018); *see also* Miss. Code Ann. § 11-46-5 (waiving "the immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment").

There are exceptions to the default rule that governmental entities are not immune to suit, one of them – the one Defendants claim entitlement to here – is "discretionary-function immunity."

*Wilcher*, 243 So.3d at 181. This exception, set forth in Miss. Code Ann. § 11-46-9(1)(d), immunizes governmental entities from suits "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." MTCA immunity is an affirmative defense. *See, e.g.*, *Miss. Dep't of Human Services v. D.C.*, 289 So.3d 712, 719 (Miss. 2019); *Estate of Grimes v. Warrington*, 982 So. 2d 365, 370 (Miss. 2008). As such, the burden of proving it falls on the party asserting entitlement to its protection. *Miss. Dep't of Human Services*, 289 So.3d at 719.

"[T]he purpose of discretionary-function immunity is not to protect *all* decisions by governmental employees involving some level of discretion but instead only those functions that by their nature are policy decisions…" *Wilcher*, 243 So. 3d at 182 (emphasis in original); *see also Moses v. Rankin Cty*, 285 So.3d 620, 623 (Miss. 2019). Since only policy decisions are meant to be immunized, the standard for determining whether a public official's decisions are entitled to discretionary-function immunity under Mississippi law is the public policy test. *Id*. at 185. This test was enunciated by the Supreme Court in *U.S. v. Gaubert*, 499 U.S. 315 (1991), and adopted by the Mississippi Supreme Court in *Jones v. Miss Depot of Transp.*, 744 So. 2d 256, 260 (Miss. 1999).

From 2014 to 2018, however, Mississippi followed a different test for determining discretionary-function immunity articulated and adopted in *Brantley v. City of Horn Lake*, 152 So.3d 1106 (Miss. 2014). Four years later, the Mississippi Supreme Court overturned its holding in *Brantley* and explicitly returned to the public policy function test. *Wilcher*, 243 So. 3d at 185. The court explained that the *Brantley* test "'marked an unwise and unworkable departure from longstanding precedent,' and by failing to consider whether the activity in question involved

policy, ignored the Legislative intent behind discretionary-function immunity." *Id*. at 182-83

(quoting *Crider v. DeSoto Cty. Convention & Visitors Bureau*, 201 So. 3d 1063, 1067-70 (Miss.

2016) (Maxwell, J., concurring in result only)).

The public-policy function test reinstated in *Wilcher* has two parts:

> "this Court first must ascertain whether the activity in question involved an element
> of choice or judgment." If so, this Court must also decide whether that choice or
> judgment involved social, economic, or political-policy considerations.

*Wilcher*, 243 So. at 187 (quoting *Miss. Transp. Comm'n v. Montgomery*, 80 So. 3d 789, 795

(Miss. 2012)); *see also Smith v. Miss. Transp. Comm'n*, 292 So.3d 231, 233-234 (Miss. 2020).

"Only when both parts of the test are met does a government defendant enjoy discretionary-

function immunity." *Wilcher*, 243 So. 3d at 187; *see also Williams v. City of Batesville*, 313 So.3d

479, 483 (Miss. 2021).

The purpose of the public policy test is "to discern between actual policy decisions of

government made by policymakers versus simple acts of negligence by government employees or

agents." *Smith*, 292 So.3d at 234. "Decisions that bear on public policy are decisions made by

individuals charged with responsibility for making those decisions that consider economic,

political, or social grounds." *Smith*, 292 So.3d at 234. "Only functions which by their very nature

are policy decisions are protected." *Bailey v. City of Pearl*, 282 So.3d 669, 672 (Miss. 2019).

Before employing the public policy test, the court "must 'correctly identif[y] "the activity

in question" – the allegedly tortious act giving rise to the claim." *Williams*, 313 So.3d at 483; *see

also, e.g., Moses*, 285 So.3d at 623; *Wilcher*, 243 So.3d at 187. Here, Plaintiffs allege that:

- Defendants Craig and the MSDH utilized a pre-flushing method when testing
  Jackson's water for lead knowing that this technique artificially lowers lead testing
  results;

- Defendants Craig and the MSDH failed to provide the citizens of Jackson with information that their water was contaminated with lead despite know the lead levels were in excess of federal and state lead limits and that ingesting lead causes serious injury to children; and

- Defendants Craig and the MSDH issued boil water notices despite that boiling water concentrates lead in the water rather than dissipating it.

If any of these acts or failures to act on the part of Craig and MSDH that Plaintiffs claim caused their injuries are not subject to discretionary function immunity, Plaintiffs' negligence claim survives Defendants' motion to dismiss. *See Shutze v. City of Pearl*, 282 So.3d 669, 677 (Miss. 2019) ("Each separate and distinct claim must meet an exemption under one of the subsections of Section 11-46-9(1) for immunity to apply to that particular claim.") (quoting *Little v. Miss. Dep't of Transp.*, 129 So.3d 132, 139 (¶15) (Miss. 2013)).

### ii.     Defendants' conduct was not based in policy considerations

The actions of Defendants Craig and MSDH that Plaintiffs allege caused, contributed to, exacerbated, and/or prolonged their exposure to lead were not policy decisions. Thus, Defendants cannot establish that the second part of the *Wilcher* public policy test and are not entitled to discretionary function immunity.

Defendants argue that "because state and federal law give MSDH wide discretion in deciding how it carries out the discretionary activities alleged in the Complaint, it must be presumed that its actions are grounded in policy." Doc. 61 at p. 27. Defendants' argument is incorrect as it conflates the two prongs of the public policy, arguing that satisfying the first automatically satisfies the second. This is not the way the Fifth Circuit has applied this test. Rather, the courts look at each part of the test separately and often determine that while a defendant's

conduct might have been discretionary, their decisions did not involve application of public policy, and thus are not entitled to discretionary-function immunity. *See Bailey*, 282 So.3d at 676 ("We must distinguish between *real policy decisions* implicating governmental functions and *simple acts of negligence* that injure citizens") (emphasis in original); *see also Dancy v. East Miss. State Hosp.*, 944 So.2d 10, 17-18 (¶22) (Miss. 2006).

Analysis of *Wilcher* and relevant cases applying the public policy test to determine the applicability of the discretionary function test in Mississippi since *Wilcher*, show that the actions that Plaintiffs complain of here – deliberately using a test that artificially lowers lead results, failing to issue warnings or public notices of the lead in Jackson's water, and issuing dangerous boil water notices – are not grounded in policy, but rather are simple acts of negligence that injured the citizens of Jackson.[4]

For instance, applying the public policy test in *Wilcher*, the Mississippi Supreme Court rejected the defendants' argument that they were entitled to discretionary function immunity because the placement of traffic-control devices was a discretionary function under Mississippi law. *Wilcher*, 243 So. 3d at 187. The court reasoned that if the plaintiff's allegations were true, the defendants' construction crew created a significant drop-off in the road and then completely failed to barricade or warn against it. Id. at 185. Applying the public-policy function test, the court found that such conduct "certainly was not the result of a policy decision. Rather, if indeed there was such a failure, it was the result of straight-up negligence." *Id*. at 187-88. Defendants' conduct is similar to the conduct of the government defendants in *Wilcher* in that Defendants' conduct also

---

[4] Plaintiffs discuss Defendants' conduct in terms of simple negligence in this portion of the brief because that is the applicable standard on Plaintiffs' state law negligence claims. As argued above, Defendants conduct also meets the standards for deliberate indifference required to defeat Craig's motion to dismiss Plaintiffs' §1983 claims.

contributed to causing a hazardous condition and they failed to warn of the hazard prolonging Plaintiffs' exposure to lead.

Similarly, in *Smith v. Miss. Transp. Comm'n*, 292 So.3d 231, 235 (Miss. 2020), the Mississippi Supreme Court found that the failure of a government employee to do his job to signal drivers that roadwork was taking place was not immunized as a discretionary function. The court explained that the employee's "alleged failure to perform his assigned duty to warn the traveling public was a decision or choice," but that such a choice "was not made by a policymaker considering social, economic, or political concerns. This allegation, if proved, does not fall within the ambit of discretionary-functionary immunity." *Id*. at 234-235. Like the defendants in *Smith*, the choice Defendants Craig made not to do their jobs to properly test Jackson's water and to issue warnings or public notices about lead in the water was not a policy decision, but rather negligence.

In *Sanders v. Attala Cty.*, the court held that discretionary function immunity did not bar the plaintiff's claim that a police officer's reckless driving while the plaintiff was a passenger in the backseat of the officer's car because, while the officer's decision to give the plaintiff a ride may have been a discretionary policy decision, that was not the conduct on which plaintiff's claim was based. 332 So.3d 292, 305 (Miss. Ct. App. 2021). Rather, the plaintiff alleged the officer drove over the speed limit around a curve in poor weather conditions, and such actions are not policy decisions. *Id.* at 305 (¶56). Additionally, in *Miss. Dep't of Human Servs. v. D.C.*, the plaintiff was molested by a foster parent the defendant agency placed him with and he alleged the agency failed to establish and enforce proper procedures, failed to protect him from harm perpetrated by agents of DHS, and failed to adequately and properly oversee and monitor his care and treatment. 289 So.3d 712, 719 (Miss. 2019). *Id*. at 719. The court found the defendant agency failed to show it was entitled to discretionary immunity from these negligence claims. *Id.* at 719-720. As with the

police officers and agency employees in these two cases, the Defendants here are not entitled to discretionary function immunity for their regular acts of negligence.

In a series of cases, Mississippi courts have held that claims of failure to properly inspect and maintain municipal property do not involve considerations of public policy and thus are not subject to discretionary function immunity. *See Williams*, 313 So.3d at 484 (decision not to maintain a sewer system does not involve policy considerations); *Moses*, 285 So.3d at 625-626 (Defendant's alleged failure to maintain a drainage creek causing flooding and property damage to the plaintiffs was "a case of simple negligence" and did "not involve policy considerations."); *Bailey*, 282 So.3d at 678 (¶21) (Defendant was not afforded discretionary function immunity to plaintiffs' claims based on its allegedly negligent failure to mark and warn of a dangerous unsecured gate in its park); *Hudson v. Yazoo City*, 246 So.3d 872, 880 (Miss. 2018) (plaintiff who presented claim under *Brantley* and lost summary judgment should be allowed to fully present negligence claim that defendants failed to properly maintain drainage ditch causing flooding and death of decedent under court's intervening *Wilcher* decision); *Hood v. City of Pearl*, 333 So.3d 73, 81-82 (¶¶29-30) (Miss. Ct. App. 2021) (plaintiff's negligent failure to inspect and maintain claim culverts and drainage system not barred by discretionary function immunity); *Reverie Boutique LLC v. City of Waynesboro*, 282 So.3d 1273, 1281 (Miss. Ct. App. 2019) (MTCA's discretionary function immunity doctrine does not necessarily bar negligence claims based on failure to maintain a sewer system). Like the failures to maintain public property in a safe condition, Plaintiffs' claims against Craig and MSDH that they failed to properly test Jackson's water and warn Plaintiffs of the hazards of lead in Jackson's water are acts of negligence not policy decisions.

Notably, Defendants cite no cases post-*Wilcher* in which a Mississippi state or federal court applied the public-policy test and determined that the claims were barred by discretionary function immunity. This is significant because *Wilcher*'s return to the public-policy test does not automatically reinstate all pre-*Brantley* precedents. *Bailey*, 282 So.3d at 673 (¶13). As the court of appeals noted in *Bailey*, the supreme court was clear in *Wilcher* that "some pre-*Brantley* cases had misapplied the test and 'stretched the bounds of "policy" beyond credulity." *Id.* Therefore, the pre-*Brantley* precedents cited by Defendants as precedent for this Court finding Defendants' acts that injured Plaintiffs were matters of policy, "must be closely examined prior to application." *Id*.

Defendants cite five cases for the broad proposition that "[n]umerous courts have held that 'the decision to warn of potential danger is a protected discretionary function." Doc. 61 at p. 28 n.25 (quoting *Rosebush v. U.S.*, 119 F.3d 438, 443 (6th Cir. 1997)). A close reading of these cases, however, reveals that they do not support application of the discretionary function immunity defense to the facts plead by Plaintiffs against Craig and the MSDH in this matter.

Four of the cases Defendants cite, *Gonzalez v. United States*, 851 F.3d 538, 541 (5th Cir. 2017), *Rosebush v. United States*, 119 F.3d 438. 440 (6th Cir. 1997), *Childers v. United States*, 40 F.3d 973, 974 (9th Cir. 1994), and *Kiehn v. United States*, 984 F.2d 1100, 1101 (10th Cir. 1993), each involved claims against the United States under the Federal Tort Claims Act alleging negligence on the part of the National Park Service ("NPS") or the Forest Service ("USFS") in their decisions not to place warnings signs at certain areas of federally owned parks or recreational areas, and instead to warn the public in alternate ways.

Such "wilderness cases" are a somewhat distinct category of cases because "when the Government acts as landowner of wilderness, certain kinds of maintenance decisions have found to contain multiple policy considerations." *Gonzalez*, 851 F.3d at 548. Specifically, in *Kiehn* the

Tenth Circuit explained that the decision of the NPS to rely on its permittee tour guides to provide warnings and "not to post warning signs in remote areas of a national monument inherently requires a balancing of public policy objectives, such as resource allocation, visitor safety and scenic preservation." *Keihn*, 984 F.2d at 1105. Similarly, in *Childers*, the Ninth Circuit noted that the NPS' decision on the manner in which it provided warnings about unmaintained trails "are policy-based, requiring [NPS rangers] to balance access with safety, and take into account conservation and resources in designing area plans and making individual trail determinations." *Childers*, 40 F.3d at 975-976. The Sixth Circuit in *Rosebush* held that the USFS' decisions about firepits at campgrounds "involve[] balancing the needs of the campground users, the effectiveness of various types of warnings, aesthetic concerns, financial considerations, and the impact on the environment, as well as other considerations." *Rosebush*, 119 F.3d at 444.

In the fifth case Defendants rely upon, *Simpson County*, the plaintiff claimed that a County employee was negligent during a storm for not marking a washed-out culvert with heavier signs and barriers such that they blew away overnight, causing the plaintiff to drive over the area at 50 miles per hour the next morning and injure his knee. *Simpson County*, 82 So.3d at 622-623. The court found that the County's decision to use the signs complained of was grounded in the economic policy of saving money. *Id*. at 626.

The defendants in each of these cases are different from Defendants here in one critical way – their decisions required them to balance competing policy considerations. The court's holding in *Dancy*, another case relied upon by Defendants, is distinguishable for the same reason because the defendants' decisions in that case regarding allowing patients to go on field trips required them to consider not only patient safety, but also competing policy goals like integrating patients into society. 944 So.2d at 17. The Defendants here were not called on to balance various

policies. Rather, they were charged with carrying out the policy of protecting the public's water under laws and regulations enacted by the legislature and the EPA. Defendants' negligent actions that caused and prolonged Plaintiffs' exposure to lead were in contravention of this policy, but were not themselves policy decisions meant to be protected by discretionary function immunity.

In contrast to the cases relied upon by Defendants, particularly helpful on the issue before this Court is the analysis of a substantially similar issue in *In re Flint Water Cases*, 482 F. Supp.3d 601 (E.D. Mich. 2020). In that case, the court rejected the EPA's argument that its decisions in response to the Flint water crisis, including its failure to warn the citizens of Flint, were susceptible of public policy analysis. *Id*. at 633-634. In reaching this conclusion, the court rejected the EPA's assertion that its actions and inactions were "grounded in, or calculated to advance, the policies of the SDWA, or any reasonable or legitimate public policy." *Id*. The court also relied on "the general principle that scientific and professional judgments are not the types of decisions that are susceptible to policy analysis." *Id*. at 634-635 (collecting cases). The court further rejected the EPA's argument that its decisions on how to deal with third parties' actions were policy decisions, finding that "the EPA was not just a third party." *Id.* at 635. The court's reasoning on all of these points applies equally to the conduct of the Defendants here and the Court should reach a similar conclusion that Defendants' decisions were not related to public policy.

As the Defendants have failed to show their entitlement to discretionary function immunity from Plaintiffs' negligence claim, their motion to dismiss should be denied.

### B. Plaintiffs complied with MTCA's pre-suit notice requirements

Defendants also move to dismiss Plaintiffs' negligence claim for failure to comply with the MTCA's requirement to provide the Defendants with a notice of claim before filing their claim. Defendants do not deny that Plaintiffs served notices of claim or complain of their timing. Rather,

they argue that the notices of claim do not contain sufficient information to substantially comply with the MTCA's notice requirements. Contrary to Defendants' argument, Plaintiffs' notice of claim letters provided sufficient information and substantially comply with the statutory requirements of Miss. Code Ann. § 11-46-11(1)-(2).

The notices of claim letters are required to "[c]ontain a short and plain statement of the facts upon which the claim is based." Miss. Code Ann. § 11-46-11(1)(b)(iii). Per the statute, this statement must contain seven categories of information: 1) the circumstances which brought about the injury, 2) the extent of the injury, 3) the time and place the injury occurred, 4) the names of all persons known to be involved, 5) the amount of money damages sought, 6) the residence of the person making the claim at the time of the injury and 7) the residence of the person at the time of filing the notice. *Id.*; *See also Marbly v. Manuel*, 210 So. 3d 1033, 1036 (Miss. Ct. App. 2015).

Plaintiffs' notices of claim letters explained that Defendant MSDH brought about Plaintiffs' injuries because MSDH was aware of the elevated lead levels in Jackson by June 2015 and MSDH officials decided to withhold that information from the public for six months—thereby allowing Plaintiffs to consume poisonous water for six months. (PR ECF No. 50, Exhibit 1; JW ECF No. 60, Exhibit 1). Each notice also identifies that Plaintiffs have suffered permanent damages—including cognitive deficits, behavioral changes, learning impairments, and more injuries that the full extent has yet to be discovered. *Id.* Each notice clearly states that Plaintiffs, who were minors at first exposure and enjoy a tolling period for the statue to limitations to their 18th birthday plus three years, were first injured during the first testing period of elevated lead levels. *Id.* Each notice seeks $500,000, the limit of any applicable insurance, or whichever is greater. *Id.* Each notice includes the personal address for each Plaintiff both at the time of initial injury and at the time of filing. *Id.* Thus, each notice of claim letter substantively complies with

Mississippi law which requires the notices to include the circumstances which brought about Plaintiffs' injuries, the time and the place of the injuries, the amount of damages sought, and the addresses for Plaintiffs both at the time of filing and the time of injury. *Id*.

Plaintiffs' notice of claim letters substantively fulfilled each of the seven required categories and set forth everything Defendants MSDH and Craig "needed to know in order to respond" to Plaintiffs' claims. *See Marbly*, 210 So.3d at 1037. Defendants do not claim that Plaintiffs' notices of claim completely failed to address any of the seven categories of information the statute requires, which arguably could make the notices insufficient. *See Lane v. Miss. DOT*, 220 So. 254, 260 (Miss. Ct. App. 2017). Instead, Defendants argue that the information Plaintiffs provided regarding some of the seven categories of required information is insufficient.

Defendants' arguments about the sufficiency of Plaintiffs' notices of claim are largely that Plaintiffs failed to append documents, such as medical records and proof of lead testing at their homes, or otherwise provide evidence of Plaintiffs' claims. Defendants, however, cite to no authority requiring Plaintiffs to provide such proofs with their notices of claim. (Doc. 51 at p. 29-30). The purpose of notices of claim is not to marshal the claimants' evidence, but rather "to [e]nsure that governmental boards, commissioners, and agencies are informed of claims against them." *Marbly*, 210 So. 3d at 1036 (citing *Lee v. Mem'l Hosp. of Gulfport*, 999 So. 2d 1263 (Miss. 2008)).

Defendants only truly make two arguments that arguably relate to the actual content of Plaintiffs' notices of claim, as opposed to the lack of evidentiary proofs attached to them. These arguments are that: Plaintiffs have not "demonstrated that they suffer from all or even some of the conditions listed in their letters;" and, "Plaintiffs do not identify the specific periods during which any of them were exposed to elevated lead levels and instead generically allege that their 'injury

occurred from August 2014 to the present in Jackson, Mississippi.'" (Doc. 51 at p. 29-30). Each of these arguments is without merit because the information that Plaintiffs provided was substantial enough to comply with Miss. Code Ann. § 11-46-11(1)(b)(iii). *See Marbly*, 210 So.3d at 1037 ("If some information is provided in each of the seven required categories, the Court must determine whether the information is substantial enough to be in compliance with the statute.") (quoting *Webster v. City of D'Iberville City Council*, 6 So.3d 448, 451 (Miss. Ct. App. 2009)).

To the extent that Defendants' argument that Plaintiffs have not "demonstrated" they suffer from the conditions listed in their notices of claim can be read as a criticism of the sufficiency of the information in Plaintiff's notices about the extent of their injuries, this argument is without merit. Plaintiffs' notices of claim explained that Plaintiffs were children exposed to elevated lead which caused them permanent damages—including cognitive deficits, behavioral changes, learning impairments, and more injuries that the full extent has yet to be discovered. Mississippi courts have found much less specific descriptions of injuries to be sufficient to satisfy the MTCA's notice of claim requirement. For instance, in *Marbly*, the plaintiff's notice of claim stated that he suffered personal injuries and property damage as a result of a vehicle crash, that he was unable to work as a result of his injuries, and stated a figure for his medical bills to date. *Marbly*, 210 So.3d at 1035. The Mississippi court of appeals found that this description of the plaintiff's injuries was sufficient to meet the pre-suit notice requirements of the MTCA. *Compare Id*. at 1037, *with Lane*, 220 So.3d at 257-258 (plaintiff's notice of claim stating only the type of damages he suffered, e.g., pain, suffering, and property damages, without any actual description of his injuries failed to satisfy pre-suit notice requirements). Further, like the plaintiff in *Marbly*, the full extent the injuries Plaintiffs will suffer due to their exposure to lead are not yet fully apparent. *See* Marbly, 1037. For instance, because toxic lead exposure effects development, intelligence, and behavior, some of its

effects only manifest as exposed children age. A notice of claim cannot be expected to contain information that the Plaintiffs do not know. *See Lee*, 999 So.2d at 1276; *Lane*, 220 So.3d at 258.

Defendants' argument regarding the insufficiency of the information about when Plaintiffs' injury occurred is similarly without merit. As Defendants acknowledge, Plaintiffs' notices of claim stated that their injuries occurred from August 2014 to the present in Jackson, Mississippi. The Plaintiffs' exposure to lead-contaminated water was ongoing and long-lasting as they drank and otherwise used water in their homes daily throughout the time alleged. Considering the nature of Plaintiffs' injuries, Plaintiffs' accurate description of when their injuries occurred is not insufficient. *See Lee*, 999 So.2d at 1267 (in *res ipsa loquitur* case plaintiff's notice of claim that included the dates of her stay in the hospital and when her injury was discovered was sufficient).

Defendants' final argument against Plaintiffs' notices of claim seems to be that there are a lot of Plaintiffs alleging similar injuries due to the same lead exposure. Defendants' conduct that caused, contributed to, and prolonged the contamination of Plaintiffs' drinking water in Jackson with toxic levels of lead, injured a lot of children severely and irrevocably in ways that will continue to manifest as they age. The number of similar notices of claim against Defendants is a result of the magnitude of their own misconduct not a defect in the sufficiency of Plaintiffs' notices.

Since Defendants raise no meritorious objections to the sufficiency of the content of Plaintiffs' notices of claim, the Court should deny their motion to dismiss Plaintiffs' negligence claim based on failure to provide pre-suit notice.

## **CONCLUSION**

Denial of Defendants' Motion to Dismiss is necessitated because Defendants have failed to meet their burden to prove that there are entitled to dismissal. Plaintiffs have shown that they

plead a recognized right to bodily integrity against Craig and that he is not entitled to qualified immunity on Plaintiffs' §1983 claim. Further, Plaintiffs' negligence claim against Defendants is not subject to discretionary function immunity and Plaintiffs served adequate notices of claim on Defendants before filing their claim.

WHEREFORE, Plaintiffs respectfully request that this Court deny Defendants MSDH and Craig's Motion to Dismiss.

Dated: May 9, 2022.

Respectfully submitted,

**LEVY KONIGSBERG LLP**

/s/ Kimberly L. Russell
Kimberly L. Russell, *PHV* 49630
Amber R. Long, *PHV 49271*
Corey M. Stern, *PHV* 49568
John P. Guinan, *PHV* 49681
605 Third Avenue, 33rd Floor
New York, New York 10158
(212) 605-6298
klrussell@levylaw.com
along@levylaw.com
cstern@levylaw.com
jguinan@levylaw.com

-and-

**CHHABRA & GIBBS, P.A.**

/s/ Rogen K. Chhabra
Rogen K. Chhabra
Darryl M. Gibbs
120 N. Congress St., Suite 200
Jackson, MS 39201
(601) 948-8005
rchhabra@cglawms.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2022, the foregoing document was filed via the U.S. District Court's CM/ECF electronic system and a copy thereof was served upon all counsel of record.


/s/ Kimberly L. Russell
Kimberly L. Russell