**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**J.W., A MINOR, BY AND THROUGH AMANDA WILLIAMS,**
**GUARDIAN AND NEXT FRIEND**                              **PLAINTIFF**

**VS**                              **CASE NUMBER 3:21-cv-00663-CWR-LGI**

**THE CITY OF JACKSON, ET AL.**                              **DEFENDANTS**

**TONY YARBER AND KISHIA POWELL'S MEMORANDUM IN SUPPORT**
**OF THEIR MOTION FOR QUALIFIED IMMUNITY AND TO DISMISS**

Plaintiff brings two constitutional claims under Section 1983 against former Mayor Tony Yarber and Kishia Powell in their individual capacities. As an initial matter, and for the reasons stated in the City of Jackson's Motion for Judgment on the Pleadings, which Yarber and Powell incorporate by reference here, Plaintiff's state-created-danger claim fails as a matter of law.

Plaintiff also brings a bodily-integrity claim. The Fifth Circuit has never recognized a bodily-integrity violation for exposure to an environmental harm, so that claim fails, too. Further, to demonstrate a substantive due process violation of bodily integrity, a plaintiff must plead facts showing a public official's actions shock the conscience and his or her decisions were made with deliberate indifference. The news articles and exhibits Plaintiff identifies in his or her pleadings close the holes in Plaintiff's Amended Complaint and show neither Yarber nor Powell's actions rose to the outrageous level necessary to support a substantive due process claim.

Nevertheless, both Yarber and Powell are entitled to the protection afforded by qualified immunity, which protects government officials from liability for reasonable decisions, the outcome of those decisions notwithstanding. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The protection of qualified immunity applies regardless of whether the government official's

1

error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.") (cleaned up).  Whether, in hindsight, Yarber or Powell could have made different decisions is irrelevant; what matters is whether "*no* reasonable [official] could have acted as [Yarber or Powell] did here, or every reasonable officer faced with the same facts would not have [acted as Yarber or Powell did]."  *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019).  Plaintiff does not meet that burden.

## RELEVANT FACTUAL BACKGROUND

The City provides water to approximately 173,514 residents.  *See* Am. Compl. [Doc. 51] at 21 (¶ 77).  It does so through two public drinking-water systems, identified separately as PWS ID No. MS0250012 and PWS ID No. MS0250008.  *See* Ex. 1 to Am. Compl. [Doc. 51-1], Mar. 27, 2020 Em. Admin. Ord.  PWS MS0250012 serves a small portion of the City's residents and portions of Byram (approximately 16,000 connections total).  *See id*; Am. Compl. [Doc. 51] at 21 (¶ 76).  This system uses groundwater drawn from wells.  *See id.*  PWS MS0250008 provides water to the vast majority of the City's water users.  *See id.* at 22 (¶ 82).  This system uses surface water drawn from the Reservoir and the Pearl River.  *See id.*  It has two water-treatment plants, O.B. Curtis Water Treatment Plant and J.H. Fewell Water Treatment Plant.  *See id*. at 22 (¶¶ 83-84).  Among other functions, both plants regulate the water's pH level.

In 2011, then-Mayor Harvey Johnson announced in his State-of-the-City address that the City was moving forward with bidding contracts "that will allow us to abandon the well system [PWS MS0250012], which is not as reliable as our surface water supply [PWS MS 0250008]."  *See* Exhibit "A," 2011 State-of-the-City Address.[1]  On March 7, 2012, the City broke ground on

---

[1] "When deciding a Rule 12(c) motion, a court may consider evidence subject to judicial notice."  *Wright v. Moore*, No. 3:20-CV-473-DPJ-FKB, 2021 U.S. Dist. LEXIS 174049, at *17-18 (S.D. Miss. Sept. 14, 2021).

the Maddox Road project, which would replace the well system.  Then-Mayor Johnson explained that "the biggest benefits of a surface water system are better water pressure and cost of water treatment."  Exhibit "B," Jacob Fuller, *City Breaks Ground on Upgrade to Water System*, JACKSON FREE PRESS (Mar. 8, 2012).

According to Plaintiff, "[b]y late 2013 or early 2014," Willie Bell met with Cynthia Hill to discuss the water system's corrosion control.  *See* Am. Compl. [Doc. 51] at 29-30 (¶¶ 125-31).  Bell was the interim Public Works Director under then-Mayor Chokwe Lumumba; Hill "ran Jackson's water treatment plants."  *Id.* at 30 (¶ 130).  One issue Bell and Hill discussed was a defective lime-injection pump at O.B. Curtis.  *See id.* at 31 (¶ 133).  Bell asked Hill to estimate "the cost of repairs, including the cost to switch to liquid lime treatment to improve corrosion control."  *See id.* 30 (¶¶ 130-32).  The estimated cost was $400,000.  *See id.*  Bell then met with then-Mayor Lumumba.  *See id.* at 30 (¶¶ 126-27).  According to Bell, after he met with Lumumba, Bell had follow-up discussions with Hill, asking, "Can this wait until the next budget year?"  *See* Anna Wolf, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, CLARION-LEDGER (Mar. 23, 2016), identified in Am. Compl. [Doc. 51] at 35 n.30.

Then-Mayor Lumumba passed away in February 2014.  In March 2014, the City approved notice of substantial completion of phases of the well water replacement project.  *See* Exhibit "C," Mar. 25, 2014 Minutes.  Yarber was elected to complete his term in April 2014.  *See* Am. Compl. [Doc. 51] at 31 (¶ 140).  Yarber did not retain Bell.  The City Council confirmed Powell as Public Works Director on July 29, 2014.  *See* Exhibit "E," *First Woman Named Director of Jackson's Public Works Department*, MISS. LINK (July 31, 2014).

Around August 2014, the City transferred approximately 16,000 water connections from PWS MS0250012 to PWS MS0250008.  *See* Am. Compl. [Doc. 51] at 36 (¶ 165); *see also* 2018

3

Consumer Confidence Report, identified in Am. Compl. [Doc. 51] at 46 n.43.  "Due to unavoidable equipment malfunctions and water main pressure issues, the wells [PWS MS0250008] were placed back in-service in July 2015 in emergency back-up status."  *Id.*

On June 23-25, 2015, MSDH performed Safe Drinking Water Act testing in the City.  *See* Am. Compl. [Doc. 51] at 41 (¶ 190).  Before receiving the test results, the City identified renovation and repair needs for both O.B. Curtis, totaling $3.5 million, and J.H. Fewell, totaling $4.9 million, which would have included—among other projects—improving the lime-feed system.  *See* Tim Summers, *Update: Council Approves Trilogy for Water Corrosion Study; Emergency Loan to Fund It*, JACKSON FREE PRESS (Apr. 5, 2016), identified in Am. Compl. [Doc. 51] at 63 n.65.  At that time, Powell "knew that because of clogging of the lines, that the system was not the most efficient system, but…did not have any data…the water leaving the plant [was] creating a problem out in the system."  *See id.* (internal quotations omitted).

On or about January 29, 2016, MSDH informed the City that 13 of the 58 samples tested in June 2015 detected lead levels above the federal action level.  *See* Am. Compl. [Doc. 51] at 47 (¶ 224); Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, CLARION-LEDGER (Jan. 29, 2016), identified in Am. Compl. [Doc. 51] at 52 n.45.  Those 13 samples were taken from southwest and north Jackson.  *See id.*  That day, the City held a press conference.  *See id.*  During the press conference, Powell reported she "immediately dispatched crews to those homes" for samples that showed an exceedance.  *See*  R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, JACKSON FREE PRESS (Feb. 3, 2016), identified in Am. Compl. [Doc. 51] at 23 n.8.  She also stated, "We want people to understand how they should be flushing their internal plumbing system before using water…These are just measures you take."  *See id.*  Specific recommendations and precautions were issued for small children and

pregnant woman.  *See* Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016), identified in Am. Compl. [Doc. 51] at 35 n.32.[2]

The recommendations and measures included, among others, running tap water on cold for one to two minutes before consumption; never using hot water for consumption; children under five and pregnant women not consuming tap water; using filtered or bottled water when mixing formula; and screening children under six for lead. *See, e.g.*, Anne Wolfe, *6 Things to Know About the Lead Water in Jackson*, CLARION-LEDGER (Mar. 25, 2016), identified in the Am. Compl. [Doc. 51] at 60 n.58.

On February 12, 2016, MSDH provided a Compliance Plan for City.  *See* Am. Compl. [Doc. 51] at 57 (¶ 269); Ex. 5 to Am. Compl. [Doc. 51-5], Compliance Plan.  The Compliance Plan directed the City, in pertinent part, to:

- [I]dentify an individual or firm providing professional engineering service to the City of Jackson for drinking water matters and provide the name or firm by written notice to the Director of the MSDH Bureau of Public Water Supply…

- [P]rovide the required Public Education pamphlet to all City of Jackson Water System customers…

- [P]rovide the required Public Education pamphlet to all Child Care Centers, Head Start Centers, Schools, Healthcare Facilities and any other locations where the City of Jackson is aware of children in congregate settings…

---

[2] Since MSDH notified the City of actionable lead levels, the City has been consistent by continually advising residents (1) to run the cold tap for one to two minutes before using tap water; (2) not to use hot water for cooking or drinking; (2) pregnant women and small children should refrain from using tap water; (3) to refrain from mixing baby formula with tap water; and (4) to screen small children for lead.  *See, e.g.*, 2018 Consumer Confidence Report, identified in Am. Compl. [Doc. 51] at 46 n.43; *see also* Anne Wolfe, *Jackson Hit with Technical Violation for Water Treatment*, CLARION-LEDGER (June 9, 2016), identified in Am. Compl. [Doc. 51] at 28 n.22 (noting that precautions for pregnant women and children would stay in place); Justin Vicory, *Department of Health Says Jackson Is In Violation of Safe Drinking Water Requirements*, CLARION-LEDGER (July 18, 2018), identified in Am. Compl. [Doc. 51] at 56 n.52.

- [S]ubmit an engineer-designed corrosion control study and plan for optimization of water treatment for the City of Jackson Water System to the Director of the MSDH Bureau of Public Water Supply…

*Id*. The City complied with its obligations to provide the required public education materials required by the Compliance Plan. *See id.* at 7.

The City selected Trilogy Engineering to design a corrosion control study and plan for optimizing the City's water treatment. *See* Am. Compl. [Doc. 51] at 5 (¶ 20). Trilogy's president was Phillip West Gibson, a licensed professional engineer "who [had] a history working on the city's water systems." *See* Tim Summers, *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016), identified in Am. Compl. [Doc. 51] at 35 n.32; *see also* Exhibit "D," Miss. Bd. of Licensure for Prof. Engineers Licensee Details. The City did so because "lime treatment [would] likely not be all that [needed to be change[d]]." Anna Wolf, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, CLARION-LEDGER (Mar. 23, 2016), identified in Am. Compl. [Doc. 51] at 35 n.30. The rationale for preceding with the Compliance Plan's mandated corrosion control study, before purchasing new equipment, was explained as follows:

> Whatever has been put in the budget in the past has had to be spent on emergencies…The reality though is now we're seeing that the liquid lime feed system, had it been installed, may not have been the optimal measure after all, and if we had just put in a piece of equipment because someone said that that would work without there actually being a proper corrosion control treatment optimization study, then we could have very well lost $400,000.

*Id.*

The City also selected Trilogy to suggest interim solutions for water treatment while the study took place. *See* Tim Summers, *Update: Council Approves Trilogy for Water Corrosion Study; Emergency Loan to Fund It*, JACKSON FREE PRESS (Apr. 5, 2016), identified in Am.

Compl. [Doc. 51] at 63 n.65.  Trilogy considered a number of options for corrosion control,

ultimately recommending soda ash.  *See* Anna Wolfe, *Jackson Water System Contains Lead*

*Joints*, CLARION-LEDGER (May 10, 2016), identified in Am. Compl. [Doc. 51] at 22 n.7; *see also*

Am. Compl. [Doc. 51] at 65 (¶ 309).

The City's remedial action improved corrosion control.  *See* Anna Wolfe, *A Year Later,*

*Jackson's Lead-Water Issue Not Solved*, CLARION-LEDGER (Dec. 13, 2016), identified in Am.

Compl. [Doc. 51] at 61 n.60 ("The latest pH field sampling in November shows an average pH

of 9.4 across the city's water system, indicating marked improvement."); Anna Wolfe, *Jackson*

*Water Issues Persist, Lead Levels Down*, CLARION-LEDGER (July 3, 2017), identified in Am.

Compl. [Doc. 51] at 64 n.68 ("It appears that water quality results from the treatment facilities

and the field water quality parameters have fallen slightly over the last two months.").  The City

also made efforts to fill open positions at O.B. Curtis and J.H. Fewell.  *See e.g.*, Steve Wilson,

*EPA Emails Reveal City's Continued Violations*, NORTHSIDE SUN (Sept. 8, 2021), identified in

Am. Compl. [Doc. 51] at 60 n.57.

With regard to the overall process of optimizing corrosion control, the EPA stated:

> [F]ederal law gives a utility years to optimize corrosion control to
> come into compliance, so lead exceedances persisting a year after
> discovery is certainly not unusual. For a city the size of Jackson,
> the Lead and Copper Rule gives up to 18 months to complete
> corrosion control studies, six months to determine the best
> treatment method and up to 24 months to install the treatment.

Anna Wolfe, *A Year Later, Jackson's Lead-Water Issue Not Solved*, HATTIESBURG AMERICAN

(Dec. 13, 2016), identified in the Am. Compl. [Doc. 51] at 61 n.60.  "Regulators and public-work

officials agree that Jackson's water-treatment facilities have completed key improvement[s]...."

Nick Judin, *EPA Tours Jackson Water Treatment Plants as City Faces Long Road to Rehab*,

MISS. FREE PRESS (July 26, 2021), identified in Am. Compl [Doc. 51] at 71 n.79.

## ARGUMENT AND AUTHORITIES

### I.   Standard of Review

A Rule 12(b)(6) motion tests the sufficiency of a party's complaint.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63, 570 (2007).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.2d 631, 634 (5th Cir. 2014); *Petersen Indus., Inc. v. Hol-Mac Corp.*, No. 4:10-cv-152-CWR-FKB, 2011 U.S. Dist. LEXIS 13338, at *3 (S.D. Miss. Feb. 9, 2011).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Petersen Indus.*, 2011 U.S. Dist. LEXIS 13338, at *3-4 (quoting *Iqbal*, 556 U.S. at 678).

The facial plausibility standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678.  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*; *see also Petersen Indus.*, 2011 U.S. Dist. LEXIS 13338, at *3 ("A plaintiff's complaint must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (quoting *Twombly*, 550 U.S. at 555).

If the exhibits attached to or incorporated into the complaint contradict the pleadings, the exhibits control.  *U.S. ex rel. Wilkins v. N. Am. Constr. Corp.*, 101 F. Supp. 2d 500, 513-14 (S.D. Tex. 2000) (citing *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995)).  The Court is also free to consider matters of public record or other matters appropriate for judicial notice.  *Id.*;

*see also Wright v. Moore*, No. 3:20-CV-473-DPJ-FKB, 2021 U.S. Dist. LEXIS 174049, at *17-18

(S.D. Miss. Sept. 14, 2021).

The legal standard is the same for dismissal motions filed under Rule 12(c).  *In re Great*

*Lakes Dredge & Dock Co.*, 624 F.3d 201, 209-10 (5th Cir. 2010); *Atwood v. Tullos*, 312 F. Supp.

3d 553, 559-60 (S.D. Miss. 2018) ("In deciding a 12(c) motion, the court accepts all well-

pleaded facts as true, viewing them in the light most favorable to the plaintiff.") (internal

quotations omitted).  The standard for a qualified immunity motion brought at the pleadings

stage is the same as any other Rule 12(b)(6) or 12(c) motion, save for one difference: the burden

is on the *plaintiff*, not the movant, to demonstrate the inapplicability of the defense.  *Cantrell v.*

*City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012).

## II.     Powell and Yarber are entitled to qualified immunity.

For Plaintiff to meet his or her burden on a motion to dismiss for qualified immunity, the

pleading must allege "(1) defendants committed a constitutional violation under current law and

(2) the defendants' actions were objectively unreasonable in light of the law that was clearly

established at the time of the actions complained of."  *Club Retro LLC v. Hilton*, 568 F.3d 181,

194 (5th Cir. 2009) (internal quotations omitted).  The Court may consider the prongs in either

order; and the failure to satisfy one prong is fatal to a § 1983 claim.  *See Pearson v. Callahan*,

555 U.S. 223, 236 (2009).  Plaintiff cannot satisfy either prong.

### 1.     Violation of the right to bodily integrity under the substantive due process clause requires a state actor's direct and intentional contact with the plaintiff.

#### a.     Fifth Circuit bodily integrity law does not encompass exposure to contaminants.

Plaintiff claims Yarber and Powell violated his or her bodily integrity in Count I.  Fifth

Circuit "case law in this area is sparse."  *Young v. Isola, Miss.*, No. 3:15cv108, 2016 WL

9

6916790, at *5 (N.D. Miss. Nov. 23, 2016), *rev'd on other grounds*, 708 F. App'x 152 (5th Cir. 2017) (per curiam). The few cases "exploring the constitutional liberty interest in bodily integrity defines this right as the right to be free from *intentional* injury inflicted by a state actor." *Bickford v. Boerne Indep. Sch. Dist.*, No. 5:15-CV-1146-DAE, 2016 U.S. Dist. LEXIS 69101, at *11 (W.D. Tex. May 26, 2016) (dismissing substantive due process claim for student's injury in school production of *Grease*) (emphasis in original). As the *Bickford* court noted, in the Fifth Circuit, the right to bodily integrity "appears to arise almost exclusively in the context of sexual abuse by a teacher in a school setting, where a school superintendent was deliberately indifferent to such conduct, despite receiving reports from students, teachers, and parents that the abuse was taking place." *Id.* at *11, n.4; *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 50-51 (5th Cir. 1994); *Doe v. Rains Cty. Indep. Sch. Dist.*, 66 F.3d 1402, 1407 (5th Cir. 1995); *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 365 (5th Cir. 2020).

In every case in which the Fifth Circuit has found a violation of bodily integrity, a state actor had direct physical contact with the plaintiff. In the *Doe* cases cited above, a teacher sexually abused a student. In *Jefferson v. Ysleta Independent School District*, 817 F.2d 303, 305 (5th Cir. 1987), a teacher tied a second grader to a chair. In *United States v. Guidry*, 456 F.3d 493, 506 (5th Cir. 2006), a police officer sexually assaulted female arrestees. In *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981), a police officer struck a photographer. In *Atteberry v. Nocona General Hospital*, 430 F.3d 245, 250 (5th Cir. 2005), a nurse killed 22 patients by intentionally and physically injecting them with a paralytic drug. In short, these cases all involve the government "laying hands" on the plaintiff.

Absent direct contact, the Fifth Circuit has declined to find a substantive due process violation. In *Pierce v. Hearne Independent School District*, 600 F. App'x 194 (5th Cir. 2015),

the court found no violation of bodily integrity when a student was killed while driving his teacher's ATV.  In reaching that the conclusion, the Fifth Circuit distinguished sexual abuse and corporal punishment cases, finding that the teacher did not "deliberately abuse, restrain, threaten or touch [the deceased]." *Id.* at 199.  The court noted Supreme Court precedent, warning courts against expanding substantive due process rights, thereby turning negligence claims into a constitutional matter. *Id.* (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

Direct physical contact is what distinguishes a viable bodily-integrity claim from a meritless environmental harm claim under § 1983.  The latter is meritless because a robust consensus of cases holds there is *no* substantive due process right to a clean environment.  In each of those cases, the plaintiff claimed that some pollutant—whether sewage, mold, chemicals, tobacco smoke, or radiation—had entered or threatened to enter her body and that the government was aware and responsible for the risk.  None found a violation of bodily integrity. To the extent the Amended Complaint states a cause of action, it is a common-law tort claim, at best.  Nothing precludes Plaintiff from properly pursuing that remedy.

For instance, in *Gasper v. Louisiana Stadium & Exposition District*, 418 F. Supp. 716 (E.D. La. 1976), a group of nonsmokers brought constitutional claims to stop smoking in the Louisiana Superdome.  The plaintiffs alleged that "allowing patrons to smoke in the Louisiana Superdome, [the Louisiana Stadium and Exposition District] is causing other nonsmokers involuntarily to consume hazardous tobacco smoke, thereby causing physical harm and discomfort to those nonsmokers…." *Id.* at 717.  The district court found there is "no constitutional right to a clean environment." *Id.* at 720-21.  The Fifth Circuit agreed. *See Gasper v. La. Stadium & Exposition Dist.*, 577 F.2d 897 (5th Cir. 1978).

The *Gasper* district court opinion relied on *Tanner v. Armco Steel Corporation*, 340 F.

Supp. 532 (S.D. Tex. 1972). In *Tanner*, the plaintiffs brought substantive due process claims for

petroleum refineries' emissions of pollutants into the air, which the plaintiff alleged caused him

pulmonary damage. *Id.* at 534. The district court found that, assuming plaintiffs could plead

sufficient state action, they still failed to state a constitutional claim. The court noted,

> [F]rom an institutional viewpoint, the judicial process, through
> constitutional litigation, is peculiarly ill-suited to solving problems
> of environmental control. Because such problems frequently call
> for the delicate balancing of competing social interests, as well as
> the application of specialized expertise, it would appear that their
> resolution is best consigned initially to the legislative and
> administrative processes.

*Id.* at 536-37; *see also Lake v. City of Southgate*, No. 16-10251, 2017 WL 767879, at 4 (E.D.

Mich. Feb. 28, 2017) (finding no fundamental constitutional right to "freedom from harmful

contaminants); *Mattoon v. City of Pittsfield*, 980 F.2d 1, 5-6 (1st Cir. 1992) (holding  that

plaintiffs had no "'constitutional right' to safe drinking water," and that even if they did, their

claims were preempted by the Safe Drinking Water Act); *Concerned Citizens of Neb. v. United

States NRC*, 970 F.2d 421 (8th Cir. 1992) (rejecting constitutional claims for exposure to

radiation from a radioactive waste disposal facility); *MacNamara v. Cty. Council of Sussex Cty.*,

738 F. Supp. 134, 142 (D. Del. 1990) (finding there is no substantive due process right to health

in a case in which a plaintiff claimed the placement of an electrical substation would harm her

health); *Hagedorn v. Union Carbide Corp*., 363 F. Supp. 1061, 1063 (N.D.W. Va. 1973)

(holding that plaintiffs failed to state a constitutional claim for damage from a "rain of pollutants

[with] the [attendant] stench of gasses [sic] and fumes."); *cf. In re Detroit*, 841 F.3d 684, 700

(6th Cir. 2016) ("[T]here is no fundamental right to water service.") (citation omitted). The

weight of authority has not recognized a claim for violation of the substantive due process right to bodily integrity from government-caused exposure to pollutants.

This Court should not, either. Neither Yarber nor Powell injected Plaintiff with lead. Yarber and Powell's policy decisions on Jackson's water system do not rise to the level of a violation of Plaintiff's bodily integrity.

### b. *Guertin v. Michigan*, 912 F.3d 907, 922 (6th Cir. 2019), is neither controlling nor persuasive.

The *Guertin* court found that "a government actor violates individuals' right to bodily integrity by knowingly and intentionally introducing life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit." *Id.* at 921. The Sixth Circuit quoted its earlier decision in *Boler v. Earley*, 865 F.3d 391, 408 n.4 (6th Cir. 2017), for the proposition that a "plaintiff need not 'establish any constitutional significance to the means by which the harm occurs.'" The *Boler* court made this statement, unsupported by any citation, in a footnote. In fact, *Boler* did not even decide whether the plaintiffs stated a bodily integrity claim. *See id.* at 408.

The *Guertin* majority looked to *Washington v. Harper*, 494 U.S. 210, 213-17 (1990), to support its analysis. But in *Washington*, the Supreme Court found that the "**forcible** injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229 (emphasis added). In other words, in *Washington*, a state actor intentionally and physically interfered with a person's body by forcing him to take medicine. *Guertin* cited no case in which a state actor did not intentionally act directly upon the plaintiff's body.

Ultimately, the *Guertin* court greatly expanded the law of substantive due process to analogize a state's forcible injections to a state's assurances that contaminated water was safe to

13

drink.  Because the Fifth Circuit has cautioned against expanding substantive due process rights, and because the Fifth Circuit has *never* recognized a bodily integrity violation without an intentional, direct action upon a plaintiff's body, this Court should decline finding such a violation here.

### 2.    Plaintiff cannot demonstrate Yarber or Powell made a conscious-shocking decision with deliberate indifference to Plaintiff's constitutional rights.

"[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Pena v. Givens*, 637 F. App'x 775, 782 (5th Cir. 2015) (unpublished).  In *Lewis*, the Supreme Court emphasized that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  *Id.* at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)).

Not only must the executive action be conscience-shocking, but it must also be made with subjective "deliberate indifference."  *Sanchez v. Oliver*, 995 F.3d 461, 473 (5th Cir. 2021).  "'Deliberate indifference is an extremely high standard to meet.'"  *Id.*  (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).  In *Pierce v. Hearne Independent School District*, 600 F. App'x 194 (5th Cir. 2015), the Fifth Circuit stressed:

> A due process violation results from "*deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) (citation omitted). As the Seventh Circuit has explained, deliberate indifference entails "conduct that reflects complete indifference to risk—when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of

> death." *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir.
> 1991) (citations and internal quotations omitted).

*Id.* at 198 (emphasis in original).  Plaintiff cannot demonstrate conscience-shocking deliberate

indifference with respect to *any* alleged decisions Yarber or Powell made.

### a.    Switching the well-serviced connections to an established source.

Plaintiff cannot show that the decision to switch the source for a minority of connections

(well water) to the source for the majority (surface water) shocks the conscience or was made

with deliberate indifference.  To begin with, as shown by public records, neither Yarber nor

Powell created the well-publicized plan to abandon the well water system.  *See* Exhibits "A"-

"C."  That plan preceded them both by almost 20 years.[3]  Under former Mayor Johnson and

former Mayor Lumumba's tenures, the City spent millions of dollars on infrastructure upgrades

---

[3] In *Williams v. Barbour*, the district court sets forth the pleading requirement for alleging a constitutional claim against a government official in his individual capacity in the Fifth Circuit:

> The generic pleading requirements of [Rule] 8 govern suits against individual defendants in their official capacity. Oliver need only provide a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Plaintiffs suing government officials *in their individual capacities, however must allege specific conduct giving rise to a constitutional violation. This standard requires more than conclusory assertions: The plaintiff must allege specific facts giving rise to a constitutional violation.*

2009 U.S. Dist. LEXIS 98114, at *7 (S.D. Miss. Oct. 2, 2009) (emphasis added); *see also Spikes v. McVea*, 2021 U.S. App. LEXIS 27612, at *1 (5th Cir. Sept. 14, 2021) (noting the qualified-immunity inquiry must focus on the role of each defendant, not the collective action of a group of defendants); *Dyer v. Houston*, 964 F.3d 374, 382 n.6 (5th Cir. 2020).  That pleading standard is consistent with *Iqbal* and *Twombly*, requiring "allegations of fact focusing specifically on the conduct of the individual who caused the plaintiffs' injury."  *Williams*, 2009 U.S. Dist. LEXIS 98114, at *7-8 (quoting *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999)); *see generally Petersen Indus. v. Hol-Mac Corp.*, 2011 U.S. Dist. LEXIS 13338, at *3-4 (S.D. Miss. Feb. 9, 2011) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (quoting *Iqbal*, 556 U.S. at 678); *Twombly*, 550 U.S. at 570 (requiring plaintiff to plead "enough facts to state a claim to relief that is plausible on its face").  Neither Yarber nor Powell is liable for the conduct of other government officials.

to enable moving all users to surface water. *See* Exhibit "C," Mar. 25, 2014 Minutes. The Johnson administration made that decision to provide more reliable service with better water pressure. *See* Exhibit "B," Jacob Fuller, *City Breaks Ground on Upgrade to Water System*, JACKSON FREE PRESS (Mar. 8, 2012). The decision to abandon the well water system—a decision that neither Yarber nor Powell made—cannot be called outrageous when it was based on those concerns.

But *even if* Yarber and Powell could somehow be responsible for a decision they did not make, Plaintiff cannot show the decision was made deliberate indifference to Plaintiff's constitutional rights. Plaintiff des not, and cannot, plead Yarber and Powell knew that moving all of Jackson's water users to the same surface water source would cause lead to leach into the water system, but yet decided to do so anyway.

Though Plaintiff attempts to fit the facts of this case into *Guertin*, there are significant differences that make deliberate indifference too high of a hurdle for Plaintiff to overcome. In *Guertin*, Flint switched the source water for *all* of its users from the Detroit Water and Sewerage Department to the Flint River. *See Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 387 (6th Cir. 2016). Thus, Flint switched from a known source to an unknown, untested source. Here, the City switched a minority of users from a known source (well water) to another known source (the Reservoir) that had successfully supplied the majority of Jackson water users for years. *See* Am. Compl. [Doc. 51] at 22 (¶ 82). Flint also implemented *no* anti-corrosion measures on the Flint River water. *Mason*, 842 F.3d at 387; *see also Guertin*, 912 F.3d at 915. Flint did not treat the water *at all*. Here, the City *did* treat the Reservoir water. As Plaintiff admits, water drawn from the Reservoir was treated at O.B. Curtis. *See* Am. Compl. [Doc. 51] at 3 (¶ 4). Plaintiff criticizes the effectiveness of the City's treatment equipment, but he or she does

not, and cannot, allege the City did not attempt to treat the water it provided. *See id.* at 33 (¶ 152).

### b.  Budgeting for a liquid lime pump or hiring Trilogy.

Plaintiff cannot show Yarber or Powell acted with deliberate indifference in not budgeting for upgrades to O.B. Curtis.  Budgeting decisions are complex and involve the types of public policy decisions that courts are loathe to second-guess.  Moreover, those decisions are legislative, not executive.  As a matter of law, the City Council is responsible for approving and adopting the City's budget, and neither the Mayor nor the Public Works Director can unilaterally decide the City's budget.  *See Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 166 (5th Cir. 2016).  Plaintiff may not base a constitutional-violation claim against Yarber or Powell on budgeting decisions.

Similarly, Plaintiff cannot show Yarber or Powell committed a constitutional violation by hiring Trilogy, because neither had the sole authority to hire Trilogy.  As the Court is aware, a public body speaks only through its minutes.  *Warnock & Assocs., LLC v. City of Canton*, 328 So. 3d 1254, 1260 (Miss. Ct. App. 2021).  The City Council, on behalf of the City, approved hiring Trilogy.  *See* Am. Compl. [Doc. 51] at 5 (¶ 20).  Again, neither Yarber nor Powell had the legal power or right to enter into a contract with Trilogy without City Council approval.

Further, the State *required* the City to hire an engineering firm to conduct a corrosion control study and make recommendations.  *See* Ex. 5 to Am. Compl. [Doc. 51-5], Compliance Plan.  Contrary to Plaintiff's misleading allegations, Trilogy was a licensed professional engineering firm that employed a licensed professional engineer who specialized in water infrastructure and had a prior relationship with the City.  *See* Tim Summers, *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016), identified in Am.

Compl. [Doc. 51] at 35 n.32; *see also* Exhibit "D," Miss. Bd. of Licensure for Prof. Engineers

Licensee Details.  There is nothing at all conscience-shocking about hiring a licensed

professional engineer when ordered by the State to do so.

### c.    Following Trilogy's soda ash recommendation.

The Court should reject Plaintiff's attempt to hold Powell and Yarber responsible for the

decision to follow Trilogy's soda ash recommendation.  To begin with, Plaintiff does not allege

*when* the decision to follow Trilogy's recommendation was made or when the change to soda ash

was implemented.  Powell left the City in May 2016 before Trilogy made any recommendation

to the City.

Yarber did not act with deliberate indifference, either.  The Fifth Circuit has held that

taking efforts to remediate a situation, even if inadequate, do not show deliberate indifference

unless the state actor "*knew* they were insufficient and intentionally failed to do more out of

indifference to [the plaintiff's] well-being."  *Estate of Aguirre v. San Antonio*, 995 F.3d 395, 421

(5th Cir. 2021) (finding gross negligence insufficient to establish the kind of subjective,

deliberate indifference that must be demonstrated to establish a due process violation). Yarber is

not a professional engineer.  It defies common sense for anyone to expect Yarber to have found

flaw with a licensed professional engineer's recommendation to use soda ash, which the State

approved.  Plaintiff does not even allege Yarber subjectively knew that the soda ash proposal

would be insufficient and intentionally failed to do more.

### d.    Statements made to the press

Yarber and Powell's statements, as quoted in the articles cited in the Amended

Complaint, are no basis for holding either liable for a constitutional violation.  *See Benzman v.*

*Whitman*, 523 F.3d 119 (2d Cir. 2008).  In *Benzman*, plaintiffs sued the EPA administrator for

issuing press releases with false and misleading statements. *Id.* at 123-24. Specifically, the plaintiffs alleged the EPA administrator knew that the air was not safe to breathe and falsely represented in press releases that it was. *Id.* at 125. The Second Circuit noted that "no court has ever held a government official liable for denying substantive due process by issuing press releases or making public statements." *Id.* The court held that only if the statements had been made with a subjective intent to harm could they rise to the level of conscience-shocking. *Id.* Because the statements were not, the court found no substantive due process violation.

As an initial matter, Plaintiff cannot show the statements Powell or Yarber made were false. Plaintiff quotes Powell out of context. She gave specific recommendations on *how* the water would be safe to drink: by flushing the system. She and the City gave specific warnings about *who* should avoid drinking the water: pregnant women and children under six. She and Yarber *accurately* stated that the crisis in Flint—where people immediately developed rashes and lost hair after drinking untested and untreated water—was not the situation in Jackson. And the City dispatched teams to warn affected homes, distributed pamphlets, and gave specific warnings to high-risk users. Given these specific warnings, Plaintiff cannot show that Yarber or Powell were deliberately indifferent to his or her constitutional rights. If the EPA's making false statements that the air was safe to breathe is not conscience-shocking, there is no reason Yarber or Powell's statements are.

Plaintiff also does not allege he or she (or his or her caregivers) *relied* on any statements Powell or Yarber made. Plaintiff does not bother to plead what each heard or read, nor does Plaintiff plead whether he or she received the specific instructions and warnings the City distributed on how to safely consume the water. Without reliance, Plaintiff cannot demonstrate that any alleged statement caused Plaintiff to ingest lead-contaminated water.

3.    **The law was not clearly established in 2016.**

Plaintiff also cannot show a violation of clearly-established law.  A law is "clearly established" when "[t]he precedent [is] clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (cleaned up).  A court must determine whether a "controlling authority" or "robust consensus of cases of persuasive authority" establishes the unlawfulness of the conduct at issue. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011) (citation omitted); *see also McClendon v. City of Columbia*, 305 F.3d 314, 327 n.10 (5th Cir. 2002).  "Generally, to satisfy this standard, the plaintiff must 'identify[] a case in which an officer acting under similar circumstances was held to have violated the [Constitution], and . . . explain[] why the case clearly proscribed the conduct of that individual officer.'" *Cope v. Cogdill*, 3 F.4th 198, 205 (U.S. 5th Cir. 2021) (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020)).  "While an exact case on point is not required, the confines of the officers' violation must be 'beyond debate.'" *Id.* (quoting *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020)).  "**Broad general propositions are not enough to overcome qualified immunity**." *Id.* (emphasis added).  "Plaintiffs are only excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  *Id.* at *206.

The *only* remotely analogous case to this one in the Fifth Circuit is *Gasper*, in which the court found *no* constitutional claim.  *Gasper v. La. Stadium & Exposition Dist.*, 577 F.2d 897, 899 (5th Cir. 1978).  *Bradley v. Puckett*, 157 F.3d 1022 (5th Cir. 1998), is *not* analogous to the case at bar, factually or legally.  First, *Bradley* involved only an Eighth Amendment claim, not a substantive due process claim.  There, the Court found a prisoner's lack of access to bathing

water while in confinement rose to the level of "cruel and unusual", which entails "restrictions of confinement [that] rise to a level that results in physical torture . . . pain without penological purpose." *Id.* at 1025 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Second, the *Bradley* plaintiff had to bathe himself in toilet water, which caused fungal infections, because he was unable to bath otherwise for several months. *Id.* A prison's decision to deprive an inmate a bath for several months is just not similar to Yarber and Powell's decisions on how to manage the City's water system.

All Fifth Circuit cases finding a viable bodily substantive due process claim involve direct physical contact. In light of the total absence "a case in which an officer acting under similar circumstances was held to have violated" a plaintiff's right to substantive due process, *Cope*, 3 F.4th at 205, Yarber and Powell could not reasonably have expected to find themselves facing a substantive due process claim.

Although Plaintiff cites the Safe Drinking Water Act and EPA regulations, neither provides a basis for Plaintiff's claims. Those statutes are irrelevant to the issue before the Court. *See Gagne v. Galveston*, 805 F.2d 558, 560 (5th Cir. 1986) ("[N]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation -- of federal or of state law -- unless *that statute or regulation* provides the basis for the cause of action sued upon.") (citation omitted). The inquiry should be based on whether the constitutional right was clearly established at the relevant time.

There also was no "robust consensus" of persuasive authority that clearly established a constitutional violation. Courts uniformly rejected constitutional claims arising from environmental harms until the Sixth Circuit's decision in *Guertin*. But, the only authority that can be considered is that in place when the alleged violation occurred. *See Kokesh v. Curlee*,

No. 20-30356, 2021 U.S. App. LEXIS 28607, at *15-20 (5th Cir. Sept. 21, 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).  *Guertin* was decided in 2019; Powell left office in 2016, and Yarber left office in 2017.  *Guertin* cannot be used to establish the lawfulness of Yarber and Powell's conduct.

*Guertin* is also not persuasive on whether Yarber or Powell's conduct was "clearly proscribed."  *See Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020).  *Guertin* relies upon no Supreme Court case with analogous facts.  The cases it cites deal with forced surgery (*Winston v. Lee*, 470 U.S. 753 (1985)); forced medication (*Washington v. Harper*, 494 U.S. 210, 213-17 (1990)); forced stomach-pumping (*Rochin v. California*, 342 U.S. 165 (1952)); and the burden of proof for withdrawal of life support (*Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269-70 (1990)).  More factually analogous are *Mattoon v. City of Pittsfield*, 980 F.2d 1 (1st Cir. 1992), dealing with contamination of a public water supply, or *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008), dealing with allegedly false statements about the risk of a pollutant.

*Guertin* found the constitutional violations in that case were obvious.  In this Circuit, the exception for "obvious" violations is narrow: "[u]nder *Taylor*, plaintiffs are only excused of their obligation to identify an analogous case in extreme circumstances where the constitutional violation is obvious."  *Cope*, 3 F.4th at 206 (citing *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam)) (internal quotations omitted).  Here, where there were competing policy reasons for the switch to surface water; where the majority of the City had been served surface water with no violations; and where the City gave tailored notice to the affected citizens, the Court should find there is no "obvious" violation.  There is nothing obviously unconstitutional about public servants making difficult decisions when faced with limited resources and competing crises,

particularly given that "substantive due process is not the clearest of Supreme Court doctrines…the caselaw in this area is contradictory, imprecise, and, well, messy." *Daves v. Dall. Cty.*, 984 F.3d 381, 411 (5th Cir. 2020) (internal quotations omitted).  Certainly, when the *Guertin* court itself divided over whether a constitutional violation had occurred at all, it is not "beyond debate" that the individual defendants here violated Plaintiff's constitutional rights.

### III.    Plaintiff does not plead a MTCA claim against Yarber and Powell individually.

In addition to the arguments raised in the City's Motion for Judgment on the Pleadings, the negligence claims should be dismissed as to Powell and Yarber, individually, for an additional reason.  To the extent Plaintiff asserts his or her negligence claim against Yarber and Powell in their individual capacities, the claim should be dismissed because Plaintiff concedes Yarber and Powell "acted in the course and scope of their employment."  *See* Am. Comp. [Doc. 51] at 16 (¶¶ 63-64) &.86 (¶ 410).  "While the MTCA permits a government employee to 'be joined in an action against a governmental entity in a *representative* capacity if the act or omission complained of is one for which the governmental entity may be liable,' the MTCA makes clear 'no employee shall be held *personally* liable for acts or omissions occurring within the course and scope of the employee's duties.'"  *City of Clinton v. Tornes*, 252 So. 3d 34, 37 (Miss. 2018) (quoting MISS. CODE § 11-46-7(2) (Rev. 2012)) (emphasis in original); *see also Dearman v. Stone Cnty. Sch. Dist.*, Civ. No. 1:13-cv-267-HSO-RHW, 2014 U.S. Dist. LEXIS 37489, at *19-20 (S.D. Miss. Mar. 21, 2014) ("The MTCA generally provides that employees of a governmental entity who act within the course and scope of employment are not personally liable for injuries arising from their acts or omissions.").

<u>**CONCLUSION**</u>

The Court should dismiss Counts I, II and III against Yarber and Powell.

RESPECTFULLY SUBMITTED, this the 12th day of May, 2022.

/s/ Terris C. Harris
TERRIS C. HARRIS

Terris C. Harris (MSB #99433)
THE COCHRAN FIRM-JACKSON, LLC
197 Charmant Place, Suite 2
Ridgeland, Mississippi 39157
Telephone: (601) 790-7600
tharris@cochranfirm.com
*Counsel for Tony Yarber and
Kishia Powell*

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2022, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which served a copy of the foregoing on all counsel of record.

/s/ Terris C. Harris
TERRIS C. HARRIS