**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| **J.W.** | **PLAINTIFFS** |
| **V.** | **CAUSE NO.: 3:21-cv-00663-CWR-LGI** |
| **THE CITY OF JACKSON, ET AL.** | **DEFENDANTS** |

*and*

| | |
|---|---|
| **P.R., ET AL.** | **PLAINTIFFS** |
| **V.** | **CAUSE NO.: 3:21-cv-00667-CWR-LGI** |
| **THE CITY OF JACKSON, ET AL.** | **DEFENDANTS** |

*and*

| | |
|---|---|
| **C.A., ET AL.** | **PLAINTIFFS** |
| **V.** | **CAUSE NO.: 3:22-cv-00171-CWR-LGI** |
| **THE CITY OF JACKSON, ET AL.** | **DEFENDANTS** |

---

**MEMORANDUM BRIEF IN OPPOSITION TO CITY DEFENDANTS' MOTIONS TO
DISMISS FILED IN *P.R.*, *J.W.*, AND *C.A.* [3:21-cv-00663 ECF NOS. 80, 82, 84 – 3:21-cv-
667 ECF NOS. 74, 76, 78, 80 – 3:22-cv-00171 ECF NOS. 44, 51, 52]**

---

COME NOW THE PLAINTIFFS, by and through undersigned counsel, and file this, their

*Memorandum Brief in Opposition* to the following dispositive motions: (1) *City of Jackson's

Motion for Judgment on the* [3:21-663, ECF No. 80; 3:21-cv-667, ECF No. 74; and 3:22-cv-171,

ECF No. 42]; (2) *Tony Yarber and Kishia Powell's motion for Qualified Immunity and to Dismiss*

[3:21-cv-663 ECF No. 82, 3:21-cv-667 ECF No. 76, and 3:22-cv-171 ECF No. 52]; (3) *Mayor

Chokwe A. Lumumba and Robert Miller's Motion for Qualified Immunity and to Dismiss* [3:21-

1

cv-663 ECF No. 84, 3:21-cv-667 ECF No. 78, and 3:22-cv-171 ECF No. 51]; and (4) *Jerriot Smash's Motion for Judgment on the Pleadings and/or Qualified Immunity* [3:21-cv-663 ECF No. 86 and 3-21-cv-667 ECF No. 80].[1] These Defendants, Kishia Powell, Tony Yarber, Chokwe Lumumba, Robert Miller, Jerriot Smash, and the City of Jackson will be referred to collectively as "City Defendants". Plaintiffs provide as follows:

## I.    INTRODUCTION

The City of Jackson and its officials knowingly and arbitrarily caused lead to poison unsuspecting citizens of Jackson through the public water system, often employing misleading pretenses in hiding the nature of these physical bodily intrusions. Plaintiffs are hundreds of water users and/or citizens of Jackson, all of whom are children who have been irreparably harmed by their ingestion of lead in their drinking water caused by the City Defendants' actions. Plaintiffs brought the present action asserting pursuant to 42 U.S.C. §1983 that the City Defendants violated their Constitutional rights to bodily integrity and to be free from state created dangers.

City Defendants assume a cramped interpretation of both precedent and the Constitution in moving to dismiss these claims. They allege that intentional, physical contact with the Plaintiffs is required to establish a Fourteenth Amendment claim. Neither the Fifth Circuit nor the Supreme Court has enunciated such a rule, and lead ingestion is nonetheless a physical intrusion that satisfies the very burden Defendants inaptly attempt to impose upon Plaintiffs. The conduct of these officials is unconstitutional under binding Supreme Court precedent. Additionally, Plaintiffs' state

---

[1] This Court authorized Plaintiffs to file one omnibus response in opposition to these motions on August 15, 2022.

claims survive the defenses these Defendants assert under the Mississippi Tort Claims Act. City Defendants' motions are due to be denied.

## II.    FACTS

Lead poisoning poses indisputable and tragic health effects—and children are particularly susceptible to its effects. [*J.W.*, Doc. 51 ¶347; *P.R.*, Doc. 41 ¶355, *C.A.*, Doc. 1, ¶356]. In children, even "low levels of exposure to lead have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells." *Id*. Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death." [*J.W.* Doc. 51 ¶350; *P.R.* Doc. 41 ¶, *C.A.* Doc. 1, ¶]. According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavior changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment." [*J.W.* Doc. 51 ¶348; *P.R.* Doc. 41 ¶356, *C.A.* Doc. 1, ¶357)]. "Lead exposure also causes anemia, hypertension renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible." *Id.* Children exposed to lead suffer catastrophic lost opportunity costs—inhibited development and diminished intelligence leading to lower economic productivity–over the course of their lives. [*J.W.* Doc. 51 ¶357-361; *P.R.* Doc. 41 ¶365-369, *C.A.* Doc. 1, ¶366-370].

Lead enters the public water supply if a public water system has lead pipes and if the water going through the pipes is corrosive. [*J.W.* Doc. 51 ¶93; *P.R.* Doc. 41 ¶101, *C.A.* Doc. 1, ¶102]. The Plaintiffs received drinking water through an aging public system that Jackson officials knew to be substantially made up of old lead pipes and lead solder connections. [*J.W.* Doc. 51, ¶¶6, 76-

77, 85-90, 143-145; *P.R.* Doc. 41 ¶¶, 6, 81-82, 92-97, 156-158; *C.A.* Doc. 1, ¶¶ 7, 82-83, 93-98, 157-159]. Jackson officials also knew that nearly all homes built before 1980 have lead solder joints or pipes composed entirely of lead, and over 70% of Jackson homes predate 1980. [*Id.*]. Jackson has two water systems, a small well water system and a large surface water system, and the surface water had been flagged as impaired for its corrosivity and the city had not treated the corrosive water for years. [*J.W.* Doc. 51 ¶¶103, 112, and 170; *P.R.* Doc. 41 ¶112, 121, 182, *C.A.* Doc. 1, ¶113, 122, 183].

In 2011, the Mississippi State Department of Health ("MSDH" identified Jackson as "high risk for lead poisoning" and recognized that "children are especially at risk since their bodies absorb lead more easily than adults." [*J.W.* Doc. 51 ¶91; *P.R.* Doc. 41 ¶98, *C.A.* Doc. 1, ¶99]. According to MSDH's data, in 2013, the City of Jackson saw a jump in lead from under 5 ppb to 13.7 ppb during the testing period ending in 2013. [*J.W.* Doc. 51, ¶92, 118-120; *P.R.* Doc. 41, ¶¶99, 131-133; C.A. Doc. 1, ¶¶100, 132-134]. These lead levels were just under the EPA's maximum contaminant level of 15ppb for lead, but they demonstrated a disturbing trajectory based on the previous testing results, which were roughly 2-4 times lower. *See* 40 C.F.R. 141.2. [*J.W.* Doc. 51 ¶91-92; *P.R.* Doc. 41 ¶98-99, *C.A.* Doc. 1, ¶100-101].[2]

---

[2] For example, for the testing period ending in 2009, testing for the surface water system evinced 4.8 ppb at the 90th percentile and 8.8 ppb at the 95th percentile. [*J.W.* Doc. 51 ¶119; *P.R.* Doc. 41 ¶132, *C.A.* Doc. 1, ¶133]. For the testing period ending in 2013, the surface water system testing revealed 13.7 ppb at the 90th percentile and 33.7 ppb at the 95th percentile. [*J.W.* Doc. 51 ¶120; *P.R.* Doc. 41 ¶133, *C.A.* Doc. 1, ¶134]. By contrast, Jackson's Maddox Road Well System with 16,000 connections revealed lead levels of only 1.7 ppb in the 90th percentile, less than one sixth the lead levels in surface water tests for both triennial testing periods ending in 2010 and 2013. [*J.W.* Doc. 51 ¶121, 122; *P.R.* Doc. 41 ¶100. 135, *C.A.* Doc. 1, ¶101, 136].

Following these findings, city officials investigated the problem and discovered that the system's corrosion control treatment had been malfunctioning for years, allowing acidic (or corrosive) water to run through and corrode lead pipes in Jackson's public water system. [*J.W.* Doc. 51 ¶111-115; *P.R.* Doc. 41 ¶120-124, *C.A.* Doc. 1, ¶121-125]. In late 2013, Jackson's then-Interim Director of Public Works, Willie Bell, discussed these issues with mayor Chokwe Lumumba Sr., Defendant Yarber, and other city officials. [*J.W.* Doc. 51 ¶126-146; *P.R.* Doc. 41 ¶138-158; *C.A.* Doc. 1 ¶139-159]. Director Bell identified the obvious source of the impending lead problem: lead had leached into the water from the city's corroded, outdated lead pipes due to highly corrosive surface water which travelled through a malfunctioning lime-injection system designed to control the water's corrosivity. [*Id.*]. Director Bell not only identified the problem. He also provided the solution and its cost: switching to a liquid lime treatment and repairing the lime injection pump for $400,000.00.[3] Director Bell cautioned against taking actions that might shock Jackson's public water system. [*Id.*]. Mayor Lumumba, Sr. accepted Director Bell's recommendation and took action to approve this expenditure in the city budget. [*Id.*]

Mayor Lumumba Sr. passed away in February 2014, shortly after he approved funding to fix this equipment. [*J.W.* Doc. 51, ¶139; *P.R.* Doc. 41, ¶152; *C.A.* Doc. 1, ¶153]. Before Mayor Lumumba, Sr. passed away, Defendant Yarber served on the city's Budget Committee as a Council

---

[3] This lime-feed system is designed to add lime to the water at the treatment plants to increase the pH, thus lowering both acidity and lead level concentrations in the water. The lime injection system was designed for liquid lime, but Jackson used lime powder that clogged underground pipes at the treatment facility. [*J.W.* Doc. 51 ¶115, 116; *P.R.* Doc. 41 ¶124, 125, *C.A.* Doc. 1, ¶125,126]. Since a lime injection valve had been clogged for years, both pre- and post-treatment water was very acidic and corrosive. [*J.W.* Doc. 51 ¶115-117; *P.R.* Doc. 41 ¶122-124, *C.A.* Doc. 1, ¶123-125]. The malfunction had an obvious solution (switch to liquid lime and fix equipment), but remained unremedied for years. [*J.W.* Doc. 51 ¶114-117; *P.R.* Doc. 41 ¶121, *C.A.* Doc. 1, ¶122].

Member and Vice Mayor. [*J.W.* Doc. 51, ¶¶141-146; P.R. Doc. 41, ¶¶155-159; C.A. Doc. 1, ¶¶156-160]. Defendant Yarber mounted a successful two-month emergency mayoral election campaign.

When Jackson's mayoral administration changed in 2014, all efforts to prevent more lead from leaching ceased. [*J.W.* Doc. 51, ¶139-147; *P.R.* Doc. 41, ¶152-160; *C.A.* Doc. 1, ¶153-161]. City Defendants, at virtually every turn after Mayor Lumumba's premature death, made conscience-shocking decisions that would lead to the inevitable public health crisis that followed. In the infancy of his mayoral tenure, Defendant Yarber ousted Director Bell and replaced him with the Defendant, Kishia Powell, as Director of Public Works. [*J.W.* Doc. 51, ¶158; *P.R.* Doc. 41, ¶161; *C.A.* Doc. 1, ¶162]. Defendants Yarber and Powell both knew about the rising lead levels and understood the purpose behind Bell's original warnings, reports, and proposal, including the cost for repair. [*J.W.* Doc. 51 ¶149; *P.R.* Doc. 41 ¶162; *C.A.* Doc. 1 ¶163]. Yarber, knowing the hazards that occasioned budget allocations for the city's corrosion control treatment, nonetheless deliberately and intentionally chose to withdraw the funding necessary to avert an impending public health crisis. [*J.W.* Doc. 51, ¶146; *P.R.* Doc. 41 ¶159; *C.A.* Doc. 1 ¶160].

This was the first decision among many that proved to be catastrophic. The next catastrophic decision directly contradicted Director Bell's admonitions against taking any action that might shock Jackson's public water system. Having pulled funding for essential repairs to address the water's corrosivity, City Defendants switched 16,000 connections from the Maddox Road Well System, which consistently returned low lead levels and low corrosivity, to the surface water system replete with highly corrosive source water that passed through defunct corrosion

control equipment.[4] [*J.W.* Doc. 51 ¶134, 164, 165, 169; *P.R.* Doc. 41 ¶82, 83, 147, 182; *C.A.* Doc. 1 ¶83, 84, 148, 183]. The obvious effect of this switch was to endanger the safety of thousands of children and to shock the water system reeling under the dangers of corrosivity and clogged corrosion control lime-injection pumps. [*J.W.* Doc. 51 ¶169, 170, 176; *P.R.* Doc. 41 ¶182, 188, 189; *C.A.* Doc. 1 ¶183, 189, 190]. The City implemented this decision entirely without basis nor any warning to residents. [*J.W.* Doc. 51 ¶177-183; *P.R.* Doc. 41 ¶190-196; *C.A.* Doc. 1 ¶191-197].

Not surprisingly, as a result of these two decisions, MSDH's triennial testing showed in June, 2015 that lead levels in Jackson had jumped again—this time far exceeding the 15 ppb regulatory lead limit at 28 ppb. [*J.W.* Doc. 51 ¶¶195, 221-225; *P.R.* Doc. 41 ¶202, 228-232; *C.A.* Doc. 1 ¶203, 229-233]. The lead levels were likely much higher than the 28.4 ppb result due to improper testing methods that the Mississippi State Department of Health employed. [*J.W.* Doc. 51 ¶¶196-220; *P.R.* Doc. 41 ¶203-227; *C.A.* Doc. 1 ¶204-227].

The City of Jackson, despite knowing of these dangerous lead levels in June, 2015, did not notify the homeowners whose lead levels exceeded safe levels and federal law, and nor did they notify the public at large until seven months later. [*J.W.* Doc. 51 ¶221, 225; *P.R.* Doc. 41 ¶228, 232; *C.A.* Doc. 1 ¶229, 233]. Particularly because lead in drinking water is not visible to the naked eye or detectable by any other human sense, concealing high lead levels is disturbing. [PR

---

4 Water deriving from the Pearl River consistently fell below 6.5 pH, which equates to nine times more corrosive than the 7.4 pH level that occasioned the Flint Water Crisis and twenty times more acidic than MDHS's preferred pH level. [*J.W.* Doc. 51 ¶98-104; *P.R.* Doc. 41 ¶106-112; *C.A.* Doc. 1 ¶107-113]. Similarly, the Ross Barnett Reservoir consistently suffered from a pH of just above 6, roughly twenty-five times more acidic than the MSDH's preferred level, and 14 times more acidic than the Flint Water Crisis levels. [*J.W.* Doc. 51 ¶105; *P.R.* Doc. 41 ¶113; *C.A.* Doc. 1 ¶114]. The likely cause of the low pH is Acid Mine Drainage, surface mine runoff into the public water supply bearing a pH of 2-6. [*J.W.* Doc. 51 ¶105-111; *P.R.* Doc. 41 ¶114-120; *C.A.* Doc. 1 ¶115-121]. The Maddox Well System, on the other hand, maintained low corrosivity with pH levels above 8, which protected service lines and thus maintained the low lead concentrations cited previously. [*J.W.* Doc. 51 ¶168; *P.R.* Doc. 41 ¶128; *C.A.* Doc. 1 ¶129].

230, 240]. [*J.W.* Doc. 51 ¶223, 233; *P.R.* Doc. 41 ¶230, 240; *C.A.* Doc. 1 ¶231, 241].   Nor did

City Defendants take any measures during these seven months and before to protect Jackson's

citizens from the rising lead levels. [*J.W.* Doc. 51 ¶225; *P.R.* Doc. 41 ¶232; *C.A.* Doc. 1 ¶233].

This concealment is not only conscience shocking on a Constitutional and human level,

but it also represents a violation of state and federal law. Mississippi requires the water system,

which is owned by the City of Jackson, to send a public notice of a lead exceedance to MSDH

"and that public notice shall be published by the department on its Web site." Miss. Code. Ann.

§41-26-13(2); see also Miss. Primary Drinking Water Regs. R. 1.2.2; 40 C.F.R. §141.80. The

system is then required to place notices in the newspaper that included the MSDH website address

at which the public notices is posted. Miss. Code. Ann. §41-26-13(2). EPA guidelines and the

Mississippi Safe Drinking Water Act mandate that the public be informed of lead exceedances as

soon as practicable. [*J.W.* Doc. 51 ¶228; *P.R.* Doc. 41 ¶235; *C.A.* Doc. 1 ¶236]; *see also* Miss.

Code. § 41-26-13; 40 C.F.R. §141.85(d)(2).

Not only did the City of Jackson, Defendant Yarber, and Defendant Powell each conceal

these lead levels, but they also affirmatively mislead the public through official statements and

public statements alike. [*J.W.* Doc. 51 ¶244; *P.R.* Doc. 41 ¶251; *C.A.* Doc. 1 ¶252].   At a press

conference on January 28, 2016, Dr. Jim Craig of MSDH stated that the water would not be safe

to drink for another six to nine months in the best case scenario. [*J.W.* Doc. 51 ¶238; *P.R.* Doc. 41

¶245; *C.A.* Doc. 1 ¶256]. In direct contradiction to Defendant Craig's statement, Defendant Powell

stated "This is not a situation where you have to stop drinking the water. This is not a widespread

issue, although we are treating it very seriously." [*J.W.* Doc. 51 ¶245; *P.R.* Doc. 41 ¶252; *C.A.*

Doc. 1 ¶253].   At the same conference, Defendant Powell stated, "It does not mean that the City

has violated the Safe Drinking Water Act, and our water is safe." [*J.W.* Doc. 51 ¶244, 247; *P.R.* Doc. 41 ¶251, 254; *C.A.* Doc. 1 ¶252, 255]. Therefore, Defendant Powell, in essence, encouraged the public to continue drinking the water known to contain dangerous lead levels that would not be safe to drink for six to nine months from the date of this statement.

Defendant Powell attempted to downplay the scope of the problem by blaming the plumbing at individual homes instead of pipes in the system, stating that the problem is not system wide. [*J.W.* Doc. 51 ¶245, 257; *P.R.* Doc. 41 ¶252, 264; *C.A.* Doc. 1 ¶253, 265].   This effort to downplay the problem was, at best, disingenuous. As alleged in the Complaint, it is widely known that lead pipes or lead connections underlay the city of Jackson, and, even barring as much, the City, including Kishia Powell, knew that 70% of Jackson homes were built before 1980, a time when lead pipes or connections were used in the home, which renders the absence of functioning corrosion control equipment especially dangerous and "system wide," notwithstanding Defendant Powell's misstatements to the contrary. [*J.W.* Doc. 51 ¶6, 85-90; *P.R.* Doc. 41 ¶6, 92-97; *C.A.* Doc. 1 ¶6, 93-98].

Defendant Yarber confirmed as much a month later at a City Council meeting Kishia Powell attended. "What we do know that isn't speculation is that over 70 percent of the homes in the city of Jackson were built before 1978 and that before that time there was no real focus on ensuring that lead plumbing was not being used in homes."[*J.W.* Doc. 51 ¶248; *P.R.* Doc. 41 ¶255; *C.A.* Doc. 1 ¶256].[5] To state that the issue is not system-wide and is a problem in the plumbing of

---

5 Citing Anna Wolfe, *Jackson City Council Talks Lead Water*, Clarion Ledger (Feb. 19, 2016), https://www.clarionledger.com/story/news/local/2016/02/17/jackson-city-council-talks-lead-water/80538910/

individual homes is thus a red herring designed to prevent a public perception crisis for government officials instead of protecting the public health of Jackson citizens.

Thus, the City of Jackson and Defendants Yarber and Powell engaged in extensive deliberation, decided to conceal this information from the public at large and from the 22% of households known to have dangerous lead levels for more than seven months, and then decided to engage in further concealment and dishonesty by assuring residents the water was safe.

The weight of Defendant Yarber's concern appeared to rest on public perception, not public health and transparency. In feigning ignorance of the obvious cause of the lead problem, he stated, "My preference is to *not talk out loud* about the speculation because you don't want to say something that is not and then people run away with it." [*J.W.* Doc. 51 ¶248; *P.R.* Doc. 41 ¶255; *C.A.* Doc. 1 ¶256, Exhibit A, February 17 Council Video, 2:14].[6] At this February 17, 2016 City Council meeting, certain Councilman repeatedly suggested a civil emergency declaration to ensure expanded testing and federal resources to thwart this crisis. [*Id.* Exhibit A, February 17 Council Video at 6:10, 16:38, 25:46, and 41:38]. Councilman Stamps urged the declaration and said that "I do see inaction, and as leaders, we're here to take some action." [*Id.*, citing Anna Wolfe, *Jackson City Council Talks Lead Water*, supra n. 5]. Defendant Yarber opposed the declaration by saying that the system is not the issue, is not compromised, and that he "doesn't want to sound the wrong alarm… and have folks saying 'We're Flint.' We're not flint." He mentioned that while he is in favor of a civil emergency, it would be difficult to explain it to the public in the midst of the Flint

---

6 The Anna Wolfe article cited in the complaint contains a link at the bottom of the article to the full video of the February 17, 2016 City Council meeting. The meeting may also be accessed by following this link: https://jacksonms.new.swagit.com/videos/02172016-843. The discussion regarding the lead results, and the time stamps cited herein, may be accessed by clicking on "Addendum Item" within the "Video Index" box at the left of the screen. The video is also attached as Exhibit A, which will be conventionally filed.

crisis, especially when there are potholes that need to be fixed.[7] [*Id.*; Exhibit A, February 17 Council Video at 4:30-44:32; *J.W.* Doc. 51 ¶251-253; *P.R.* Doc. 41 ¶258-260; *C.A.* Doc. 1 ¶259-261].

> Defendant Yarber, evidently content not to sound *any* alarm acknowledged the following:
>
> "We've been singing this song, I know since I became mayor, that our infrastructure and particularly our water system, that *we're in a real critical situation*. The city, in terms of the system, is fine. There are some things we want to make sure of to ensure that the city system stays fine, like making sure that our water treatment systems are being brought up to date. We are still, all the time, on edge about the ability of our water system in its maintenance to be able to provide what we need provided."

[*Id.* citing Anna Wolfe, *Jackson City Council Talks Lead Water*, supra n. 5]. Defendant Yarber thus acknowledged the critical situation but doubled and tripled down on minimizing notice to citizens by falsely asserting that the water system was fine.

Defendant Powell also misled the public and the City Council at the February 17, 2016 hearing by reiterating that the problem was occurring at specific homes, that the water mains are made of different materials (cast iron and PVC), and that there is no lead in the water as it leaves the treatment plant. By this point, Powell would have already understood that lead underlay Jackson's city streets, and that the absence of lead as water leaves the treatment plant is completely beside the point. [*J.W.* Doc. 51 ¶6, 134, 254-259; *P.R.* Doc. 41 ¶6 ,141, 261-265; *C.A.* Doc. 1 ¶6, 142, 262-266]. Defendant Powell chose her words in a calculated effort to mislead. While certain

---

7 "I think in the moment of Flint, we declare a civil emergency, it's… going to be even harder to explain that than it is to explain that while we're out filling potholes every day, we still got 3 million more potholes to go, right? So it's hard to explain that when people are running over potholes." [Exhibit A, February 17 City Council Video, 44:04- 44:12]. Defendant Yarber, knowing that the solution to the problem is corrosion control,  then stated that there are only two ways to fix this problem… the homeowner replumbs their whole house or there's some kind of filtration device connected to the inlet of the house on their side of the water meter…."  [*Id.* 44:34-44:55].

pipes underneath Jackson may be made of cast iron, Defendant Powell nonetheless maintained this deliberately misleading narrative by omitting the obvious concern that lead pipes also underlay the city and that even the cast iron pipes have lead joints. She later stated, "I think it's widely known that some cast iron pipe has had lead and oakum joints, but that's not the same as a lead pipe." [*J.W.* Doc. 51 ¶6, 89; *P.R.* Doc. 41 ¶6, 96; *C.A.* Doc. 1 ¶6, 97].[8] In this same interview, Defendant Powell recognized that even lead connections raise corrosion control concerns.

She also remarked that a major difference between Jackson and Flint is that Flint did not have corrosion control measures in place, but Jackson did. [*J.W.* Doc. 51 ¶248; *P.R.* Doc. 41 ¶255; *C.A.* Doc. 1 ¶256]. This was misleading because Jackson's corrosion control had been defunct and ineffective for years.

Defendant Powell, like Defendant Yarber, placed undue weight on public perception concerns. For example, Defendant Powell, having (1) downplayed the prevalence of lead in the water system's pipes and infrastructure, (2) asserted that there are no records of lead lines underground, and (3) asserted that the only lead pipes exist in the home, immediately fired one of her employees for alerting the public that in fact, the City's pipes made of iron also contain solid bands of lead every 20 feet. [*J.W.* Doc. 51 ¶258; *P.R.* Doc. 41 ¶265; *C.A.* Doc. 1 ¶266]. Defendant Powell maintained that she fired this whistleblower, Jonathan Yaeger, for "possibly creating unwarranted public fear" in February 2016.  [*J.W.* Doc. 51 ¶292-295; *P.R.* Doc. 41 ¶299-302; *C.A.* Doc. 1 ¶300-303].

---

8 Citing Anna Wolfe, *Jackson Water System Contains Lead Joints*, Clarion Ledger (Mar. 15, 2016), https://www.clarionledger.com/story/news/local/2016/03/15/city-water-system-has-some-lead-joints/81780766/. Defendant Powell's remarks are quoted in part and also contained in a video embedded in the article.

At a subsequent press conference, Defendant Yarber, despite the obviously high, noncompliant levels of lead, stated, "there has not been any notification to the City of Jackson that our water is unsafe. We have not received that from the Mississippi Department of Health." Defendant Powell stated, "We are nowhere near the levels seen in Flint," which was untrue, too, in light of evidence both that the problem was more widespread than that of Flint and that Jackson's water was 9-14 times more corrosive than that found in Flint. [*J.W.* Doc. 51 ¶95, 103-104, 249; *P.R.* Doc. 41 ¶103, 109, 112-113, 256; *C.A.* Doc. 1 ¶104, 110, 113-114, 257].[9]

Council members again urged the declaration of a civil emergency at a subsequent meeting on March 1, 2016.[10] Defendant Powell repeated the misleading statement that the problem with the lead was happening at specific homes with lead pipes, and that the water leaving the treatment plant was not contaminated. [*J.W.* Doc. 51 ¶257; *P.R.* Doc. 41 ¶264; *C.A.* Doc. 1 ¶265]. The City Counsel again voted against the measure to declare an emergency at this meeting, thus foregoing federal assistance to help reverse the water crisis.

Multiple other Jackson officials, speaking at the direction of final policymakers for the City, told the public that the water was not unsafe to drink, which is false as alleged in the Complaint and supported by testing data and a failed corrosion control system. [*J.W.* Doc. 51 ¶159-

---

9 Citing Lisa Riordan Seville, Hannah Rappleye, Tracy Connor and Stephanie Gosk, *'People are Scared': Jackson, Mississippi Copes With Lead Alarm*, NBC News (Feb. 25, 2016), https://www.nbcnews.com/news/us-news/people-are-scared-jackson-mississippi-copes-lead-alarm-n525961. Defendant Yarber's remarks are embedded in the article as a video.
10 David Kenney, *Jackson City Council Tables Water Emergency*, WLBT3 (Mar. 1, 2016), https://www.wlbt.com/story/31360020/council-tables-water-emergency/. This article is cited in Plaintiffs' Complaint. A video of the full hearing is attached hereto as Exhibit B. It is also available online: https://jacksonms.new.swagit.com/videos/68824. The water issues are addressed in Item 4 and Item 5. While this video is not attached to the pleadings, it is the full video of a meeting referenced in Plaintiffs' pleadings, which will provide additional specificity to surrounding allegations contained in the complaint as well as matters presented outside the pleadings by individual defendants Yarber and Powell.

161; *P.R.* Doc. 41 ¶266-268; *C.A.* Doc. 1 ¶267-269]. At the same time as Defendants Powell, Yarber, and these other Jackson officials stated that the water was safe to drink in January and February, 2016, follow-up testing of the same sample of homes showed that half of the homes previously showing exceedances from the June sample remained in excess of the EPA's 15 ppb threshold, while yet different homes now showed dangerous levels, demonstrating that the problem was in fact system wide and not limited to residential plumbing. [*J.W.* Doc. 51 ¶262; *P.R.* Doc. 41 ¶269; *C.A.* Doc. 1 ¶270]. 11% of Jackson's homes were still testing above the 15ppb threshold for lead. [*Id.*]. In fact, testing revealed levels as high as 476 ppb, over 30 times in excess of the EPA's action level of 15 ppb and consistent levels between 50 and 106 ppb. [*J.W.* Doc. 51 ¶263-264; *P.R.* Doc. 41 ¶270-271; *C.A.* Doc. 1 ¶271-272].

Misleading statements of the same character would continue through 2018. Defendant Miller, for example, continued the misleading narrative that "there's been no detecting of lead or copper in the water supply." [*J.W.* Doc. 51 ¶265-267; *P.R.* Doc. 41 ¶272-274; *C.A.* Doc. 1 ¶273-275]. Even though Jackson had just been cited for failure to comport with an MSDH compliance plan in 2018, Defendant Miller still maintained that the "water is still safe to drink." [*J.W.* Doc. 51 ¶268; *P.R.* Doc. 41 ¶275; *C.A.* Doc. 1 ¶276].

Amidst these several misleading statements by Jackson officials between January and March 2016, Jackson exacerbated the crisis by issuing a boil water notice in February 2016, which actually causes lead concentrations to increase. [*J.W.* Doc. 51 ¶289-292; *P.R.* Doc. 41 ¶296-298; *C.A.* Doc. 1 ¶297-299]. In February, 2016, MSDH issued a compliance plan for Jackson, which required an engineer-designed corrosion control study and plan for optimization of water treatment to be approved by MSDH. [*J.W.* Doc. 51 ¶269-271; *P.R.* Doc. 41 ¶276-278; *C.A.* Doc. 1 ¶277-

279]. Until MSDH approved the plan, Jackson was required to ensure a constant pH of at least 8.5 and to implement repairs or modifications to the water system in order to achieve this level as soon as possible, but no later than October 1, 2016. [*J.W.* Doc. 51 ¶271; *P.R.* Doc. 41 ¶279; *C.A.* Doc. 1 ¶280]. Jackson repeatedly failed to meet the mandates of the plan, as confirmed by a letter from MSDH to Jackson dated March 22, 2016. [*J.W.* Doc. 51 ¶276; *P.R.* Doc. 41 ¶283; *C.A.* Doc. 1 ¶284]. Not surprisingly, the Compliance Plan identified a failing lime-feed system at the city's OB Curtis Water Treatment Plant as the likely culprit of the elevated levels of lead. [*J.W.* Doc. 51 ¶112; *P.R.* Doc. 41 ¶121; *C.A.* Doc. 1 ¶122].

Jackson, notwithstanding the mandates of the Compliance Plan, failed to install necessary components for corrosion control until around October, 2017. [*J.W.* Doc. 51 ¶279-282; *P.R.* Doc. 41 ¶286-289; *C.A.* Doc. 1 ¶287-290]. Not surprisingly, then, the highly corrosive nature of Jackson's water continued throughout 2016, bearing a pH of between 6.3 to 7.5 (10 to 22 times more acidic than the Compliance Plan's mandate) after the water has been treated at the two plants. [*J.W.* Doc. 51 ¶285-286; *P.R.* Doc. 41 ¶292-293; *C.A.* Doc. 1 ¶293-294]. This low pH predictably corresponded with high lead levels at the tap. [*J.W.* Doc. 51 ¶287-288; *P.R.* Doc. 41 ¶294-295; *C.A.* Doc. 1 ¶295-296]. Even as late as at least 2017, and more likely until as late as February 17, 2022, correspondence revealed that Jackson continued to fall short of the Compliance Plan and the EPA's Lead and Copper Rule. [*J.W.* Doc. 51 ¶32, 283; *P.R.* Doc. 41 ¶37, 290; *C.A.* Doc. 1 ¶38, 291].[11]

---

11 Citing Steve Wilson, EPA Emails Reveal City's Continued Violations, The Northside Sun, https://www.northsidesun.com/local-news-top-stories/epa-emailsreveal-citys-continued-violations#sthash.zt33DM8L.JWEPdmmP.dpbs. This article provides further detail regarding the many extensions granted to Jackson for compliance, and, notwithstanding same, Jackson's consistent failure to meet extended deadlines, required pH levels, and other corrosion control standards.

Defendants Yarber and Powell quietly installed a political ally to pursue a costly corrosion control study as an excuse to avoid declaring emergency to trigger federal assistance. At the March 1, 2016 hearing, Defendants Yarber and Powell discouraged the Councilmembers' efforts to secure cost-effective federal assistance by saying, "we've got an engineer on board who is working with us and has started assessing the plant to address the measures that we have under our control." [Exhibit B, March 1 City Council Video at 16:32-16:46]. In response to one councilman, who encouraged declaring a state of emergency to trigger federal assistance, Defendant Powell said, "We have that assistance. We've got an engineer on board…. So I just wanted to say we do have resources that are teed up." [March 1 City Council Video at 42:37-44:05]. When asked what engineer was on board, she responded, "Trilogy." [March 1 City Council Video at 68:30-69:12]. Trilogy, of course, had not received the vote of the City Council, and was instead quietly selected by Yarber and Powell. [March 1 City Council Video at 72:13]. Defendant Powell estimated that the fees for Trilogy would be $400,000.00, roughly the same amount required to fix the corrosion control equipment prior to the lead levels spiraling out of control. [March 1 City Council Video at 68:38; *J.W.* Doc. 51 ¶124-125, 158; *P.R.* Doc. 41 ¶131-132, 171; *C.A.* Doc. 1 ¶131-132, 172].[12]

Trilogy Engineering Services was owned and managed in part by Thessalonian Leblanc, a non-engineer who held an unreported campaign fundraiser for then-candidate Yarber in 2014. [*J.W.* Doc. 51 ¶300-301; *P.R.* Doc. 41 ¶307-308; *C.A.* Doc. 1 ¶308-309]. The City Council first voted unanimously against the contract with Trilogy on March 10, 2016. The Contract would have

---

12 Citing Anna Wolfe, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, Clarion Ledger, (Mar. 23, 2016), available at https://www.clarionledger.com/story/news/local/2016/03/22/offering-jacksonwater-solutions new-treatment-needed/82120680/.

increased Trilogy's income by 700% [from $50,000 to $400,000] from the previous nine-month period. [Exhibit C, March 10 City Council Meeting at 14:00].[13] City Councilmembers stated that the contract was too expensive, questioned why an out-of-state company owned by a non-engineer would be considered over local expertise in a "city full of engineers."  [March 10 City Council Meeting at 12:23, 29:46]. The City ultimately approved the Trilogy contract once the City negotiated a reduction in the cost of the contract. Trilogy was thus hired to conduct a corrosion control study to come into compliance with the Safe Drinking Water Act. [*J.W.* Doc. 51 ¶298-302; *P.R.* Doc. 41 ¶305-309; *C.A.* Doc. 1 ¶306-310]. To put this in perspective, Jackson approved a corrosion control *study* in 2016, nearly five years after Jackson was marked as "high risk for lead poisoning" and three years after Director Bell provided the obvious solution of switching to liquid lime. The study was conducted between October, 2016 and April, 2017. [*J.W.* Doc. 51 ¶339; *P.R.* Doc. 41 ¶346; *C.A.* Doc. 1 ¶347]. At this meeting on March 10, 2016, the emergency declaration was voted down for a third time. [March 10 City Council Meeting – Item 39].

Trilogy knew that a switch to liquid lime would alleviate the clogging issue caused by lime powder in the City's corrosion control system and discussed as much with City officials on or prior to March, 23 2016. [*J.W.* Doc. 51 ¶307; *P.R.* Doc. 41 ¶314; *C.A.* Doc. 1 ¶315].[14] As previously

---

13 The meeting may also be accessed by following this link: https://jacksonms.new.swagit.com/videos/68825. The discussion regarding the Trilogy, and the time stamps cited herein, may be accessed by clicking on "Item 34" within the "Video Index" box at the left of the screen. While this video is not attached to the pleadings, it is the full video of a meeting referenced in Plaintiffs' pleadings, which will provide additional specificity to surrounding allegations contained in the complaint and matters outside the pleadings presented in individual defendants Yarber and Powells' motion. The Court may draw reasonable inferences in Plaintiffs' favor at this juncture in the event Yarber and Powells' extraneous exhibits are considered.

14 Citing Anna Wolfe, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, Clarion Ledger, (Mar. 23, 2016), available at https://www.clarionledger.com/story/news/local/2016/03/22/offering-jacksonwater-solutions new-treatment-needed/82120680/.

stated, Yarber, Powell, and the City also knew that liquid lime would alleviate the problem. Defendants Jerriot Smash and Robert Miller, Kishia Powell's successors, also would have understood that Mississippi's uniquely humid climate would lead to soda ash clumping in the feed system, and that liquid lime would alleviate the problem. [*J.W.* Doc. 51 ¶319-323; *P.R.* Doc. 41 ¶318-322; *C.A.* Doc. 1 ¶319-323]. Nonetheless, the City followed Trilogy's recommendation in 2017 to retrofit the lime silos to feed soda ash instead of liquid lime, even though the equipment itself was designed to accommodate liquid lime, not soda ash or powder lime. [*J.W.* Doc. 51 ¶311-315; *P.R.* Doc. 41 ¶318-322; *C.A.* Doc. 1 ¶319-323].

In June, 2017, the *average* pH of Jackson's water leaving the treatment plant was 7.4, approximately 12 times more corrosive than the mandates of the MSDH Compliance Plan, and more corrosive too than the levels in February 2016. [*J.W.* Doc. 51 ¶323; *P.R.* Doc. 41 ¶330; *C.A.* Doc. 1 ¶331]. The City would remain in violation of both the MSDH Compliance Plan and the SDWA for the years 2018, 2019, 2020, and 2021, all of which coincide with Defendant Mayor Lumumba's tenure and most of which coincide with Defendant Miller's tenure, who left office in July, 2020. [*J.W.* Doc. 51 ¶336; *P.R.* Doc. 41 ¶343; *C.A.* Doc. 1 ¶344].

On March 27, 2020, the EPA issued to the Defendant, Mayor Lumumba, Jr., an Administrative Order which cited multiple SDWA violations and noted that the water system "presented an imminent and substantial endangerment to the persons served by the system." [*J.W.* Doc. 51 ¶327; *P.R.* Doc. 41 ¶334; *C.A.* Doc. 1 ¶335]. The order concluded that pH meter readouts were off by up to 2 units because a necessary technician position had gone unfilled, causing monitoring equipment to remain uncalibrated and in a state of disrepair. [*J.W.* Doc. 51 ¶325-329; *P.R.* Doc. 41 ¶332-336; *C.A.* Doc. 1 ¶333-337]. In keeping with Jackson's custom of concealing

public health emergencies from Jackson citizens, Mayor Lumumba did not alert the public or the City Council of the violations, nor of the dire pronouncements of the Administrative Order, until April, 2021, a year after the Administrative Order issued. [*J.W.* Doc. 51 ¶331-334; *P.R.* Doc. 41 ¶338-341; *C.A.* Doc. 1 ¶339-342]. The City then resisted efforts to obtain a copy of the order and related correspondence through the Mississippi Open Records Act. [*J.W.* Doc. 51 ¶332-333; *P.R.* Doc. 41 ¶338-339; *C.A.* Doc. 1 ¶339-340].

The following month, in May 2021, the City issued a notice to its citizens that for the monitoring periods of 2018, 2019, 2020, and 2021, it failed to consistently meet treatment technique requirements in contravention of the Lead and Copper Rule and the City's Optimized Corrosion Control Plan. [*J.W.* Doc. 51 ¶335-336; *P.R.* Doc. 41 ¶342-343; *C.A.* Doc. 1 ¶343-344]. The notice provided multiple examples of violations of the MSDH Compliance Plan and the Safe Drinking Water Act. Even though MSDH extended until December, 2019 the deadline by which the City must complete source water treatment installation, the deadline remained unmet well into 2021, and the City had also failed to install optimal corrosion control treatment at one of the treatment plants as of April 27, 2021. [*J.W.* Doc. 51 ¶300-301; *P.R.* Doc. 41 ¶307-308; *C.A.* Doc. 1 ¶308-309].

To put this in perspective, in 2011, MSDH tagged Jackson as "high-risk for lead poisoning," and in 2013, previous Public Works Director Bell provided a warning and a plan to install corrosion control by repairing the lime injection pump as early as 2013, nearly eleven and eight years, respectively, before the EPA's Administrative Order cited Jackson for being noncompliant with law and the Compliance Plan. Since the 2015 and 2016 lead exceedances, the EPA identified 1,476 days during which the city failed to comply with proper treatment technique

requirements. That is, roughly four out of the five and a half years between 2015 and 2021, the city's drinking water failed to meet the minimum quality requirement for four of those years. [*J.W.* Doc. 51 ¶345-346; *P.R.* Doc. 41 ¶352-353; *C.A.* Doc. 1 ¶353-354].

Another example of the City's shortcomings is its failure to adequately staff the water treatment plants. Defendant Lumumba appreciated the risk of this shortage and failed to rectify it despite his power to ensure sufficient staffing at the treatment facilities. [*J.W.* Doc. 51 ¶341-344; *P.R.* Doc. 41 ¶348-351; *C.A.* Doc. 1 ¶349-352].

As of the filing of Plaintiffs' complaints, the City of Jackson remained out of compliance with the 290

City Defendants move to dismiss Plaintiffs' §1983 claims and state law negligence claims against the City of Jackson, Kishia Powell, Tony Yarber, Jerriot Smash, Chokwe Lumumba, and Robert Miller. Plaintiffs respectfully submit this *Memorandum of Law* in support of their opposition to these motions. They are due to be denied.

## III.    GOVERNING STANDARD

In assessing a motion to dismiss pursuant to Fed. R. Civ. P. 12, the Court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). To survive a motion to dismiss, a plaintiff is not required to adhere to a standard of heightened specificity in factual pleadings, but is only required to provide "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 553, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)(quoting *Twombly*, 550 U.S. at 570). Courts must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 589. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Goldston v. City of Monroe*, 621 F. App'x 274, 276 (5th Cir. 2015)(citing *Iqbal*, 556 U.S. at 678).

In each of the three consolidated complaints, Plaintiffs dedicate more than 60 pages, excluding exhibits, to specific factual allegations. The allegations are far beyond the insufficient "threadbare recitals" of elements supported by "mere conclusory statements" described in *Iqbal*, and well beyond, too, the sufficient "short, plain statement" of Fed. R. Civ. P. 8. These allegations are sufficient to defeat City Defendants' motions. At minimum, discovery should commence on the federal claims against the City of Jackson, state claims against Trilogy, and the state claims asserted against all defendants during the pendency of these qualified immunity motions.

The Fifth Circuit has traditionally permitted discovery, even if limited to the defense of qualified immunity, where Plaintiffs have pleaded "sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts." *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir. 1995). Additional remedial options are the filing of a Rule 7 reply. Id. at 1432. ("Qualified immunity's limits upon access to the discovery process create a new and large role for the Rule 7(a) reply…."). *See also Carty v. Rodriguez*, No. 06-41579, 2009 U.S. App. LEXIS 29608, at *5 (5th Cir. 2009).

However, intervening Fifth Circuit precedent has reversed these traditions in part. It stated in June of this year: "Where public officials assert qualified immunity in a motion to dismiss, a district court must rule on the immunity question at that stage. It cannot defer that question until

summary judgment. Nor can it permit discovery against the immunity-asserting defendants before it rules on their defense." *Carswell v. Camp*, 37 F.4th 1062, 1066 (5th Cir. 2022).

As such, these motions should be conclusively denied. In the alternative, should the Court consider any party to be entitled to dismissal at this juncture, dismissal should be without prejudice, or Plaintiffs should be given an opportunity to amend their complaint in light of the intervening *Carswell* decision.

## IV.    ARGUMENT

Plaintiffs structure their arguments as follows: (1) The City Defendants violated two rights secured by the Substantive Due Process Clause of the Fourteenth Amendment, the right to bodily integrity and the right to be free from state created danger, which are actionable under 42 U.S.C. §1983; (2) Defendants' rely on irrelevant precedent in an effort to attack Plaintiffs' claims; (3) The acts and omissions of the individual defendants as policymakers with delegated authority are chargeable to the City of Jackson under *Monell* and its progeny; (4) The individual defendants, Tony Yarber, Kishia Powell, Chokwe Lumumba, Robert Miller, and Jerriot Smash are not entitled to qualified immunity; (5) Plaintiffs' state claims are viable under the Mississippi Tort Claims Act.

## A.    PLAINTIFFS HAVE PLEAD COGNIZABLE FOURTEENTH AMENDMENT CLAIMS

The substantive due process clause of the Fourteenth Amendment ensures the right to be secure in one's bodily integrity and to be free from state-created danger. Plaintiffs allege that City Defendants violated both rights, which are actionable pursuant to 42 U.S.C. §1983. Section 1983 allows for a cause of action against any person acting under color of law who subjects an individual "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…." 42 U.S.C. §1983. The statute is to be liberally construed to meet its remedial purpose "in

22

aid of the preservation of human liberty and human rights." *Owen v. City of Indep., Mo.*, 445 U.S. 622, 635–37, 100 S. Ct. 1398, 1408, 63 L. Ed. 2d 673 (1980)(quoting Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871)). Plaintiffs will first set forth the contours of Plaintiffs' right to bodily integrity, establish that City Defendants' conduct shocks the conscience, and then refute Defendants' mischaracterizations of these rights.

### 1.  PLAINTIFFS' RIGHT TO BODILY INTEGRITY

The Fourteenth Amendment's due process guarantee "denotes not merely freedom from bodily restraint but also … generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). As such, the Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977)). *See also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994)("The Supreme Court has expanded the definition of 'liberty … to include…the fundamental rights implicit in the concept of ordered liberty' and 'deeply rooted in this Nation's history and tradition' under the Due Process Clause.'")(quoting *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir. 1990)).

Consistent with the foregoing, it is undisputed that the right to bodily integrity has historical roots dating back to the early years of our republic. The Supreme Court has been clear since then: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or

interference of others, unless by clear and unquestionable authority of law." *Union P.R. Co. v. Botsford*, 141 U.S. 250, 251 (1891); *U.S. v. Berry*, 670 F.2d 583, 590 (5th Cir. 1982); *Schmerber v. Cal.*, 384 U.S. 757, 772 (1966) ("[t]he integrity of an individual's person is a cherished value of our society.").

The Supreme Court has repeatedly held that *any* compelled intrusion into the human body triggers constitutional liberty interests. *Missouri v. McNeely*, 569 U.S. 141, 159 (2013)("We have never retreated, however, from our recognition that any compelled intrusion into the human body implicates significant, constitutionally protected privacy interests.").

The Fifth Circuit has also repeatedly stated "that 'the right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process.'" *Jefferson on behalf of Jefferson v. Ysleta Independent School Dist.*, 817 F.2d 303, 305 (5th Cir. 1987) (quoting *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981); *see also, e.g.*, *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 365 n.67 (5th Cir. 2020); *Priester v. Lowndes Cty*, 354 F.3d 414, 421 (5th Cir. 2004); *Alton v. Texas A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450-51 (5th Cir. 1994).

In this regard, Fourteenth Amendment liberty interests may encompass a variety of rights to be free from bodily intrusions by the government. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278-279 (1990)(O'Connor, S., concurring)("a protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions and… the refusal of artificially delivered food and water is encompassed within that liberty interest."); *Washington v. Harper*, 494 U.S. 210, 221-22, 110 S. Ct. 1028, 1036 (1990)(There is "no doubt that… respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic

drugs under the Due Process Clause of the Fourteenth Amendment."); *Missouri v. McNeely*, 569 U.S. 141, 148, 133 S. Ct. 1552, 1558 (2013)("[A] compelled physical intrusion beneath [defendant's] skin and into his veins to obtain a sample of his blood for use as evidence in a [DUI] criminal investigation" triggered bodily integrity concerns such that an exception to the warrant requirement did not exist); *Winston v. Lee*, 470 U.S. 753, 764-65, 105 S. Ct. 1611, 1619 (1985)(Coerced incision to retrieve bullet from suspect's chest considered an "extensive intrusion on respondent's personal privacy and bodily integrity.")(punctuation omitted); *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 445 (5th Cir. 1994)(a student's right not to be subject to physical sexual abuse by school employees); *Bradley v. Puckett*, 157 F.3d 1022, 1025-1026 (5th Cir. 1998)(a prisoner's right to access to bathing facilities); *Jefferson on behalf of Jefferson v. Ysleta Independent School Dist.*, 817 F.2d 303, 305 (5th Cir. 1987)(student's right to be free from bodily restraint unrelated to any justification, such as punishment or discipline).

Even in novel circumstances, "rights may be inferred from our prior decisions." *Cruzan*, 497 U.S. at 278. Based in part on the foregoing precedent, the Sixth Circuit Court of Appeals decided a case involving precisely the same allegations as against City Defendants at issue before this Court. It held: "Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection." *Guertin v. Michigan*, 912 F.3d 907, 920-21 (6th Cir. 2019).

As will be set forth more fully below, Plaintiffs' allegations are "on all fours" with the facts of *Guertin*, in which public officials switched the City of Flint's municipal water system to the Flint River, which was 19 times more corrosive than the previous water supply. Flint nonetheless

dispensed this water to its citizens without adding chemicals necessary to combat the water's known corrosivity and without functioning corrosion control equipment. *Guertin*, 912 F.3d at 915.

In Jackson, before switching well connections to surface water, City Defendants knew that lead levels were rising in the surface water systems, knew the surface water was 15-20 times more corrosive than the well system and 9-14 times more corrosive than the water in Flint. [*J.W.* Doc. 51 ¶95, 103-104, 168, 249; *P.R.* Doc. 41 ¶103, 109, 112-113, 128, 256, 291, 292; *C.A.* Doc. 1 ¶104, 110, 113-114, 129, 257, 292, 293]. Nonetheless, Jackson implemented the switch to surface water without notice to citizens, repeatedly failed to repair corrosion control equipment, failed to use the equipment as intended (liquid lime), concealed lead exceedance levels, and downplayed the extent of the crisis under false pretenses.

### a.  CITY DEFENDANTS' CONDUCT SHOCKS THE CONSCIENCE

To state an actionable claim for the violation of the Fourteenth Amendment, Plaintiffs must show that government officials' conduct was "arbitrary, or conscience shocking, in a constitutional sense.'" *Hitt v. McLane*, 854 Fed. Appx. 591, 596 (5th Cir. 2021)(quoting *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012)); *see also, e.g.*, *Cty of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957); *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *U.S. v. Salerno*, 481 U.S. 739, 746 (1987); *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 881 (5th Cir. 2004). For their behavior to be conscience shocking, officials must have acted with deliberate indifference toward the plaintiffs' rights. *See*, *e.g.*, *Cty of Sacramento*, 523 U.S. at 849-850; *Alton v. Texas A&M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999); *Hare v. City of Corinth*, 74 F.3d 633, 647-648 (5th Cir. 1996).

The deliberate indifference standard, as opposed to an intent to do harm, "is sensibly employed only when actual deliberation is practical…." *City of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). Deliberate indifference is, of course, the governing standard in the Fifth Circuit as well. *See e.g. Garza v. City of Donna*, 922 F.3d 626, 636 (5th Cir. 2019)("In this line of cases, which includes *en banc* decisions two decades apart, none requires proof that officials subjectively intend that the harm occur. The case law of the other circuits adheres to *Farmer* and hence does not require a showing of subjective intent either."); *Estate of Gray v. Dalton,* No. 1:15CV061-SA-DAS, 2017 U.S. Dist. LEXIS 2138, at *13 (N.D. Miss. Jan. 6, 2017)("[I]n situations wherein the implicated agents are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action, their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights.").

Deliberate indifference is met where Defendants "were aware of facts from which the inference could be drawn" that their actions "created a substantial risk of danger. We need not address the form that such a risk might eventually manifest." *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 882 (5th Cir. 2004). A factfinder may find deliberate indifference based on circumstantial evidence and may infer the existence of a subjective state of mind "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S. Ct. 1970, 1981 (1994). *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 254 (5th Cir. 2005)("[A]cting or failure to act with deliberate indifference to a substantial risk of serious harm ...is the equivalent of recklessly disregarding that risk.")(quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)); *McClendon v. City of Columbia*, 305 F.3d 314, 326 n.8 (5th Cir. 2002).

City Defendants clearly exhibited deliberate indifference here. With the benefit of the early warnings of Director Bell in 2013, the early designation by MSDH that Jackson was at "high risk for lead poisoning," and the warning that "children are especially at risk since their bodies absorb lead more easily than adults," these Defendants, instead of heeding these early warnings, committed affirmative acts and omissions at almost every turn that they knew would cause lead to poison Jackson water consumers. These actions included, *inter alia*, removing corrosion control allocations from the budget, failing to switch to liquid lime and to repair the corrosion control equipment, switching well connections to corrosive surface water, failing to take action to correct the problem after lead levels began to rise *and* exceeded safe levels, concealing these test results, and misleading the public about the import of these results after they were made public, firing a whistleblower, and issuing a boil-water notice that exacerbated the problem even further.

*Guertin*'s analysis is illustrative here by virtue of the similarity of facts presented within a similar legal framework. There, the Court of Appeals weighed various factors in focusing on "the entirety of the situation…" in finding that the Defendants' conduct shocked the conscience. They include: the type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm. The Court also used two factors to determine that the government's conduct was arbitrary, namely the nature of the relationship between the government and the plaintiff, and whether a legitimate governmental purpose motivated the official's acts. *Guertin*, 912 F.3d at 924.

**The type of harm weighs in favor of Plaintiffs.** Lead is a neurotoxin that causes severe and irreparable developmental disorders in children. [*J.W.* Doc. 51 ¶346-356; *P.R.* Doc. 41 ¶345-364, 256; *C.A.* Doc. 1 ¶346-365].

**The level of risk weighs in favor of Plaintiffs.** The City Defendants knew that lead would poison the citizens of Jackson based on known corrosivity levels, known corrosion control malfunctions, known lead pipes and connections in the City's water infrastructure (as well as in individual homes), known rising and exceeded lead levels, and known, but disregarded, cost-effective solutions and warnings in 2013 from Director Bell. City Defendants were warned to repair corrosion control equipment and not to take action that would shock the system, but the City nonetheless removed budgetary allocations for equipment repairs and switched 16,000 well connections to highly corrosive surface water. It was thus known to a moral certainty that a large population of children would be exposed to lead and permanently injured.

**The time for deliberation weighs in favor of Plaintiffs.** Lead levels began rising to dangerous levels in 2013, and the City Defendants failed to staff and repair necessary corrosion control equipment over the span of several years before and after lead results exceeded the action level. The City Defendants escalated the impending crisis by switching well connections to surface water, prioritizing public perception above public health, and prioritizing the award of a costly contract to a political ally, Trilogy, in lieu of federal aid and decisive action to adequately treat the water. Suffice it to say, City Defendants were not met with split-second decisions.

**Jackson did not have a legitimate government interest, and this factor weighs in favor of Plaintiffs.** Government officials have and likely always will assert through litigation an alternate reason for their unconstitutional conduct. Such, however, does not foreclose constitutional accountability under a deliberate indifference standard, particularly at the 12(b)(6) or summary judgment stage. *See e.g. Chipley v. Yazoo Cty.*, No. 3:16cv901TSL-RHW, 2018 U.S. Dist. LEXIS 66639, at *16 (S.D. Miss. Apr. 20, 2018)("The court acknowledges [jailer's] claims

that he was short-handed and unable to perform all his duties and also check on Rhodes as often as jail policy required….[T]he fact that he would prioritize other duties, like handing out snacks, over monitoring a suicidal inmate, is reflective of deliberate indifference.")

The City Defendants posit an alternative reason for every constitutional misstep, but none of these alternatives, particularly at this 12(b)(6) stage, absolve them. For the decision to switch well connections to surface water systems, City Defendants invoke improved water pressure and budgetary concerns. The exchange of improved water pressure for lead poisoning is conscience shocking, and budgetary concerns are also illegitimate because "jealously guarding the public's purse cannot, under any circumstances, justify the yearlong contamination of an entire community." *Guertin*, 912 F.3d at 926. City Defendants also maintain that a prior administration approved the switch, but this issue is due to be resolved in Plaintiffs' favor. Even accepting Defendants' factual contention as true, though, the switch occurred under Yarber and Powell's tenure, and they had been warned of the dangers of shocking the system. Nonetheless, under Defendants' version of events, they allowed the switch to happen, let well users remain connected to surface water, and failed to immediately reconnect them to the well system.

For their multiple misleading statements and concealment of lead levels in excess of the action level, City Defendants engage in semantic contentions that the City was not in violation of the SDWA and that some of their statements to the public were true. Regardless of whether *certain* statements were true, Plaintiffs allege in the Complaint multiple misstatements both generally and specifically. City Defendants' asserted justifications thus present factual disputes with the Complaint that are due to be resolved in Plaintiffs' favor.

Defendants Yarber and Powell also maintain through a news article that the budgetary allocations for corrosion control were removed based on nondescript emergencies. [3:21-cv-663, Dock. 84, Pg. 6]. As used by these Defendants, this contention is hearsay. Moreover, this contention, like other stated justifications, are mere pretext for arbitrary action and deliberate indifference. At City Council meetings, City Defendants maintained concerns of public perception and potholes in declining to trigger federal aid through a public emergency. Pretext is also evident through the City Defendants decision to award Mayor Yarber's political ally an expensive contract in lieu of accepting cost-effective federal aid. Plaintiffs' assertions and all reasonable inferences must be drawn in their favor at this juncture.

**The nature of the relationship between the government and plaintiff weighs in favor of Plaintiffs because it is involuntary.** *Guertin* looked at the involuntary nature of the intrusion upon consumers as embodied in the principle of informed consent. "[T]he central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body." *Guertin*, 912 F.3d at 919. Lead, being the invisible toxin that it is, cannot be voluntarily consumed by unwitting citizens. *Guertin* stated:

> "[V]arious defendants' assurances of the water's potability hid the risks, turning residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination…. Misleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional."

*Guertin*, 912 F.3d at 925-26 (6th Cir. 2019)(punctuation omitted). Here, Jackson officials knew lead levels would rise based on the faulty corrosion control system in the surface water system,

knew that lead levels were in fact rising, switched well water users to the surface water system, discovered levels had exceeded safe levels, withheld this information for seven months, assured citizens the water was nonetheless safe when in fact it was unsafe, and continually failed to address the problem in contravention of former Director Bell's clear warnings and cost-effective solution. These considerations render Plaintiffs' ingestion of lead-contaminated water to be wholly involuntary.

Defendants seek to distinguish *Guertin* from this action in one common and overarching way, namely that City Defendants did not intentionally harm the plaintiffs, unlike the defendants in *Guertin*. First, as cited above, the standard of conduct governing this issue is deliberate indifference, not intentional harm. Moreover, Defendants misread *Guertin*, which actually said, "There is no allegation defendants intended to harm Flint residents." *Id*. at 926. "We deal here not with these extremes, but rather in the middle… something… less than intentional conduct…." *Id*. at 923. (internal citations and quotations omitted). Rather than intentional harm, *Guertin* spoke in terms of "*affirmative steps* to systematically contaminate a community through its public water supply with deliberate indifference…." *Id*. at 933. [Emphasis added]. Plaintiffs have cited multiple affirmative steps these Defendants took in causing this public health crisis in Jackson.

Efforts to distinguish *Guertin* are unavailing, too, because the Fifth Circuit has already favorably cited *Guertin* to support the conclusion that a Plaintiff need not allege subjective intent to do harm. *Garza v. City of Donna*, 922 F.3d 626, 636 n.7 (5th Cir. 2019)(citing *Guertin*).

In maintaining that its conduct did not shock the conscience, Jackson adopts by reference the arguments presented in the motions of the individual defendants, Kishia Powell, Tony Yarber, Jerriot Smash, Chokwe Lumumba, and Robert Miller. [3:21-cv-663, Dock. 81, Pg. 8]. Before

addressing these individual arguments, Plaintiffs first address two common issues raised by Defendants Powell, Yarber, Lumumba, and Miller. Specifically, these defendants maintain that neither their misrepresentations regarding the water's safety nor their violations of law provide bases for Plaintiffs' claims.

Defendants are wrong. While Plaintiffs concede that a mere statutory violation or a mere misrepresentation, standing alone, does not necessarily give rise to an actionable claim, Defendants seek to dissociate a holistic view of these multiple factors contained in Plaintiffs' allegations. For example, they cite a case in which misrepresentations, standing alone, were not actionable.[15] But Plaintiffs do not allege that these misrepresentations are the sole basis for their claims. Then, City Defendants maintain that regulatory or statutory violations do not dictate in favor of denying qualified immunity. However, Plaintiffs do not allege that that these violations are the sole basis for their claims, and cases make clear that it is stand-alone violations of law or standards of care that do not amount to a constitutional violation.[16]

---

[15] In *Benzman v. Whitman*, 523 F.3d 119, 128 (2d Cir. 2008), for example, the Second Circuit rejected a claim against officials who in a press release stated in the wake of the September 11 terrorist attack that the air was safe enough to return to work and school in lower Manhattan and Brooklyn. The Second Circuit held that an intent to cause harm was necessary in what essentially arose to the level of split-second decisions, namely what to do in the face of a disaster. The *Guertin* decision rejected the same arguments these defendants posit in reliance on *Benzman*. "[T]hose matters [in *Benzman*] involved the balancing of competing governmental interests—restoring public services and protecting public health—during a time-sensitive environmental emergency. We have no such similar facts here on the face of plaintiffs' complaint." *Guertin*, 912 F.3d at 929.

[16] *See Gumns v. Edwards*, No. 20-231-SDD-RLB, 2020 U.S. Dist. LEXIS 85908, at *36 (M.D. La. May 15, 2020)(In the context of prisoners in the early stages of the COVID-19 pandemic, the District Court made clear that "the failure to strictly adhere to CDC guidelines is not *ipso facto* evidence of deliberate indifference," that "*mere departure* from recommended best practices is not *in and of itself* deliberate indifference," and that "lack of adherence to industry best practice standards it not *in and of itself* deliberate indifference.")(emphasis added); *Davis v. Scherer*, 468 U.S. 183, 194, 104 S. Ct. 3012, 3019 (1984)("Officials sued for constitutional violations do not lose their qualified immunity *merely* because their conduct violates some statutory or administrative provision.")(emphasis added); *Edwards v. Johnson*,

Violations of statutes or regulations and misrepresentations are but two among many allegations establishing deliberate indifference, and, to that end, they inform the obviousness of the violation under the clearly established law prong of qualified immunity, *infra*. Misrepresentations go to the heart of bodily integrity claims: whether the Plaintiffs consented to the intrusion. With regard to statutory violations, even if Defendants *complied* with statutes or regulations under the SDWA, they may nonetheless be in violation of the due process clause. *See Boler v. Earley*, 865 F.3d 391, 408 (6th Cir. 2017)("[A] state actor's deliberately indifferent action concerning contaminants in public water systems, which created a special danger to a plaintiff that the state knew or should have known about, could violate the Due Process Clause without also violating the SDWA."). Similarly, conduct can violate both the SDWA and the Due Process Clause because violations of each are "not wholly congruent." See id. at 408-409 (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258, 129 S. Ct. 788, 797 (2009)("Under some circumstances, actions that violate the SDWA may also violate the Equal Protection Clause or Due Process Clause.").

In this case, the same conduct that gives rise to a constitutional depravation also corresponds with statutory or regulatory violations and misrepresentations, but neither nor both of them form the only bases for Plaintiffs' claims. At least one Fifth Circuit case has considered violations of state statutes in denying qualified immunity. *See Atteberry v. Nocona Gen. Hosp.*,

---

209 F.3d 772, 779 (5th Cir. 2000)("[A] violation of prison regulations *in itself* is not a constitutional violation."); *Huffman v. Williams*, Civil Action No. 3:21-cv-P217-RGJ, 2021 U.S. Dist. LEXIS 153716, at *7 (W.D. Ky. Aug. 16, 2021)(where prisoner neither alleged that defendant knew of nor that he ignored a risk of harm, "the violation of federal guidelines does not give rise to a constitutional claim."); *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998)("[W]hen seeking to prove a municipality's malevolent motive, plaintiffs must introduce more evidence than *merely* the opinion of an expert witness.").

430 F.3d 245, 257 (5th Cir. 2005)(considering statutory violations in the context of clearly established law, but declining to find that violations of statute in every context vitiates the availability of qualified immunity by creating a non-discretionary function).

In light of the foregoing, Plaintiffs now turn to each individual Defendants' conduct in turn. In doing so, it bears mention that City Defendants attempt to turn the 12(b)(6) standard on its head, seeking inferences and factual disputes in their favor. Similar litigants have tried and failed in such an endeavor:

> One can place a benign construction on the factual allegations and draw inferences so that the facts amount to a negligent mismanagement of priorities and risks; but the allegations also support a reasonable inference that [defendant] prioritized a drive to cut costs with deliberate and reckless indifference to the likely results, and Ambrose refused to reconnect to Detroit water despite knowing the substantial risk to Flint residents' health. For now, we conclude that plaintiffs' complaint plausibly alleges a constitutional violation as to these defendants.

*Guertin*, 912 F.3d at 927.

### i. **KISHIA POWELL AND TONY YARBER**

Defendants Powell and Yarber expend a substantial portion of their briefs disputing Plaintiffs' version of facts. Their motion for qualified immunity adds an additional layer of procedural complexity. In disputing Plaintiffs' version of the facts and asking that reasonable inferences be drawn in their favor, Defendants present matters outside the pleadings. The defendants attach five exhibits to their motion beyond the pleadings. [3:21-cv-663, Docket. No. 82 at 2]. Yarber and Powell ask the Court to rely on their statements in media articles, Mayor Johnson's State of the City speech from 2011, City Council meeting minutes pre-dating the events in the complaint, and even ask the Court to interpret federal regulations based on an EPA statement

35

given to the *Clarion Ledger* as reported in the *Hattiesburg American. See* Docket No. 83 at 15-18 (attaching Exhibits A-D).[17]

For example, they ask the Court to rely on their statements in media articles, Mayor Johnson's State of the City speech from 2011, City Council meeting minutes pre-dating the events in the complaint, and these Defendants even ask the Court to interpret federal regulations based on an EPA statement given to the *Clarion Ledger* as reported in the *Hattiesburg American*. [See 3:22-cv-663, Dock. 83, Pg. 7].

Procedurally, these efforts are for naught for multiple reasons. First, even if admitted by the Court, these extraneous matters present, at best for Defendants, factual disputes and inferences due to be resolved in Plaintiffs' favor, "even if doubtful in fact." In most instances, however, these extraneous matters represent something more akin to inapplicable background or red herrings than exculpatory facts. Second, the point is well taken that the Court may permissibly refer to public records on a 12(b)(6) motion, but the public records Defendants seek to admit are not permissible because they are hearsay, lack trustworthiness, and are not subject to judicial notice, a consideration Defendants mention, but do not analyze.

The Court should reject Defendants Yarber and Powell's attempt to draw inferences in their favor by relying on matters outside the pleadings.[18] Generally, in deciding a motion to dismiss for failure to state a claim, if "matters outside the pleading are presented to and not excluded by the

---

17 Exhibit "A," 2011 State-of-the-City Address; Exhibit "B," Jacob Fuller, City Breaks Ground on Upgrade to Water System, Jackson Free Press (Mar. 8, 2012); Exhibit "C," Mar. 25, 2014 Minutes; Exhibit "D," Miss. Bd. of Licensure for Prof. Engineers Licensee Details; and Exhibit "E," First Woman Named Director of Jackson's Public Works Department, Miss. Link (July 31, 2014).

18 The same reasoning applies to the remaining defendants to the extent they incorporate Yarber and Powell's brief by reference.

court, the motion shall be treated as one for summary judgment. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). Neither these Defendants nor Plaintiffs seek to convert the motion to one for summary judgment, and these extraneous matters should be excluded in the interest of Rule 12(b)(6) and judicial economy.

Although Courts can take judicial notice of matters of public records at the motion to dismiss stage, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019), that does not broadly include "*all* documents which may be accessible to the public." *Ambler v. Williamson Cnty.*, No. 1-20-CV-1068-LY, 2021 U.S. Dist. LEXIS 35905, at *10 (W.D. Tex. Feb. 25, 2021) (emphasis in original) (citation omitted). Courts usually reserve this discretionary power on a motion to dismiss for "proceedings and rulings, including criminal case dispositions such as convictions or mistrials, decisions of governmental agencies, and published reports of administrative agencies." *Engerat v. Quincy Bioscience, LLC*, No. 1:19-CV-183-LY, 2019 U.S. Dist. LEXIS 174329, at *9 (W.D. Tex. Oct. 8, 2019)(listing those items as what "properly may be considered on a motion to dismiss"); *see also Ambler*, No. 1-20-CV-1068-LY, 2021 U.S. Dist. LEXIS 35905 at *10 ("Public records are typically government-provided records and a commercial website is not a public record.")(citations and internal quotations omitted).

On the other hand, Defendants' extraneous documents are of a different sort, which are further-reaching and less amenable to conclusive judicial consideration in the absence of

discovery.[19] For example, they ask the Court to rely on statements made in media articles not contained in the pleadings. [63:22-cv-663, Dock. 83, Pg. 3, 6, citing and relying on Exhibit "B," Jacob Fuller, City Breaks Ground on Upgrade to Water System, Jackson Free Press]. Meanwhile, courts have "routinely [] declined to take judicial notice of facts asserted in news reports and newspapers because they are 'not a source whose accuracy cannot be questioned.'" *Ambler*, No. 1-20-CV-1068-LY, 2021 U.S. Dist. LEXIS 35905 at *10 n.8 (listing cases).

Moreover, even if any or all of the extraneous documents defendants rely on qualify as a matter of public record, a court may only take judicial notice of a "fact that is not subject to reasonable dispute." Fed. R. Civ. P. 201(b). At this stage in the litigation, the facts outside the pleadings are forcibly subject to reasonable dispute to the extent that they contradict plaintiffs' allegations from the complaint, which - at this point - the Court must accept as true. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

There is another compelling reason why the Court should reject Defendants Yarber and Powells' improper attempt to draw inferences in their favor by relying on matters outside the pleadings—the implications of *Carswell*. As discussed, *supra*, the Fifth Circuit's recent decision in *Carswell* forecloses Plaintiffs' opportunity to seek discovery before the qualified immunity issues are decided. *Carswell*, 37 F.4th at 1066. As a result, Plaintiffs (and defendants) are strictly

---

19 Defendants' justification for their far-reaching effort to go outside the pleadings is limited. They cite only one case for the general proposition that courts may consider evidence subject to judicial notice without elaborating or supporting why these five items fall into that category. *See* 3:21-cv-663, Dock. 83, Pg. 2 n.1. Rather, the lone case defendants cite is about a court taking notice of an arrest warrant and has nothing to do with the kind of documents they are proposing the court take notice of here. *Wright v. Moore*, No. 3:20-CV-473-DPJ-FKB, 2021 U.S. Dist. LEXIS 174049, at *17 (S.D. Miss. Sep. 14, 2021) (ruling court could take judicial notice of arrest warrant issued by the Kemper County Justice Court).

limited to the pleadings without any opportunity of further discovery in resolving the qualified immunity defense.  Therefore, it would be unjust to permit defendants to attach exhibits and documents outside the pleadings to their motion to dismiss and rely on evidence outside the record at this stage without affording Plaintiffs an opportunity to conduct discovery on these extraneous issues, particularly where, as here, Plaintiffs filed these actions before *Carswell* was decided.

However, if the Court permits Defendants to rely on the matters outside the record, then Plaintiffs should be afforded an opportunity to conduct discovery.[20] If the Court decides to consider the City Defendants' extraneous evidence, then the motion to dismiss will essentially be converted to a motion for summary judgment and as such the Court should permit discovery rather than just accept defendants' unilateral interpretation of the contents of these exhibits, particularly a lengthy document of meeting minutes, the import of which is neither clear nor specifically cited. *Cobbins v. Graham*, No. 21-155-JWD-EWD, 2022 U.S. Dist. LEXIS 121438, at *6 (M.D. La. July 11, 2022)("*Carswell* conclusively establishes that all discovery must be stayed pending resolution of a qualified immunity defense raised in a motion dismiss, *but does not end the inquiry* here where the defense is asserted via summary judgment so that evidence outside the original pleadings may be considered.")(emphasis added).[21]

---

20 Plaintiffs, on the other hand, while maintaining that the Court's decision should limit its analysis to the pleadings, nonetheless assert that if the Court permits Yarber and Powell to rely on extraneous exhibits, then discovery should be permitted, or the Court should draw inferences adverse to City Defendants through Plaintiffs' attached videos in denying the motion because the videos include admissions by a party opponent and because they are either: (1) reasonably construed to have been referenced in the pleadings because the videos were cited to and/or embedded within an article Plaintiffs attached to their Complaint; or (2) represent the video of a meeting referenced in Plaintiffs' pleadings, which will provide additional specificity to surrounding allegations contained in the complaint.

21 In *Cobbins*, the court ultimately stayed discovery because there was a video of the incident at issue in the case (a traffic stop) which allegedly "utterly discredit[ed] the non-movant's version of events that no reasonable jury could believe him." No. 21-155-JWD-EWD, 2022 U.S. Dist. LEXIS 121438 at *8. That is

Plaintiffs provide a number of specific allegations against both Tony Yarber and Kishia Powell. Plaintiffs allege that Tony Yarber and Kishia Powell understood previous Director Bell's recommendations that switching the Maddox Road Well System to surface water would shock an already overstressed treatment facility reeling under malfunctioning corrosion control equipment. They knew the lead levels were rising and that corrosivity remained dangerously high throughout the surface water system (up to 14 times more acidic or corrosive than that of the Flint Water Crisis) while the Maddox Road Well System had both low lead levels and corrosivity alike. These Defendants nonetheless removed from the budget allocations for corrosion control equipment repairs and implemented the dangerous switch to surface water anyway.

Plaintiffs also allege that these Defendants knew of lead exceedance levels and concealed them from the public for seven months, which violated state and federal law.[22] Miss. Code. § 41-26-13; 40 C.F.R. §141.85(d)(2). Once released, these Defendants downplayed the lead levels by failing to warn and continuing to assure the public that the water was safe. These Defendants failed to immediately reconnect to the well system and were then pivotal figures in deciding to hire Trilogy, presumably based on unethical political considerations in lieu of both accepting federal aid and making a cost-effective $400,000.00 repair to the corrosion control system. Once Yarber

---

not the case here; Defendants cannot point to any conclusive evidence like a video which discredits all of Plaintiffs' allegations spanning several years leading up to and following the Jackson Water Crisis. As such, the Court can permit discovery if it decides to consider evidence outside the pleadings. *Id.* ("This is not to say that every case in which a defendant elects to assert qualified immunity through a summary judgment motion which requests consideration of evidence outside the pleadings should warrant a stay of discovery. The decision in this case is specifically limited to the fact that the only additional evidence to consider is video evidence [that allegedly completely discredits Plaintiffs' version of the events].").

22 Plaintiffs also allege that Defendant Craig did not notify Jackson City officials (nor 22% of residences whose lead levels exceeded the EPA's Lead Copper Rule) until seven months after he received the results. To the extent these allegations are inconsistent, they are both viable and true assertions at this juncture. *See* Fed. R. Civ. P. 8(d)(3)("A party may state as many separate claims or defenses as it has, regardless of consistency.").

became mayor, he fired Director Bell, who sounded the alarm and warned the City, Yarber, and Powell, of the water crisis to come and how to prevent it. In similar fashion, Kishia Powell fired a whistle blower early in her tenure because he said that Jackson's pipes have lead connections.

These allegations represent a square peg in the square hole that is *Guertin* and additional law cited, *supra*. However, Defendants Yarber and Powell take yet another, unique stab at evading *Geurtin*'s reasoning. They state:

> In *Guertin*, Flint switched the source water for *all* of its users from the Detroit Water and Sewerage Department to the Flint River. Thus, Flint switched from a known source to an unknown, untested source. Here, the City switched a minority of users from a known source (well water) to another known source (the Reservoir) that had successfully supplied the majority of Jackson water users for years. Flint also implemented no anti-corrosion measures on the Flint River water. Flint did not treat the water at all. Here, the City did treat the Reservoir water.

[3:21-cv-663, Doc. #83, Pg. 16]. (Internal citation omitted). Defendants Yarber and Powells' application of such a granular comparison is unpersuasive. First, they make the curious distinction that Flint switched *all* of its users to an unknown source. By logical extension, one could interpret Defendants as saying that if Flint committed a conscience-shocking decision to subject *all* of its citizens from a safe water source to a dangerous water source, then Jackson should evade constitutional accountability altogether because its conscience-shocking decision was to only switch 16,000 thousand connections from an unsafe source to a knowingly dangerous water source. This contention, while out of touch, misses the legal import of Section 1983, which extends a remedy to "any citizen" subjected to a constitutional deprivation. It also misses the practical import of the switch. Not only did the switch endanger the lives and health of former well-users, but it also shocked the surface water system which was already reeling under known elevated lead levels and a faulty corrosion control pump, thus endangering *all* Jackson residents.

41

Moreover, it is not exculpating to say that Jackson switched from a known source to another known source. It is actually incriminating in light of what these officials actually knew about both sources. They knew that the well water system was functioning at pH levels that posed no threat of lead leaching into the drinking water, and they knew that the lead levels were much lower than the surface water system. They also knew that the surface water users were (1) experiencing rising lead levels prior to the switch, (2) regularly operating at a pH level that would undoubtedly cause lead to leach into the water, and (3) failing to control pH levels due to the malfunctioning lime injection system. Defendants Yarber and Powell received advance notice by Director Bell that switching the well connections to surface water would shock the system, and that the lime injection pump could easily and cheaply be repaired.[23]

Similarly unavailing is the contention that Flint did not treat the water at all, whereas Jackson did treat the water. Such is, at best, a flimsy distinction between a City that does not treat its water at all and a City that knows that its treatment equipment is malfunctioning, resulting in elevated lead levels, and then in lieu of a cost-effective remedy, it permits the equipment to remain in disrepair, awards a costly contract to a political ally, and foregoes federal aid to assist in curing the lead and corrosion control problems.

Yarber and Powell decouple four separate factual allegations and dispute them: (1) Switching 16,000 well connections to corrosive surface water, (2) Having authority to make

---

[23] This consideration renders moot Yarber and Powell's other argument, which is that the City had made the decision to switch well users well in advance of Yarber or Powell's tenure. While Plaintiffs' allegations at this stage prevail as true over Defendants' assertions, Plaintiffs nonetheless prevail under Yarber and Powell's contention. Having been warned of the dangers of following through with this plan in 2013, their failure both to prevent the switch and to switch the connections back to well water evinces deliberate indifference.

budgetary decisions and to hire Trilogy, (3) Following Trilogy's soda ash recommendation, and (4) Misleading the public. Each is addressed in turn.

*Yarber and Powell Switch 16,000 Well Connections to Highly Corrosive Surface Water*

Several months into Yarber and Powell's tenure, the City switched 16,000 connections to highly corrosive surface water. They confront this allegation by asking the Court to take judicial notice of a political speech printed in a Jackson Free Press article and provided in their Exhibit A.[24] Furthermore, it is not clear that this article supports the conclusions suggested. Then-Mayor Johnson stated:

> We have let a contract for the installation of a 48" transmission line that will allow us to abandon the well system, which is not as reliable as our surface water supply. We will bid the remaining segments of this project by the end of the year.
>
> We are in the final stages of negotiations for the 54" transmission line that will connect the O.B. Curtis Water Plant to the J.W. Fewell Plant, and increase our water supply reliability.
>
> We are moving forward with the Maddox Road Booster Station and the addition of a major water tank in the Highway 18 area of South Jackson that will increase capacity and will also support our efforts to abandon the well system.

It is not clear that this hearsay provides the point that Yarber and Powell seem to be making, namely that it was Mayor Miller, not Yarber, who made the decision to switch from well to surface water. However, this hearsay suggests that Mayor Johnson was moving forward with a booster station and a major water tank at Maddox Road, and that he was in the process of negotiating efforts to abandon the well system and to connect the two surface water treatment facilities with

---

24 This article and the State of the City Speech are inadmissible hearsay. Furthermore, they do not meet the standards for judicial notice, which requires that a fact be "generally known within the trial court's territorial jurisdiction; or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a)-(b). Defendants do not provide argument in support of judicial notice except to mention it in passing.

each other. It does not say that all well connections would be transferred over to the already-existing surface water systems.

Then, Yarber and Powell attach meeting minutes from March 25, 2014, which they contend proves that the City, while Yarber was still a councilman (and campaigning for Mayor),[25] had substantially completed the "construction of the Maddox Road Booster Station Prestressed Concrete Water Storage Tank." This does not contradict what Plaintiffs allege. Plaintiffs allege, "The Yarber administration [and Powell] quietly switched the water source for those thousands of water users to the unsafe, corrosive surface water from the Pearl River and the Reservoir." [*J.W.* Doc. 51 ¶163-170; *P.R.* Doc. 41 ¶14, 176-180; *C.A.* Doc. 1 ¶14, 177-181]. This allegation is true at this juncture, and to the extent these extraneous matters conflict, they must be resolved in Plaintiffs' favor at this juncture.

Even if the decision to switch was set in motion well before Yarber and Powell's tenure, the Complaint alleges and Yarber and Powell do not dispute that they implemented the switch. Despite knowing how dangerous this switch could be, they "directed their staff to carry out the most harmful and neglectful options for the well-water switch as well as the corrosion control methods." [*J.W.* Doc. 51 ¶172-176; *P.R.* Doc. 41 ¶184-189; *C.A.* Doc. 1 ¶185-190].

If the decision to switch was made before their tenure, intervening circumstances demanded action to ensure the decision was not implemented. The absence of this action, at minimum, suggests deliberate indifference. Affirmatively accelerating and exacerbating the problem demands a finding of deliberate indifference. For example, lead levels were rising to the

---

25 Yarber, for his part, may be held accountable in his individual capacity, both for his conduct while serving as Mayor and as Councilman.

federal action level in 2013, but instead of taking measures to combat the foreseeable and preventable crisis that followed, Yarber and Powell took affirmative steps to accelerate the problem by directing their staff to implement, not prevent, the switch, and then failed to immediately switch the 16,000 connections back to the well system.

Yarber and Powell maintain, "Plaintiff does not, and cannot, plead Yarber and Powell knew that moving all of Jackson's water users to the same surface water source would cause lead to leach into the water system, but yet decided to do so anyway." [3:21-cv-663, Dock. 83, Pg. 16]. Plaintiffs can and did plead as much, noting that Yarber and Powell knew of rising lead levels and understood Director Bell's warnings against taking action that might shock the system and the dangers of failing to repair the liquid lime pump.[26] [*J.W.* Doc. 51 ¶143, 149, 150, 153, 172-175; *P.R.* Doc. 41 ¶156, 162, 163, 166, 184-187; *C.A.* Doc. 1 ¶157, 163, 164, 167, 185-188]. They nonetheless eliminated the funding allocated during the prior administration to fix Jackson's corrosion control and implemented the well-to-surface switch in October 2016. [*J.W.* Doc. 51 ¶146; *P.R.* Doc. 41 ¶159; *C.A.* Doc. 1 ¶160].

Separate and apart from the well-to-surface switch, Plaintiffs have nonetheless cited several other unconstitutional acts that evince deliberate indifference and preclude qualified immunity.

*Yarber and Powell Had Authority to Hire Trilogy and to Remove Budgetary Allocations for Corrosion Control*

---

26 *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d at 255 ("The Plaintiffs do not, with any specificity, allege how [Defendants] came to know of these facts, but their pleadings are sufficiently detailed on this score to survive a motion to dismiss.") *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 255 (5th Cir. 2005).

Yarber and Powell then seek to pawn their actions off on the City Council by stating that they do not have the "sole" authority to hire Trilogy and cannot "unilaterally" make budgetary decisions to withhold corrosion control expenditures, evidently conceding that they indeed have at least some authority to hire Trilogy and to partake in budgetary decisions. [3:21-cv-663, Doc. #83, Pg. 16]. Defendants cite state law to contend that a city council speaks through its minutes, but such state law does not impede a federal court's application of federal law in subjecting Yarber and Powell to the deliberate indifference standard for the role they actually played in installing Trilogy as well as the role they played in the City Council's decisions (budgeting or otherwise). Both roles were pivotal.

When the City Council met in February and March 2016, certain councilmembers pressed for an emergency declaration in order to trigger federal aid at three different meetings. Defendant Yarber cited public perception concerns in discouraging this measure, and Kishia Powell stated, "We have that assistance. We've got an engineer on board." That engineer was Yarber's political ally, Trilogy. Therefore, Yarber and Powell exhibited their authority by quietly installing Trilogy before the City Council voted on the contract. Councilman Floyd remarked on March 10, 2016, stated that the City Council was "completely in the dark" on Trilogy's appointment, and was befuddled by a request for $400,000 in the midst of opposition to efforts to declare a civil emergency and to increase testing for $20.00 a test. [Exhibit C, 36:02-37:45]. Furthermore, even the City of Jackson stated that "*the Yarber Administration* later took that [corrosion control] expenditure out of the budget," which indicates that Yarber had the power to inform budgetary decisions, such as removing the allocation for needed lime-injection repairs [*J.W.* Doc. 51 Exhibit 2 ¶4; *P.R.* Doc. 41 Exhibit 2 ¶4; *C.A.* Doc. 1 Exhibit 2 ¶4].

46

Therefore, it appears that even in the absence of City Council approval or meeting minutes, Yarber and Powell had authority to quietly install a political ally and to influence budgetary decisions without the vote of the City Council.[27]

*Following Trilogy's Soda Ash Recommendation*

Defendant Powell maintains that she left her position for the City of Jackson prior to Trilogy's recommendation to implement a soda ash system instead of liquid lime. Her culpability remains intact, however, for her crucial role in switching well connections to surface connections, misleading the public, concealing dangerous test results, quietly installing Trilogy instead of implementing a $400,000 repair to the liquid lime system, and firing a whistleblower, *inter alia*.

Defendant Yarber maintains that he is not an engineer, and, as such, cannot be expected to contest the recommendation of Trilogy to switch to soda ash. However, he knew as early as 2013 that the lime system needed to undergo a $400,000 repair that included a switch to liquid lime to prevent lead leaching. [*J.W.* Doc. 51 ¶130, 143, 145, 146; *P.R.* Doc. 41 ¶143, 156, 158, 159; *C.A.* Doc. 1 ¶144, 157, 159, 160]. [P.R.]. The Complaint alleges that "The City of Jackson, who knew or should have known of the dangers of this plan, agreed to implement the change to soda ash." [*J.W.* Doc. 51 ¶322; *P.R.* Doc. 41 ¶329; *C.A.* Doc. 1 ¶330]. Thus, the reasonable inference to be

---

27 Yarber and Powell also argue that they were simply following the mandates of the MSDH Compliance Plan in hiring Trilogy, but the Compliance Plan required that Jackson "identify *an individual or* firm… for drinking water matters." [*J.W.* Doc. 51 ¶269-270, Exhibit 5; *P.R.* Doc. 41 ¶267, Exhibit 5; *C.A.* Doc. 1 ¶278, Exhibit 5]. Councilmembers expressed concern that for much less than $400,000.00, and individual could be hired full time for corrosion control. [Exhibit C at 17:09-18:01, 39:00-40:00]. Councilman Stamps expressed concern that the majority owner, Ms. LeBlanc, is a not an engineer. [*Id*. at 21:25-22:55]. Councilman Stokes noted a lot of "shenanigans in this order," that "it doesn't pass the smell test" and that other companies should have been considered. [*Id*. at 27:20-29:33]. Furthermore, nothing in the plan urged them to hire their political ally, Trilogy, at an exorbitant cost or to prioritize a corrosion control *study* in lieu of federal assistance and actually fixing the problem in the meantime. The Compliance Plan also required them to maintain a safe pH level, which Jackson repeatedly failed to meet. Jackson remained out of compliance with the plan despite multiple extensions.

drawn at this juncture is that Defendant Yarber knew the switch to soda ash was dangerous, regardless of whether he was an engineer.

Defendants' arguments in this regard lack merit and do not negate the extensive indicia of deliberate indifference presented in this action.

### Defendants Yarber and Powell Mislead the Public

Turning now to Plaintiffs' claim that City Defendants mislead the public, Plaintiffs plead the following:

> The Jackson Defendants – most prominently Yarber, Powell, and official statements made on behalf of Jackson – made numerous false statements, either explicitly asserting or otherwise strongly implying, that Jackson's water was safe to drink when in fact it was not. [*J.W.* Doc. 51 ¶244; *P.R.* Doc. 41 ¶251; *C.A.* Doc. 1 ¶252].

> Indeed, [Defendant Powell] made repeated statements reassuring the City of Jackson's citizens and water users that Jackson's water was safe to drink even though it was not. [*J.W.* Doc. 51 ¶246; *P.R.* Doc. 41 ¶253; *C.A.* Doc. 1 ¶254].

> [O]ther Jackson officials also told the press and public that Jackson's water is "not unsafe" to drink. [They] spoke with the permission of, and at the direction of, Defendants Yarber and Powell. [*J.W.* Doc. 51 ¶259-260; *P.R.* Doc. 41 ¶266-267; *C.A.* Doc. 1 ¶267-268].

> False statements of essentially the same character would continue over time. [*J.W.* Doc. 51 ¶265; *P.R.* Doc. 41 ¶272; *C.A.* Doc. 1 ¶273].

These allegations must be treated as true for the purposes of this motion, even if Yarber and Powell contest them.

Plaintiffs also plead some but not all misrepresentations more specifically: (1) Defendant Powell stated that "This is not a situation where you have to stop drinking the water," when MSDH reported the water would not be safe to drink for 6-9 months. [*J.W.* Doc. 51 ¶238, 245; *P.R.* Doc. 41 ¶245, 252; *C.A.* Doc. 1 ¶246, 253]; (2) Defendant Powell stated that the lead exceedance levels

"[do] not mean that the city has violated the SDWA, and our water is safe," when the water certainly was not safe. [*J.W.* Doc. 51 ¶247; *P.R.* Doc. 41 ¶254; *C.A.* Doc. 1 ¶255]; (3) Defendant Powell tried to assure the public that Jackson had corrosion control in place when in fact it had malfunctioning equipment and uncontrolled corrosivity. [*J.W.* Doc. 51 ¶152, 248; *P.R.* Doc. 41 ¶165, 255; *C.A.* Doc. 1 ¶166, 256]; (4) Defendant Powell stated that Jackson was "nowhere near the levels seen in Flint," when in fact a larger proportion of homes in Jackson than in Flint exceeded the federal action level, and Jackson's water was 11 to 14 times more corrosive than that of the Flint water supply. [*J.W.* Doc. 51 ¶103, 104, 249-251; *P.R.* Doc. 41 ¶109, 112-113, 256-258; *C.A.* Doc. 1 ¶110, 114, 115, 257-259]; (5) Defendant Yarber said "I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint." [*J.W.* Doc. 51 ¶251-252; *P.R.* Doc. 41 ¶258-259; *C.A.* Doc. 1 ¶259-260]; (6) Defendant Powell mislead the public by suggesting that the problem is not system-wide, denying Jackson had lead pipes, and that plumbing issues within the home were causing the problem, when in fact Director Powell knew that Jackson's lines had solid bands of lead every twenty feet. [*J.W.* Doc. 51 ¶90, 257-259; *P.R.* Doc. 41 ¶97, 264-266; *C.A.* Doc. 1 ¶98, 265-267]; (7) Defendants Powell and Yarber directed and permitted other Jackson officials to tell the public that Jackson's water is "not unsafe" to drink at a time when testing showed grave and serious lead levels. [*J.W.* Doc. 51 ¶259-263; *P.R.* Doc. 41 ¶266-271; *C.A.* Doc. 1 ¶267-272].

These misrepresentations are alleged in the complaint, but others are evident in the attached videos. Yet others are alleged but not individually identified in the Complaint as Plaintiffs have also alleged additional misrepresentations occurring over time. The Sixth Circuit found similar coverups to be indicative of deliberate indifference. *See Waid v. Earley (In re Flint Water Cases)*,

960 F.3d 303, 326 (6th Cir. 2020)("But at this stage, the allegations plausibly support a reasonable inference that he did act with deliberate indifference when he helped to cover up the [Flint Water] crisis.")

Yarber and Powell specifically contest almost none of these contentions, maintaining instead that Plaintiffs take these statements out of context. In this regard, Yarber and Powell have, at best, drawn an inference in their favor that they were sending mixed messages to Jackson's citizens. Councilman Stamps stated as much at the March 1, 2016 meeting, roughly nine months after lead exceedance levels were discovered and three years after Director Bell provided the solution to the impending problem. [Exhibit B, at 14:03 and 48:13]. Notwithstanding arguments to the contrary at the 12(b)(6) state, the Yarber and Powell's message overamplified one general message that the water was safe when in fact it was not.

Yarber and Powell also maintain that the statements contrasting Jackson from Flint were true because in Flint, "people immediately developed rashes and lost hair after drinking untested and untreated water…." [3:21-cv-663, Dock. #83, Pg. 19]. Such an assertion deflects the analysis away from a deliberate indifference analysis of conduct into a comparison of damages between Jackson and Flint residents. Notwithstanding Yarber and Powell's efforts to draw reasonable inferences in their favor, the reasonable inference to be gleaned at this juncture is that these statements are part of a larger set of well-pleaded allegations leading to the inescapable conclusion that Yarber and Powell exhibited deliberate indifference.

Defendants Powell and Yarber, as well as Defendants Lumumba and Miller, then make the curious argument that Plaintiffs have not pleaded that they heard nor that they relied on Jackson and MSDH officials' misleading statements about the water. First, reliance on misleading public

statements is not a prerequisite to a bodily integrity claim, especially where the consumers are paying for safe, not poisoned, water. Even if reliance was a prerequisite, such reliance is a reasonable inference to be drawn from the detailed allegations of the Complaint in part because Plaintiffs allege that these misstatements, among other acts of deliberate indifference "individually and in combination… caused… Plaintiffs… to be poisoned." [*J.W.* Doc. 51 ¶28, 34; *P.R.* Doc. 41 ¶33, 39; *C.A.* Doc. 1 ¶34, 40]. While true in fact, this allegation is at minimum true at this stage, "even if doubtful in fact." Jackson officials were uniquely positioned to know of existing lead levels, not the children consuming this invisible toxin.

However, this blame-the-victim narrative misses the point in another, more fundamental way. Defendants' reassurances about water already presumed by citizens to be safe is not the only evidence of deliberate indifference. It is also the *absence* of any adequate notice or warning that the water was *unsafe* that renders this conduct constitutionally deficient and indicative of deliberate indifference.

### ii.  Defendants Robert Miller and Chokwe Lumumba

Defendant Lumumba assumed office as Mayor in July 2017, and Robert Miller became Public Works Director on September 26, 2017. They presided over almost four years (between 2018-2021) of SDWA violations, which include failure to maintain and calibrate pH monitoring equipment, failing to staff the water systems, failing to ensure the water met minimum quality standards, and failing to install corrosion control in violation of the MSDH Compliance Order. While mere violations of law do not, in and of themselves, establish deliberate indifference, they may nonetheless serve as one basis among many in this analysis. Furthermore, these Defendants failed to disclose these violations and the contents of the EPA Administrative Order for over a

year. Their resistance to producing documents in response to public records' requests also shows an intent to hide from the public the truth about lead in Jackson's water. These efforts, too, provide evidence of as well as an extension of an apparent policy and custom of the City of Jackson to exhibit deliberate indifferent to Plaintiffs' rights by concealing from them and misleading them regarding the neurotoxin known to have permeated Jackson's water supply. These violations, when coupled with affirmative efforts to conceal the same, give rise to an inference of deliberate indifference.

Furthermore, Plaintiffs allege Defendant Miller would have understood that Mississippi's uniquely humid climate would lead to clumping in the feed system and that using a liquid lime system was advisable in such a climate. [*J.W.* Doc. 51 ¶314-315, 318, 322; *P.R.* Doc. 41 ¶321-322, 325, 329; *C.A.* Doc. 1 ¶322-323, 326, 330]. Defendants Miller and Lumumba nonetheless presided over the implementation and continuation of Trilogy's recommendation to switch to a soda ash system, thus continuing the City's dangerous custom of failing to maintain corrosion control equipment essential to prevent lead from leaching into the City's drinking water.

Defendants take issue that Plaintiffs have not alleged that Jackson's water exceeded the action level during their tenure. Plaintiffs need not allege at this stage that the lead levels exceeded the action level because it may be reasonably inferred at this juncture. Plaintiffs were born as late as 2021, including those who were born during and before Miller and Lumumbas' tenure, and they allege that Defendants' acts and omissions were the proximate cause of their injuries. [*J.W.* Doc. 51 ¶¶407; *P.R.* Doc. 41 ¶370, 414; *C.A.* Doc. 1 ¶371, 415]. As such, having alleged that their injuries are based on lead poisoning through the public water system, the reasonable inference to be drawn at this juncture is that they were poisoned with lead as a result of Defendants Miller and

52

Lumumba's failure to maintain the public water system and that the lead levels were thus high. [*J.W.* Doc. 51 ¶362, 371; *P.R.* Doc. 41 ¶370, 378; *C.A.* Doc. 1 ¶373, 379]. Furthermore, the EPA noted in 2021 that Jackson's water system "presented an imminent and substantial endangerment to the persons served by the system." [*J.W.* Doc. 51 ¶327; *P.R.* Doc. 41 ¶334; *C.A.* Doc. 1 ¶335]. This inference is further bolstered by the practice of MSDH to collect water samples in a manner that underreports lead exceedance levels. [*J.W.* Doc. 51 ¶¶196-220; *P.R.* Doc. 41 ¶203-227; *C.A.* Doc. 1 ¶204-227].

The City would remain in violation of both the MSDH Compliance Plan and the SDWA for the years 2018, 2019, 2020, and 2021, all of which coincide with Defendant Mayor Lumumba's tenure and most of which coincide with Defendant Miller's tenure, who left office in July 2020. [*J.W.* Doc. 51 ¶335; *P.R.* Doc. 41 ¶343; *C.A.* Doc. 1 ¶344]. To put this in perspective, previous Public Works Director Bell had provided a plan and a warning to install corrosion control by repairing the lime injection pump as early as 2013, nearly eight years before the EPA cited Jackson for being noncompliant with law and the Compliance plan. Since the 2015 and 2016 lead exceedances, the EPA identified 1,476 days during which the city failed to comply with proper treatment technique requirements. That is, during roughly four of the five and a half years between 2015 and 2021, the city's drinking water failed to meet the minimum quality requirement for four of those years. [*J.W.* Doc. 51 ¶344; *P.R.* Doc. 41 ¶352-353; *C.A.* Doc. 1 ¶353-354].

Despite Jackson's ongoing failure to maintain corrosion control, failure to maintain pH monitoring equipment, failure to meet minimum quality standards, and failing to staff the water systems, Defendant Miller joined his predecessor in deliberately misleading statements in July 2018, in which he maintained that "there's been no detecting of lead or copper in the water supply."

[*J.W.* Doc. 51 ¶265; *P.R.* Doc. 41 ¶272; *C.A.* Doc. 1 ¶273]. He then maintained that "the water is still safe to drink" after Jackson was cited with yet another technical violation for its failure to comply with the MSDH-issued compliance plan. [*J.W.* Doc. 51 ¶268; *P.R.* Doc. 41 ¶275; *C.A.* Doc. 1 ¶277].

Defendant Lumumba, for his part, knew of the extensive shortage of system operators at the water treatment plants and had the power to adequately staff them to help ensure adequate corrosion control. He nonetheless failed to do so. [*J.W.* Doc. 51 ¶340-344; *P.R.* Doc. 41 ¶348-351; *C.A.* Doc. 1 ¶349-352]. Defendant Lumumba recites a fanciful recitation of questions suggesting that perhaps Mayor Lumumba did not have the power to adequately staff the treatment plants. This factual dispute may be explored throughout discovery and presented to a jury, perhaps, but it cannot be resolved in Mayor Lumumba's favor at this juncture.

Plaintiffs also allege that Miller and Lumumba breached their duties to Plaintiffs in ways including but not limited to the following:

   a.  Failing to require appropriate corrosion control treatment;

   b.  Failing to install, have, maintain, and repair appropriate corrosion control equipment and methods;

       *****

   d.  Failing to require proper testing of Jackson's water at the O.B. Curtis and J.H. Fewell Water Treatment Plants;

   e.  Failing to conduct proper testing of Jackson's water at the O.B. Curtis and J.H. Fewell Water Treatment Plants;

   f.  Failing to require proper testing of Jackson's drinking water;

   g.  Failing to conduct proper testing of Jackson's drinking water;

h.  Failing to have, maintain, and repair properly functioning equipment capable of monitoring appropriate pH levels;

i.  Stating that appropriate corrosion control equipment was in place;

j.  Representing that the water was safe to drink when it was really not safe to drink;

k.  Ignoring evidence that Jackson's water was unsafe to drink;

l.  Withholding information that showed that Jackson was not taking steps to ensure its water was safe to drink;

m.  Withholding information that showed that Jackson's water was unsafe to drink; and

n.  Failing to warn Plaintiffs that Jackson's water was not safe to drink.

[*J.W.* Doc. 51 ¶402; *P.R.* Doc. 41 ¶409; *C.A.* Doc. 1 ¶410]. These allegations establish deliberate indifference and a violation of Plaintiffs' right to bodily integrity. Additionally, or in the alternative, Plaintiffs request an opportunity to seek leave to amend to provide additional allegations.

### iii. Defendant Jerriot Smash

Jerriot Smash succeeded Kishia Powell as Jackson's Director of Public Works in May, 2016. During his tenure, the City accepted the soda ash recommendation, even though Defendant Smash would have understood that Mississippi's uniquely humid climate would lead to soda ash clumping in the feed system, and that liquid lime would alleviate the problem. [*J.W.* Doc. 51 ¶310-318; *P.R.* Doc. 41 ¶318-325; *C.A.* Doc. 1 ¶319-326]. Nonetheless, the City followed Trilogy's recommendation in 2017 to retrofit the lime silos to feed soda ash instead of liquid lime, even though the equipment itself was designed to accommodate liquid lime, not soda ash or powder lime. [*Id.*]

Plaintiffs allege that Defendant Smash breached his duty to Plaintiffs in ways including but not limited to the following:

a.  Failing to require appropriate corrosion control treatment;

b.  Failing to install, have, maintain, and repair appropriate corrosion control equipment and methods;

       ****

d.  Failing to warn Jackson's citizens and water users that the City was switching water sources to a source with a much lower pH that would cause lead to leach into drinking water;

e.  Failing to require proper testing of Jackson's water at the O.B. Curtis and J.H. Fewell Water Treatment Plants;

f.  Failing to conduct proper testing of Jackson's water at the O.B. Curtis and J.H. Fewell Water Treatment Plants;

g.  Failing to require proper testing of Jackson's drinking water;

h.  Failing to conduct proper testing of Jackson's drinking water;

i.  Failing to have, maintain, and repair properly functioning equipment capable of monitoring appropriate pH levels;

j.  Stating that appropriate corrosion control equipment was in place;

k.  Representing that the water was safe to drink when it was really not safe to drink;

l.  Ignoring evidence that Jackson's water was unsafe to drink;

m.  Withholding information that showed that Jackson was not taking steps to ensure its water was safe to drink;

n.  Withholding information that showed that Jackson's water was unsafe to drink; and

n.  Failing to warn Plaintiffs that Jackson's water was not safe to drink.

[*J.W.* Doc. 51 ¶402; *P.R.* Doc. 41 ¶409; *C.A.* Doc. 1 ¶410]. These allegations must be taken as true and establish deliberate indifference and a violation of Plaintiffs' right to bodily integrity. Additionally, or in the alternative, Plaintiffs request an opportunity to seek leave to amend to provide additional allegations.

Having set forth Plaintiffs' bodily integrity claim and the conscience-shocking conduct giving rise to it, Plaintiffs focus now on City Defendants' unavailing efforts to mischaracterize the right at issue.

### b. DEFENDANTS CITE IRRELEVANT PRECEDENT IN THEIR EFFORT TO MISCHARACTERIZE THE RIGHT AT ISSUE

City Defendants mischaracterize Plaintiffs' claims in similar ways as the State Defendants Jim Craig and MSDH did in their pending motion to dismiss. However, City Defendants rely on a different line of precedent. To the extent the Court may deem relevant the discussion of the cases cited by the State Defendants, Plaintiffs adopt by reference as if set forth fully herein their argument in response to State Defendants' motions to dismiss. [*J.W.* Doc. 10, Pgs. 10-25; *P.R.* Doc. 73, Pgs. 10-25].

City Defendants, for their part, argue that (1) caselaw in the Fifth Circuit is sparse and should not be expanded to encompass mere negligence claims (Plaintiffs' claims are not mere negligence claims); (2) a number of cases in the Fifth Circuit involve physical contact, or "laying hands", and (3) one case dismissed a bodily injury claim in which (though not *because*) there was no physical contact. From these arguments, Jackson seeks to thread the needle into the unsupported conclusion that "direct physical contact is what distinguishes a viable bodily integrity claim from a meritless environmental harm claim under § 1983." [*P.R.* Doc.#43, Pg. 4-5].

This contention is for naught. In rejecting this very contention, the Fifth Circuit stated, "Defendants argue the alleged sexual abuse does not shock the conscience because Deputy Boyd did not effectuate it using physical force. We disagree. *Physical force is not a requirement of a violation of the right to bodily integrity*…. Thus, we have recognized violations of the right to bodily integrity where the officer never physically touched the plaintiff and the plaintiff suffered purely psychological harm." *Tyson v. Cty. of Sabine*, No. 21-40590, 2022 U.S. App. LEXIS 20902, at *15-16 (5th Cir. July 28, 2022)(emphasis added).

Nonetheless, even absent this express rejection of City Defendants' physical contact theory, it nonetheless fails here because (1) lead comes into "physical contact" with a person drinking lead-poisoned water even though the toxin is invisible, and (2) none of these cases *foreclose* a bodily injury claim in this context, particularly in light of the plethora of Supreme Court cases defining the right such that Plaintiffs' case against Jackson fits squarely within its contours.

Turning now to the foregoing arguments individually, Jackson's contention that caselaw is sparse is fundamentally flawed, or simply irrelevant, for three reasons. First, if Fifth Circuit precedent is sparse with regard to bodily integrity claims, it is nonetheless bound by Supreme Court precedent, which is abundant in the bodily integrity context as cited, *supra*. Second, sparsity of caselaw does not equate to caselaw that disallows bodily integrity claims. Third, the Supreme Court often determines the existence of the right in the absence of preexisting cases on point. *See Cruzan*, 497 U.S. at 278-279 (1990)(O'Connor, S., concurring)("a protected liberty interest… may be inferred from our prior decisions."); *Guertin*, 912 F.3d at 934 ("Before *Cruzan*, a factually identical case had not been decided by the Court. Nonetheless, the Supreme Court held that the

right to bodily integrity claim there was compelled by the logic and reasonable inferences of its prior decisions.").

To support this sparsity contention, Jackson cites *Young v. Isola*, which collected cases holding that verbal sexual harassment in the absence of physical contact does not give rise to a constitutional claim. Nor does mere verbal sexual harassment and "forcefully grabb[ing] Plaintiff by her left arm." *Young v. Isola*, No. 3:15-cv-00108-GHD, 2016 U.S. Dist. LEXIS 163079, at *16-*17 (N.D. Miss. Nov. 23, 2016). The District Court characterized the arm grab as "an unwanted touching not resulting in physical injury…" *Id.* at *18 Here, Plaintiffs did suffer physical injury from drinking lead contaminated water. Furthermore, it should go without saying that verbal sexual harassment is in no way acceptable, and, in the context of the Fourteenth Amendment right to bodily integrity, nor is it in any way comparable to lead poisoning that causes developmental incapacities and brain damage arising from the deliberate indifference, concealment, and false pretenses exhibited by City Defendants.

Then, in addition to incorrectly characterizing a violation of bodily integrity to require a direct laying of hands, Defendants also mischaracterize the requisite intent necessary to establish such a claim. Jackson quotes a district court case to mischaracterize the right to bodily integrity as a right to be free from "intentional injury inflicted by a state actor." *Bickford* at *11.[28] As set forth, *supra*, the level of intent required under both Supreme Court and Fifth Circuit precedent is

---

28 The peculiar facts of this case, inapposite to the allegations at issue in this case, involve a stage prop falling on a student in a school production of *Grease*. Far from a deliberate indifference framework under the Fourteenth Amendment, *Bickford* simply stands for the contention that merely negligent conduct does not violate the Constitution. Accordingly, "it is important to keep in mind that 'section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Bickford*, 2016 U.S. Dist. LEXIS 69101, at *12.

deliberate indifference, not an actual intent to cause harm. Further, *Bickford*'s own logic is counter to the interpretation of the case that the City Defendants advance. First, *Bickford* relies on *Doe v. Taylor*, which applied deliberate indifference, not "intentional injury" in the sense Jackson posits. *Bickford v. Boerne Indep. Sch. Dist.*, No. 5:15-CV-1146-DAE, 2016 U.S. Dist. LEXIS 69101, at *11 (W.D. Tex. May 26, 2016)(citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450-52 (5th Cir. 1994)(superintendent, who did not touch a student, denied qualified immunity for the conduct of a teacher). Furthermore, Jackson itself quotes *Bickford* as saying that the right to bodily integrity "appears to arise *almost* exclusively in the context of sexual abuse by a teacher in a school setting where a superintendent was *deliberately indifferent* to such conduct, despite receiving reports from students, teachers, and parents that the abuse was taking place." *Bickford*, at *11 (emphasis added).

Jackson thus attempts to construct a "laying hands" and "intentional injury" framework, but in so doing relies on a deliberate indifference case in which the culpable superintendent in *Taylor* never actually laid hands on the student. *Taylor*, too, recognized that since 1981, the Fifth Circuit has held that "the right to be free of state-*occasioned damage* to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450-51 (5th Cir. 1994)(emphasis added). *Taylor* does not state that intentional "laying hands" is required, it says that *state-occasioned damage* is actionable. Deliberate indifference, not intent to cause harm, is the governing standard in this case under Supreme Court and Fifth Circuit precedent alike. Furthermore, while *Bickford* noted that bodily integrity claims "arise almost exclusively" in the sexual harassment setting, neither *Young*, *Bickford*, nor *Taylor* states that bodily integrity claims are incapable of arising in other contexts.

Then, Jackson correctly cites to cases in which laying hands on a student or patient did result in a bodily integrity violation. The obviousness of those violations does not foreclose the obviousness of the violations Jackson committed here. What Jackson fails to mention is that even state actors who never touch a plaintiff are nonetheless held responsible. Take, for example, the case of *Atteberry v. Nocona*, in which, as Jackson states, "a nurse killed 22 patients by intentionally and physically injecting them with a paralytic drug." [Doc. # 43 171 Pg. 5]. At issue in *Atteberry* was not the liability of the nurse. Rather, the Court denied qualified immunity to the supervising Director of Nursing and the Hospital Administrator, both of whom, though never actually laying hands on the patients, were denied qualified immunity. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 250, 257 (5th Cir. 2005). The Court denied qualified immunity to these supervisors because the paralytic drug went missing at the same time patients were dying at an unusually high rate, and the hospital officials' failure to act under such circumstances could amount to deliberate indifference. *Id.* at 256. *See also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450-51 (5th Cir. 1994)(superintendent did not touch a student, but was held responsible for a teacher's conduct towards the student).

Not only does *Atteberry* disprove Defendants' contention that violations of bodily integrity must involve a physical touching with intent to harm in order to be actionable, it also underscores an important principle that favors Plaintiffs. The constitutionally concerning conduct of the nurse was not the unwanted physical contact that occasions an injection. Rather, like here, the concerning conduct was the harmful substance she injected into the patients, a paralytic drug introduced into the body of 22 patients. Similarly, the City of Jackson caused a neurotoxin to enter into the body

61

of Plaintiffs. The physical ingestion of drinking water, standing alone, is not concerning. It is the physical intrusion of the neurotoxin that constitutes a constitutional depravation.

Similarly, the Fifth Circuit and district court bodily integrity cases Plaintiffs cite, *supra*, are not concerned with the actual touching of a plaintiff. The right to refuse artificially delivered food and water is based on informed consent and liberty more than physical touching. *Cruzan*, 497 U.S. at 269. Similarly, the right to deny state-administered antipsychotic drugs was based in part on the fact that it was *unwanted*, not the fact that its administration would require physical touching. *Harper*, 494 U.S. at 221-22. The physical intrusion of a blood sample triggered bodily integrity interests because of privacy, not because of harm or the physical nature of the intrusion. *McNeely*, 569 U.S. at 148. The government efforts to surgically retrieve a bullet from the body of a person for evidentiary purposes triggered bodily integrity concerns based on privacy and informed consent as well, noting that where there is consent, such a surgical operation is not "demeaning or intrusive." *Winston*, 470 U.S. at 764-66. Here, similarly, Jackson residents did not consent to consume an invisible, government-caused neurotoxin in the drinking water, which triggers bodily integrity interests much like those found in *Cruzan*, *Harper*, *Winston*, and *McNeely*.

Moreover, *McNeely* stated that "*any* compelled intrusion into the human body implicated significant, constitutionally protected privacy interest." *Id*. at 159. [Emphasis added]. *McNeely* did not state that any "hands-on" intrusion is actionable. Therefore, there is a gaping leap from the dictates of *Cruzan*, *Harper*, *Winston*, and *McNeely* to Defendants' attempt to limit bodily integrity claims in the Fifth Circuit to "laying hands" sexual abuse in the school setting.

For all Jackson's reliance on inapplicable district court cases in its effort to manufacture a "laying hands" rule, at least one district court recognized that a bodily integrity claim may lie in

the absence of physical contact. For example, in *Petty v. Venus Corr. Unit*, an inmate brought a bodily integrity claim because, he alleged, guards expected him to masturbate in front of them, but his claims failed "due to his *uncoerced consent* to masturbate for the prison officers." *Petty v. Venus Corr. Unit*, No. 3:00-CV-1753-M, 2001 U.S. Dist. LEXIS 27123, at *8 (N.D. Tex. Apr. 10, 2001)(emphasis added). Thus, the Court held, "[t]o state a claim for a violation of his right to bodily integrity, plaintiff must allege some physical contact between himself and the guards *or at least that he was coerced to violate his own bodily integrity*. In the absence of coercion, one's bodily integrity is not violated…." Here, on the other hand, City Defendants violated Plaintiffs' right to bodily integrity without consent and based in part on their misconduct in affirmatively concealing and misleading the public about the lead problem. Thus, Jackson's theories unravel at every turn in light of the cases it cites, binding Supreme Court precedent, and district court cases in the Fifth Circuit.

Notwithstanding these fundamental flaws in Jackson's reasoning, however, it cites another case not unlike the fallen *Grease* prop in *Bickford* by resort to yet another mere negligence case in which a student was killed while driving an ATV owned by a teacher who, with the permission of the school, withdrew students from class to work on his farm as part of their coursework. *Pierce v. Hearne Indep. Sch. Dist.*, 600 F. App'x 194, 196 (5th Cir. 2015). While undersigned counsel is at odds to discern the relevance of this case to the action before this Court, Jackson seems to cite this case to bolster their argument that "laying hands" or "direct physical contact" is some sort of trend in the Fifth Circuit. Like *Bickford*, *Pierce* simply declines to extend an action under Section 1983 to merely negligent conduct in the absence of deliberate indifference.

Significantly, City Defendants fail to appreciate that the introduction of a physical toxin such as lead is in fact a physical intrusion, regardless of whether the physical contact was through hands, a nurse's shot, a police officer's blood draw, a surgeon's knife, or a city's water supply. The glue that binds each of these acts is *state-occasioned damage* in violation of the Fourteenth Amendment. Here, the damage is not only state-occasioned, City Defendants perpetuated this damage by exhibiting conscience shocking deliberate indifference.

At this point in its brief, Jackson cites *Collins* for the contention that Courts should be cautious in expanding due process law by turning a negligence claim into a constitutional matter. *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068 (1992). This point is well-taken but irrelevant because Plaintiffs' allegations do not involve mere negligence. Rather, Plaintiffs' allegations comport with the very mechanism the Supreme Court enunciated to prevent the Constitution from becoming a "font of tort law": the shocks-the-conscience test employing the deliberate indifference standard. *Lewis*, 523 U.S. at 848 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). To the extent that Plaintiffs' allegations against Jackson are novel, they are in that sense not unlike those allegations giving rise to such bodily integrity cases as *Cruzan*, *Harper*, *Winston*, and *McNeely*. The circumstances of those cases were jurisprudentially novel before they were decided. Jackson is unable to assert a legitimate basis for why the liberty interest in bodily integrity should not be recognized in this context. Jackson simply argues that it should not be recognized *now* because it has not arisen *yet*.[29]

---

[29] City Defendants also argue that *Guertin* greatly expanded the law of substantive due process, but in doing so Jackson minimizes the logical conclusions the court gleaned from the likes of *Cruzan*, and *Guertin* speaks for itself on this issue. *Guertin*, 912 F.3d at 934. Furthermore, while Jackson states that the Fifth Circuit has cautioned against expanding due process, the Supreme Court has too. Nonetheless, such caution

Even the most cautious analysis of Plaintiffs' claims results in clear substantive due process violations, and *Collins* simply advised courts that, "It is important, therefore, to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake and what the city allegedly did to deprive [plaintiff] of that right." *Id.* Focusing on Plaintiffs allegations, they allege a clear substantive due process violation through City Defendants' knowing introduction of lead into the city's drinking water, their concealment of same, and their affirmative efforts to downplay the problem under false pretenses.

The substance of *Collins* is illustrative of its concern with expanding negligence claims into constitutional claims. *Collins* involved a claim that a municipal employer violated the decedent's substantive due process rights by failing to provide him, a sanitation professional for the city, with a reasonably safe workplace. *Collins*, 503 U.S. at 125-126. The Court explained why this claim did not rise to the level of a constitutional violation:

> Petitioner does not claim that the city or any of its agents deliberately harmed her husband. In fact, she does not even allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured. Instead, she makes the more general allegation that the city deprived him of life and liberty by failing to provide a reasonably safe work environment.

*Id*. at 125-126.

Unlike the petitioner in *Collins*, Plaintiffs do not merely rely upon a general assertion that Defendants owed them a safe environment. Rather, Plaintiffs do what the petitioner did not do in *Collins* – Plaintiffs allege that Defendants exhibited deliberate indifference, knowingly exposed

---

did not stop the Supreme Court from acknowledging substantive due process to encompass fundamental rights in new circumstances such as in *McNeely*, nor did it stop the Sixth Circuit from doing so in *Guertin*, and nor should it stop this Court from doing so here.

them to a significant risk, then exacerbated that risk by switching 16,000 connections from safe well water to corrosive surface water, concealing this switch, concealing the elevated lead levels, failing to reconnect users to the well system, misleading the public by pronouncing that the water was safe after publishing the lead levels, and failing to ensure adequate corrosion control at the surface water facilities, among other fact-intensive allegations. Thus, the Court's holding in *Collins* that the Due Process Clause "does not guarantee municipal employees a workplace that is free of unreasonable risks of harm," *id*. at 129, bears no relevance to Plaintiffs' claims against these Defendants for violating their rights to bodily integrity.

After *Collins*, Jackson pivots into futile attempts to reframe Plaintiffs' claims as a substantive due process right to a clean environment. Plaintiffs do not allege a violation of a right to a clean environment. Jackson's primary case on this contention is one in which the Fifth Circuit held, "What it all comes down to is that the plaintiffs claim a constitutional right to stop *other individuals* from smoking in the Superdome while a performance is in progress." *Gasper v. La. Stadium & Exposition Dist.*, 577 F.2d 897, 898 (5th Cir. 1978)(emphasis added). This case is irrelevant to the question of a public water system knowingly causing and exacerbating conditions that caused lead to poison Jackson's citizens and then knowingly misleading them about the known presence of lead in the water. Plaintiffs in *Gasper* knew that private individuals were smoking in the Superdome. They were free to leave, or to just not go to the Superdome. Jackson citizens, on the other hand, had no idea they were consuming a dangerous neurotoxin, nor that they were doing so as a result of City Defendants' deliberate indifference.

Tellingly, the individual Defendants concede that *Gasper* is only "*remotely* analogous" to this case. [*J.W.*, Doc. 85, Pg. 13](emphasis added). Not only that, they contend that *Gasper* is

"[t]he *only* remotely analogous case to this one." [*Id.*]. Nonetheless, Defendants forge ahead in their search for a rule that simply does not exist and arrive at another case that is not even remotely analogous to this one – a 1972 district court case in which the plaintiffs tried to sue a <u>private</u> oil refinery company for emitting air pollutants near their residence. The district court correctly dismissed what amounted to a nuisance suit between private parties because there was no state action that would trigger a constitutional analysis under Section 1983. *Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 536-537 (S.D. Tex. 1972). Jackson cites this case in an effort to discourage this Court from "solving problems of environmental control." [3:21-cv-663, Dock. 81, Pg. 6, quoting *Tanner*]. Notably, though, this 1972 decision predates such iconic Supreme Court decisions as *Cruzan*, *Winston*, *McNeely*, and *Harper*, whose contours envelope Plaintiffs' allegations here, even if the allegations also contain an important overlapping degree of environmental concern. This case, furthermore, goes beyond mere "environmental control," as Plaintiffs allege conscience-shocking conduct that caused the ingestion of a dangerous neurotoxin.

Jackson then cites a litany of cases that bear little resemblance, if any, to this case and the constitutional issues presented. *See Lake v. City of Southgate*, No. 16-10251, 2017 WL 767879, (E.D. Mich. Feb. 28, 2017)(landlord tenant dispute with a housing authority over a plumbing issue); *Concerned Citizens of Neb. v. United States* NRC, 970 F.2d 421, 422 (8th Cir. 1992)(non-profit organization seeking to prevent construction of a nuclear waste facility and bringing unrelated constitutional challenges to federal regulations); *MacNamara v. Cty. Council of Sussex Cty.*, 738 F. Supp. 134, 142-143 (D. Del. 1990)(zoning dispute in which no right to bodily integrity was alleged in regard to the approval of an electric substation); *Hagedorn v. Union Carbide Corp.*, 363 F. Supp. 1061, 1064 (N.D.W. Va. 1973)(another unpersuasive district court case predating

67

*Cruzan*, *Winston*, *McNeely*, and *Harper*); *In re City of Detroit*, 841 F.3d 684, 699 (6th Cir. 2016)(bankruptcy court correctly dismissed complaint alleging a "right to water service at a price they can afford to pay.");

Defendants' futile efforts to recharacterize Plaintiffs' claims do not end there. They rely on the First Circuit's holding in *Mattoon v. City of Pittsfield*, 980 F.2d 1 (1st Cir. 1992) to make the misplaced argument that Plaintiffs' claims hinge on a right to safe drinking water. In *Mattoon*, the court upheld the District Court's grant of summary judgment on the grounds that the Safe Water Drinking Act preempted the plaintiffs' claims. *Mattoon*, 980 F.2d at 6. In making this preemption holding, the court did not reject a right to safe public drinking water, it assumed the right for analysis purposes. *Id.* ("even assuming a 'fundamental constitutional right' to safe public drinking water…").[30]

Thus Defendants' efforts to reframe Plaintiffs' right as the right to be free from environmental contaminants misrepresents the claims and misapprehends the case law governing

---

[30] Defendants do not argue that Plaintiffs' claims are preempted in their motion to dismiss. Such a defense would be without merit for the reasons articulated by the Sixth Circuit in a well-reasoned opinion extensively analyzing the issue and concluding that the SDWA does not preclude §1983 claims for violations of public water users' rights to bodily integrity and to be free from state created danger. *See Boler v. Early*, 865 F.3d 391, 401-409 (6th Cir. 2017). As the court pointed out in *Boler*, the First Department's decision in *Mattoon* "predated *Fitzgerald*, where the Supreme Court explained that when reviewing cases in which the § 1983 claim alleges a constitutional violation, the appropriate framework is to seek to infer congressional intent from the text and legislative history of the statute, review the nature and extent of the remedial scheme, and compare the rights and protections of the statute with those found in the Constitution." *Boler*, 865 F.3d at 405–06 (citing *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 252 (2009)). Further, *Mattoon* was recently distinguished even *within* the First Circuit. *See Hootstein v. Amherst-Pelham Reg'l Sch. Comm.*, 361 F. Supp. 3d 94, 107–109 (D. Mass. 2019). *See also Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 257 (5th Cir. 2005)(As part of an analysis denying qualified immunity, the Fifth Circuit stated, "Moreover, the Plaintiffs have alleged that [Defendants] failed to comply with a number of relevant state statutes…. It is enough, at this point, to say that some of these statutes may create non-discretionary duties which would vitiate qualified immunity, and others may create duties with an element of discretion.").

the right to bodily integrity. Plaintiffs do not claim that Defendants had a duty to protect them from mere contaminated water or to guarantee mere environmental control, but rather, that they violated their right to bodily integrity when they made arbitrary, conscience-shocking decisions they knew would cause, contribute to, exacerbate, and/or prolong the physical ingestion of lead-contaminated water, and then affirmatively concealed and misled Jackson's citizens. The right at issue is thus more akin to the right at issue in *Guertin*: "[i]nvoluntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection." *Guertin*, 912 F.3d at 921.

## 2. RIGHT TO BE FREE FROM STATE-CREATED DANGER

Plaintiffs' allege, at minimum, a violation of the right to bodily integrity. Nonetheless, in addition to, or in the alternative, Plaintiffs may proceed under the state-created danger doctrine, as both require the same standard, deliberate indifference, and are based on the same allegations set forth above. *See e.g. McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th Cir. 2002)("Regardless of the theory of liability that a plaintiff is pursuing, in order to state a viable substantive due process claim the plaintiff must demonstrate that the state official acted with culpability beyond mere negligence.").

The Fifth Circuit has oft repeated the requisite showing required to prove a claim under this theory: "In order to recover under the state-created danger theory, we assume that a plaintiff would have to show, at a minimum, that: (1) the state actors created or increased the danger to the plaintiff and (2) the state actors acted with deliberate indifference." *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 313 (5th Cir. 2002). The Fifth Circuit has since reiterated these elements in

reliance on a case in which a college campus bonfire, not a third party, caused injuries. *Doe v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 865 (5th Cir. 2012)(quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536-37 (5th Cir. 2003)).[31] Therefore, while the Fifth Circuit has yet to be presented with a viable state-created danger case, it has nonetheless defined its contours such that third-party crime or violence need not be shown as a pre-requisite. Rather, the analysis is context-specific. Here, Plaintiffs allege that Defendants created, exacerbated, and failed to remedy the danger to Plaintiffs independent of *and* because of the acts of a third party, Trilogy. Thus, the Fifth Circuit should recognize a viable state-created danger claim in this case.

Defendants cite the unpublished case of *Dixon v. Alcorn Cty. Sch. Dist.*, 499 F. App'x 364, 368 (5th Cir. 2012) to contend that the state-created danger claim does not exist without a "known victim." These governmental defendants knew that their conduct would cause harm to any citizen user of the contaminated water that flowed through the City's pipes. Their conduct does not cease to be targeted, nor do the victims cease to be "known victims" simply because the conduct was aimed at thousands of victims. To hold otherwise would allow government officials to escape constitutional liability in the most heinous cases, where they knowingly injure entire communities. *Contra Guertin v. Michigan*, No. 16-cv-12412, 2017 U.S. Dist. LEXIS 85544, at *61-62 (E.D. Mich. June 5, 2017)(dismissing state-created danger claim due to lack of government actor's interaction with plaintiffs, a decision not presented on appeal to the Sixth Circuit). *Guertin*, 912 F.3d at 915.

---

31 While *Scanlan* appears to expressly recognize the state-created danger theory, *Covington* explains how the Fifth Circuit does not recognize it. "Despite the potential confusion created by *Scanlan* and *Breen*, recent decisions have consistently confirmed that the Fifth Circuit has not adopted the 'state-created danger' theory of liability." *Covington Cty. Sch. Dist.*, 675 F.3d at 864-865.

This state-created danger claim is based on the same conduct giving rise to the bodily integrity claim. Suffice it to say, the City Defendants literally created the danger to Plaintiffs by switching well users to surface water, failing to switch to liquid lime, removing funding for corrosion control, and accepting the knowingly deficient recommendations of Trilogy to convert a liquid lime corrosion control system to soda ash. The Defendants, furthermore, increased the danger by failing to disclose it to Plaintiffs, thus prompting ongoing ingestion of this neurotoxin. The elements of a state-created danger claim are met here. In light of the similarity of the factual allegations undergirding both Fourteenth Amendment claims, Plaintiffs proceed now to additional background specific to the claims pending against Jackson.

### 3. MUNICIPAL LIABILITY OF JACKSON

Jackson seeks dismissal of Plaintiffs' federal claims based solely on the contention that bodily integrity and state-created danger claims are not viable in the Fifth Circuit. Jackson adopts the arguments of the individual defendants, who are entitled to raise the defense qualified immunity. As such, the Court may deny the City of Jackson's motion based on these substantive issues alone, as argued above. Respecting an abundance of caution, Plaintiffs nonetheless provide the following background regarding municipal liability claims.

Jackson is a "person" for purposes of Section 1983, and the Fourteenth Amendment claims are viable against it. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 700, 98 S. Ct. 2018, 2040 (1978). Municipalities like Jackson may not assert qualified immunity. *See Brandon v. Holt*, 469 U.S. 464, 468, 105 S. Ct. 873, 876 (1985)(citing *Owen v. City of Independence*, 445 U.S. 622 (1980))("[A] municipality is not entitled to claim the qualified immunity that the city's agents can assert."). As such, its motion to dismiss is not entitled to be decided "at the earliest possible stage" and the

allegations against the City of Jackson are sufficient to deny the motion and to permit discovery to proceed against it forthwith.

Suffice it to say, Plaintiffs have set forth multiple ways, *inter alia*, in which Jackson has exhibited deliberate indifference and committed violations of the Constitution chargeable to the municipality: (1) ignoring rising lead levels, (2) knowing that levels would rise due to inadequate corrosion (pH) control and declining to repair malfunctioning corrosion control equipment, (3) removing corrosion control allocations from the budget, (4) implementing the knowingly dangerous plan to switch well users to surface water without notice to consumers, (5) concealing lead contamination from citizens for seven months, (6) misleading the public into believing the water is safe, (7) prioritizing public perception above the safety of Jackson citizens, (8) failing to immediately reconnect users to the well system, (9) reciprocating a political favor by hiring Trilogy at greater expense than necessary and in lieu of declaring an emergency to trigger federal assistance, (10) firing whistleblowers (Director Bell and Jonathan Yaeger), (11) and implementing the knowingly dangerous plan of Trilogy to switch to soda ash, not liquid lime.

### 4.   QUALIFIED IMMUNITY/INDIVIDUAL DEFENDANTS

The City Defendants are not entitled to qualified immunity. To establish personal liability on the merits of Plaintiffs' claims, "it is enough to show that [Defendants], acting under color of state law, caused the deprivation of a federal right." *Goodman v. Harris Cnty.*, 571 F.3d 388, 394-95 (5th Cir. 2009) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Qualified immunity purports to protect public officials acting within the scope of their official duties from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In order to overcome Defendants' assertion of qualified immunity in this case, "the plaintiff[s] must satisfy a two-prong test." *Melton v. Phillips*, 875 F.3d 256, 257 (5th Cir. 2017)(en banc)(citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011)(en banc)). "First, the plaintiff must show 'that the official violated a statutory or constitutional right.'" *Melton*, 875 F.3d at 257 (quoting *Morgan*, 659 F.3d at 371). "Second, the plaintiff must show that 'the right was 'clearly established' at the time of the challenged conduct.'" *Id.* Though the order in which these prongs are decided are ultimately optional, it is important to resolve the constitutional question first. *See Cole v. Carson*, 935 F.3d 444, 472 (5th Cir. 2019)(Willett, D., dissenting)(encouraging the Supreme Court to "nudge courts to address the threshold constitutional merits rather than leave the law undeveloped.").

### i.    Plaintiffs have alleged a violation of a constitutional right.

The first prong of the qualified immunity analysis asks "whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015). Plaintiffs adopt by reference as if set forth fully herein the foregoing arguments regarding the Fourteenth Amendment and the conduct of each individual City Defendant.

### ii.    The right at issue has at all relevant times been clearly established.

The second prong of the qualified immunity analysis asks whether the constitutional right at issue was clearly established at the time of the challenged conduct. *Melton*, 875 F.3d at 257. The Court has also phrased this prong to ask whether the defendant's conduct was "objectively reasonable in light of clearly established law." *Carroll*, 800 F.3d at 169(quoting *Thompson v. Upshur Cnty., Tex.*, 245 F3d 447, 457 (5th Cir. 2001)). Objective reasonableness is essentially

subsumed within the "clearly established" prong. *See Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012)(internal citations omitted)("If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable."); *Williams v. Kaufman County*, 352 F.3d 994, 1002, n.12 (5th Cir. 2003)("The district court, however, unnecessarily decoupled the clearly established/objective unreasonableness test of the Supreme Court. That is, if a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable.").

Defendants overstate the specificity required by the non-textual "clearly established" prong of qualified immunity. The Supreme Court has held that in determining the level of generality for clearly established law, "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)(granting qualified immunity to officers shooting a suspect engaged in a high-speed chase)(punctuation and citation omitted). *See also Harmon v. City of Arlington*, 16 F.4th 1159, 1166 (5th Cir. 2021)("The specificity requirement assumes special significance in excessive force cases, where officers must make split-second decisions to use force."). *Salazar v. Molina*, 2022 U.S. App. LEXIS 16711, *14-15 (5th Cir. 2022)("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.").

Here, by contrast, Plaintiffs allege a Fourteenth Amendment violation, not a Fourth Amendment violation. By the same token, Plaintiffs allege constitutional violations based on

volitional acts and omissions of multiple high-level officials, all of whom committed such acts and omissions with the benefit of months and years of deliberation, and many of whom have expertise in the area of corrosion control and water systems. Thus, Plaintiffs need not define clearly established law at the granular level that may accompany split-second decisions of a police officer in the Fourth Amendment context.

Moreover, deliberate indifference claims are inherently better qualified for application of a general statement of law. *See Cope v. Cogdill*, 3 F.4th 198, 218 n.6 (U.S. 5th Cir. 2021)(Dennis. J, dissenting)(collecting cases)("Unsurprisingly, then, the Supreme Court has never applied *Mullenix*'s admonition against defining clearly established rights at a high level of generality in reviewing a deliberate indifference claim. And even following *Mullenix*, our sister circuits have recognized that, in the context of a deliberate indifference claim, clearly established rights may be defined generally.").

> In one of the early touchtone cases on qualified immunity, the Court stated:
>
> "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right."

*Anderson v. Creighton*, 483 U.S. 635, 639 (1987). In striking the balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," the *Anderson* Court recognized that while a Fourteenth Amendment Due Process violation may require less specific clearly established law than the Fourth Amendment, a standard more specific than "any action that violates that Clause" must be enunciated. *Id*. Thus, the Court determined the prevailing standard today:

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Id*. at 640.

In *Hope v. Pelzer*, the Court elaborated on this standard by providing that a court may deny qualified immunity to government officials where the constitutional violation is obvious, or where "reasonable warning" may be imparted to government officials by cases with "notable factual distinctions." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)(citing *United States v. Lanier*, 520 U.S. 259, 261 (1997)). The Court reiterated that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)(citing *Lanier*, *supra*, at 261; *Anderson*, *supra*, at 640). As such, *Hope* stood for the proposition that fundamentally or materially similar previous cases are not necessary, and that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[32] *Id*. Thus, the Court cautioned against "the danger of a rigid, overreliance on factual similarity." *Id*. at 742.

As relied upon in *Hope*, Judge Posner has framed the propriety of the obviousness standard in the following way:

---

[32]  Justice Thomas, in dissent, agreed that "Certain actions so obviously run afoul of the law that an assertion of qualified immunity may be overcome even though court decisions have yet to address 'materially similar' conduct." *Hope v. Pelzer*, 536 U.S. 730, 753-754 (2002)(Thomas, J. dissenting)(Citations omitted).

> It begins to seem as if to survive a motion to dismiss a suit on grounds of immunity the plaintiff must be able to point to a previous case that differs only trivially from his case. But this cannot be right. The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.

(*K. H. Through Murphy* v. *Morgan*, 914 F.2d 846, 851 (7th Cir.1990); *Hope*, 536 U.S. at 741; *United States v. Lanier*, 520 U.S. 259, 271 (1997)(quoting *United States v. Lanier*, 73 F.3d 1380, 1410 (6th Cir. 1996)(Daughtery, M., dissenting). *See also Doe v. Taylor Indep. Sch. Dist.*, 975 F.2d 137, 142 (5th Cir. 1992)(quoting Judge Posner's language above in finding a Constitutional proscription against public school teachers sexually molesting school children).

　　*Hope* went yet a step further in relying on an administrative notice to the defendant. "Our conclusion that 'a reasonable person would have known' of the violation is buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of its practices before the incidents in this case took place." (quoting *Harlow*, 457 U.S. at 818). *Hope*, 536 U.S. at 744.

　　Therefore, binding case law, a consensus of persuasive authority, fair warning, obviousness, and even administrative notices (such as from the DOJ) may satisfy the "clearly established" prong of qualified immunity. In this case, Defendants were put on notice of the unconstitutional nature of their conduct by binding case law, fair warning, obviousness, and administrative notices.

　　The Supreme Court has relied on the *Hope* obviousness standard at least twice in overruling the Fifth Circuit for applying too high a level of factual specificity under this prong. *See Taylor v. Riojas*, 141 S. Ct. 52, 54, 208 L. Ed. 2d 164 (2020)(inmate housed in feces-strewn cell for six days defeated qualified immunity); *McCoy v. Alamu*, 141 S. Ct. 1364, 209 L. Ed. 2d 114 (2021)(a prison

guard was denied qualified immunity for pepper spraying an inmate in light of contested facts as to whether the inmate provoked the guard); *McCoy v. Alamu*, 950 F.3d 226, 229 (5th Cir. 2020(vacated and remanded by *McCoy v. Alamu*, 141 S. Ct. 1364 (2021)).

As such, the Fifth Circuit has taken notice of the obviousness standard. *See Villarreal v. City of Laredo*, 17 F.4th 532, 536 (U.S. 5th Cir. 2021)("And as the Supreme Court has repeatedly held, public officials are not entitled to qualified immunity for obvious violations of the Constitution."); *Ramirez v. Guadarrama*, 2 F.4th 506, 517 (5th Cir. 2021)(Willett, D., dissenting)("[*R*]*ecent Supreme Court decisions reinvigorat[ed] the 'obviousness' principle in cases involving clear constitutional abuses.* Twice in recent months, the Court has directed this court to be less reflexive in granting qualified immunity in cases involving, and absolving, egregious behavior.")(emphasis original).

Unlike the Sixth Circuit in *Guertin*, the Fifth Circuit has not yet been presented with a case on all fours with this one. However, this has never been the standard of qualified immunity, and "[t]he lack of a comparable government-created public health disaster precedent does not grant defendants a qualified immunity shield. Rather, it showcases the grievousness of their alleged conduct[.]" *Guertin*, 912 F.3d at 933.

Plaintiffs concede that the *Guertin* decision postdates much of Defendants' unconstitutional conduct. However, *Guertin*'s reasoning is compelling in its finding not only that Supreme Court precedent sufficiently defined the contours of the right long ago such that it applies in the context of this case, but also that this case is an obvious instance of a constitutional violation.

*Guertin* stated:

If an individual has a right to refuse to ingest medication, then surely she has a right to refuse to ingest a life necessity. *Cruzan* instructs as much, recognizing that the

78

> logic of its bodily integrity cases… encompasses an individual's liberty interest to refuse food and water essential to life. And if an individual has a right to refuse the consumption of beneficial water, then certainly any reasonable official would understand that an individual has a right to refuse the consumption of water known to be lead-contaminated, especially when those individuals involved in tainting the water simultaneously vouched for its safety.

*Guertin*, 912 F.3d at 934 (punctuation and citations omitted).

In the context of the "clearly established" prong, *Guertin* emphasized the obviousness of the violation:

> If ever there was an egregious violation of the right to bodily integrity, this is the case; the affront to human dignity in this case is compelling, and the defendants' conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe their conduct is constitutionally permissible under the Due Process Clause."

*Guertin*, 912 F.3d at 935 (punctuation and citations omitted).

Just as *Guertin* relied on logic and obvious inference in finding the law in this context to be clearly established, this logical progression of analysis has also been employed in the Fifth Circuit. Take, for example, Judge Ho's opinion in the First Amendment context. In *Vilarreal*, Judge Ho recites through a plethora of analogies where a reporter was arrested in retaliation for publishing the names of a car crash victim and a suicide victim and calling law enforcement to confirm the identity of these victims. "If freedom of the press guarantees the right to publish information from the government, then it surely guarantees the right to ask the government for that information in the first place." *Villarreal v. City of Laredo*, 17 F.4th 532, 536-540 (5th Cir. 2021). The Supreme Court, albeit not in the context of a "clearly established" analysis, has said that liberty principles "may be inferred from our prior decisions." *Cruzan*, 497 U.S. at 278.

Such obvious logic as employed in *Guertin* and *Villarreal* should be a minimum expectation of high-level officials and officials with apparent expertise in water systems, or else

qualified immunity becomes an insuperable barrier to civil rights claimants and a vehicle to protect even "the plainly incompetent or those that knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)(qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

Furthermore, just as *Hope* considered a DOJ notice to the Defendants in finding the violation was obvious under this prong, a similar notice was provided to Jackson by MSDH in 2013, who tagged Jackson as "high-risk for lead poisoning." Similarly, Director Bell's prophetic warnings and solutions fell on deliberately deaf ears.

City Defendants, evidently content to disregard the foregoing provisions of the "clearly established" prong, cite *Gasper*, the Superdome smoking case, *supra*. Plaintiffs agree with these Defendants that *Gasper* does not help Plaintiffs' argument in this analysis. Nor, however, does it hurt. The reason is that *Gasper* is completely inapposite to Plaintiffs claims here, as discussed, *supra*.

Then City Defendants cite *Bradley v. Puckett*, in which a prisoner's lack of access to bathing water while in confinement rose to the level of cruel and unusual punishment, which entails "restrictions of confinement [that] rise to a level that results in physical torture… pain without penological purpose." *Bradley v. Puckett*, 157 F.3d 1022 (5th Cir. 1998). Defendants maintain that this case is irrelevant because it is an Eighth, not Fourteenth Amendment claim. However, if it is considered "physical torture" to deny a convicted prisoner anything other than toilet water for bathing water, surely it then follows that knowingly introducing a dangerous neurotoxin into *drinking* water without a legitimate government purpose is, at minimum, a violation of free citizens' bodily integrity.

80

On the issue of statutory violations, Defendants cite *Gagne v. Galveston*, 805 F.2d 558, 560 (5th Cir. 1986) under this analysis for the proposition that "[N]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation -- of federal or of state law -- unless that statute or regulation provides the basis for the cause of action sued upon.". [*J.W.* Doc. #85, pg. 14]. This quote appears in the context of whether or not a duty was ministerial or discretionary. The more central tenet from *Gagne* is the same as cited, *supra*, namely that "officials sued for constitutional violations do not lose their qualified immunity *merely* because their conduct violates some statutory or administrative provision." *Id*. at 559 (citing *Davis v. Scherer*, 468 U.S. 183, 194 (1984)(emphasis added).

Here, the individual defendants were aware MSDH had tagged Jackson as "high risk for lead poisoning," in 2011, and then in 2013, former Director Bell warned Jackson Officials and presented a cost-effective plan for preventing lead contaminations. Yet these defendants did nothing but ignore, accelerate, and exacerbate the problem at every turn, resulting in SDWA violations as early as 2015 and continuing until as late as 2021, a decade after MSDH pronounced Jackson to be "high risk." The concealment of lead exceedance levels not only transgresses the Constitution, but it also violated state and federal law of which these Defendants would have known. Miss. Code. § 41-26-13; 40 C.F.R. §141.85(d)(2). These considerations, *inter alia*, are indicia of deliberate indifference that was objectively unreasonable, which further underscore the obviousness of the violation under *Hope*.

Furthermore, while the Court is not at liberty to weigh these individual defendants' credibility at this juncture, the Defendants' misrepresentations urge a finding both of objectively unreasonable deliberate indifference and of obviousness under *Hope*. Thus, whether this Court

employs the obviousness standard, binding Supreme Court precedent, the EPA administrative notice and MSDH Compliance Order the City Defendants received, the many instances of dishonesty exhibited by these Defendants, or a combination of them all, Plaintiffs have satisfied the "clearly established" prong of qualified immunity. Qualified immunity should be denied.

## B.    MISSISSIPPI TORT CLAIMS ACT

### 1.    Plaintiffs' Failure to Provide Pre-Suit Notice is Partial and Should be Deemed to be Moot.

City Defendants do not contest that Plaintiffs provided proper pre-suit notice under the Mississippi Tort Claims Act. Rather, City Defendants raise one common issue under the MTCA in two, but not all of these consolidated cases. In 3:21-CV-663 and 3:21-CV-667, Defendants maintain that Plaintiffs filed suit sooner than 90 days after sending a notice of claim under Miss. Code. Ann. §11-46-11(3)(b). This point is well-taken and conceded. However, Plaintiffs waited the requisite 90 days before filing suit in case number 3:22-CV-171. In light of the consolidation of these cases, the issue should be deemed moot because Plaintiffs complied with the requisite 90-days in 3:22-CV-171.

If the Court deems Plaintiffs claims to be deficient in this regard, the issue may be resolved simply because neither the statute of limitations nor the notice requirement poses a barrier to relief at this juncture. The filing of the Complaint tolled the statute of limitations, and any dismissal based on failure to perfect notice is without prejudice. Therefore, even if the Court were to dismiss the claims, Plaintiffs could still refile these claims or dismiss them against Defendants and refile without sending a second notice letter. Miss. Code §11-46-11(3)(a)-(b). *See also*, *Greenwood Leflore Hosp. v. Watson*, No. 2020-IA-00037-SCT, 2021 WL 4097743, at *4 (Miss. Sept. 9, 2021)(Plaintiff filed initial complaint before the 90-day waiting period expired. Statute of

limitations tolled, complaint was dismissed without prejudice, and second filed complaint was proper based on the initial notice).

### 2. The State Claims Should Proceed Against the Individual Capacity Defendants, Even Though Only One May be Held Liable

The individual City defendants maintain that they cannot be held personally liable because Plaintiffs allege that they acted in the course and scope of their employment. This point is well-taken, but the Court need not dismiss the claim against them in their individual capacity because the complaint may be read to assert both individual and course-and-scope claims against these defendants. In the alternative, Plaintiffs may allege, or discovery may support a finding that these defendants did not act in the course and scope of their employment for purposes of the Mississippi Tort Claims Act, which provides:

> An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties. For the purposes of this chapter an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense.

Miss. Code § 11-46-7(2). This provision first sets forth the prohibition against personal liability for acts an employee committed in the course and scope of her employment. It also makes clear that either the governmental entity or its employee, but not both, may be held liable.

Then, Section 11-46-7(2) defines "course and scope" and makes clear that the employee, not the governmental entity, may be held liable for "conduct constitute[ing] fraud, malice, libel, slander, defamation, or any criminal offense." *Id*. Plaintiffs' allege acts of affirmative concealment against Defendants Yarber, Powell, Miller, Smash, and Lumumba. Plaintiffs also allege that

83

Defendants Yarber, Powell, engaged in affirmative misrepresentations to the public and engaged in unethical conduct in awarding a costly corrosion control study contract to Trilogy, a political ally of Defendant Yarber.

As such, Plaintiffs allegations at this juncture as well as evidence to be discerned through discovery may establish that these individuals committed some degree of fraud, malice, or a criminal offense. For example, with regard to Defendants Powell and Yarber's reasonably-inferred reciprocal political arrangement with Trilogy, their conduct may rise to the level of a crime. *See* §97-11-53("No public official shall directly or indirectly... receive, offer to receive or agree to receive any gift...or promise of any money, property or other tangible or intangible thing of value as an inducement or incentive for (a) the awarding or refusal to award a contract...."). Another potential crime triggered by the conduct of all individual City Defendants is their failure to perform their duties in ensuring compliance with the SDWA, providing corrosion control, and providing for the safety of Jackson citizens. *See* § 97-11-37("If any... mayor... or any other officer of any city... shall knowingly or wilfully fail, neglect, or refuse to perform any of the duties required of him by law... or shall violate his duty in any respect, he shall, on conviction thereof, be fined... or be imprisoned....").

Therefore, Plaintiffs' claims against *both* the individuals and the City should proceed as alternative forms of relief at this early juncture, even though only one may ultimately be deemed liable. Plaintiffs' complaint may be read to assert claims against these individuals in both their individual capacities as well as within the course and scope of employment, which is a permissible form of pleading. *See Ellis v. Lowndes Cty.*, No. 1:16-CV-177-DMB-DAS, 2017 U.S. Dist. LEXIS 200717, at *19 (N.D. Miss. Dec. 6, 2017)("In this case, [plaintiff] has pleaded in the alternative,

as is his right, that, in obtaining the arrest warrant, [defendant] acted both within and outside the course and scope of his duties.")(applying MTCA and citing Fed. R. Civ. P. 8(d)(2)).

In this action, Plaintiffs state the defendant "is sued in his [or her] individual capacity…." [[*J.W.* Doc. 51 ¶62-66; *P.R.* Doc. 41 ¶67-71; *C.A.* Doc. 1 ¶68-72]. Two principles contained in Rule 8 afford the Court bases for denying the individual Defendants' efforts to dismiss these claims. First, Rule 8 provides, "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Rule 8 also dictates that "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). As such, justice dictates that the claims be permitted to proceed in the interest not only of justice, but also of judicial economy. For example, the Court may read the Complaint to assert inconsistent theories of relief, namely state claims against individuals both within and without the course and scope of their employment. On the other hand, should the Court read Plaintiffs' Complaint to allege representative capacity claims only, then Plaintiffs may refile them and file a motion to amend to clarify the alternative capacities in which these defendants are sued, which may delay this action.

## V. CONCLUSION

In light of the foregoing, the City of Jackson and its officials knowingly and arbitrarily caused lead to poison unsuspecting citizens of Jackson through the public water system, often employing misleading pretenses in hiding the nature of these physical bodily intrusions. The motions should be denied.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the motions to dismiss be denied. To the extent the Court deems dismissal of any party to be due, Plaintiffs request that dismissal be without prejudice and that Plaintiffs be afforded an opportunity

to amend their complaint. Plaintiffs request an opportunity to conduct discovery against the City of Jackson and Trilogy. Plaintiffs also request an opportunity to conduct discovery against Defendants Yarber and Powell if the Court does not disregard the matters they raise beyond the pleadings. Plaintiffs request such other general or specific relief to which they may be entitled in the premises.

It is respectfully submitted, this the 22nd day of August, 2022.

*Corey Stern*

*Jacob B. Jordan*
Corey Stern, *Pro Hac* 49568
John Guinan, *Pro Hac*
Kimberly Russell, *Pro Hac*
Jacob B. Jordan, MSB #104230
LEVY KONIGSBERG, LLP
605 3rd Avenue, 33rd Floor
New York, New York 10158
(212) 605-6288
jjordan@levylaw.com

/s/ *Rogen K. Chhabra*
Rogen K. Chhabra, MSB #99131
CHHABRA & GIBBS, PA
120 North Congress Street, Suite 200
Jackson, Mississippi 39201
(601) 948-8005
Email: rchhabra@cglawms.com

## CERTIFICATE OF SERVICE

I, Jacob B. Jordan, hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

It is so certified, this the 22nd day of August, 2022.

*Jacob B. Jordan*
Jacob B. Jordan, MSB #104230