```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                        NORTHERN DIVISION

 3

 4   J.W., A MINOR, BY AND THROUGH AMANDA WILLIAMS
     AS GUARDIAN AND NEXT FRIEND, ET AL.          PLAINTIFFS
 5
     VERSUS              CIVIL ACTION NOS. 3:21-cv-00667-CWR-LGI
 6                                         3:22-cv-00171-CWR-LGI
                        Related Cases: 3:23-cv-00243-CWR-LGI
 7                                      3:21-cv-00667-CWR-LGI
                                        3:23-cv-00246-CWR-LGI
 8                                      3:22-cv-00171-CWR-LGI
                                        3:23-cv-00250-CWR-LGI
 9                                      3:23-cv-00478-CWR-LGI

10   THE CITY OF JACKSON, MISSISSIPPI, ET AL.      DEFENDANTS

11

12                     MOTIONS PROCEEDINGS
              BEFORE THE HONORABLE CARLTON W. REEVES,
13              UNITED STATES DISTRICT COURT JUDGE,
                        MARCH 2, 2023,
14                    JACKSON, MISSISSIPPI

15

16

17                 (APPEARANCES NOTED HEREIN.)

18

19

20

21

22   REPORTED BY:

23       CANDICE S. CRANE, RPR, RCR, CCR #1781
         OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

1   **A P P E A R A N C E S :**

2   FOR THE PLAINTIFFS:   COREY M. STERN, ESQ.
                          ROGEN K. CHHABRA, ESQ.
3                         DARRYL M. GIBBS, ESQ.

4   FOR DEFENDANT CITY OF JACKSON:
                          CATORIA PARKER MARTIN, ESQ.
5                         CLARENCE WEBSTER, III, ESQ.
                          ADAM STONE, ESQ.
6                         KAYTIE M. PICKETT, ESQ.

7   FOR DEFENDANT MAYOR CHOKWE A. LUMUMBA, JR.,
    AND ROBERT MILLER:   JOHN F. HAWKINS, ESQ.
8
    FOR DEFENDANTS TONY YARBER, KISHIA POWELL,
9   AND JARRIOT SMASH:   TERRIS C. HARRIS, ESQ.

10  FOR DEFENDANTS MSDH AND JIM CRAIG:
                          GERALD L. KUCIA, ESQ.
11                        DOUGLAS T. MIRACLE, ESQ.
                          EDDEREK LINNEL COLE, ESQ.
12                        MEADE W. MITCHELL, ESQ.
                          ORLANDO RICHMOND, SR., ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **TABLE OF CONTENTS**

2     Style and appearances...................................1-2

3     ORAL ARGUMENTS:

4          By Mr. Mitchell....................................  6

5          By Mr. Stern...................................... 68

6          By Mr. Mitchell...................................108

7          By Mr. Webster....................................125

8          By Mr. Stern......................................139

9          By Mr. Webster....................................157

10         By Mr. Hawkins....................................173

11         By Mr. Stern......................................179

12         By Mr. Hawkins....................................183

13         By Mr. Harris.....................................184

14         By Mr. Stern......................................184

15    Certificate of Court Reporter..........................190

16

17

18

19

20

21

22

23

24

25

1                    **IN OPEN COURT, MARCH 2, 2023**

2

3         MS. SUMMERS:  All rise.  Hear ye, hear ye, hear ye,

4    the United States District Court for the Southern District

5    of Mississippi, Northern Division, is now in session.  The

6    Honorable Carlton W. Reeves presiding.  May God save the

7    United States and this Honorable Court.

8         THE COURT:  You may be seated.

9         Good morning.  We're here today in the case of JW, a

10   minor, et al., versus the City of Jackson, et al., Cause

11   Number 3:21-CV-663, and I know there are related cases

12   3:21-CV-667 and 3:21-CV-171.

13        We're here to address the various motions that have

14   been filed by the defendants.  I think every defendant has

15   filed some form of motion, except for Defendant Trilogy, is

16   it?  That's the only -- Trilogy Engineering Services has

17   not filed anything.  I take it, then, everybody says that

18   they need to be let go, and Trilogy carry the water for the

19   rest of this case forever and for all eternity.  That's

20   what y'all want; right?  Yeah.  Okay.

21        All right.  So who do I have for the plaintiffs?

22        MR. CHHABRA:  Rogen Chhabra for the plaintiffs, Your

23   Honor.

24        MR. GIBBS:  Darryl Gibbs for the plaintiffs.

25        MR. STERN:  Corey Stern, Your Honor, it's a pleasure

```
 1   to be before you.

 2         THE COURT:  All right.  Thank you.

 3         Who's for the City of Jackson?

 4         MR. WEBSTER:  Clarence Webster, Your Honor.

 5         THE COURT:  All right.

 6         MR. WEBSTER:  And I have my law partners, Adam Stone

 7   and Kaytie Pickett, in the courtroom as well.

 8         THE COURT:  Okay.  Thank you.

 9         Mayor Chokwe Lumumba, Jr., is his counsel here?

10         MR. HAWKINS:  Yes, Your Honor.

11         THE COURT:  You need to speak into the microphone

12   for the court reporter.

13         MR. HAWKINS:  Yes, Your Honor.  John Hawkins for

14   Mayor Lumumba and Robert Miller.

15         THE COURT:  Okay.  All right.  Who is here for

16   Jarriot Smash?

17         MR. HARRIS:  Your Honor, Terris Harris on behalf of

18   Jarriot Smash, Tony Yarber, and Kishia Powell.

19         THE COURT:  Okay.  Thank you, Mr. Harris.

20         Mississippi Department of Health?

21         MR. MITCHELL:  Meade Mitchell and Orlando Richmond

22   on behalf of the department as well as Mr. Jim Craig.

23         THE COURT:  Okay.  Thank you.

24         MR. MITCHELL:  And also Gerald Kucia here with the

25   Attorney General's Office, my law partner Beau Cole is in
```

```
 1    the audience, and Doug Miracle with the Attorney General's
 2    Office.
 3              THE COURT:  Okay.  All right.
 4         MR. WEBSTER:  And, Judge, just for the record, the
 5    City Attorney for Jackson is here as well.
 6              THE COURT:  All right.  So we'll take up these
 7    motions now.  I'm ready to hear whichever order y'all --
 8    it's a bunch of y'all.
 9         MR. MITCHELL:  Your Honor, my name, again, is Meade
10    Mitchell.  I'm here on behalf of the state Department of
11    Health and Mr. Jim Craig.
12              As the Court mentioned, there are three consolidated
13    cases here: the Williams case, the Reed case, and the Ford
14    case.  There are approximately a thousand plaintiffs in
15    these three cases.  In each of the cases, our clients have
16    filed a 12(b)(6) motion.  The complaints in each of these
17    three cases against our clients and the motions by our
18    clients are virtually identical on all three of the cases,
19    so unless I say otherwise, all the arguments that I make
20    here are going to be about our motions in all three of the
21    cases, which I think is what the Court desires; correct?
22              THE COURT:  That would be great.
23         MR. MITCHELL:  In these cases, Your Honor, the
24    plaintiffs have sued many defendants, and the allegations
25    against each of the defendants are different.  And those
```

 1    distinctions are important in evaluating whether or not the

 2    plaintiffs have set forth a cognizable claim.  Here, though

 3    the department and Mr. Craig disputes the accuracy of the

 4    plaintiffs' claims against them, we recognize for the

 5    purposes of this motion that you've got to look at the

 6    facts as the plaintiffs pled them and accept them as

 7    accurate in determining whether they've stated a cognizable

 8    claim.  But here --

 9        THE REPORTER:  Slow down a bit for me, please.

10        THE COURT:  Yeah, you need to slow down --

11        MR. MITCHELL:  But here --

12        THE COURT:  -- for the court reporter.

13        MR. MITCHELL:  -- the face of the complaint does not

14    state a viable claim against our clients.

15        Now, before I get going, I want to talk a little bit

16    about this.  You know, I know that perhaps Mr. Stern may --

17    may come here and he may talk generally about the state of

18    the City of Jackson's water, but the current -- and the

19    current issues about the City of Jackson's water have been

20    highly publicized.  But this isn't a case against my

21    clients about the current state of Jackson's water system.

22    And while there are allegations against some of the

23    defendants in this case covering many years, this motion is

24    about whether the plaintiffs have pled a cognizable claim

25    against the department and Mr. Craig for actions they

1    allegedly took in 2015 and 2016 only.

2        Though the complaint is long, there are only three

3    factually based allegations against my clients in a very

4    narrow period of time.  Against Mr. Craig they've asserted

5    two 1983 claims.  Each allege a substantive due process

6    violation under the Fourteenth Amendment of the United

7    States Constitution: One is they allege that we violated

8    the right to bodily integrity; and, two, they allege we

9    violated the right to be free from a state-created danger.

10        Also, they've asserted a negligence claim against

11   both Mr. Craig and the department, and those negligence

12   claims are governed under the MTCA.  Two of the three

13   claims relate to the manner of testing for lead and copper

14   in 2015 and the timeliness of the reporting of the findings

15   of those tests in January 2016.  The last relates to the

16   propriety of a boil water instruction Mr. Craig allegedly

17   issued in February of 2016.

18        Now, to provide a basic context for what I'm talking

19   about with these claims, the federal government enacted the

20   Safe Drinking Water Act in 1974, and it's overseen and

21   enforced by the EPA at the national level.  At the

22   Mississippi level, our legislature adopted the Mississippi

23   Safe Drinking Water Act in 1997.  Thereunder, the state

24   assumed the primary enforcement responsibility in

25   Mississippi for the federal Safe Drinking Water Act.  The

1    EPA, of course, still has enforcement authority in the

2    state, but Mississippi -- the Mississippi department

3    assigned the responsibility for primary enforcement was the

4    Department of Health.

5         The federal Safe Drinking Water Act has a rule

6    called "the Lead and Copper Rule."  All water systems in

7    the country are required to comply with this rule, not just

8    Jackson.  As part of the Lead and Copper Rule, samples must

9    be gathered from every water system in the country at

10   certain intervals.

11        At the time of the events at issue in this

12   complaint, Jackson had to gather samples at three-year

13   intervals; that's called triennial testing.  Prior to the

14   events at issue in this complaint, the last triennial

15   testing period had ended on December 31st, 2012.  The

16   testing at issue concerning my clients' concerns the

17   testing for the triennial period that began on January 1st,

18   '23, (sic) and ended on December 31st, 2015.

19        Triennial testing under the Lead and Copper Rule is

20   not a testing of all homes in Jackson.  It is a testing of

21   a sampling of homes.  For the three-year period that ended

22   on December 31st, 2015, it was a testing of 58 homes in

23   Jackson.

24        Under the LCR, water test samples are gathered and

25   tested for lead; then they're ranked from highest

1    concentration of lead to lowest concentration of lead.  The

2    top 10 percent of the samples, the top ten highest, are

3    averaged, and if the average exceeds 15 parts per billion,

4    that is called a Lead and Copper Rule Action Level, and

5    steps are required to be taken by the water system here in

6    Jackson.  In this case, the testing for the three-year

7    period that ended on December 31st, '15, did exceed

8    15 parts per billion, and that was the first time that had

9    occurred in Jackson.

10        With this context, let's look at the factual

11   allegations against Mr. Craig.  Section 6 of the complaint

12   concerns the LCR testing.  Plaintiffs claim that Mr. --

13   that the department, at Mr. Craig's direction, conducted

14   water testing in June using improper test methods.  They

15   specifically claim that Mr. Craig instructed and conducted

16   that the tests be run by gently running water to fill the

17   containers.  So, Your Honor, when they -- when the tests

18   are run, you have to fill a container, and then they send

19   those in for testing.  They claim that that was done gently

20   instead of running it as a normal water would be run, and

21   that we instructed that there be preflushing of the water

22   tips -- taps before the sample was gathered.  Plaintiffs

23   argue this was contrary to EPA guidance and likely lowered

24   the results of the lead detected; that's Count 1.

25        THE COURT:  Okay.  So if that's the case that

1    they're alleging, then that would be unauthorized or that

2    would be something out of bounds of what the EPA would

3    require.  I mean, it's unauthorized, does that sort of lead

4    to it?

5         Because I have to accept -- like you said, I have to

6    accept what they say in the complaint right now as true.

7    So you've described for me how EPA said the tests were

8    supposed to be done, what intervals the tests were supposed

9    to be done, and that they were doing that.  They claim that

10   the testing procedure that the state engaged in was

11   unauthorized.

12        Unauthorized by whom?  I guess the EPA, but it was

13   unauthorized.  So is there a response to that?

14        MR. MITCHELL:  The response to that is they claim it

15   was contrary to EPA guidance, not regulation, not statute.

16   They claim it was contrary to EPA guidance.  And, Judge,

17   the mere fact that -- obviously, you do have to look at the

18   complaint and look at the words as plead, but the words as

19   pled don't state a claim.  It's still not -- it's still not

20   a constitutional right.  It's still not a clearly

21   established constitutional right.  It still doesn't survive

22   the Mississippi Tort Claims Act discretionary immunity

23   test.

24        THE COURT:  Well, we're going to deal with the

25   federal constitutional stuff first, because you

1     mentioned --

2          MR. MITCHELL:  That's right.

3          THE COURT:  -- the other state law claims --

4          MR. MITCHELL:  That's right.

5          THE COURT:  -- second.

6          MR. MITCHELL:  That's right.  So that's the first

7     claim.

8          The second claim is they claim we provided -- that

9     Mr. Craig provided notification of the results of that

10    testing to Jackson in an untimely manner.  In particular,

11    they claim that Mr. Craig did not provide the results to

12    Jackson until January of 2016 for the triennial testing

13    period, even though the water testing occurred in late

14    2015.

15         The last allegation against my clients is that they

16    claim in February of 2016, Mr. Craig warned that small

17    children and pregnant mothers shouldn't consume the water

18    for six months without boiling it.  They claim that this

19    was dangerously ignorant, because boiling water causes

20    higher lead levels in the water.

21         So that's it; those are the factual claims against

22    my clients.  They may argue they've pled more, they

23    haven't.  There's --

24         THE COURT:  Well, let's assume that is what they've

25    pled, exactly what you said that the test the state used is

1    unauthorized; that information taken from those

2    unauthorized tests yielded unreliable information; that

3    that information -- and then they relied on that unreliable

4    information and forwarded that information in an untimely

5    manner to the state -- excuse me, to the City of Jackson.

6    And then because it was unreliable and the type of

7    information that they did give to the City of Jackson

8    saying boil your water, the fact that you told them to boil

9    the water lead to more problems, because it increased the

10   level of lead in whatever pot you were boiling the water

11   in.

12        So assuming that those are the claims and assuming

13   that each of those things can be proven, then the next step

14   is what, Mr. Mitchell?

15        MR. MITCHELL:  To address whether we're entitled to

16   qualified immunity concerning those claims.  And we contend

17   that we are, and I'll explain why.  Because they have to

18   establish that they can survive -- once we raise it, it's

19   their burden to refute any qualified immunity assertion of

20   Mr. Craig --

21        THE COURT:  Are you conceding that there's a

22   constitutional violation on the front end?

23        MR. MITCHELL:  Absolutely not.

24        THE COURT:  Okay.

25        MR. MITCHELL:  They have to show that there's a

1    constitution of a -- that there's a violation of a

2    constitutional right, and then they have to show it was a

3    violation of a clearly established constitutional right,

4    and then they have to show that the alleged misconduct was

5    objectively unreasonable in light of that clearly

6    established constitutional right, and they fail at every

7    level.

8         Qualified immunity has to be resolved at the

9    earliest phase of the litigation.  It has to be based upon

10   an examination of the pleadings.  Generalities in the

11   pleadings don't do it.  There have to be specific factual

12   allegations that must be evaluated to determine whether

13   we're entitled to qualified immunity.

14        THE COURT:  Well, let me ask you about that.  I'm

15   going back to the core premise of what I just said, would

16   that create -- I mean, is that particular enough that the

17   state was obligated to do tests?  I think you'll concede

18   that the state -- you said EPA guidance said the state had

19   to do tests.  They might have done them on a triennial

20   basis or some other.

21        Is the state required to test the water?

22        MR. MITCHELL:  No.  We're not required to test the

23   water.

24        THE COURT:  Did the state --

25        MR. MITCHELL:  I didn't say that.

1          THE COURT:  Okay.

2          MR. MITCHELL:  I did not -- I did not say that.

3          THE COURT:  Okay.  The state is not required to test

4   the water?

5          MR. MITCHELL:  The state is not required to test the

6   water.  They have a lab where there's water testing done.

7          THE COURT:  Okay.  So the state is not required to

8   test the water?

9          MR. MITCHELL:  They're not required to, but they do

10  for multiple cities in the -- around the state.

11         THE COURT:  Okay.

12         MR. MITCHELL:  And the allegations here obviously

13  that have to be accepted is that we did, so I'm accepting

14  them.  So I'm -- I'm arguing the face of the pleadings,

15  Your Honor, right.

16         THE COURT:  Okay.  But I'm asking this specific

17  question:  Is the state required to test water?

18         MR. MITCHELL:  It's not required to, no.

19         THE COURT:  Okay.  All right.  So if it's not

20  required to test water, it doesn't matter what type of

21  techniques they used to test the water then, I presume

22  would be the state's argument; right?

23         MR. MITCHELL:  That's not the argument that I'm

24  making, Your Honor.

25         THE COURT:  Oh, okay.

1      MR. MITCHELL:  I'm -- I'm simply arguing that on the

2  face of the pleadings, they haven't stated a claim that

3  would survive qualified immunity.  I think what you were

4  asking is a pretty detailed factual question, which I'm

5  really not prepared to address here in this motion

6  argument.  I'm prepared to address whether or not they've

7  stated a claim based on the face of the pleadings, and I

8  don't believe they have.  Of course, I don't believe they

9  can satisfy their burden --

10     THE COURT:  They said the state has used

11  unauthorized techniques.  I think that's in the complaint,

12  or maybe I'm adding words to it.

13     MR. MITCHELL:  It has to be a -- Judge, it's not --

14  the allegation that we violated a guidance in the EPA or

15  the allegation that we -- we -- even that we violated some

16  sort of EPA standing rule doesn't mean that they've

17  established a clear constitutional right.  It has to be a

18  constitutional right.

19     You know, a constitutional right is far different

20  than violating guidance, and that's where they really fail

21  here.  This is not a constitutional claim that they've

22  asserted, and that's why they're not going to be able to

23  survive.  Its -- you know, they've pled a state-created

24  danger claim.  The Fifth Circuit has never, never

25  recognized a state-created danger claim.  They've rejected

1    it over and over and over again:  The *Chavis* decision in

2    2015, the *Cancino* decision in 2019, the *Robinson* decision

3    in 2020.  It's been rejected over and over again, and that

4    really should end the inquiry on their state-created

5    danger, substantive due process claim.

6        Also, Your Honor, since it's never been recognized,

7    even if the Court were to recognize it now, it could not be

8    said to have been clearly established at the time of

9    Mr. Craig's alleged acts in 2015 and 2016.  And in fact,

10   the *Chavis* decision in 2015 has a summary statement that

11   says that.

12       The other claim that they assert, Your Honor, is a

13   due --

14       THE COURT:  What was the purpose of the state

15   providing the boil water notices to the people in the City

16   of Jackson?  Why did the state do that?

17       MR. MITCHELL:  Your Honor, I'm not sure they did.

18   They -- there's one sentence in the complaint that says

19   that Mr. Craig advised women and children to boil the water

20   for six months.  You're asking me about the factual

21   accuracy of it; I don't know.  I'm only looking at the

22   words of the complaint.  That's the one sentence in the

23   complaint that says anything about that; that's all I know.

24       So in terms of the bodily integrity claim, their

25   claim is that we violated the right to bodily integrity

1  under the Fourteenth Amendment, and so it's those three

2  actions --

3      THE COURT:  I'm going to go back to my previous

4  question first.  I'm going to allow you to make your

5  argument.

6      MR. MITCHELL:  Yes, sir.

7      THE COURT:  We're going to do that.  We've got

8  plenty of time for all y'all.

9      MR. MITCHELL:  Sure.  Sure.

10      THE COURT:  But these are very important issues to

11  the Court.

12      MR. MITCHELL:  I understand.

13      THE COURT:  So if you -- if you issue the boil water

14  notices -- maybe the plaintiff will tell me -- but what is

15  the purpose of issuing the boil water notice?

16      MR. MITCHELL:  Judge, it doesn't say that we issued

17  a boil water notice.  It just -- the words of the complaint

18  are Mr. Craig, in February of 2016, advised that women

19  (sic) and pregnant women should boil water for the next six

20  months.  It doesn't say how it was issued or anything about

21  it.  I don't know what they're talking about.  But I have

22  to accept it as true for the purposes of this argument.

23  Okay?  So I am, but it still doesn't state a claim.

24      THE COURT:  Okay.  I mean, generally, people warn

25  people of something, so that they can be informed of

1    something.

2         MR. MITCHELL:  Yeah, sure.

3         THE COURT:  I mean, wear your seatbelt --

4         MR. MITCHELL:  Sure.

5         THE COURT:  -- because not wearing your seatbelt

6    might get you hurt, so what would be the purpose of

7    telling -- if all that is said is that the women and

8    children were told not to drink the water, does the

9    complaint say enough?  Should they have to say more?

10         MR. MITCHELL:  Yes.

11         THE COURT:  Okay.

12         MR. MITCHELL:  All they say is this was -- what they

13    said is that telling people to do that was grossly ignorant

14    or dangerously ignorant, because they say when you boil the

15    water, it actually increases the lead because you're

16    boiling off the water and that increases the lead content.

17         That's all they say.  They had to have said more.

18    You know, gross negligence and -- is not enough to defeat

19    qualified immunity.  Those claims simply can't survive.

20         So we were talking about the right to bodily

21    integrity claim.  So the key issue is there's no

22    constitutional right that they've asserted as to any of

23    these three allegations.  To state a cognizable claim that

24    survives qualified immunity, they have to find a recognized

25    liberty interest within the purview of the Fourteenth

1    Amendment of the Constitution.  It's not enough to allege

2    misconduct.  The misconduct must violate a constitutional

3    right.  It's a --

4          THE COURT:  So there let me -- let's go to that

5    point.  Their position -- I think their position is it

6    violated their right to bodily integrity, that's the

7    constitutional claim they're asserting.  Can we agree on

8    that point?

9          MR. MITCHELL:  We can agree, Your Honor, that the

10   Supreme Court has recognized that a bodily integrity right

11   exists under the Fourteenth Amendment of the U.S.

12   Constitution.  But not as to these facts, we can't.

13         THE COURT:  Okay.  But that's the claim they're

14   trying to travel under.

15         MR. MITCHELL:  That is the claim they're trying to

16   travel under.

17         THE COURT:  Okay.  All right.

18         MR. MITCHELL:  And state-created danger, which the

19   Fifth Circuit has rejected.

20         THE COURT:  Okay.  You can take them in whichever

21   order you want to take them in.

22         MR. MITCHELL:  Yeah.  I'd already addressed

23   state-created danger, which I think should be rejected

24   because the Fifth Circuit's rejected it.  So I'm going to

25   concentrate now on bodily integrity, if that's okay with

 1    the Court?

 2         THE COURT:  That's fine.

 3         MR. MITCHELL:  All right.  So for them to establish

 4    a constitutional right exists, the Supreme Court has held

 5    that the due process right must be so deeply rooted in this

 6    nation's history and tradition and implicit in the concept

 7    of ordered liberty that neither liberty nor justice would

 8    exist if it were sacrificed.  And that's out of the

 9    *Washington* case, a Supreme Court case in 1997.

10         Bodily integrity is a generally accepted

11    constitutional right, as this Court just mentioned, but

12    that's not the question.  The question is whether an

13    intrusion on the bodily integrity constitutional right is

14    recognized in the circumstances alleged as to Mr. Craig.

15    In evaluating these questions, the Supreme Court has said

16    that they're always reluctant to expand the scope of

17    substantive due process because guideposts for responsible

18    decision-making are scarce in this area; and that's the

19    *Collins* Supreme Court case in 1992.

20         And the Supreme Court also stated the court must

21    exercise "judicial self-restraint" and "exercise the utmost

22    care whenever asked to break new ground in this field."

23    That's again the *Collins* case.

24         Here, the plaintiffs are asserting a violation of an

25    alleged constitutional right to safe drinking water.

1    That's not how they describe their bodily integrity claim,

2    but I believe that is exactly what they've pled.  There is

3    no clearly established constitutional right to safe

4    drinking water protected in the United States Constitution.

5    There's an entire statutory and regulatory framework on the

6    federal and national level on safe drinking water.

7         But plaintiffs' assertion as to this Section 1983

8    claim is that there exists a constitutional right under the

9    Fourteenth Amendment, and that right does not exist.  It's

10   not a liberty interest that's deeply rooted in this

11   nation's history and tradition.  It's not a right implicit

12   in the concept of ordered liberty.  The conceptual premise

13   that the framers of the constitution in 1789 considered

14   safe drinking water a protected constitutional right isn't

15   logical.

16        THE COURT:  Should we look at what the framers did

17   for the Fourteenth Amendment, though, and not go back to

18   1789?  Because the Thirteenth, Fourteenth, and Fifteenth

19   Amendment might have tried to fix what was left out by the

20   guys who did 1789.  You're talking about bodily integrity

21   from the Fourteenth Amendment?

22        MR. MITCHELL:  That's right, Your Honor.

23        THE COURT:  So why go back to 1789 for example?  Why

24   not look at what was the premise under the Fourteenth

25   Amendment?

1        MR. MITCHELL:  You know, Your Honor, you're --

2   that's -- you make a good point.  Maybe you should look at

3   it at the time the Fourteenth Amendment was adopted, but

4   that was also before disinfection of public water systems

5   had even begun in the United States.  Again, the premise

6   that this was a constitutionally protected right at those

7   early dates was simply --

8        THE COURT:  But the Fourteenth Amendment was done to

9   give bodily integrity, to give some indicia of personhood

10  to the formerly enslaved individual.  They were now

11  persons, so they had something to protect in themselves.

12  They had a right now to their own bodies, did they not,

13  through the Fourteenth Amendment that did not even exist

14  for them in 1789?

15       MR. MITCHELL:  You're talking about the freed

16  slaves?  Yes, Your Honor.

17       THE COURT:  Right.  Right.  So bodily integrity,

18  what does that mean under the Fourteenth Amendment versus

19  what it might have meant under the amendments in 1789, or

20  what it might mean today?

21       MR. MITCHELL:  Your Honor, the cases that I've

22  examined say over and over and over again that if ground

23  has not been broken in these areas, that the Court should

24  be extremely reluctant to break new constitutional ground

25  for fear that the floodgates of litigation would open

1  because there aren't guideposts that guide things.  I
2  believe this, recognizing a constitutional right to
3  contaminant-free water, would be a textbook example of an
4  improper expansion of the U.S. Constitution, and I believe
5  that the *Collins* case, a U.S. Supreme Court case, the *Reno*
6  Supreme Court case, and even the *Gonzalez* Fifth Circuit
7  case support that.
8        The plaintiffs here, Your Honor, I will say this,
9  they claim they're not even making -- that their bodily
10  integrity claim isn't the right to safe drinking water.
11  I think they do that, because they understand that such a
12  claim can't proceed under the laws that I've seen.  But
13  they are making that claim, because what they alleged is
14  Mr. Craig -- first, they didn't allege Mr. Craig introduced
15  lead into anybody's body; he didn't.  Their allegations are
16  that he should have -- that he failed to test properly,
17  that he failed to warn timely, and that he failed to issue
18  a proper boil water notice.
19        Those are allegations about failing to protect
20  plaintiffs from contaminated water.  But if the U.S.
21  Constitution doesn't guarantee a constitutional right to
22  clean drinking water, how can it guarantee the right not to
23  be exposed to contaminated drinking water?  We submit that
24  it does not, and that their 1983 claims should be
25  dismissed.

1          Moreover, Your Honor, in addition to it not being a

2    constitutional right that is recognized, it certainly was

3    not a clearly established right in 2015 and 2016 when the

4    alleged actions occurred.  To establish and defeat

5    qualified immunity, the plaintiffs have to set forth highly

6    specific case law that would put an official on notice that

7    his conduct was unconstitutional, and the Fifth Circuit has

8    said that in many, many cases.  The precedent at the time

9    of the alleged conduct here, 2015, 2016, must have placed a

10   constitutional question beyond debate.  Abstract general

11   statements of legal principles without near analogous facts

12   are not enough; that's the *Vincent* case in 2015.  To be a

13   clearly established constitutional right, the contours of

14   the law must be so clear that every reasonable official

15   would have understood he was violating the constitution.

16        The plaintiffs do not cite a U.S. Supreme Court case

17   or a Fifth Circuit case that has ever held that the

18   Fourteenth Amendment right to bodily integrity includes a

19   constitutional right to contaminant-free water.

20        Now, it's not our burden to show the absence of a

21   constitutional right.  It's their burden to show that it

22   does not exist.  It's not our burden to show the absence of

23   it, but I will tell you this, Your Honor, there are courts

24   that have said it doesn't exist.  There's a case called

25   *Colshaw* out of California, and it said that the right to

1    bodily integrity is not coextensive with the right to be

2    free of an allegedly contaminated substance in public

3    drinking water.  It stated that the constitution does not

4    guarantee the right to contaminant-free water.

5         And there's several other cases that suggest that

6    there is not a constitutional right to be free from

7    pollutants generally.  There's a case called *Concerned*

8    *Citizens of Nebraska* out of the Eighth Circuit that says

9    there's no right to be free of nonnaturally occurring

10   radiation.

11        There's a case called *Lake* out of the Southern

12   District of Michigan in 2017 stating that whenever federal

13   courts were asked to determine if there's a fundamental

14   right to freedom from contaminental (sic) harm --

15   contaminants, harmful contaminants, they've rejected it.

16        There's a case called *Hagedorn* out of Virginia where

17   claims of exposure to pollutants from a plant were not

18   protected.  The court said that there's no right to be

19   protected from environmental degradation.

20        There's a case called *In Re: Detroit* out of the

21   Sixth Circuit that says there's no fundamental right to

22   water service.  Even the *Guertin* case, which is the case

23   out of the Sixth Circuit that you see cited by the

24   plaintiffs in their brief a lot, that they rely heavily

25   upon, states there's no fundamental constitutional right to

1    water service or to a contaminant-free environment.

2        There can be little question that plaintiffs are

3    attempting to create a new constitutional claim, and the

4    novelty of the claim is enough to doubt it and to deny it.

5    If there's no precedent that puts the claim beyond debate,

6    then the law affords qualified immunity.

7        Now, to be clear, the court -- the plaintiffs are

8    arguing that that's really not what they're claiming but

9    they -- if that's not what they're claiming, they are

10   arguing that the body integrity rights should be greatly

11   expanded.  They're trying to argue that the bodily

12   integrity rights should be expanded to cover the

13   allegations against Mr. Craig, but they don't cite any

14   Fifth Circuit case recognizing such a claim based on the

15   facts alleged against Mr. Craig.

16       In fact, Judge, courts in the Fifth Circuit have

17   traditionally recognized invasion of the constitutional

18   right to bodily integrity only where there's direct

19   physical conduct -- contact by the defendant with the

20   plaintiff or in extreme examples where the defendant

21   coerced a plaintiff into physical action.  There's no

22   physical contact or coercion alleged against Mr. Craig.

23       The plaintiffs don't cite any case other than

24   *Guertin* that's remotely like the claims against Mr. Craig,

25   but the *Guertin* case falls short of the highly specific

1  case law that is required to establish a clearly

2  established constitutional right.

3        Moreover, and critical to this case, *Guertin*'s a

4  2019 decision.  It postdated Mr. Craig's acts by years.  It

5  could not have put Mr. Craig on notice in June of '15 and

6  February of '16 that his alleged decisions were clearly

7  unconstitutional.

8        You know, Your Honor, what the plaintiffs argue,

9  what it boils down to is they argue that Mr. Craig's

10  conduct was so egregious that it ought to be recognized as

11  a violation of the right to body integrity.  But no case

12  suggests using an incorrect water test method, providing

13  late notice, or providing an ill-advised boil water notice

14  is a clearly established constitutional violation.

15        Also, Your Honor, they can't satisfy their burden of

16  showing that Mr. Craig's conduct was objectively

17  unreasonable in light of clearly established law.  The

18  objectively unreasonable standard requires us to look at

19  case law on deliberate indifference.  The law on whether a

20  defendant's alleged conduct is deliberately indifferent is

21  examined to determine whether their conduct is objectively

22  unreasonable.

23        I will say this, Your Honor, many cases in this

24  circuit address this as kind of part and parcel of

25  determining whether there's a clearly established

1    constitutional right, but regardless, the Court must

2    address whether the allegations as pled state a claim

3    against Mr. Craig that he acted with deliberate

4    indifference to a clearly established constitutional right.

5    The law has to be particularized to the facts of a case.

6    It must show the conduct is unconstitutional beyond debate.

7         For deliberate indifference, a defendant has to

8    subjectively know and then consciously disregard an

9    excessive risk to the plaintiffs' health.

10        THE COURT:  Just make sure you slow down a bit when

11   you're reading.

12        MR. MITCHELL:  I'm sorry; I do have a tendency to

13   move fast.  I apologize.

14        A state actor must also have actual knowledge of an

15   excessive risk.  That's a high standard.  It's a lot more

16   than negligence.  It's more than gross negligence.  They

17   must have a purpose to cause harm; that's deliberate

18   indifference.  So the question here is does the case law

19   support finding that the acts committed by Mr. Craig were

20   deliberately indifferent?  It doesn't.

21        Let's look at the boil water notice.  Only two

22   sentences of the complaint relate to this.  Plaintiffs

23   allege that Mr. Craig in February warned small children and

24   pregnant mothers not to consume the water for six months

25   without boiling.  They say that's dangerously ignorant, but

1    they cite no cases suggesting that issuing an ill-advised

2    boil water notice would be deliberately indifferent to a

3    clearly established constitutional right.  They cite no

4    cases suggesting that every reasonable official should have

5    known that if his boil water notice was incorrect, he was

6    impinging on a protected constitutional right.

7         THE COURT:  So all they have to do is, what, to

8    allege that particular claim?

9         I mean, what we're here on is a 12(b)(6), so if they

10   allege that claim like you say it should be alleged, does

11   that get them across to the next step?  If they say every

12   reasonable official would know that issuing a boil water

13   notice telling parents, telling mothers of small children,

14   for six months, do not drink the water without boiling

15   notice, every reasonable official who knows that the water

16   has lead contaminants in it, then go and issue that notice,

17   then that reasonable official is acting unreasonable, and

18   therefore is in violation of whatever.

19        I mean, because I think what you've just said is

20   that's not in there.  And if they were to put that in

21   there, does that get them closer to where they need to go?

22        MR. MITCHELL:  Absolutely not.

23        THE COURT:  Okay.

24        MR. MITCHELL:  Absolutely not.  The words are just

25   words.  The Court looks at the facts that are alleged in

1    the complaint to determine whether or not clearly

2    established case law suggests that factual pattern violates

3    clearly established constitutional law.  They can put all

4    those words in that they want.  This fact pattern is not

5    going to violate clearly established constitutional law,

6    and it should fail.  Mr. Craig is entitled to qualified

7    immunity on the boil water issue.

8         The second issue is the water test methods.  Again,

9    that's the one where they claim that we used water testing

10   techniques that were wrong; that we gently ran the water

11   instead of running -- instructing them to run it normally,

12   and that we ran the water or flushed the pipes instead of

13   not running the water and flushing the pipes before the

14   testing began.  To be clear, they don't refer to a statute

15   or a regulation of the EPA that mandates that testing occur

16   in the manner that they allege.  Rather --

17        THE COURT:  But even if they did, you, I think

18   earlier -- please correct me if I'm wrong.  Even if they

19   did, you would say that EPA stuff would be guidance.

20        MR. MITCHELL:  Well, no, the EPA does have

21   regulations, Your Honor.

22        THE COURT:  Okay.

23        MR. MITCHELL:  They do have regulations.  They just

24   don't cite any regulations.  They cite to a guidance

25   document.

1          THE COURT:  Okay.  All right.

2          MR. MITCHELL:  What they refer to is a letter

3     written by the EPA.  It's attached as Exhibit 3 to the

4     complaint.  It's a letter by an EPA Director named Ralph

5     Scott to another director for a group called "The Alliance

6     of Healthy Homes."  It's a letter that was addressing

7     questions that had been raised about the DC water system.

8     That's what they claim Mr. Craig wasn't following in 2015

9     and 2016, a letter from the EPA to another water system,

10    and here's what it --

11         THE COURT:  And what's the date of that letter?

12         MR. MITCHELL:  The date, it was in 2008.  I don't

13    remember the exact date, but it was a 2008 letter.

14         And the funny thing is, Judge, I want you to -- I

15    won't read it all, but I would encourage you to look at the

16    letter and -- and because that letter is a part of this

17    complaint.  And here's what the letter says, we -- and this

18    is a quote from the letter:  "We believe that homeowners

19    collecting samples should use their water as they normally

20    would."

21         Let me back up.  The letter here was asking about

22    some of the test methods that Washington DC was doing for

23    collecting Lead and Copper Rules, and so they were asking

24    the EPA for information about whether some of these tests

25    were done right.  And the EPA responded to this group and

1   said the purpose of the monitoring protocol is to determine

2   if corrosion control is effective in reducing lead and

3   copper leaching at times and locations where we would

4   expect the levels to be greatest under normal conditions.

5       The next sentence is, "We believe that homeowners

6   collecting samples should use their water as they normally

7   would." Okay. That's one of the key sentences they rely

8   on.

9       And then the next paragraph says, "We do not

10  understand why Washington believes that it would be

11  necessary to request flushing only in households

12  participating in the sampling. While this may fall within

13  a strict legal interpretation of the regulations, we

14  believe it goes against the intent of the monitoring

15  protocol, since it changes the normal water use. We will

16  discuss this matter with the water quality manager at that

17  Washington facility to determine if there's a rationale

18  that we should consider as we evaluate this issue."

19      Now, it doesn't -- this letter doesn't say anything

20  about running water gently being incorrect. It just says

21  run the water as you normally would. It doesn't say that

22  flushing pipes violates the EPA regulations. In fact, it

23  says that doing so falls within the strict legal

24  interpretations of the EPA regulations, but that they think

25  it goes against the intent of them. But then it has an

 1  important "but."  It says, "but we'll speak to the water

 2  supplier and evaluate it further."

 3       Running water gently or flushing the pipes doesn't

 4  violate the express terms of this letter.  There's

 5  certainly no reasonable argument that gently running water

 6  or flushing pipes evidences deliberate indifference to a

 7  clearly established constitutional right based on this

 8  letter, and there are no cases supporting such a theory

 9  whatsoever.

10       Now, the next thing they argue is that the flushing

11  practice or running the water before you took the sample

12  was not consistent with an EPA recommendation that issued

13  on February 29th of 2016, and they attached that memorandum

14  as Exhibit 4 to the complaint.  Here's their first, biggest

15  problem:  That memorandum is dated February 29th, 2016.

16  The 58 samples were taken in June of 2015.  The memorandum

17  came out seven months after the testing was done, so it

18  doesn't -- it's not pertinent to the allegations against

19  Mr. Craig, because it didn't exist.

20       Also, the EPA memorandum did contain a

21  recommendation, and it said the EPA recommends that

22  sampling instructions not contain a prestagnation flushing

23  test.  But because it issued seven months after the testing

24  had been completed, it has no bearing on this case.

25  Moreover, it's a memo, not a regulation.  There are no

cases suggesting that not following a nonbinding guidance
document constitutes deliberate indifference.  There really
just aren't any cases, Judge, suggesting that Mr. Craig
should have been aware there was a clearly established law
suggesting that if one used preflushing versus
nonpreflushing, he was violating the constitution of the
United States.

On the other hand, there are cases that say that
violation of state and federal guidelines aren't enough;
*Holloway* out of Kentucky.  Other cases state that failure
to follow industry standards, operating procedures, and
federal guidelines don't constitute deliberate
indifference; that's the *Gumns* case out of the Middle
District of Louisiana.  So that's the second allegation
against our client.

The third is the timeliness of the reporting, so the
plaintiffs claim that Mr. Craig reported the results of the
testing that he did in June of 2015 on those 58 homes late.
Those were the homes that were the subject of the Lead and
Copper Rule testing that I told the Court about at the
beginning of my argument.  Those were the tests for the
triennial period that ran from January of '13 until
December 31st of '15.

Plaintiffs claim that Mr. Craig didn't provide the
results to Jackson until January 26, 2016, even though the

1    testing occurred in late June.  Now, they also pled that

2    Mr. Craig explained at a press conference that he was

3    following EPA guidelines in determining when to report.

4    They also claim that Mr. Craig did not rely on a reasoned

5    analysis of those EPA guidelines, and they cite to a

6    regulation that they claim says that the testing should

7    have been reported to the public as soon as possible.  They

8    cite 40 CFR 14185.  That's the only regulation they cite,

9    but the regulation doesn't impose duties on the department.

10   It imposes duties on water suppliers like Jackson, not

11   Mr. Craig.  A constitutional violation can't exist for not

12   following a regulation that doesn't apply to them.

13        Also, they may argue that Mr. Craig's actions were

14   intentional, but that boilerplate allegation in the

15   complaint isn't supported by the actual factual allegations

16   in the complaint.  What's available for the Court to

17   analyze are the allegations that he relied improperly on

18   EPA guidance, and you can't just look at labels and

19   conclusions.  You've got to look at the facts as alleged.

20        But more importantly, Your Honor, they don't cite

21   any case suggesting it's beyond debate that Mr. Craig

22   should have known he was acting in a manner deliberately

23   indifferent to a clearly established constitutional right

24   if he reported lead testing results for a small sampling of

25   Jackson homes late.  Again, the question is whether late

1    notice violates fundamental rights and liberties that are

2    deeply rooted in our nation's history and tradition; that

3    are implicit in the concept of ordered liberty; and that

4    neither liberty or justice would exist if they're

5    sacrificed; and secondarily whether they were clearly

6    established at the time of Mr. Craig's acts.  Viewed in

7    that context, the claims fail.

8         There are actually many cases, Your Honor, that have

9    refused to recognize a constitutionally protected due

10   process right for failure to warn of hazards, many.  For

11   example, the United States Supreme Court in *Collins versus*

12   *City of Harker Heights*, that's a 1992 case, was asked to

13   recognize a constitutional substantive due process claim

14   for employees of the city to be warned of the possibility

15   of an asphyxia when doing sewer repairs in the line, and

16   the allegations were that the city knew of the risk based

17   on prior incidents.  The court refused.  The court said we

18   have previously rejected claims that the due process clause

19   should be interpreted to impose federal duties that are

20   traditionally imposed by state law.

21        *Collins* was the first of many cases -- we looked at

22   that *Collins* case and looked to see what other cases have

23   cited for a similar proposition.  There are lots of cases.

24   Here's an example from the Fifth Circuit.  The Fifth

25   Circuit in 103 F. App'x 814 (5th Cir. 2004), the plaintiffs

1    allege that their school was built in a manner that

2    resulted in water leaking into the building allowing toxic

3    mold to form.  They claim that the school district should

4    have known about the mold infestation but failed to warn

5    the employees and students of the danger.  The District

6    Court granted the school district's motion to dismiss the

7    1983 claim.  The court found that the plaintiffs did not

8    state a viable Section 1983 claim based upon the alleged

9    failure to provide a safe, healthy work environment.

10          Citing *Collins*, the Fifth Circuit affirmed the

11   dismissal on appeal holding that a government employer's

12   failure to warn about known hazards in the workplace does

13   not violate due process, even if such conduct might be

14   actionable under state law.  That's the Fifth Circuit.

15          THE COURT:  Well, you gave me the citation.  Could

16   you give me the name of it?

17          MR. MITCHELL:  I actually brought these cases to

18   provide to the Court.  *Greene versus Plano*, 227 F.Supp. 2d

19   615, Eastern District of Texas, 2002, affirmed by the Fifth

20   Circuit 103 F.App'x 542 (5th Cir. 2004).

21          Your Honor, may I approach?

22          THE COURT:  You may.  Make sure the other side --

23          MR. MITCHELL:  There are several cases on the point

24   I'm talking about, so that's the Fifth Circuit case.

25          Here's another case out of Pennsylvania.  The

1    plaintiffs in that case filed a 1983 claim against the

2    Philadelphia Housing Authority based on its failure to

3    disclose the presence of asbestos and other harmful

4    substances at a Philadelphia Housing Authority facility.

5    The District Court dismissed the claim finding the Supreme

6    Court precedent, including *Collins*, had rejected the notion

7    there was a constitutional right to a safe working

8    environment.

9         The Third Circuit affirmed the dismissal finding

10   that the plaintiffs' claims, like those in *Collins*,

11   involved allegations the Government knew of unsafe working

12   conditions and failed to take actions.  The court found

13   that such conduct, the failure to warn of a known risk, did

14   not rise to the level of a constitutional violation as a

15   matter of law.

16        There's another case out of New York, *Paige versus*

17   *New York City*.  The plaintiffs brought a 1983 action

18   alleging that the New York Housing Authority failed to

19   enforce federal and state laws requiring annual lead paint

20   inspections for all dwellings.  The court granted the

21   defendant's motion to dismiss alleging that -- finding that

22   the failure to take action didn't amount to an affirmative

23   violation of the plaintiffs' constitutional rights.

24        And last there's a case out of Indiana.  The

25   plaintiffs filed a 1983 action against the East Chicago

1    Housing Authority alleging they had been exposed to lead

2    and arsenic contamination at a public housing complex.

3    They alleged the housing authority intentionally concealed

4    that contamination from them.  The court dismissed those

5    claims finding that the plaintiffs had not alleged a

6    constitutional violation.

7         The court noted that *Collins* and its progeny require

8    the dismissal of bodily integrity 1983 claims based on a

9    willful failure to warn.  They found that there's no

10   constitutional due process right to be warned of a known

11   harm even where the Government has offered false

12   assurances.

13        Now, there are two other cases in there, Your Honor,

14   that support what I'm arguing.  The failure to take action

15   is not an affirmative act that is normally recognized under

16   the due process clause of our country.  It's the reason the

17   vast, vast majority of the cases involving a violation or

18   invasion of the right to bodily integrity involve direct,

19   physical conduct by the defendant, not a failure to act.

20        As such, the plaintiffs' alleged violations

21   providing late notice about water sampling, providing late

22   notice of test results, providing an improper boil water

23   notice do not establish a violation of a clearly

24   established constitutional right and certainly not one that

25   existed in 2015 and 2016, and so Mr. Craig is entitled to

1    qualified immunity.

2        Now, that's the end of my 1983 argument, and I'll

3    move on to the Mississippi Tort Claims Act argument.

4        THE COURT:  All right.  What if the -- okay.  We'll

5    let you go to your tort claims.

6        MR. MITCHELL:  Judge, the state is generally immune

7    from suit, but the Mississippi Tort Claims Act waives that

8    immunity under certain scenarios.  Its contours are the

9    exclusive state law remedy for injuries caused by the torts

10   of government entities' employees.

11       The plaintiffs here don't dispute the negligence

12   claims against the department and Mr. Craig are governed by

13   the Mississippi Tort Claims Act.  As the Court I'm sure is

14   aware, Mississippi Code 11-46-9 sets forth a number of

15   exceptions to the waiver of sovereign immunity, and if any

16   of those exceptions apply, the department and Mr. Craig are

17   immune.  We submit that one of those exceptions mandates

18   dismissal as to the discretionary function immunity test.

19   That's Mississippi Code 11-46-9(1), and it states that a

20   governmental entity and its employees acting within the

21   course and scope of their employment or duties shall not be

22   liable for any claim based upon the exercise or performance

23   or the failure to exercise or perform a discretionary

24   function or duty.

25       Now, the purpose of this provision, Your Honor, is

1   to protect government actors from judicial second-guessing

2   of legislative and administrative decisions grounded in

3   social-economic policy in tort suits.  The provision

4   replies -- applies whether the Court believes the

5   Government entity or its employee abused discretion.

6          To gain immunity under this test, the Mississippi

7   Supreme Court has adopted a two-prong public policy

8   function test.  The activities must be discretionary; in

9   other words, they must involve choice or judgment.  And

10  number two, the choice or judgment must involve social,

11  economic, or policy considerations.  The test is identical

12  to the test under the federal Tort Claims Act and they're

13  very -- the case law on those are very related.

14         And as to the first prong, the plaintiffs don't

15  challenge that the actions of Mr. Craig were discretionary,

16  so I'll just move straight to the second prong.

17         Under the second prong, the complaint must allege

18  facts which would support a finding that the challenged

19  acts were not the kind of conduct that can be said to be

20  grounded in policy.  Importantly, the defendants don't have

21  to prove they actually considered any policy implications

22  in choosing to engage in the activities.  The question is

23  whether their conduct was susceptible to policy analysis

24  and that's --

25         THE COURT:  Well, do you believe the activity that

```
 1    the defendant -- excuse me.  What does the defendant

 2    contend that the activity in which it engaged that the

 3    plaintiff -- what do you believe the plaintiff is saying

 4    about the activity that they contend that you engaged in?

 5         MR. MITCHELL:  We believe that they're claiming that

 6    our policy on water testing was flawed.  We believe they

 7    contend our policy on when -- the timing of when to issue

 8    the test results on that testing was flawed, and we believe

 9    they're contending that the policy on what we said in our

10    boil water notices was flawed.  And because we believe that

11    all of those are policy decisions, we believe it falls

12    within the policy exception, and that we're entitled to

13    immunity.

14         THE COURT:  So basically going back to what we

15    talked about in the opening I think, that you used some

16    sort of preflushing method that was not proper.  That's one

17    of them; right?

18         MR. MITCHELL:  I didn't hear what you --

19         THE COURT:  You used some sort of pretesting,

20    preflushing method; that the preflushing method that the

21    state engaged in was improper.

22         MR. MITCHELL:  That's right.  We believe --

23         THE COURT:  I mean, that's one of the allegations;

24    right?

25         MR. MITCHELL:  Yes, one.  We believe they allege
```

1    that our -- the way we tested or sampled the water,

2    flushing, was an improper policy; that's number one.

3         We believe they are alleging that the timing of when

4    we reported those results in January of 2016 was another

5    improper policy.  And last, we believe that they are

6    arguing that the way that we issued one particular boil

7    water advisory was an improper policy decision.  And

8    because we believe that all of those allegations relate to

9    policy, it falls within the discretionary immunity function

10   of the MTCA.

11        THE COURT:  Do they also -- I guess this is part of

12   that third point, but they also contend that you failed --

13   that the state failed to provide the citizens of Jackson

14   with sufficient information, so that they can make the

15   right choices; right?

16        MR. MITCHELL:  That was part of that, that we

17   provided the late notice; that's part and parcel of that

18   statement is that we -- they claim that we should have

19   provided the notice earlier than we did, and because of

20   that, the citizens of Jackson were deprived of notice for a

21   period of time.  It's the same argument.

22        THE COURT:  And that the notice that you provided

23   was improper or defective because it tells them to boil the

24   water, and the fact of boiling the water itself exacerbates

25   the amount of lead in it.  So you give them the

 1  information, they followed what you tell them to do, and it

 2  kills them --

 3      MR. MITCHELL:  Actually the --

 4      THE COURT:  -- right?  Or it messes up the children.

 5      MR. MITCHELL:  I saw those -- you just connected

 6  those two, and I've never seen them as connected.  They

 7  claim that we provided the results of the 58 tests late in

 8  January of 2016.  The boil water notice they're talking

 9  about was a month later.  I don't -- there's no connection

10  to those two, Your Honor.  You've just connected them, and

11  I haven't seen them connected in that way in the complaint.

12  They're all three distinct acts, if that makes sense, the

13  way that they're pled.

14      THE COURT:  Okay.  The complaint, you read it as a

15  whole; right?

16      MR. MITCHELL:  The way I read the complaint as a

17  whole is they were alleging two acts connected, associated

18  with the water testing and then a boil water notice that

19  was a separate event.

20      Judge, the Mississippi Supreme Court and the Fifth

21  Circuit have recognized that decisions involving

22  considerations of public welfare fall within the

23  discretionary function provision.  There's a *Dancy* case, a

24  Mississippi Supreme Court case from 2006 that says

25  government conduct that involves policy considerations that

1    emanates from and relates to matters of human welfare, they

2    indicated that that was a policy decision.

3        There's a case called *In Re: Katrina*, which is an

4    FTCA case finding that the Army Corps of Engineers conduct

5    in failing to dredge -- that the Army Corps of Engineers

6    conduct in carrying out dredge operating --

7        THE COURT:  But we would -- well, is there no

8    difference between how the Mississippi Supreme Court has

9    construed its MTCA between how the federal courts construe

10   the FTCA?

11       MR. MITCHELL:  There was a case -- I can't remember

12   the case cite now.  I mean, the case says that the MTCA

13   appears to be virtually identical in pattern on the FTCA.

14   It seems there's actually cases that suggest that the --

15   that we've tried to mesh our decisions in Mississippi with

16   analogous decisions of the Federal Tort Claims Act.

17       THE COURT:  Okay.

18       MR. MITCHELL:  I can't answer the question of

19   whether there might be some minutia of difference, Judge,

20   but in general, they walk in lockstep.

21       When established government policy as expressed or

22   implied by statute or regulation allows a government agent

23   to exercise discretion, it must be presumed that the

24   agent's acts were grounded in policy.  Now, that's out of

25   the *Daubert* U.S. Supreme Court case.  Its quote is, "If a

1   regulation allows the government employee discretion, the

2   very existence of the regulation creates a strong

3   presumption that a discretionary act authorized by

4   regulation involves consideration of the same policies

5   which lead to the promulgation of the regulation."  That's

6   a U.S. Supreme Court case.

7          Here, the express purpose of the Mississippi Safe

8   Drinking Water Act is to establish a state program to

9   assure the provision of safe drinking water.  The

10  standards, it's given very broad discretion to pursue these

11  rights.  In the exercise of its authority, the department

12  may adopt rules and regulations governing the public water

13  system.  It has broad powers and duties to take action, and

14  it can take any action it "deemed necessary" to protect the

15  public water health.  And all of these statutory provisions

16  I just mentioned are cited in our brief.

17         This broad discretion granted to the department to

18  carry out its supervisory authority creates a strong

19  presumption that the alleged acts of Mr. Craig in carrying

20  out those duties involved policy considerations.  The

21  plaintiffs don't allege facts that would rebut this

22  presumption.  Plaintiffs construe Mr. Craig's conduct too

23  narrowly.  They claim they weren't policy considerations,

24  that they were just negligent acts, but that's too narrow

25  of a construction.

1        THE COURT:  What if it's just negligent acts of a

2   failure or duty to warn or a failure to have warned

3   properly, would that be a policy decision?  Would that be

4   covered by the discretionary function exception in your

5   view?

6        MR. MITCHELL:  Yes.

7        THE COURT:  If one of the claims is or if the Court

8   construes one of the claims being that the state has failed

9   warn, failed to properly warn its citizens of the danger in

10  the water, if it's simple failure to warn?

11       MR. MITCHELL:  No, Your Honor.  The case law

12  suggests that those are all -- those are all susceptible to

13  policy analysis, and that's the question of whether they're

14  susceptible to policy analysis.

15       These are not low-level decision processes.

16  Mr. Craig is a high-level official at the department.  It's

17  assumed that the actions he's taking are pursuant to

18  policy, and the case law that we've cited in our

19  brief suggests --

20       THE COURT:  Well, the state would be untouchable on

21  anything then; right?  Because the state has policies in

22  place.  The state -- everything that the state does is a

23  policy choice, a policy decision.

24       MR. MITCHELL:  They actually -- well, they actually

25  talk about it, Your Honor, and there are a number of cases

1    on this that are cited in our brief.

2         There are certainly examples of where simple acts of

3    negligence do not -- that the state is not immune on those.

4    For example, there's a case called *Smith versus Mississippi*

5    *Transportation*, and in that case, there was one employee

6    that was assigned the duty of signaling passing vehicles of

7    a construction zone ahead.  And he didn't do that, and they

8    said that was a simple act of negligence that wasn't

9    susceptible to any sort of policy analysis.

10        THE COURT:  Is it because he's a low-level person?

11   Because he's on the street doing the work, you know, with

12   the road crew, and his obligation is to do the flagging --

13        MR. MITCHELL:  It's because --

14        THE COURT:  Wait, wait, hold on.  And because the

15   difference is you mentioned Mr. Craig is so high up, so

16   because he's so high up, obviously he's thinking statewide

17   or he's doing something differently.  I mean, he's

18   making -- whatever he does becomes a policy decision, I

19   think, according to what you said earlier.

20        MR. MITCHELL:  No.  I think, Your Honor, the reason

21   there is because he was assigned a specific task, and he

22   knew what he was supposed to do and he didn't do it, which

23   was negligence.  Whereas, the decision of the Department of

24   Transportation about where, when, and how to place traffic

25   warning signals they said would be a policy decision.

1          Mr. Craig's acts as alleged in this complaint are

2    more analogous to the *Smith* case.  They're more analogous

3    to the transportation commission's decisions about when and

4    where to place signs than the acts of a simple flagman.

5          THE COURT:  So the construction of the specific

6    wording in the boil water notice, for example, that the

7    state approved, then that would be a policy choice.  The

8    specific words used I guess to only warn pregnant mothers

9    and children, for example, as opposed to warning everyone

10   else.

11         MR. MITCHELL:  Your Honor, it's difficult for me to

12   see how they can argue the words in a specific boil water

13   notice wouldn't be connected to some sort of policy of how

14   you issue boil water notices, so, yes, I believe it's

15   policy.

16         Your Honor, that's -- so in sum, the allegations in

17   this case relate to the Mississippi Department of Health's

18   administrative-level policies about how to best collect and

19   test drinking water and report the results.  They're also

20   about whether the boil water policies are sound.  Whether

21   or not the Mississippi Department of Health acted

22   negligently, which we dispute, in choosing to go about

23   these activities is not determinative, because the

24   decisions are presumed to have been made in furtherance of

25   the Safe Drinking Water Act's broad public health policy

1    objectives, and therefore these claims are barred by the

2    MTCA's discretionary function provision.

3        Now, Your Honor, I'm almost through.  I've got one

4    more MTCA argument to make.  Under the MTCA, the plaintiffs

5    were required to provide certain advance suit notice to the

6    parties.  Before they file suit, 90 days before they file

7    suit, they've got to file and provide a short and plain

8    statement of the facts that the claim's based on, the

9    circumstances which brought about the injury, the extent of

10   the injury, the time and place the injury occurred, the

11   names of all persons known to be involved, the amount of

12   money they seek, and their residence.  And the purpose of

13   this is to allow entities to be properly informed of the

14   claims before they file them.

15       The plaintiffs have to substantially comply with

16   this, and what constitutes substantial compliance is a

17   question for you, the Court, to decide.  But, here, the

18   plaintiffs didn't substantially comply.

19       I have attached to the motions that I filed in this

20   case the notice of claims that were provided to the

21   department and Mr. Craig.  There are a thousand individual

22   plaintiffs, but their notice of claim letters are virtually

23   identical.  The only unique information in any of those

24   notice of claims letters is the name of the plaintiff and

25   their address.  The letters do not state that any

1    plaintiff --

2         THE COURT:  Well, let me ask you this.  Assuming I

3    agree with you on that, what's the remedy?  For them to go

4    back and --

5         MR. MITCHELL:  Yeah.

6         THE COURT:  -- redo it?

7         Because they have -- are we -- is the statute of

8    limitations an issue with respect to most of these

9    children?

10         MR. MITCHELL:  I don't know how old any of these

11    children are based upon the information that I've been

12    given.

13         THE COURT:  But assuming they are children, how long

14    do they have to file a tort claims notice claiming that

15    they've been damaged by a governmental entity?  Assuming

16    they're all children.

17         MR. MITCHELL:  I wasn't really prepared to address

18    it, but I think the law is they have a year after they

19    reach the age of majority.

20         THE COURT:  Okay.  And what's --

21         MR. MITCHELL:  I think.

22         THE COURT:  -- the age of majority?

23         MR. MITCHELL:  I think so.

24         THE COURT:  Right.  And what's the age of majority:

25    18 or 21?

1   MR. MITCHELL:  That's -- Judge, I don't know the

2 answer to that.  I can't remember.  I can't remember if

3 it's 18 or 21.  I think it's 18.

4   THE COURT:  Okay.  So assuming it's 18 and assuming

5 all of these children here are 18 or less or 17 or less,

6 wouldn't the remedy be to allow them to put the things in

7 the claim, to submit a claim to the state in the way that

8 you want it, so that you could have all of your information

9 that the state desires to have?

10   And then wait 90 days for the state to act on it,

11 and then file their suit in either state court or here?

12   MR. MITCHELL:  That would be --

13   THE COURT:  I mean, that's what you want; right?

14   MR. MITCHELL:  That's what we want, yeah.  And

15 whether or not all of these plaintiffs were to come back

16 would be another question, because we don't have any

17 information about whether any of these thousand children --

18 and there's a thousand more to come at least -- whether any

19 of these thousand children have been tested for -- had

20 their blood tested for lead or have any diagnosis.

21   And if they can't put that information in a notice

22 of claim, they may not come back.  And they shouldn't

23 because they shouldn't be before this court if they don't

24 have a diagnosis of injury that's been reported in their

25 notice of claim letters.

1          THE COURT:  Right.  Okay.  So what does the

2    notice of -- the notice of claim has to be that I ingested

3    lead or that I was injured?

4          MR. MITCHELL:  The notice of claim needs to have

5    some sort of showing that there's -- these children have

6    been tested for lead and some sort of showing -- a specific

7    showing, not a boilerplate statement that is the same for

8    all 1,000 plaintiffs -- that they have some diagnosed

9    injury related to their alleged exposure.

10          THE COURT:  What law requires them to bring the

11    proof in the administrative claim that they have been

12    tested and/or that they have been injured?

13          I drank the water, the water has lead in it, I have

14    these mental whatever disabilities because of having drank

15    the water.  Does the Tort Claims Act require more?

16          MR. MITCHELL:  The Tort Claims Act doesn't specify

17    exactly what the detail is.  It leaves it to the Court to

18    make that determination.  It requires substantial --

19          THE COURT:  But if that's the case, I mean, it

20    shouldn't be left to the Court, right, because the

21    administrative process should mean something.

22          I know under the FTCA, the administrative process

23    means something.  You file a notice of a claim to the

24    agency, so that the agency can evaluate the claim to

25    determine what is there, to get information, so that the

1    agency can resolve the claim, if necessary.

2         So what is a notice provision here, other than to

3    give the governmental entity 90 days to review it, and then

4    after that 90 days, the plaintiff can then go to court?

5         MR. MITCHELL:  Judge, I haven't found a case that's

6    on point with the argument I'm making about a mass filing

7    of a thousand plaintiffs.  I believe that the statute, when

8    it says you have to state -- you have to provide --

9    substantially comply with providing real information about

10   the extent of the injury that that means you cannot put the

11   same boilerplate statement in 1,000 plaintiffs' notices

12   that says we have one of the following conditions.  That is

13   meaningless.  It is meaningless.

14        THE COURT:  Meaningless to whom?

15        MR. MITCHELL:  Meaningless to -- to --

16        THE COURT:  To the agency, to the administrative

17   agency?

18        MR. MITCHELL:  It's meaningless because it tells me

19   absolutely nothing about that particular plaintiff, because

20   he's just lumped in with a thousand others who said exactly

21   the same thing with no level of --

22        THE COURT:  And so through the administrative

23   process, can't the state ask them for more?

24        MR. MITCHELL:  I don't know the answer to that

25   question, Your Honor.  All I know is they're supposed to

1    comply with these notice requirements before they file

2    suit, and that there are many, many cases that indicate

3    when they fail to do so, the suit is dismissed.  They have

4    to then comply with the notice requirements before

5    rebringing it.  So I don't know the answer to your

6    question.

7        THE COURT:  So I guess my question is, we have a

8    thousand plaintiffs here and a thousand more to come you

9    say, --

10        MR. MITCHELL:  At least.

11        THE COURT:  -- so are we going to have to be dealing

12    with this for the next 18 years for those children -- well,

13    for those children who are six years old, for example, they

14    have until they're 18 or 21 to bring their claim, and if

15    they brought and submitted an administrative claim to the

16    state, said this is John Doe; I live in Jackson,

17    Mississippi; my address is -- this is what it is; I drank

18    the water from the time I was six years old to ten years

19    old; I got grades of whatever, I've been affected by the

20    water that I've drank.

21        So they file their administrative claim.  The state

22    doesn't act for 90 days, then they bring a lawsuit.  Would

23    that person be barred if the state brings this argument

24    saying, look, Judge, you look at it; it doesn't say enough.

25    Okay.  It doesn't say enough, and I agreed with you and I

1    dismiss it.  But they're 12 years old now.  Do they have a

2    right then to go back and fix, you know, until that -- to

3    cure whatever deficiency you're saying that you did not

4    have enough information on the front end?

5         Because that's what the administrative claim should

6    be about: giving the governmental entity enough information

7    to evaluate it.  And until they get that information to

8    evaluate it, do the plaintiffs get second, third, fourth,

9    fifth bites?

10         I mean, because these are children, and their

11    one-year statute of limitations, or what I heard that they

12    have until the age of majority to bring their claim, so do

13    they repeatedly bring these separate claims?  And if they

14    do, will we ever -- will we ever get to the end of this

15    case?

16         MR. MITCHELL:  Here's the answer to the question

17    that I think fits the case.  I believe these notices are

18    horribly written and poor in terms of the information they

19    provide.  I believe that there are many more plaintiffs to

20    come.  I believe that bringing this issue to this Court

21    right now is the best way for me to assure judicial economy

22    and economy of the parties, because I'm now asking this

23    Court to tell us exactly what it insists upon in these

24    notices.  I believe --

25         THE COURT:  I think they should -- let the state

1  tell me --

2      MR. MITCHELL:  I want to read --

3      THE COURT:  Let the state tell me what it requires,

4  too, because I don't want you to go back and say federal

5  court can't tell the state what needs to be in the tort

6  claims notice.

7      MR. MITCHELL:  I want them to tell me what years

8  they allege, because all they do is say for every one of

9  them August 2014 till now.  That's it, every one of them,

10  the same thing.

11      I want them to tell me who their people are of

12  interest, because all they do is name the defendants, and

13  they don't name anybody else who lives in any of these

14  houses who are clearly key witnesses.  And I want them to

15  tell me whether they've had a blood test or some other test

16  for lead and whether they have a diagnosed injury of any

17  sort of problem related to lead, and if they don't have a

18  diagnosed injury, they shouldn't be in this court and you

19  shouldn't have to be dealing with them.

20      THE COURT:  So how many witnesses -- I mean, you're

21  talking about the witnesses in the home and all that kind

22  of stuff?

23      MR. MITCHELL:  That's what the notice requires.  It

24  says you have to provide a list of the wit- -- I mean,

25  people who have known facts.  That's the law.  I mean,

1    maybe they missed somebody, but they surely know who the

2    parents are.  They should know who lives in the house with

3    the person, which is a very important person to determine

4    whether or not that child drank the water; don't you think?

5    I think it is.

6         And they have not identified a single person, a

7    single person other than defendants of people who have

8    knowledge, so those are -- to me, not stating the time, not

9    stating anybody else in the house, not stating whether they

10   have any sort of lead-exposure diagnosis or injury

11   diagnosis are pretty serious flaws.

12        THE COURT:  Okay.  So once they do that, is the

13   state going to try to administratively resolve these cases,

14   or are we going to be right back here?

15        MR. MITCHELL:  We'll be right back here.

16        THE COURT:  We will be right back here?

17        MR. MITCHELL:  Oh, absolutely.  We don't think we

18   did anything wrong, Judge.  Let me make that very, very

19   clear, but maybe --

20        THE COURT:  So we'll be right back here -- wait,

21   wait -- we'll be right back here in 90 days or 90 days

22   after they give you the information they need?

23        MR. MITCHELL:  But maybe not all 1,000 of them if

24   they don't have a diagnosed injury.  Maybe -- maybe some

25   are removed from this Court's docket.  Maybe some that

1    might be thinking about filing don't.

2        Your Honor, that's all I have on my argument.  I

3    appreciate the Court's time and attention.  Thank you.

4        THE COURT:  Well, I did have one question.

5        MR. MITCHELL:  Oh, I'm sorry, Your Honor.

6        THE COURT:  You had jumped over to the state issue

7    before, and I wanted to ask you, you had talked about this

8    social, economic, and political policymaking considerations

9    of Mr. Craig and others.

10        Are there any social, economic, or policy

11    considerations if the Court were to read the complaint --

12    and, of course, the plaintiff is going to tell us what it

13    believes is in that complaint and all that.

14        But if the Court were to read their complaint to

15    suggest that the state is at least being sued for

16    misleading the people in its notices and misleading them,

17    if that is the claim saying, you know, I was talking about

18    the failure to warn.  But also if they are arguing that the

19    warning itself misled them, would that be sort of covered

20    by your analysis about it's a policy choice, it's an

21    economic choice?  It's a social, economic, or policy choice

22    to affirmatively mislead?

23        MR. MITCHELL:  Your Honor, the answer to the

24    question is where regulation allows the government agent to

25    exercise discretion, it's presumed that it's grounded in

 1    policy.  So the answer to your question is, yes, they are

 2    still policy determinations.

 3         And, again, there are cases that say decisions,

 4    like, that involve public welfare like this is --

 5    everything we're talking about here about the water is

 6    public welfare.  Public welfare falls within the

 7    discretionary function provision, so the answer to your

 8    question is, yes, Your Honor, I still believe it's policy.

 9         THE COURT:  Okay.  And going back to your state

10    claims, you've said that the defendant -- again, tell me

11    what it is the notice of claim must have according to what

12    the state believes the law require?  Must name the

13    individual, must tell when the act or occurrence occurred,

14    I think, the date --

15         MR. MITCHELL:  Name the people in the home that

16    are -- at least the people in the home that would be

17    witnesses.

18         THE COURT:  Now, it said name witnesses.  It doesn't

19    say name who's in the home, I mean.

20         MR. MITCHELL:  The actual words, Your Honor, I

21    should be specific, and I'm sorry.  Let me look at exactly

22    what it says, Your Honor.

23         What it says is the name of all persons known to be

24    involved.  And so I believe that that includes the parents

25    of the children in the home, because they would be

1    involved.

2        THE COURT:  Would that also include every individual

3    who worked for the City of Jackson who might have --

4        MR. MITCHELL:  I --

5        THE COURT:  -- been involved in some way?

6        MR. MITCHELL:  No, I don't think so, Your Honor.  I

7    think that might be stretching it, substantial compliance,

8    too far, but I do think it certainly includes the people

9    who live with the minor children who would have seen the

10   minor child ingesting water.  I think it has to state the

11   time --

12       THE COURT:  Well, wait, I want to make sure.  Are

13   you just talking about parents or are you talking about

14   siblings or what?

15       MR. MITCHELL:  Everybody that lives in the home.

16   I'm thinking about parents in particular, but, yes, I think

17   it should be everyone who lives in the home.

18       The time and place of the injury has to be in the

19   notice, and that's something more than August of 2014 to

20   now.  And then the extent of the injury, and I believe that

21   should include whether they've been tested for lead in

22   their body and whether they've been diagnosed with any

23   injury related to lead.  Not the same statement for all

24   1,000 plaintiffs.  Specific statements as to each specific

25   plaintiff as to whether or not they've been tested for lead

1    and whether or not they have a diagnosed injury and saying

2    what the test was and what it revealed and what the

3    diagnosed injury is.

4         THE COURT:  And so what would be the purpose of the

5    state having all that information at that stage?  I'm just

6    curious.  I know under the FTCA, the agency is under an

7    obligation to try to do the investigation to resolve the

8    claim.  They do the investigation to resolve the claim, and

9    if the claim cannot be resolved, then it goes to the court

10   system.

11        So if the state gets all of this information, the

12   pretesting information, posttesting information, what is

13   it -- what is the state or any of these governmental

14   entities going to do with the information?

15        MR. MITCHELL:  Resolving the claims is but one

16   purpose of the notice.  It's also to --

17        THE COURT:  Because the other purpose is for you to

18   go investigate it.

19        MR. MITCHELL:  Yeah, to know and to be properly

20   informed of the claims -- to be properly informed of the

21   claims and to take corrective action if we need to.  I

22   don't think there's any corrective action here that needs

23   to be taken.  But to be properly informed of the claims,

24   that's a very important thing for us, Your Honor, because I

25   will tell you that the first thing we do here, in my

1    opinion, is we -- we file a motion to dismiss, because we

2    don't believe there's a cognizable claim.

3        The second thing that I think has to be addressed --

4        THE COURT:  But the motion --

5        MR. MITCHELL:  -- before we file --

6        THE COURT:  Hold on.  The motion to be dismissed

7    will be filed after the suit is filed after the 90 days.

8        I'm talking about what is the state going to -- what

9    are these governmental entities going to do with the

10   administrative claim itself?

11       You get all that information.  If they give you

12   reams and reams of every test that the child has taken, and

13   those reams shows that there's positive stuff.  What is the

14   state going to do with it, other than I guess tell the

15   plaintiff in 91 days now after you've given it to us, go

16   file your suit, so we can then turn around and file a

17   motion to dismiss before the federal judge or the state

18   court judge who has now received this particular case?

19       MR. MITCHELL:  We would have an opportunity to

20   review it, plain and simple, to evaluate whether they have

21   a legitimate claim, and we can't do that with this notice.

22   We can't.  We can't do anything with the boilerplate

23   statement for all 1,000 plaintiffs containing a boilerplate

24   statement of injuries.  We can't.  We can't even evaluate

25   them.  We're entitled to exactly what the statute says

1   we're entitled to: the ability to evaluate them.

2         THE COURT:  Okay.  So nothing in this -- this is the

3   notice I think you received.  It's Exhibit 1 to something,

4   the notice of claim.  Nothing in there informs the

5   Mississippi Department of Health what their -- what these

6   plaintiffs, what any one of these plaintiffs, is

7   contending?

8         MR. MITCHELL:  No, that's not what I said, Your

9   Honor.  Nothing in there said -- defines the date properly.

10  Nothing in there tells me who lived in the homes.  Nothing

11  in there tells me if a particular plaintiff has had any

12  sort of lead testing or has a specific diagnosis of injury.

13        There are general statements in all 1,000 of them.

14  If you'd look, you'd see the extent of the injury section

15  in there, Your Honor, in the exhibit -- in the exhibit.

16  Its -- there's one clause in there, it says "extent of

17  injury," and if you find it in there, you will have found

18  the exact same language that is in all 1,000 of those

19  letters, boilerplate.

20        THE COURT:  Well, "the extent of the injury, upon

21  information and belief, the plaintiff has suffered

22  injuries, including but not limited to: cognitive deficits,

23  behavioral changes, memory and attention deficits, learning

24  impairments, impaired emotional functioning, and

25  visual-perceptual deficits.  The full and precise extent of

1    plaintiff's injuries and future harm is currently unknown."

2        And then it says the injury occurred from

3    August 2014 to the present in Jackson, Mississippi, so you

4    know where the injury occurred.  You know when it occurred.

5    You know what injuries that they claim they suffered.

6        Now, it sounds like the only thing you need or you

7    claim to need is who are -- who may be some of the

8    witnesses.

9        MR. MITCHELL:  No, Your Honor.  I disagree with what

10   you just said.  I don't believe I know anything based upon

11   this boilerplate about when the alleged injury occurred.

12   "August 2014 to present" tells me nothing.  The same "upon

13   information and belief" under the recitation of every

14   possible --

15       THE COURT:  What requires them to do anything more

16   specific than August 2014?  What, under Mississippi --

17       MR. MITCHELL:  That's what I believe.

18       THE COURT:  -- law, requires them to do anything

19   other than a date range like that?

20       MR. MITCHELL:  I believe that substantial compliance

21   with the notice provisions does, Your Honor.  I don't

22   believe this is substantial compliance.  I don't believe a

23   thousand identical statements, which tell me absolutely

24   nothing about any particular plaintiff, complies with the

25   notice provisions of the MTCA.

```
1            I think it has to be particularized, and I think if
2    you'll look at this, you'll see that it's not.  It's a
3    thousand of the same boilerplate language for all 1,000
4    children, and if we don't do something about it, the next
5    1,000 are going to look just like this with the same
6    boilerplate language that tells us nothing.
7            THE COURT:  Assuming that there was a -- and we've
8    had these cases before, I'm sure, with the state.  Assuming
9    you have a school bus, the school bus runs into another
10   school bus.  You've got 60 children involved in the
11   accident.  They describe that there was an accident between
12   two school buses.  I was thrown about the vehicle, and I
13   was hurt.  The accident occurred on March 2nd, 2023, in
14   Hinds County, Mississippi, in Jackson, Mississippi.  On
15   this date, I suffered injuries.  I'm under the medical care
16   of X.  Is that enough information if each one of those 60
17   children were to have filed that?
18           The witnesses were the bus driver and all the other
19   students on the bus.  Would that be enough information, or
20   would that be too vague because we don't know the extent of
21   the injury of each individual?  Does that give the state
22   enough information to go out and do and evaluate this claim
23   or these claims that have been filed for each of the 60
24   individuals?  Although they're all going to say the same
25   thing.  The extent of the injuries are I got hurt.
```

```
 1          MR. MITCHELL:  No, I don't think that's enough.
 2          THE COURT:  Okay.  But if you got --
 3          MR. MITCHELL:  I thought that the date information
 4   that you gave in that example would have been enough.  I
 5   thought that the date -- I just don't think the description
 6   of the injuries would be enough to satisfy and
 7   substantially comply with the MTCA notice requirements.
 8          THE COURT:  Okay.  All right.
 9          MR. MITCHELL:  Thank you, Your Honor.
10          THE COURT:  Thank you.
11          For my court reporter's purposes, we're going to
12   take a brief recess for about 15 minutes.  I'd like to hear
13   from the plaintiffs with respect to the arguments, and
14   that's how we're going to do it.  And whatever other
15   defendant comes up next, you'll have an opportunity for
16   rebuttal, Mr. Mitchell.
17          All right.  We'll be in recess.
18          MR. MITCHELL:  Thank you, Your Honor.
19          MS. SUMMERS:  All rise.
20               (A brief recess was taken.)
21          MR. STERN:  Thank you, Your Honor.  May I approach?
22          THE COURT:  You may.
23          MR. STERN:  Corey Stern on behalf of the plaintiffs,
24   and if I go too fast, I would love it for somebody to
25   remind me or to stop me.  Because sometimes I do, and I
```

1  apologize in advance.

2          THE COURT:  Okay.  We will.

3          MR. STERN:  I'm sure you will.

4          I intend to try and take the arguments against what

5  Mr. Mitchell just argued in order, but I'd like to start

6  just for a second at the end when Your Honor was discussing

7  the state Tort Claims Act, you had some pointed questions.

8          Number one, the age of majority in Mississippi is

9  21, which means that each of our clients has until age 22

10  to provide their notice of claim.

11          Number two, if -- and I don't want to pretend or act

12  as though I am a Mississippi practitioner who has had 20

13  years of experience practicing in state courts in

14  Mississippi.  But our local counsel, counsel for these

15  plaintiffs, has informed me that in 25 years of their

16  practice in filing notices of claims with the state and

17  other agencies, they have never provided notices with the

18  level of specificity that exists in this case.

19          And the reality is that it seems as though

20  Mr. Mitchell's and the state's argument is most concerned

21  about the fact that there are so many, that there are a

22  thousand notices that all indicate the same injuries.  But

23  I would submit to the Court that if a plane were to crash

24  and there were 250 people on board, and all of them filed a

25  notice of claim for some state agency or some act within a

 1  state agency that went wrong, all of them would have the

 2  same injury; they'd all be dead.

 3      And I'm not claiming and we're not claiming that any

 4  children died or that someone committed the act of murder

 5  or homicide of any kind.  But just because a thousand

 6  children all suffer cognitive deficits, just because a

 7  thousand children claim to have consumed water in the same

 8  city over the same period of time, that doesn't make it

 9  deficient.  And if any one of these notices singularly had

10  been presented to any state agency, this idea that they

11  were deficient simply wouldn't be based on the same

12  foundation that Mr. Mitchell just presented.

13      And in addition to that, it seems as though what

14  Mr. Mitchell and his clients want from our clients is to

15  provide medical documents.  They want us to provide

16  diagnoses for some injuries that take years to actually

17  evolve because a child's brain continues to develop over

18  time, which is why the statute of limitations is a year

19  after they turn 21 -- because kids' injuries don't always

20  manifest themselves as quickly as, say, a broken arm would

21  from a bus crash -- only so after 90 days, they could walk

22  into court at some point after a complaint was filed and

23  then argue they are immune from liability because of the

24  discretionary function.

25      I would submit to the Court, how do they know

1   they're immune from liability based on the discretionary

2   function prong if they can't make heads or sense about what

3   the claims are?  You can't walk in and argue to the Court

4   that all of the things alleged in this notice of claim

5   elicit this exception to the rule that they are immune from

6   liability, but at the same time say that we don't know what

7   they're actually alleging against us.  That's

8   counterintuitive.

9       THE COURT:  Well, let me ask you this question I

10  asked the state with respect to if the Court agrees with

11  the state, and you go back and you do your best attempt to

12  get the state what they want, and the state still says

13  that's not enough.  They sit on it for 90 days, that's not

14  enough with respect to that particular plaintiff.  You file

15  suit in state or federal court, wherever these cases may

16  end up landing.  Whatever court -- because, you know, if

17  you decide later on to just go with state court claims, it

18  may end up being a state court.  So I'm suggesting that you

19  do what they ask -- you do what you think they have

20  asked --

21      MR. STERN:  They would --

22      THE COURT:  Hold on.

23      MR. STERN:  Oh, sorry.

24      THE COURT:  And then you file suit in court; they

25  file a motion to dismiss because it does not -- we don't

1    have enough medical records.  You claim that the child was

2    hospitalized.  You claim that the school records were here;

3    well, we only have his school records from elementary

4    school.  You don't have his school records from high

5    school.  You don't have his school records from trade

6    school from the time he was 18 to 21, so therefore the

7    claim is still not sufficient.  A court will be obligated,

8    I presume, then to dismiss it.

9        And then because the plaintiff would still have

10   until they're 21 or 25 or whatever that age is, would that

11   plaintiff then be able to come back, give them the

12   information, file the administrative claim, like, including

13   the middle school records now, including the high school

14   records?  Because that was the one thing that -- or the

15   couple of things the state said were missing and justified

16   dismissal.

17       Would you be able to do that is my question?

18       MR. STERN:  So, yes, and here's why:

19       First, I believe that the notice of claim in and of

20   itself would toll any type of statute as to the notice,

21   because if it's deficient, then the party would have more

22   opportunity to cure the deficiency.

23       Number two, because of the reasons that Your Honor

24   has articulated in terms of the statute of limitations and

25   the year from when a minor reaches the age of majority,

1    they'd have until at least they were 22 years old.

2        But more importantly, the purpose of the notice of

3    claim is for efficiencies.  It's to create an environment

4    where state agencies can evaluate claims in an efficient

5    manner to avoid protracted litigation, to avoid having 20

6    or 30 lawyers involved to come into a courtroom to argue

7    motions to dismiss.  The whole purpose of the notice of

8    claim is to create efficiencies.  And under the, you know,

9    Mitchell standard or the state's articulated standard

10   that's being suggested now, it's a requirement that each

11   plaintiff actually prove their case by way of the notice of

12   claim in order for a child, for instance, to prove a lead

13   poisoning case.  First, you have to show that the child had

14   ingested lead, whether its from paint or water.  Then you

15   have to show they were actually injured; they suffered

16   cognitive deficits.

17       How does that work?  You have to hire a

18   neuropsychologist to evaluate the child to make a

19   determination about those deficits.  Then you have to hire

20   somebody, usually a pediatrician, to make the determination

21   that those deficits articulated by that expert were caused

22   by the very ingestion of lead, be it from paint, be it from

23   water.

24       Then you have to hire an economist to look at the

25   child to, to look at the testing, to look at the reports of

1    those other experts to make the determination that Child

2    John, who has ADHD, has other cognitive deficits, and a

3    psychologist (sic) says would have earned X but instead

4    would earn Y.  The economist then has to place numbers and

5    values on the future earnings of that child under what

6    Mr. Mitchell articulated should be the standard that he

7    wants Your Honor to dictate to the plaintiffs in this case:

8    a thousand who have already filed their notices.  And a

9    thousand more who may, and who knows how many other

10   children in Jackson may one day make a claim?

11          He wants all of that in a notice of claim, and that

12   is litigation.  That is how we determine damages.  That is

13   how we determine causation.  And this idea that a notice of

14   claim requires all the witnesses, a notice of claim when it

15   asks for who has knowledge about this, it's about the

16   individuals from the agency being put on notice, so they

17   know what's being claimed against them.

18          If every child in Jackson was required to not only

19   have a neuropsych, not only have a pediatrician, not only

20   have an economist, not only provide their school records,

21   but provide the names of every witness, or some subjective

22   standard where at least the names of the witnesses who live

23   in the house, that would cause inefficiencies.  It flies in

24   the face of why we have a notice of claim process not just

25   in Mississippi or in Georgia or in Michigan, but even the

1    federal tort claims.  It's to avoid what Your Honor is

2    articulating would be a cyclical filing of notices to fix

3    notices to fix notices only so eventually Mr. Mitchell, or

4    someone else from the state or on behalf of the city, can

5    walk in and say we've read them, they're boilerplate; they

6    don't tell us anything.  But despite that they don't tell

7    us anything, we are entitled to immunity because of the

8    discretionary function.

9         And, again, I submit to Your Honor if we know so

10   well that we file a motion to dismiss the -- the state tort

11   claims act separate and apart from the timing of the

12   notice.  Then substantively, we are asking Your Honor --

13   the state and the city -- you must dismiss the Mississippi

14   Tort Claims Act because the notices as provided led us to

15   believe that we are entitled to the discretionary function,

16   what more do they need from the plaintiffs?

17        What more do they need to determine that they're

18   immune?  So they want each child in Mississippi or their

19   lawyers to spend thousands upon thousands upon thousands of

20   dollars to get experts, to get records, to then submit

21   those in writing in a way that meets the code, which means

22   it either has to be by certified mail or FedEx, only so

23   they can read them, and then walk into this courtroom or a

24   state courtroom to say we've read it all, it's no longer

25   boilerplate.  We really appreciate it.  Now we know that

1   Johnny has a lead level of 8.5, but that doesn't change the

2   conduct upon which they're asking the Court to determine

3   that they're entitled to immunity.

4        THE COURT:  Okay.  Slow down a little bit for the

5   court reporter.

6        MR. STERN:  Okay.  Thank you.

7        All right.  I want to now go back, if Your Honor

8   would indulge me, to the various claims that plaintiffs

9   have alleged.  We've just spent significant time on the

10  Tort Claims Act.  I'm going to go back to the two

11  constitutional claims.

12       THE COURT:  Yeah.  That's what I'm really interested

13  in --

14       MR. STERN:  Okay.

15       THE COURT:  -- because plaintiff (sic) reads your

16  complaint, and they sort of say how they viewed it.

17       MR. STERN:  Sure.

18       THE COURT:  They -- well, the defendant, the state

19  says this is what the plaintiff has pled.

20       MR. STERN:  I never --

21       THE COURT:  Now, you tell me what the plaintiffs

22  pled.

23       MR. STERN:  I've never had a case where I filed a

24  complaint where the defendants read it the same way that we

25  believe we pled it, and so this is not a unique

1    circumstance.  And obviously on this type motion under Rule

2    12, Your Honor must take, in the light most favorable to

3    the plaintiffs, a whole reading of the complaint as it

4    should be read.

5         I'll start with this, Mr. Craig, he's not a robot.

6    This is not someone who just moves from point A to point B

7    and just makes decisions based on policy, and the complaint

8    doesn't say that he's -- he's violated plaintiffs' rights

9    to bodily integrity because he didn't follow the directive.

10   What the complaint says, when read in the light most

11   favorable to the plaintiff, is that he crafted a

12   methodology to yield lower test results that -- let me go

13   back a minute.

14        Mr. Craig has been in this position or at least

15   worked for this department since 2004.  This is not someone

16   who just showed up one day in 2014 or 2015 or 2016 and

17   decided that he was going to make all kinds of policy

18   decisions.  This was someone who as early as 2004 worked

19   for the Mississippi State Department of Health.

20        In 2011 the Mississippi Department of Health

21   recognized, and the complaint pleads this, it alleges this,

22   that they were aware the City of Jackson was at high risk

23   for lead poisoning; that the children in Jackson were at

24   high risk for lead poisoning.  So while we don't say that

25   in 2011, Mr. Craig, who had been in the job since 2004,

1    must have been aware of lead poisoning and that being a

2    very, very high probability for the City of Jackson.  When

3    you read in the complaint that he was there in '04, when

4    you read in the complaint that he was there through at

5    least 2016, when you read in the complaint that as early as

6    2011, the Mississippi State Department of Health knew that

7    Jackson was a ticking time bomb for lead poisoning and lead

8    contamination and that kids could get hurt, it is not just

9    easy to, but it must be read, the complaint, to know that

10   Mr. Craig was aware.

11        So let's start with this fact as pled in the

12   complaint that by 2011, five years before any of this ever

13   happened, everybody wants to -- to -- or Mr. Mitchell came

14   in and said, well, I expect Mr. Stern's going to talk about

15   the current condition of the water in Jackson.  I'm not

16   going to say a word about the current condition of the

17   water in Jackson.  I'm going to focus exclusively on the

18   time period Mr. Mitchell argued about when he was up here

19   prior to the break knowing that Jackson was a hotbed for

20   lead poisoning, knowing that children could be poisoned,

21   he -- he created testing procedures to conceal test

22   results, conceal.  He trained employees to run taps slowly

23   knowing full well because of his experience at the

24   Mississippi State Department of Health that doing so would

25   yield lead levels that were lower than they really were

1    separate and apart from guidance from anyone.  No one needs

2    to show there's a violation of bodily integrity because

3    Mr. Craig violated some statute promulgated by the federal

4    law or by the EPA or that the guidance is what plaintiffs

5    are alleging.

6          What plaintiffs are alleging is that this man knew

7    when he was in charge in 2011, in 2012, in 2013, in 2014,

8    in 2015, in 2016 that Jackson had no corrosion control;

9    that Jackson was consisting primarily of lead pipes,

10   joists, and solder; that five years earlier, it was put on

11   notice that the city could very well become a time bomb.

12   Before Flint -- before Flint, they knew that Jackson could

13   have very high lead results and kids could be poisoned, and

14   then with that knowledge, he made the decision to teach the

15   folks in his department how to preflush to skew the results

16   deliberately.  He made the decision to tell them to run the

17   water slowly to skew the results deliberately.  And then

18   when the results came in in 2015, yes, he was mandated to

19   report them, and instead he waited six months before he

20   told any parent in Jackson.

21         All the people who filed their notices of claims on

22   behalf of their children that weren't sufficient enough, he

23   waited six months to let them know what he knew in 2011 and

24   what he surely knew when the test results came back even

25   after they were performed or before they were performed

1   using his methodology.

2       THE COURT:  What in the complaint alleges that he

3   was required to let them know sooner than six months?

4       MR. STERN:  Absolutely.

5       THE COURT:  I said what in the complaint itself

6   alleges that he was obligated to inform the public?  You

7   say he waited six months?

8       MR. STERN:  Correct.

9       THE COURT:  What in the complaint says or alleges

10  that he should have or that he was either required to, or

11  are we just saying that waiting the six months to do it is

12  problematic?

13      MR. STERN:  So I can point Your Honor to -- we'll

14  talk about the JW complaint.  It's Document 51, it's the

15  amended complaint.  I'll point to you a number of

16  paragraphs, and then tell you what the paragraphs say.

17  It's paragraph 195, 221 to 225, 196 to 220, 228.

18      Some of these may be inclusive because I've just

19  made a list based on the allegations, and then I'll tell

20  you what they say.

21      223, 231, 232, 226 to 235, and 242 to 243, and it

22  says that in June 2015, lead levels were in exceedance of

23  the 90th percentile, which according to EPA regulations

24  requires notice to be placed on the website of the

25  Mississippi State Department of Health as well as in a

1    newspaper to provide the residents and citizens of Jackson

2    information about where they can find these results.  These

3    exceedances immediately triggered those notices.  That's

4    what's pled, the requirement for those notices.

5         THE COURT:  That's all I need to know, where it is

6    in the complaint.

7         MR. STERN:  Yeah.

8         THE COURT:  You suggest that those paragraphs will

9    tell me exactly where it is in the complaint.

10         MR. STERN:  Yes.  And, respectfully, Your Honor came

11    upon something when -- when you had an interaction with

12    Mr. Mitchell earlier where he said I have not read the

13    complaint the way you did, Your Honor, but you're reading

14    it a different way than I did.  And you said, well, aren't

15    I supposed to read it in the light most favorable to the

16    plaintiff inclusive of all the facts?

17         And what the complaint says, which is what Your

18    Honor pointed out, when Craig finally provided the notices

19    late -- when he provided them late, he downplayed the

20    results and blamed the EPA.  There was literally no public

21    information about what was in the water that these children

22    were drinking despite being triggered to provide that

23    information to the citizens of Jackson.  If that's not

24    recklessness -- and I'll get into the standard of conduct

25    that's required under the law and why what Mr. Mitchell

 1    described as the standard is a little bit different than

 2    what we believe the cases actually say.

 3         But if that's not deliberate indifference -- if a

 4    man who knows five years earlier that Jackson can be a

 5    hotbed for lead poisoning and that children could get hurt.

 6    If a man knows that the exceedances, which are words that

 7    someone in his position would know, but not everybody else

 8    might necessarily understand what they mean.  If he knows

 9    there's exceedances in the 90th percentile triggering

10    notices and he waits six months, if that is not deliberate

11    indifference, then I don't know what is.

12         To the point about whether the bodily integrity or

13    the concept of bodily integrity is actually a

14    constitutionally protected right, I'm not sure what I heard

15    Mr. Mitchell say.  On the one hand, I think he said that it

16    is constitutionally protected, and it is.  The Supreme

17    Court has recognized through the Fourteenth Amendment that

18    bodily integrity is absolutely a protected right.

19         *Missouri versus McNeely*, which was cited by

20    Mr. Mitchell, although I'm not sure for the proposition the

21    court recognized it.  But the court said, "We have never

22    retreated," and this was in 2013.  2013 before the Flint

23    water crisis; 2013 before the testing came, but 2013

24    after -- after Mr. Craig knew that Flint (sic) was a hotbed

25    for lead poisoning, "We have never retreated from our

 1    recognition that any compelled intrusion into the human

 2    body implicates significant constitutionally protected

 3    privacy rights."

 4         *Schmerber versus California*, "The integrity of an

 5    individual's person is a cherished value of our society."

 6         And then I'm not sure, again, if Mr. Mitchell was

 7    saying the Fifth Circuit had not recognized this right, but

 8    if he did, he's wrong.  In *Doe versus Edgewood*, that's 964

 9    F.3d 351; *Priester versus Lowndes County*, 354 F.3d 414;

10    *Alton versus Texas A&M University*, 168 F.3d 196.  The Fifth

11    Circuit has recognized that the right to bodily integrity

12    is protected by the Fourteenth Amendment.

13         There's this idea that all of the defendants have

14    posited to the Court that what plaintiffs are saying is

15    that we had our rights violated because they didn't provide

16    us with safe water; that is not true.  That is not at all

17    what plaintiffs are saying.

18         Plaintiffs are claiming not that Craig had a duty to

19    protect them from contaminated water, but that he violated

20    their rights to bodily integrity when he made decisions

21    that caused, contributed to, exacerbated, or prolonged

22    their ingestion of lead-contaminated water.  No one is

23    saying he's the shield.  No one is saying that the right to

24    bodily integrity includes a violation of the right because

25    someone didn't act as a shield.

1          When reading the allegations in the complaint in the

2     light most favorable to the plaintiffs, plaintiffs are

3     alleging that he was a sword; that he affirmatively took

4     steps to cause, contribute, exacerbate, and prolong.

5          And when Your Honor wanted to know why it was so

6     important that there was a boil water notice alert for

7     pregnant women and for children and why does that matter?

8     It matters because that prolongs, it contributes to, it

9     exacerbates.  If Mr. Craig knew in 2011 that Flint (sic)

10    was a hotbed -- I'm sorry; I apologize for saying

11    "Flint" -- that Jackson was a hotbed for lead poisoning and

12    that kids in Jackson could be hurt, and if he knew in 2015

13    that there were exceedances in the water that went above

14    the 90th percentile, which requires notice by the EPA to be

15    posted on the website, to be put in a newspaper.

16         If he knew all of that and as an officer and as the

17    delegated officer from the Mississippi State Department of

18    Health knew what the dangers of lead are, which is pled in

19    the complaint that he did, how in the world would he not

20    know that boiling lead-contaminated water would make it

21    worse; that it would concentrate the lead in the water?

22         And so to the extent that Mr. Mitchell or anyone

23    from the city wants to argue that what plaintiffs are

24    really saying is that Mr. Craig was required to protect

25    them and protect their bodily integrity as a shield,

1  consider what that notice did for anybody who read it and

2  followed it.  Craig knew lead was bad, he knew it was bad

3  for kids, he knew it was present in the water, and then he

4  told children and pregnant women to boil it and make it

5  worse before drinking.  That's a sword, Your Honor, not a

6  shield.

7        There's a number of cases that the defendants cited

8  in their brief, and I'm happy to go through them about why

9  the defendants are wrong.  But to the extent that we've

10  addressed them in our briefs, we think our briefs are very

11  on point in terms of distinguishing the facts of those

12  cases in the way the defendants described them versus what

13  those facts really mean.  Those are Supreme Court cases.

14        But to the extent the defendants have argued the

15  Fifth Circuit has never recognized situations like this,

16  the cases they cite are simply not on point, and we can

17  start with *L&F Homes and Development, LLC versus the City*

18  *of Gulfport*.  What the defendants want you to believe is

19  that circumstance is the same here, but that circumstance

20  dealt with property rights.  It dealt with property rights,

21  and there the court analyzed whether the developer of a

22  subdivision had a property interest in a new, as opposed to

23  a continued, water service.  Unlike our 1983 claims against

24  Mr. Craig, which are involving to be free from the

25  government causing bodily injury.  Property interests are

1   matters of state law.  This is what the court found, and

2   they stem from independent sources such as state statutes,

3   local ordinances, existing rules, contractual provisions,

4   or mutually explicit understandings.

5        There -- even though the outcome is good for what

6   the defendants want you to believe it stands for -- in

7   determining that the developer had not shown it was

8   deprived of a property interest in the continuation of

9   existing electrical service, the court declined to expand

10  this authority to provide a property right exists in

11  obtaining water service, not just continuing service in

12  place.  Therefore, not only did *L&F Homes* deal with a

13  totally distinct issue of whether a subdivision has a

14  property interest under state law in obtaining water

15  service, but to the extent that it's relevant at all to the

16  issues in this matter, the court's recognition of a

17  property interest in continuing electrical and water

18  services actually supports the plaintiffs' interests here.

19       In *Kaplan versus Clear Lake*, (5th Cir. 1986), the

20  denial of water service did not amount to substantive due

21  process.  The holding there doesn't support defendants'

22  argument that plaintiffs have not asserted a recognized

23  constitutional right.

24       THE REPORTER:  Slow down for me, please.

25       MR. STERN:  Sorry.

 1          Just because they found that there wasn't a

 2    violation doesn't stand for the proposition that they

 3    didn't recognize there's actual -- actually a cognizable

 4    right.

 5          And *Collins* was cited at length, and in fact, you

 6    know, we received five cases that cited *Collins*.  We

 7    received them this morning.  I didn't get them in advance,

 8    and, you know, if we're going to talk about strict

 9    compliance of certain things, it would have been nice to

10    receive those cases that are being argued today in advance

11    of today.

12          But the holding in *Collins* was that the due process

13    clause doesn't guarantee municipal employees a workplace

14    that is free from unreasonable risk of harm.  It doesn't

15    bar plaintiffs' claims against Defendant Craig for

16    violating their right to bodily integrity.

17          The cases cited by the defendants from outside the

18    circuit, from outside the Fifth Circuit are also similarly

19    unavailing.  *Brown versus Detroit Public Schools*, neither

20    the text nor the history of the due process clause supports

21    a right to a contaminant free-environment; that's true.

22    But plaintiffs aren't alleging they have a right to a

23    contaminant-free environment.  They are alleging Mr. Craig

24    took affirmative actions to increase and to make worse

25    their damages.

1          I understand that there's some comments that have

2     been made about the concept of state-created danger, and

3     that the Fifth Circuit has rejected it.  So before I get

4     into the actual conduct, so -- so let me backtrack a

5     minute.

6          Clearly the bodily integrity claim is rooted in law

7     both from the United States Supreme Court and the Fifth

8     Circuit and from outside the circuit that it is a

9     constitutionally protected claim.  In order to prove a

10    bodily integrity claim, we need to show that it's

11    constitutional protected.  We need to know they knew it was

12    something that would be protected, and then we need to talk

13    about the conduct.

14         We have also made an allegation for a state-created

15    danger claim, and Mr. Mitchell has argued that there is no

16    recognition of a state-created danger claim.  The Fifth

17    Circuit has rejected the state-created danger claim, and it

18    just doesn't exist.

19         In order to prove both a bodily integrity claim and

20    a state-created danger claim, the underlying conduct that

21    needs to be shown is the same.  So, first, let me just

22    address when it comes to state-created danger why

23    Mr. Mitchell and his clients are wrong.

24         THE COURT:  Well, before you move there --

25         MR. STERN:  Yeah.

1              THE COURT:  -- because we will talk briefly about

2       state-created danger.  But with respect to bodily

3       integrity, do the plaintiffs contend that it's been -- that

4       that claim has been stated specifically enough through

5       their complaint?

6              MR. STERN:  If you read the complaint as a whole,

7       absolutely, Your Honor.  And if not, if the Court were to

8       read the complaint and believe under any circumstance that

9       it hasn't been stated clearly enough, obviously it would be

10      permissive for the Court to allow -- especially in this

11      case where there's no statute of limitation issues.

12             These are minor children who, as Your Honor has

13      discussed at length, when it comes to the state Tort Claims

14      Act claim, they could bring their claims for quite some

15      time from now.  And so I 1,000 percent believe that the way

16      the claims have been alleged, when reading the complaint as

17      a whole, satisfy what's required under bodily integrity.

18      But if the Court were to find that they're not, providing

19      leave for plaintiffs to amend the complaint to further

20      satisfy whatever's required would be completely permissive,

21      and we would ask the Court to do so.  Although, we don't

22      think it's required.  When it comes to -- if you'll just

23      give me one second, Your Honor.

24             Before I get to the state-created danger, in order

25      to satisfy in addition to the -- to the allegations about

what Mr. Craig did or didn't do, in order to satisfy the
bodily integrity prongs, one of the things that is required
is to show that the rights were clearly established.  And
one of the things that Mr. Mitchell, he didn't -- he didn't
go into great detail about it, but he certainly spoke about
it, was that it wasn't clearly established in 2015 and
2016.  He cited *Guertin* where the plaintiffs cite this case
from the Sixth Circuit that had to do with the Flint water
crisis, and how in the world could Mr. Craig have known at
that point in time that these were clearly established
rights when that case, when that decision came after what
happened here.

But the level of specificity that the defendants are
suddenly requiring the plaintiffs to show to show it was
clearly established is -- it's -- it's -- frankly it's
ridiculous.  *Doe versus Taylor Independent Schools* from the
Fifth Circuit, this is a quote, "The term 'clearly
established' does not necessarily refer to 'commanding
precedent' or that is 'factually on all-fours with the case
at bar' or that holds the 'very action in question'
unlawful.  Rather, a constitutional right is clearly
established if 'in the light of pre-existing law the
unlawfulness is apparent.'"

Put more simply, officials have to observe generally
well-developed legal principles.  Fifth Circuit precedent

 1    establishes a right to bodily integrity and includes the

 2    right to clean water long before the conduct at issue in

 3    this case, and that's even far greater than what the

 4    plaintiffs are alleging was their right to bodily

 5    integrity.

 6         In *Bradley versus Puckett*, a 1998 case -- which came

 7    14 years before Mr. Craig even found out that lead was

 8    going to be something that was a problem for the citizens

 9    of Jackson -- the court found that a disabled prisoner's

10    allegations that while on lockdown for possession of a

11    weapon, he was deprived access to a shower chair to prevent

12    him from falling in the shower, and therefore could not

13    bathe for months, stated a claim for cruel and unusual

14    punishment under the Eighth Amendment.  The court found

15    that the plaintiff had a valid claim to the extent that he

16    complains of unsanitary conditions that deprived him of

17    basic human needs and exposed him to health risks.

18         The court explained why the plaintiff adequately

19    stated a claim for a violation of his recognized

20    constitutional rights.  The court said, Bradley asserts

21    that he was unable to bathe for several months; that prison

22    officials were aware of his special needs but deliberately

23    ignored them; that he was therefore forced to clean himself

24    using toilet water; and that the unhygienic conditions

25    resulted in a fungal infection which required medical

1  attention.  Therefore, Bradley alleges that the unsanitary

2  condition violated contemporary standards of decency, which

3  threatened his physical and mental well-being.

4       "Contemporary standards of decency which threatened

5  his physical and mental well-being," that's as early as

6  1998 in the Fifth Circuit, the circuit the state claims has

7  no precedent whatsoever for the type of bodily integrity

8  claims the plaintiffs make here --

9       THE COURT:  But this is not an Eighth Amendment

10  claim, is it?

11       MR. STERN:  It's not.  It's not.

12       THE COURT:  I know it's not, I mean.  And the courts

13  have gone from -- you have to allege stuff and you have

14  to -- you cannot allege it in generality.  Qualified

15  immunity sort of cases out there that it's tough to allege

16  a right.  You have to look at everything, and some cases

17  suggest that you must find a case from a particular circuit

18  from the Supreme Court that's exactly like the one before

19  you.

20       MR. STERN:  I understand that some cases say that.

21  But to go back to that case and then to address Your

22  Honor's point, as early as 1998 precedent in this

23  jurisdiction existed which put any reasonable water

24  official on notice that conduct such as what plaintiffs

25  allege here in their complaint could have violated bodily

1    integrity.  But because the material precedent is not a

2    requirement in the Fifth Circuit, state officials can still

3    be on notice that their conduct violates established law

4    even in novel factual circumstances, and that's M*cClendon*

5    *versus City of Columbia*, (5th Cir. 2002).

6        Again, this is a quote.  This isn't a Corey Stern

7    quote, this is from *McClendon*.  State officials can still

8    be on notice that their conduct violates established law

9    even in novel factual circumstances, 305 F.3d 314 (5th Cir.

10   2002).

11       And while the defendants are correct that the Sixth

12   Circuit's decision in *Guertin* came after the alleged

13   conduct that plaintiffs describe here in their complaint,

14   they are right.  They are 100 percent right.  *Guertin* did

15   not occur in a vacuum.  What the Sixth Circuit relied on in

16   coming to the decision in *Guertin* is this same case law

17   that this court should and must rely on to come to the same

18   decision here.  They cited the Supreme Court cases that we

19   cite in our brief.  Those all came before 2016.

20       Those all came before *Guertin*, and so it's not a

21   matter of just looking at *Guertin* and saying, well, *Guertin*

22   happened, so Mr. Craig and Mayor Yarber and Utilities

23   Director Powell and Utilities Director Miller because of

24   *Guertin*, if this had happened after *Guertin*, they would be

25   put on notice.  No, the same analysis that the *Guertin*

1    court undertook in analyzing United States Supreme Court

2    precedent on the issue of Fourteenth Amendment bodily

3    integrity is the same analysis that this Court should

4    undertake now.  So don't -- if Your Honor would indulge me,

5    we're not asking you to look at *Guertin* and say Craig was

6    on notice.  We're asking you to look at *Guertin* and see how

7    that court came to its decision, because the facts there

8    are materially similar here, but you don't need *Guertin* to

9    make the finding.

10        All right.  Getting back to the issue of

11    state-created danger.  It is true, it is 100 percent true

12    as Mr. Mitchell said the Fifth Circuit has not yet adopted

13    the state-created danger theory.  And just to go back one

14    second, it is absolutely true that the government is not

15    required to protect individuals from dangers.  Again, it's

16    not a shield.  It's not required to protect.

17        What the state-created danger theory is, it's an

18    exception to that rule, but it has not ruled -- the Fifth

19    Circuit has not ruled that courts should throw out such

20    claims on that basis alone.

21        THE COURT:  But it has never found a state-created

22    danger --

23        MR. STERN:  Not yet.

24        THE COURT:  -- no matter how bad the facts were.

25        MR. STERN:  Not yet but --

1           THE COURT:  You think this case right here would be

2    the case?

3           MR. STERN:  Yes, sir.  It has outlined the contours

4    of state-created danger theory, and more importantly at the

5    motion to dismiss stage, the Fifth Circuit should take the

6    light most favorable to the plaintiffs.  And so here using

7    what the Fifth Circuit has said is the way you can do a

8    state-created danger, even though they haven't yet.

9    Plaintiffs meet even the strictest view of the

10   state-created danger theory.

11          Under the strictest view, here's what plaintiffs

12   need to show: state actors were deliberately indifferent.

13   We'll get to that in a minute, and I guess I'm jumping back

14   to jump ahead.  But let's assume for a minute that we're

15   able to convince Your Honor that these actors were

16   deliberately indifferent, that means -- and I'll get to it

17   in a minute -- that they knowingly disregarded a risk.

18   There's nobody that can read the complaint to read that

19   Mr. Craig or any of the state officials didn't knowingly

20   disregard the risk.  They all knew of the risk in 2011.

21          In fact, in 2013 Mayor Lumumba's -- and I don't want

22   to butcher his name -- his father, senior, as well as the

23   at-the-time-acting director of the utilities, they created

24   a plan to address the risks that in 2011 they were made

25   aware of.  So nobody can argue they didn't deliberately

1    ignore a risk that existed, and reading the complaint

2    clearly says that.

3          But separate and apart from the deliberate

4    indifference prong, they increased the danger that a known

5    person or a class of persons would be harmed by a third

6    party.  So here's the test, this is what the Fifth Circuit

7    says is the test that has never been met before:

8          One, the actors were deliberately indifferent.

9          Two, in a way that created or increased the risk of

10   danger that a known person or a class of persons would be

11   harmed by a third party.

12         The known class of persons, I mean, to the extent

13   that Mr. Mitchell claims that the -- the MTCA notice is

14   deficient, which obviously we don't agree with, I think

15   it's pretty clear that the notices are for kicks.  I think

16   it's pretty clear from the complaint that all of the

17   allegations are being brought on behalf of children.  I

18   think it's pretty clear from a plain reading or an

19   expansive reading or whatever reading anyone wants to take

20   of the complaint that we are talking about a very specific

21   segment of the population.

22         The complaint doesn't say that property owners have

23   been harmed because of property damage contributing to the

24   diminution of value.

25         THE COURT:  Well, I'm going to interrupt you there,

1  because I'm thinking about the *Doe versus Covington County*

2  case here out of this division that went up to the Fifth

3  Circuit.  I'm not sure if it was cited in the briefs, but I

4  always think about that one when I think about

5  state-created danger.  A child in a school where the school

6  has a policy that says only a particular list of persons of

7  names that we have, we require you to tell us who we can

8  let your child go to, so it's there to protect that child

9  that's in that school at elementary school.

10        But for many times on several days, the school

11  authorities allowed an unidentified individual to come take

12  that child out of school and rape her repeatedly on a

13  number of different times.  The Fifth Circuit said that was

14  not a state-created danger.

15        MR. STERN:  Correct.

16        THE COURT:  So how do we -- how can I say that that

17  one child -- because that's a school, that's an elementary

18  school.  You're talking about much less than the City of

19  Jackson.  You're talking about specific policies in place

20  at a specific school for those specific children.  A policy

21  in place for the child identified third parties who might

22  harm the child -- that would be people who are not on this

23  list -- and then they allow a person to come in and take

24  that child out of school several times, and on each

25  occasion, that person raped that child.  And that's not a

1    state-created danger, so how could this be?

2         MR. STERN:  So despite the facts of that case -- and

3    I'm trying to represent my clients as best I can, and I

4    don't want to diminish what they've been through.  None of

5    them have been through what the child in that case has been

6    through, and so I'll say that up front.

7         The difference, however, in distinguishing this case

8    from that situation is the culpable knowledge and conduct.

9    It's the knowingly disregarding a risk.  That conduct was

10   awful.  What happened to that child --

11        THE COURT:  The knowing disregard of the risk in

12   this state if you allow a child to go home with a stranger

13   or a child to go home with a nondesignated person on that

14   child's list.  If they say that Corey Stern is the only

15   someone who can pick up my child, and then they allowed

16   John Doe to pick up the child -- I don't want to -- I was

17   about to say some others --

18        MR. STERN:  I don't think of them like that.  These

19   are all decent human beings.

20        THE COURT:  And they allow -- and they look at the

21   list, and the person identifies himself as Tommy Keys.

22        MR. STERN:  Yeah.

23        THE COURT:  And they say, Tommy Keys, your name is

24   not on the list, but you claim to know this child.

25        MR. STERN:  Sure.

1          THE COURT:  And they let him, and they let Tommy

2    Keys get the child.

3          MR. STERN:  So here's the difference, if Your Honor,

4    again, would indulge me.  Separate and apart from the

5    conduct, if you had allowed -- if you were the school and

6    you had allowed Corey Stern or you had allowed Meade

7    Mitchell or you had allowed any one of these lawyers to

8    pick up the child, that is not a known risk.  It may be a

9    bad policy.

10          It may be bad to let a stranger pick up a child, but

11    I would submit to the Court that I hope I live in a world

12    where most strangers are decent human beings.  Where not

13    everyone who is a stranger would necessarily rape a child.

14          Here, there's no dispute that it was a known risk.

15    There's no argument that anyone can make that lead is not a

16    neurotoxin.  There's no argument, at least based on the way

17    the pleadings contain allegations, that it wasn't known to

18    Mr. Craig or any of the city officials before any of this

19    happened that Flint (sic) was at risk of significant lead

20    poisoning.  And so I would simply submit to the Court that

21    that case is different from this case, because there a

22    woman who -- or a man who sat at the front office of that

23    public school and allowed that child to go to this person

24    who they may or may not have known was a stranger --

25          THE REPORTER:  Slow down, please.

1          MR. STERN:  -- could never have known.

2          THE COURT:  Well, but they knew that person's name

3     was not on the list.

4          MR. STERN:  They knew the person's name was not on

5     the list, but they didn't know that the person was a

6     rapist.

7          THE COURT:  No, it doesn't matter.  They allowed the

8     child to go with somebody whose name is not on the list.

9          MR. STERN:  I would submit to the Court that that

10    doesn't rise to the level that this does in terms of

11    disregarding a known risk.

12         THE COURT:  The risk of letting a child go with a

13    stranger, a person that cannot be identified by the school

14    officials is a known risk.

15         MR. STERN:  This isn't going well for us, so I'm

16    going to move on.  What I will say, though, is that I would

17    couch it differently, Your Honor.  I would say that the

18    known risk of sending a child with a rapist is different

19    than sending a child with a stranger.

20         THE COURT:  Okay.

21         MR. STERN:  But I'm not going to die on that hill,

22    not today.

23         THE COURT:  All right.  All right.

24         MR. STERN:  And when we get to conduct, and then

25    here's where we'll put state-created danger in a box

1    somewhere and not light it on fire yet, but I see the

2    gasoline.

3        Then the standard to determine whether Mr. Craig's

4    conduct was objectively unreasonable is the deliberate

5    indifference standard.  Mr. Mitchell says that and I say

6    that, but we say what that means is something different.

7        The second part of the qualified immunity analysis

8    is only for the Court to determine, in the lights most

9    favorable to the plaintiffs at this stage, that the conduct

10   of the defendants was objectively unreasonable when applied

11   against the deliberate indifference standard.  And that's

12   from *Hernandez* which is 380 F.3d 872 (5th Cir. 2004), and

13   here's what *Hernandez* says: "To act with deliberate

14   indifference, a state actor must consciously disregard a

15   known and excessive risk to the victims' health and

16   safety."

17       A state actor -- Mr. Craig is a state actor; nobody

18   disputes that -- must consciously disregard a known and

19   excessive risk -- the complaint says that Mr. Craig was

20   there in 2004; he was there in 2011; he was there in 2015;

21   he was there in 2016.  And as early as 2011, he would have

22   known there was a substantial risk of lead poisoning in the

23   City of Flint, (sic) and he knows that that's a risk to the

24   victims' health and safety.  It's as easy as that.

25       Deliberate indifference, furthermore, Your Honor, is

determined by a subjective standard of recklessness.  Not

objective, subjective, and the Fifth Circuit has explained,

and this is in *Atteberry versus Nocona General Hospital*,

that's at 430 F.3d 245.  It's a Fifth Circuit case from

2005, that the test for deliberate indifference is

subjective rather than objective in nature because -- and

this is important -- "an official's failure to alleviate a

significant risk that he should have perceived but did not,

while no cause for commendation, cannot under our cases be

condemned as the infliction of punishment."

        Here, Mr. Craig took affirmative steps.  The

allegations of the complaint is that he made it worse.  He

exacerbated it; he prolonged it.  Under these standards, a

state official will be denied qualified immunity if the

evidence showed that she or he merely refused to verify

underlying facts that he strongly suspected to be true --

we don't think he suspected them to be true, we know he

knew them to be true -- or declined to confirm inferences

of risks that he strongly suspected to exist.  And that's

also from *Hernandez* at page 884.

        There's also a case that we submitted to Your Honor,

I think it was in August of 2022.  We sent a letter and

copied opposing counsel about a case that wasn't included

in our briefs that we wanted the Court to consider, because

it came out at a time prior to or subsequent to when we

1    would have filed the briefs on this.  And that case is

2    *Harris versus Clay County, Mississippi*, and it is the

3    United States Court of Appeals for the Fifth Circuit Case

4    No. 21-60456.  We provided the opinion to the Court, and to

5    boil it down, what that case says is that lying alone or

6    being disingenuous or misleading -- misleading is enough to

7    cause a constitutional violation.  We've alleged way more

8    than misleading.  We're alleging that he knew, that he

9    prolonged, that he intentionally, that he willfully, that

10   he created something to undermine what the test results

11   really would have been, that he deliberately did things so

12   that people wouldn't know.  But misleading -- misleading in

13   and of itself warrants a constitutional violation,

14   especially at this stage.

15        I've got a lot more in the binder.  I could have

16   gone on and on about the -- the trash can gasoline issue.

17   But if Your Honor has questions, it may be appropriate at

18   this time for me to try and respond.

19        THE COURT:  I just -- and you can be as brief as you

20   need.  What's your response to why the discretionary

21   function exception does not apply --

22        MR. STERN:  Sure.

23        THE COURT:  -- to this state defendant?

24        MR. STERN:  Sure.  So it's a two-part test, and

25   number one, you have to show that the purpose of

1   discretionary function is not to protect all decisions.

2   And so I picked up on something Your Honor was talking

3   about with Mr. Craig.  At one point, Your Honor asked if

4   this was a low-level city employee or state employee who

5   was fixing something on the street, perhaps the -- the

6   immunity wouldn't apply.

7        But here for Mr. Craig, wouldn't anything be

8   considered a policy decision, and the reality is that not

9   every decision made by a high-level official meets the

10  test.  So what the Court has to first ascertain is whether

11  the activity in question involved an element of choice or

12  judgment.  I don't think anybody contends that what

13  Mr. Craig did or didn't do, as pled in the complaint,

14  consisted of activities that required some element of

15  choice or judgment.  We concede that, and I think the state

16  concedes that as well.  You have to show that.

17       But then the second part, this is -- this is where

18  it's not mutually exclusive.  You can find -- the Court

19  must also decide whether that choice or judgment involved

20  social, political, or economic considerations.  What is the

21  social or political or economic consideration of misleading

22  the people of Jackson?

23       What is the social, political, or economic

24  consideration for telling pregnant women and parents of

25  children that they should make their kids water worse and

1    then have them drink it?

2          What is the social, political, economic

3    consideration of waiting six months to post on a website

4    information about the test results and to post in the

5    newspaper where folks from Jackson can find the information

6    about their test results?

7          I would submit to the Court that while prong A is

8    clearly met, prong two is not.  There's no political,

9    social, or economic consideration that went into what we

10   allege Craig did or didn't do, in the same way there was no

11   political, social, or economic consideration that went into

12   what we allege the city actors have done.

13         THE COURT:  Okay.  And, finally, with respect to

14   you've been talking about the Sixth Circuit case --

15         MR. STERN:  *Guertin*.

16         THE COURT:  -- the *Guertin* case.  But what might be

17   your best Fifth Circuit case that might have put Craig or

18   the other defendants on notice that --

19         MR. STERN:  Oh, there are so many.

20         THE COURT:  -- that there are acts --

21         MR. STERN:  Sure.

22         THE COURT:  -- that you allege were

23   unconstitutional?

24         MR. STERN:  I think the case -- and I'll give you a

25   series of them because the -- one issue I didn't address

1    that encompasses an answer to your question, Your Honor, is

2    that one of the other things Mr. Mitchell stated on the

3    record was that there's never been a case that in order to

4    find a violation, you have to find a physical touching.

5         And so the progeny of cases that we cite, starting

6    with *Tyson versus City of Sabine*, the contention that

7    direct physical contact is what distinguishes a viable

8    bodily integrity claim from a meritless environment claim

9    is for naught.  I'm asking you to read that case not in the

10   way they want you to read it, but in the way that we

11   distinguish it in ours.

12        In rejecting that very contention, the Fifth Circuit

13   stated, "Defendants argue that the alleged sexual abuse

14   doesn't shock the conscious because Deputy Boyd did not

15   effectuate using physical force."  We disagree; physical

16   force is not a requirement of a violation of the right to

17   bodily integrity.

18        THE COURT:  I agree with you on that point.  I'm

19   going to see if they -- I'm not sure if that was responded

20   to in the rebuttal.  That's *Tyson versus City of Sabine*?

21        MR. STERN:  I can do *Doe versus Taylor Independent*

22   *Schools*, deliberate indiff -- I'm sorry.

23        Let's go with *Atteberry*.  *Atteberry* is the case

24   where there's a nurse who -- who poisons a bunch of people.

25   And in that case, what the Court says in Atteberry is the

1   constitutionally concerning conduct of the nurse was not

2   the unwanted physical conduct that occasioned the

3   injection.  Rather like here, the concerning conduct was

4   the harmful substance that she injected into the patients,

5   a paralytic drug introduced into the body of 22 patients.

6         Similarly, here, the City of Jackson caused --

7   caused a neurotoxin to enter into the body of plaintiffs.

8   Mr. Craig caused a neurotoxin to prolong being exposed --

9   these children to being exposed and ingested by the

10  plaintiffs.  And so all of the Fifth Circuit cases,

11  honestly, cited by the defendants, if you read our brief

12  and the way we've distinguish them, they don't stand for

13  the propositions of what defendants claim they do.

14        In fact, the idea that the Fifth Circuit hasn't

15  recognized a right to bodily integrity or that a neurotoxin

16  or a toxin of any sort would be considered a violation

17  of -- of bodily integrity is simply wrong.  The very cases

18  that they cite on this point actually support our

19  arguments, if not forever, at least at this stage.

20        THE COURT:  Thank you, Mr. Stern.

21        MR. STERN:  Thank you.

22        THE COURT:  Mr. Mitchell, briefly I think --

23        MR. STERN:  May I ask one more thing?  If -- if Your

24  Honor is -- I'm sorry.  I said I was done.  If the cases

25  that were presented and given to Your Honor this morning as

 1    persuasive, which were presented to us for the first time

 2    as well, I haven't had a chance to look at them.  And if

 3    Your Honor's going to hang a ruling in any way on any of

 4    these cases, we would just respectfully request the

 5    opportunity to respond.

 6         THE COURT:  Trust me, I have not looked at them

 7    either.

 8         MR. STERN:  Okay.  Thank you.

 9         MR. MITCHELL:  I'll be brief, Your Honor, or at

10    least I'll try to be.

11         THE COURT:  Let me ask you that point about the

12    physical force thing, too.  Whether physical force is not a

13    requirement of a violation of the right to bodily integrity

14    that was cited in the plaintiff's opposition, and I'm not

15    sure if, in your rebuttal, you either agreed with that or

16    disagreed.  Because as I said, I see that quote from *Tyson*

17    *versus City of Sabine*, which is a 2022 case from the Fifth

18    Circuit, 42 F.4th 508 at 518.

19         MR. MITCHELL:  No, I can't say that a direct

20    physical force is an absolute requirement under our case

21    law.  That's generally the case.

22         THE COURT:  Okay.

23         MR. MITCHELL:  But very much generally the case, and

24    it seems to be the exception where that does not occur.

25    That -- that's my position.

1              THE COURT:  Okay.  All right.

2          MR. MITCHELL:  You know, Mr. Stern described the

3      actions of Mr. Craig in a very egregious way, and in a way

4      that I think is not consistent with the allegations of the

5      complaint.

6          I believe that I described the allegations that are

7      asserted against my client fairly and accurately, and I

8      stated the paragraphs that the -- the sections of the

9      complaint that are there.  But regardless of the way he

10     described them, even if you accept that as true, which I

11     don't think it is because those are labels and conclusions

12     that are not supported by the factual allegations of the

13     complaint.  But even if you accept it as true, the way he

14     described the actions of my client, those are not clearly

15     established constitutional violations.

16         Over and over again I kind of heard that it was my

17     job -- that he was distinguishing the cases that I said

18     supported my position.  It's not my job to submit cases

19     that refute his position.  It is his job, it is Mr. Stern's

20     job to submit cases that support his, and he didn't.  And

21     he didn't do it, and he couldn't do it.  And it's not

22     because he's not a good lawyer, it's because the cases

23     don't exist, Your Honor.

24         This is a 12(b)(6) motion; we look at the law that

25     exists right now.  They had the burden of coming forward

1    with the case law to support their theory.  And they simply

2    can't do it, because there's not any case law that says

3    when you use a different test method than a letter in 2008

4    to the Washington DC group that said you weren't supposed

5    to use, that that's violating clearly established due

6    process rights under the constitution.

7            There's not a case that suggest that if you're late

8    in issuing a warning that you violated due process rights

9    in the U.S. Constitution.  In fact, there's a lot of cases

10   that say failure to warn never does it.

11           There's not a case that says if you -- if the

12   content of your boil water notice was not right on one

13   occasion, that you've violated due process rights under the

14   United States Constitution.  It's not there.  It's not

15   there.

16           They continued to press for the state-created danger

17   theory.  Judge, I think you heard it, I'll say it.  I think

18   they suggested the Fifth Circuit was just waiting for the

19   right case, that's not what I see at all.  I see that the

20   Fifth Circuit is not going to recognize this claim, and I

21   will tell you if it ever did, it was not a recognized claim

22   in 2015 and 2016.  And that's fatal to their case, because

23   if it's not clearly established in 2015 and 2016, it

24   couldn't put Mr. Craig on notice.  The *Chavis* case actually

25   said that.

1          Even if it were recognized, they haven't pled all

2     the -- the potential elements of that plausible claim.

3     They haven't shown that we used -- that Mr. Craig used his

4     authority to create the dangerous environment.  Mr. Craig

5     didn't create anything.  They have alleged that the lead

6     levels in Jackson's water were from old pipes and corrosive

7     water sources; he didn't do that.

8          They have to allege that he -- that there was --

9     that he was aware of an immediate danger to a known

10    victim -- a known victim.  Now, all they've alleged is a

11    geographic class of people.  It doesn't satisfy the

12    elements.  It's not going to be recognized.  The claim

13    should fail.

14         Bodily integrity, it is not our position that a

15    constitutional right to bodily integrity does not exist; it

16    is not.  It is our position that a constitutional right to

17    bodily integrity does not exist as to the facts pled

18    against Mr. Craig, and certainly it was not clearly

19    established at that time.

20         Yes, we contend that the bodily integrity right that

21    they plead is a right to safe drinking water.  We didn't

22    bring that up out of nowhere.  The *Guertin* case that they

23    talk about so much that I disagree with -- I disagree with

24    the majority in the *Guertin* case.  I believe that the

25    dissent in the *Guertin* case was a far more reasoned

```
 1    analysis than the majority.  The majority -- the dissent in
 2    the Guertin case described allegations in the complaint
 3    very similar to the allegations in this case as plaintiffs
 4    asserting a right to contaminant-free water, and they
 5    rejected it.  The same argument that I'm making, the same
 6    kind of facts, that's what I believe they've pled, and
 7    they're not --
 8         THE COURT:  Do you have a right to be free from
 9    people misleading you --
10         MR. MITCHELL:  No.
11         THE COURT:  -- about what the water is?
12         MR. MITCHELL:  No.  That's the warning cases that I
13    just told you about.
14         THE COURT:  You don't have a right?
15         MR. MITCHELL:  No, not a -- not a United States
16    Constitutional right under the due process clause of the
17    Fourteenth Amendment, and that's what they've alleged.  And
18    that's what the Collins case says, you don't have a right
19    to those kind of warnings under the Constitution --
20         THE COURT:  Even though --
21         MR. MITCHELL:  -- of the United States.
22         THE COURT:  -- it invades your bodily integrity.
23         MR. MITCHELL:  No, they're not recognized as bodily
24    integrity invasions.  That's the point of the Collins case;
25    they're not recognized as invasions of bodily integrity
```

1    under the United States Constitution because they're --

2    that's -- that's what all of those cases say, the *Collins*

3    case and those that I gave you.

4         Now, even if you say I don't really think they're

5    claiming a right to safe drinking water, they still haven't

6    provided cases supporting their claim that the bodily

7    integrity right under the constitution should be expanded

8    like this.  It's got to be a clearly established

9    constitutional right.

10        You've written so many opinions on this; I've read

11   them all.  I mean, it has to be very clear law, very clear

12   law that would put any official on notice that he was

13   violating the law.  None of the cases that they've cited

14   does that.

15        They've cited the *Bradley* case, which is a prisoner

16   case about not allowing a prisoner to bathe, and the guards

17   making him drink out of the toilet.  That's nothing like

18   the allegations against Mr. Craig.

19        They talk about sexual abuse cases, the *Taylor*

20   *Independent School District* that's nothing like the

21   allegations against Mr. Craig.  They talk about -- one of

22   the things they talk about is a student was tied to a chair

23   by a teacher with a jump rope.  That's nothing like the

24   allegations against Mr. Craig.

25        They cite a couple of U.S. Supreme Court cases,

1  *Cruzan* and *Washington* about the patient can refuse medical

2  treatment.  Okay.  And that, you know, there's a long list

3  of cases that supports the right to refuse unwanted medical

4  treatment, but the reasoning of those cases is that making

5  them take it is considered battery.  You can't force them

6  to take medication if they don't want to take it.  It's a

7  recognized bodily integrity right.  Those cases are nothing

8  like the allegations against Mr. Craig.

9       THE COURT:  If you're providing the citizens of

10 Jackson contaminated water, is that the equivalent of

11 battering them?

12      MR. MITCHELL:  No.

13      THE COURT:  Okay.

14      MR. MITCHELL:  We didn't provide the water, and

15 we're not alleged to have, anyway, Your Honor, but, no.

16      And then the case they claim is on point: *Guertin*,

17 that's the Flint, Michigan case.  This is not Flint, and

18 the allegations in this case aren't Flint.  And if you read

19 the *Guertin* case carefully, you'll see this case is not

20 Flint.  And as I mentioned to you before, that decision is

21 flawed, and the dissent there is more logical we believe.

22      But moreover, Judge, moreover, the factual pattern

23 is not the same as to Mr. Craig.  First of all, let's look

24 at what they did recognize.  The bodily integrity right

25 that the court recognized was that, "A government actor

1    could not knowingly and intentionally introduce

2    life-threatening substances into an individual without

3    their consent."  Mr. Craig is not alleged to have knowingly

4    and intentionally introduced anything into the plaintiffs.

5         Second of all, in Flint, the state MDEQ had taken

6    over the Flint water system, and the decision states that

7    the MDEQ was instrumental in authorizing Flint to use an

8    ill-prepared water treatment plant to distribute water from

9    a river it knew was rife with public health compromising

10   complications.  And it then said that the MDEQ falsely

11   assured the public the water was safe and tried to refute

12   assertions to the contrary.  That is nothing akin to the

13   allegations against Mr. Craig.

14        Citing bodily integrity cases at a high level of

15   detail, at a high level of generality doesn't do the job.

16   You have to have highly specific case law that would put

17   the official on notice.  Precedent must put the existence

18   of that constitution right beyond debate.

19        And be careful here, Your Honor, in doing what they

20   ask, because suddenly every failure to warn case by every

21   government official is a constitutional violation, which is

22   exactly what *Collins* said shouldn't be.  It could open the

23   floodgates of 1983 litigation.  It's contrary to the

24   admonition not to expand constitutional rights.  It's

25   contrary to what the *Collins* decision said.

1          I know that the plaintiffs don't like our arguments

2    and -- but we're arguing the law.  We're making arguments

3    premised on very clearly established 1983 law, and they

4    have failed to set forth a viable, cognizable legal claim.

5    And I suggest that the emotionally charged arguments seem

6    almost to be a suggestion to disregard the law and that --

7    the law governs this case, Your Honor.  The law is clear.

8          Given the legal landscape in this case, Mr. Craig

9    would have had no notice that his alleged acts selecting an

10   alternate water sampling method, issuing a late notice, or

11   ignorance of the effect of lead concentrations in a boil

12   water notice were objectively unreasonable under clearly

13   established constitutional law.

14         THE COURT:  When did Mr. Craig begin the first set

15   of testing?

16         MR. MITCHELL:  The allegations are that he did it

17   June 23rd and the 24th and maybe 25th --

18         THE COURT:  Of what year?

19         MR. MITCHELL:  Of 2015.  Sorry.

20         THE COURT:  2015?

21         MR. MITCHELL:  Yes, Your Honor.

22         THE COURT:  Do the allegations allege when he first

23   should have done it?  He was doing them triennially; right?

24         MR. MITCHELL:  There's no allegation about when --

25         THE COURT:  Okay.

1          MR. MITCHELL:  -- or doing the testing at the wrong

2     time.  It's just that he reported the results late.

3          THE COURT:  Okay.  All right.  You heard Mr. Stern's

4     response to the questions.  I'm turning to the state tort

5     claims notice, and, again, I'm looking at what the statute

6     requires.  And I guess you still contend that they don't

7     have sufficient information according to what the statute

8     says, "Contain a short and plain statement of the facts

9     upon which a claim is based, including the circumstances

10    which brought about the injury."

11         I think the claim says drinking the water brought

12    about the injury.  The extent of the injury, they list all

13    those possible claims that they might have.  The time and

14    place of the injury, the time didn't say a specific day.

15    The place is Jackson presumably.  The names of -- it does

16    say the names of all persons known to be involved.  All

17    persons, so that would include if the child did not --

18    under the state's theory, I assume if the child did not

19    list all those persons who were aware of the sort of

20    defects that they might have been suffering from, if the

21    child was in school, each teacher might have been aware

22    that the child was in the old -- in the old broad words,

23    was a little bit slow or he didn't act this way or do this

24    this way and all that.

25         If they did not have that information when you --

1    when the statute says "all persons," would that turn any

2    notice that they have to one which has not substantially

3    complied?

4         MR. MITCHELL:  Well, Judge, first, obviously if they

5    don't know about persons that are involved, they can't

6    identify them, so that doesn't necessarily violate the

7    statute.  If you don't know, you don't know.

8         THE COURT:  No.  No.  I'm talking about if you do

9    know but you don't list.

10         MR. MITCHELL:  Well, then --

11         THE COURT:  If you don't list all the school

12    teachers who may know.

13         MR. MITCHELL:  Your Honor, I don't believe -- I

14    don't believe that substantial compliance with the names of

15    all persons known to be involved would include such a broad

16    listing.  I think it would include the parents and the

17    people that live with the child in the home.

18         But I -- but what I did really hear, Judge, I heard

19    some incredibly troubling things that I thought Mr. Stern

20    was saying.  I heard that some of these children may not

21    have manifested an injury.  You know that we can't -- you

22    can't bring claims in Mississippi based on fear of disease.

23    If it hasn't manifested, if they're not injured, they

24    shouldn't be here.  I heard --

25         THE COURT:  Well, that would -- that would be

1    something you would bring to the Court; right?

2        MR. MITCHELL:  Well, that would be something that I

3    could and I would and I might if they include it in the

4    notice, but of course, they haven't.

5        The other thing that I heard is they may not have

6    even hired people to determine whether or not they're

7    injured.  Wow, really?  Why are they here in this court

8    system if they haven't done that?

9        Yeah, it's expensive.  Sure, it costs money to get a

10   diagnosis, but without one, they shouldn't be here.  This

11   is a court we need -- the court should, always should

12   afford people that are injured rights to have their claims

13   litigated in court.  But they must be injured, Your Honor,

14   and that needs to be established, and, yes, that needs to

15   be set forth in these notices.

16       But what he said about that was so troubling to me,

17   that maybe they haven't even done that, had anybody

18   determine whether they're injured.  Does that mean that

19   every child in Jackson is just going to start filing their

20   cases here whether or not they've ever been exposed to

21   lead --

22       THE COURT:  And discovery --

23       MR. MITCHELL:  -- whether or not they --

24       THE COURT:  And discovery will reveal, would it not?

25       MR. MITCHELL:  No.  They still --

1      THE COURT:  Because they have the burden of proving

2  it.  They have the burden of proof.

3      MR. MITCHELL:  They have the burden of proof, but

4  they have -- they have a burden before they enter this

5  court to tell us if they actually have an injury.  That's

6  what this --

7      THE COURT:  They have --

8      MR. MITCHELL:  -- statute says.

9      THE COURT:  -- the burden of proof.  So if they give

10  you the names and they say this Person X is injured because

11  of the water, that would be enough if they showed they have

12  some sort of affidavit from somebody.  When, in fact, after

13  discovery begins, you may develop the theory that, no, it's

14  not because of the lead that came from the water.  It's

15  from the lead that came from their house in their paint;

16  the child routinely ate paint chips.

17      But that would not mean that that case cannot move

18  to court, would it not?  I mean, if he had that

19  information?

20      MR. MITCHELL:  Well, that, you made -- you stated a

21  good point.

22      THE COURT:  Because you all are going to depose

23  these people, --

24      MR. MITCHELL:  You stated an excellent point, Judge.

25      THE COURT:  -- and you're going to argue about every

1  injury they had.  And you're going to say, no, you're

2  not -- your mental stuff is not based on having drank the

3  water, its because of something else.  It's congenital,

4  it's hereditary, it's all of that.

5       But that gets them to the court at least; right?

6       MR. MITCHELL:  But what you just said is very

7  important.  We might dispute what caused the injury --

8       THE COURT:  You will.

9       MR. MITCHELL:  -- but what got them into court is

10  identifying an injury to begin with; and that's what they

11  have failed to do.  They have not identified an injury to

12  begin with.  We're not to the disputing what caused it

13  phase.  We're to the did you give me notice that you even

14  have one phase, which is what they were required to do

15  under the statute.

16       And if it hasn't manifested, if they don't have

17  anybody that says they're even injured, they shouldn't be

18  in this court.  And that's what these notices will tell me

19  and allow me to evaluate and consider these claims, and

20  that's what the law requires.

21       THE COURT:  So how -- I'm just asking is this going

22  to end up being 1,000 individual claims or 800 or 600

23  individual claims?

24       MR. MITCHELL:  What do you mean, Your Honor?  I'm

25  sorry.  I didn't --

1          THE COURT:  There are 800 different plaintiffs.

2     There are 600 different plaintiffs, when they go back and

3     do everything like you want to do, maybe the list comes

4     down to 350.  Are they going to pursue a lawsuit on each

5     one of those separately?

6          MR. MITCHELL:  Oh, I don't know how they would

7     refile them.  I think they could refile them en masse like

8     they've done here.  I think they could do that.

9          I think -- I think the real potential here is that

10    you might see less plaintiffs coming back into this system,

11    or at least I will be given the notice about whether they

12    have legitimate claims.

13         THE COURT:  Okay.  All right.

14         MR. MITCHELL:  The other issue is a policy -- Judge,

15    I think I've covered the policy issues enough.  I mean,

16    it's under the MTCA.  Again, you know, we don't have to

17    prove the actually considered policy implications.  The

18    posited conduct only has to be susceptible to policy

19    analysis.  You know, the federal and state drinking water

20    acts give really broad discretion and supervisory powers to

21    the state in regulating drinking water issues; that broad

22    discretion creates a strong presumption that the

23    discretionary acts involves some consideration of policy.

24         So, again, applying these legal principles, the

25    state defendants' acts in overseeing the water supply, the

1    decisions they made on testing methods, timing of

2    reporting, and content of boil water notices were decisions

3    made by individuals charged with the responsibility for

4    those decisions, and they involved policy.

5         There's cases -- there are a number of cases out

6    there that talk about that.  The *Dancy* case, which is a

7    2006 case, it says, "Government conduct involves policy

8    consideration when the activities 'emanating from or

9    relating to matters of human welfare.'"  That's what these

10   are.

11        There's a number of cases that are cited and

12   explained in the brief that describe the difference between

13   what is a policy decision, which is entitled to immunity,

14   versus what is a simple negligence decision by some --

15   perhaps a lower-level person failing to do something, some

16   particular act.

17        THE COURT:  Make sure you stay on the microphone.

18        MR. MITCHELL:  Oh, again, I apologize, Judge.

19        This is -- you know, without going into a lot more

20   detail, the *Smith* case they cited, which is a 2020 case;

21   the Simpson County case, which is *Simpson County versus*

22   *McElroy*, 82 So. 3d 621, another 2011 Mississippi Supreme

23   Court case, all support our arguments that the actions of

24   Mr. Craig here in this situation were policy

25   considerations, and he's entitled to immunity.

```
 1            I'll add one last thing.  They said if they hadn't
 2      stated the claim right, they'd like a chance to amend it.
 3      The -- the claims against Mr. Craig, no matter how many
 4      times they amend, are never going to be clearly established
 5      bodily integrity constitutional rights.  Any amendment,
 6      Your Honor, to add more verbiage about how bad it was is
 7      not going to -- is not going to remedy or solve any
 8      problems they have.  These are not clearly established
 9      constitutional claims.  They were not clearly established
10      at the time of Mr. Craig's act.  Any amendment to try to
11      add words would be futile, and we would oppose that.
12            THE COURT:  All right.  Thank you.
13            Candice, how are you doing?
14            THE REPORTER:  I could use a break.
15            THE COURT:  We're going to take a five-minute break,
16      and then I'll turn to the City of Jackson.  And I don't
17      think the rest of them will be as lengthy, because we've
18      covered a lot of ground with respect to this.  But I will
19      give you an opportunity to make your full argument that you
20      think you need to make, and I'll have a few specific
21      questions I think.  But we're going to take about a
22      ten-minute break.
23            My goal is to -- I have another obligation at 2:00.
24      And so my goal is to be done long before then, so that the
25      court reporter can get a lunch break as well.  We'll be in
```

 1    recess.

 2         MS. SUMMERS:  All rise.

 3              (A brief recess was taken.)

 4         THE COURT:  You may be seated.

 5         Mr. Webster?

 6         MR. WEBSTER:  Thank you, Judge.  Clarence Webster

 7    for the plaintiff.  I understand there are some time

 8    constraints here --

 9         THE COURT:  I'm not going to -- you know, I'm going

10    to give you an opportunity to make your argument.

11         MR. WEBSTER:  Yes, sir.  But for one thing, the City

12    of Jackson along with the individual defendants who are

13    connected to the City of Jackson, we filed a joint answer,

14    and there is some overlap between our various arguments.

15    And even though the City of Jackson doesn't have a

16    qualified immunity defense, there are some arguments with

17    regards to whether there's a constitutional violation, what

18    was established at the time these things happened.

19         There's some overlaps, so I will spend the bulk of

20    my time talking about the legal issues and whether there

21    was a constitution violation.  And then counsel for the

22    individual defendants will deal with the specific conduct

23    of those individuals as alleged in the complaint.

24         Understanding the Court's time, because I think we

25    can get this done, I think I will start with the easy issue

 1    first and then we work backwards.

 2             THE COURT:  Okay.

 3             MR. WEBSTER:  And the easiest issue is we didn't get

 4    90 days notice of the negligence claim in the cases filed

 5    in case numbers 21-663 and 21-667.

 6             THE COURT:  Okay.

 7             MR. WEBSTER:  Plaintiffs acknowledge that.  They

 8    served the notice on one day, and they filed the complaint

 9    on another.  There's one remedy for that, the claims have

10    to be dismissed.  The plaintiffs argue, without citing any

11    cases, that consolidation somehow cures the issue, but

12    Mississippi law is clear that there's no procedural cure or

13    substantive cure for failure to give notice.  So those

14    claims go out the window or those claims are out right now.

15    And this is not just an academic exercise, because there

16    are named plaintiffs in this case who are currently over

17    the age of 21 based on the demographic information that we

18    have.

19             All right.  These --

20             THE COURT:  So you would move to dismiss those

21    plaintiffs?

22             MR. WEBSTER:  Yes, sir.

23             THE COURT:  Okay.  So --

24             MR. WEBSTER:  We would move to dismiss all of the

25    state law claim -- well, the negligence claim in all of the

1 21-663 and 21-667 cases, so the two cases that were filed

2 in '21.

3   THE COURT:  Okay.  So they would be dismissed

4 without prejudice but not without consequences --

5   MR. WEBSTER:  Yes, sir.

6   THE COURT:  -- which would sort of be your argument.

7   MR. WEBSTER:  That's the argument, yes, sir.

8   THE COURT:  Okay.  Because for those who are still

9 less than 21 or whatever that magical age is --

10   MR. WEBSTER:  Yeah, we'll cross that bridge when we

11 get there, when they refile.

12   THE COURT:  What about those -- okay.  But you've

13 had them 90 days now; right?

14   MR. WEBSTER:  The notices -- the notices of -- we

15 have not received proper notices, no, sir.

16   THE COURT:  You have not received the notices of

17 claim?

18   MR. WEBSTER:  We have their notices now, Your Honor.

19   THE COURT:  Okay.

20   MR. WEBSTER:  Yeah.  And --

21   THE COURT:  You received them, but they filed suit

22 one day later you're saying?

23   MR. WEBSTER:  That's correct.

24   THE COURT:  And those notices of claim, you do have

25 those?

1          MR. WEBSTER:  We do have those, yes, sir.

2          THE COURT:  All right.  Now, help me out with this

3    other issue about whether or not even -- because if these

4    are going to be dismissed, they're going to have to refile

5    them.  They're going to have to give them to you.

6          MR. WEBSTER:  Yes, sir.

7          THE COURT:  What do they need to give to the City of

8    Jackson that complies with the Tort Claims Act, 11-46-1?

9          MR. WEBSTER:  Judge, we don't raise that argument.

10   The City of Jackson doesn't raise that argument, so I'm not

11   prepared to speak on it.  Our only argument as to why the

12   state law claims should be dismissed in 21-663 and 21-667

13   is we didn't get proper notice.

14         THE COURT:  Okay.  So is it your contention then

15   that the notices that have been provided are sufficient?

16         MR. WEBSTER:  I will say this, Judge.  We received

17   the same notices in the 22 cases, and we have not moved to

18   dismiss the negligence claim.  Is that fair?

19         THE COURT:  Okay.  All right.

20         MR. WEBSTER:  Let's leave it at that.  All right?

21   Thank you, Judge.

22         THE COURT:  Thank you.

23         MR. WEBSTER:  So next would be the state-created

24   danger claim, and I think as Mr. Stern said that one's in

25   the box and the gasoline --

1          THE COURT:  The gasoline is burning on that one.

2          MR. WEBSTER:  Okay.  Good.  All right.  Thank you,

3     Your Honor.

4          All right.  So the plaintiffs have filed a very

5     thorough complaint.  There's been a lot of briefing and a

6     lot of paper in this case.  But the question before this

7     Court on this bodily integrity claim and whether they've

8     pled a violation of bodily integrity is not whether the

9     City of Jackson provided, is providing, has provided

10    contaminated water, which we dispute they have.  They have

11    not.

12         The question is whether the actions of the City of

13    Jackson as alleged in the complaint compelled the

14    plaintiffs to consume water.  Not the provision of the

15    water, it's not putting the cup out there in front.  It's

16    putting the cup out in front, pointing to it, and saying

17    you have to drink it.

18         Now, in *Guertin* in Michigan -- and Mr. Stern knows a

19    lot more about that case than I ever will -- the question

20    was or what the court hung its hat on was that the

21    officials up there took away informed consent from the

22    citizens by lying to them.  There is no allegation of a lie

23    here.  The allegation is --

24         THE COURT:  The water is safe to drink, I've heard

25    that through the mouths of multiple city officials, and

1    they've alleged that.   Now, whether that's true...

2        MR. WEBSTER:   What is beautiful about plaintiffs'

3    complaint is they cited it, where they got those quotes

4    from, and they are specific, handpicked quotes from

5    Clarion-Ledger articles and they -- and I -- if you look at

6    footnote 45 of their complaint, if you look at footnote 23

7    of their complaint, and you look at what the official said,

8    the officials always said the water is safe to drink

9    subject to certain precautions.   The city gave warnings.

10        Since January of 2016, the city has said if you're

11   going to drink the water, here are five things you need to

12   know: Run your cold tap for one to two minutes before

13   drinking the water; do not use hot water for cooking or

14   drinking; pregnant women and small children should refrain

15   from using tap water; three, to refrain from mixing baby

16   formula with tap water; and, four, to screen small children

17   for lead.

18        That's in the notices.   That's in the statements

19   from Mr. Miller to Kishia Powell to the mayoral defendants

20   in this case.   And so the question -- I mean, so let's be

21   clear about this.   We're talking about this in the

22   constitutional sense.   We're not talking about it in the

23   negligence sense.   We're not talking about it in the

24   statutory sense.   We're talking about this in the

25   constitutional sense.

1        In the constitutional sense, the due process clause

2   is to stop state actors from intentionally doing things to

3   people, and there is no allegation of intentionality here.

4   Unless I'm wrong, but there is no allegation that any city

5   official said here are my three options; let me pick the

6   one that hurts the citizens of Jackson the most.  There's

7   no allegation of that.

8        So the question becomes what did the -- of the

9   allegations the plaintiffs allege in the complaint, what

10  did they do to take informed consent away from the citizens

11  of Jackson?  What did they do to say we're not giving you a

12  choice on whether you drink this contaminated water or not?

13  We're going to tell you it's not contaminated, even though

14  it is.

15       There is no allegation of a lie in the complaint.

16  The complaint is City of Jackson officials said certain

17  things, and they could have said it better or they could

18  have said it differently.  And the due process clause does

19  not allow that type of second-guessing of government

20  officials in any circumstance.  That's not the point of the

21  due process clause.

22       In fact, the Supreme Court has been clear, the due

23  process clause is phrased as a limitation on the state's

24  power to act, not as a guarantee of certain minimal levels

25  of safety or security.  It forbids the state itself from

1    depriving individuals of life, liberty, and property

2    without due process, but its language cannot be extended to

3    impose an affirmative obligation on the state to ensure

4    that those injured do not --

5         THE REPORTER:  Slow down for me, please.

6         MR. WEBSTER:  Excuse me -- do not come through harm

7    through other means.

8         So, again, the provision of the water -- and I

9    believe plaintiffs are saying this, it's not the provision

10   of the water that gives rise to their claims.  It's that

11   we -- they argue that we somehow did something to make --

12   to force people to drink the water and --

13        THE COURT:  Well, let me ask this question, and it

14   may be, you know, a very easy answer, and then I have a

15   couple more following that.

16        Is it the city's position that it has no obligation

17   to provide clean water?

18        MR. WEBSTER:  It is not -- oh, that is -- no, that

19   is not the city's position.  There are statutory

20   obligations.  There are state law obligations.  There are

21   tort law obligations.  There's not a constitutional

22   obligation.

23        And, Judge, that may sound very, very harsh, but

24   this is what the United States government has told the

25   world.  In 2008, the United States government, in response

1  to a request from the United Nations, said that the United

2  States Constitution does not guarantee a right to safe

3  water or sanitation.  Although, various other laws do.

4          THE COURT:  Okay.

5          MR. WEBSTER:  And what -- and the only argument the

6  City of Jackson is making is there may be other avenues.

7  And if those avenues were in front of us right now, we may

8  be here on a motion to dismiss; we may not be here at all;

9  we may be in discovery.  But there is no constitutional

10 avenue.

11         THE COURT:  What is the city's position on whether

12 or not it at least has an obligation not to poison the

13 water or allow toxic stuff --

14         MR. WEBSTER:  The city cannot intentionally poison

15 or contaminate the water, yes.  The city, it is -- it would

16 be a constitutional violation for the city to take an

17 affirmative action to intentionally hurt its citizens, yes,

18 but that's not alleged in this case.

19         THE COURT:  Okay.

20         MR. WEBSTER:  Giving plaintiffs' complaint the best

21 reading, that's not alleged.

22         THE COURT:  Okay.  The warning piece is alleged, I

23 think, --

24         MR. WEBSTER:  Certainly.

25         THE COURT:  -- so if the city knows that the water

1    is dangerous, do they have an obligation to warn the

2    citizens?

3        MR. WEBSTER:  And the city -- my position here is

4    that when you look at the -- and the pleading standards in

5    the Fifth Circuit are clear.  If the plaintiffs attach some

6    article to their complaint, and the complaint says one

7    thing and the articles say something else, you have to look

8    to the articles.

9        And the articles and other exhibits that the

10   plaintiffs attached, which are cited in our brief

11   throughout, say the city official said the water was safe

12   to drink, but you need to take precautions in light of

13   what's going on with the water system.  And they're in

14   notices that went out to water users.  They're in notices

15   that we, as water users, still get today I believe.

16       If you go on the City of Jackson website now, I

17   think you'll find those notices that talk about how to use

18   the water, running it for one or two minutes, not using hot

19   water for cooking, and telling the various -- the same

20   people who plaintiffs have filed a lawsuit here on behalf

21   of, telling pregnant women and small children to refrain

22   from using the tap water.

23       THE COURT:  What about the boil water notices that

24   come out with the water bill, or not just with the water

25   bill, we hear boil water notices all the time.

1          MR. WEBSTER:  Judge, if you give me one second,

2   there's no media here.  There's more than -- so I can say

3   this freely, there's more than one problem with the city's

4   water that people -- that people have -- oh, let's see.

5   God, I'm trying to think of the right way to say this in a

6   legal sense.

7          The boil water notices are not being put in place to

8   address the lead issues.  There are other issues with

9   turbidity and water-pressure issues that require the water

10  be boiled.  There's no allegation anyone at the city has

11  ever said boil the water because of lead, period.

12         THE COURT:  But does anybody in the city know if you

13  boil the water, it exacerbates the lead in it?

14         MR. WEBSTER:  I heard -- plaintiffs have alleged

15  that, but that is not factually proved for one.  And,

16  Judge, let me be clear because -- because the City of

17  Jackson is not being alleged to have issued these notices,

18  I'm not in a position to talk very intelligently about it.

19  I do know that in working on this case, that when these

20  boil water notices go out, they're to address issues

21  separate and apart from lead, and the professionals and the

22  agencies who are making these recommendations are

23  considering all of the compelling different issues.

24         THE COURT:  So it's the city which issues boil water

25  notices?  The city does not issue boil water notices?

 1          MR. WEBSTER:  I do not believe the plaintiff has

 2    alleged that the city has issued boil water notices.

 3          THE COURT:  Okay.  So that issue they tied to the

 4    state defendants only then?  I mean, the boil water --

 5          MR. WEBSTER:  Yeah, the boil water notices, yes,

 6    sir.

 7          THE COURT:  All right.  Okay.

 8          MR. WEBSTER:  I can tell you what issues they say

 9    are on the city defendants, and the boil water issue is not

10    one of them.

11          THE COURT:  Okay.  Yeah.

12          MR. WEBSTER:  It's the decisions that were made as

13    to the operation of the water system, which, again, that's

14    a separate -- that's not what we're here on, or we

15    shouldn't be here on in a constitutional sense.

16          What we're here on in a constitutional sense is what

17    did the city do to force people to drink the water?  And

18    provision of the water does not get you there, and it

19    doesn't get you there for a number of reasons.  Number one,

20    courts in the Sixth Circuit, in the Second Circuit, and I

21    think in the First Circuit have all said there's no right

22    to water or to clean water.  The United States government

23    has said it.

24          THE COURT:  The Fifth Circuit has said it?  Because

25    I heard you say First, Second, Sixth, so...

1          MR. WEBSTER:  Every court that we're aware of in the

2     United States government has said it.

3          THE COURT:  Except for the Fifth Circuit?

4          MR. WEBSTER:  I don't know what --

5          THE COURT:  Has the Fifth Circuit said it?

6          MR. WEBSTER:  I don't believe the Fifth Circuit has

7     said it.  This is an issue of --

8          THE COURT:  Well, they may say something different.

9          MR. WEBSTER:  They might say something different.

10    But I will say this, the Fifth Circuit has said that there

11    is no right to a contamination-free environment.  They've

12    been clear about that.

13         Okay.  So the issue comes down to did the city --

14    and, I mean, let's just -- I'm going to be as colloquial as

15    possible about it, but did the city lie to the citizens of

16    Jackson?  And there's no allegation in the complaint that

17    they did.  The allegation is the city officials said

18    things, and they could have said it better or they could

19    have said it differently.  And those are not the type of

20    questions that the due process clause or Section 1983 or

21    substantive due process jurisprudence allows courts to

22    answer, and there's a reason.  I mean, we can get into the

23    policy reasons for that.

24         Government should not be lying to citizens knowing

25    it's going to expose them to an injury, and that's not what

1    happened.  So, I mean, I -- I have no position on that but

2    they shouldn't, but that's not what happened here.

3        There's no allegation of a lie.  Even when you look

4    at the complaint, there are several points where the

5    plaintiffs say even though what Ms. Powell or Mr. Miller

6    said was technically true, it was misleading because.  And

7    the Second Circuit has really dealt with this issue in the

8    context of the 9/11 cases where there were public

9    statements made reassuring the public about the condition

10   of the air that people were breathing post 9/11.  And the

11   court said absent an intent to injure, there's no

12   constitutional or substantive due process violation coming

13   from a public official offering assurances of environmental

14   safety that turn out to be substantially exaggerated; and

15   that's the case we found that was most on point.

16       And, Judge, I'm not going to plow over old ground

17   that has not been raised generally, so with that, I will

18   conclude my argument unless the Court has more or different

19   questions.

20       THE COURT:  There are a lot of different briefs.  Do

21   you join in, or did you raise the discretionary function?

22       MR. WEBSTER:  We did not.

23       THE COURT:  You did not.  Okay.  All right.  Thank

24   you, Mr. Webster.  I appreciate you.

25       Let's take Mr. Stern and then the individual

1    defendants.

2    　　　MR. STERN:  I'll be very brief, Your Honor, or I'll

3    try to be.  Thank you again.

4    　　　First, I want to point to the Court a case called

5    *Greenwood Leflore Hospital versus Watson*; it's at 324 So.

6    3d 766, and it actually stands for the proposition that if

7    a notice is deficient on its face or for timing, that you

8    don't need to refile the notice.  You can actually do --

9    this has to do with the state Tort Claims Act.  And so this

10   entire sort of back and forth with everybody and the court

11   about reserving the notice and then waiting 90 days, the

12   case on point says you don't have to do that.  You can

13   dismiss without prejudice the claims and simply refile, so

14   if the defendants are going to --

15   　　　THE COURT:  But that will include a dismissal

16   without prejudice being without consequence.

17   　　　MR. STERN:  I don't know, and I understand what one

18   of the lawyers -- I believe it was the lawyer that just

19   spoke or maybe Mr. --

20   　　　THE COURT:  It was Mr. Webster, because I asked him

21   specifically.

22   　　　MR. STERN:  So the notice was sent, and then the

23   complaint was filed.  Because the claims in the complaint

24   will be dismissed without prejudice and there's no need to

25   resend the notice, and then the complaint will simply be

1    refiled, all it really does is start the clock.  Whether

2    that means there's no consequence to the however many

3    children they say are over 21.  I also don't think it's 21,

4    I think it's 22, because it's one year plus the age of

5    majority.  And so we're talking in sort of amorphous

6    details about what is probably a handful, potentially, of

7    the plaintiffs out of what was a thousand notices, so that

8    issue doesn't necessarily need to be decided right now.

9         I'm simply stating for the Court's knowledge, for

10   your staff's knowledge, and for the defendant's knowledge

11   that there's no requirement.  In fact, it's not required

12   that plaintiffs resend their notice of claim.  And to the

13   extent the city hasn't challenged the sufficiency of the

14   notice in the same way that Mr. Mitchell has, I think it's

15   just a different conversation, so I just wanted to put the

16   Court on notice of that.  I haven't read the case in full,

17   but I was informed by local counsel that it's on point.

18   It's good law, and I think it's a deeper dive.  Again,

19   that's Greenwood --

20        THE COURT:  Has the statute of limitations tolled on

21   the filing of the original complaint?  I mean, I'm trying

22   to think of all these technical issues that we're going to

23   face --

24        MR. STERN:  So I --

25        THE COURT:  -- because we're going to file

1  everything that we possibly can file.

2      MR. STERN:  As I often say, I don't know.

3      THE COURT:  All right.  Okay.

4      MR. STERN:  But to the more, you know, from my

5  perspective, substantive issue about the city defendants,

6  and I'll try not to address all of them specifically.  But

7  it's going to be hard not to.

8      I'm so sorry, can you --

9      MR. WEBSTER:  Webster.

10      THE COURT:  Webster.

11      MR. STERN:  I knew his first name was Clarence.

12      You know, Mr. Webster just often and early repeated

13  the phrase about intent, intent to harm, there was no

14  intent to harm.  There was no intentional conduct.  The

15  deliberate indifference standard, as opposed to an intent

16  to do harm, is sensibly employed only when actual

17  deliberation was practical; that's the *City of Sacramento*

18  *versus Lewis*, 523 U.S. 833, that's a 1998 case.

19      This intent to do harm is not the standard in the

20  Fifth Circuit, no matter how many other circuits opposing

21  counsel wants to cite.  See *Garza versus the City of Donna*,

22  that's 922 F.3d 626, it's a 2019 case.  In this line of

23  cases, which includes en banc decisions 20 years apart,

24  none requires proof of officials subjectively intending the

25  harm that occurs.

1          The case law of the other circuits adheres to *Farmer*

2     and hence doesn't require a showing of subjective intent

3     either, and that's in *The Estate of Gray versus Dalton*, and

4     that's 1:15-CV-061-SADS; that's from the Northern District

5     of the Mississippi.  In situations where the implicated

6     agents are afforded a reasonable opportunity to deliberate

7     various alternatives prior to electing a course of

8     action -- and this is important.  Everything I hope I say

9     is important, but this is specifically important.

10         In situations where the implicated agents, meaning

11    the city officials and the state officials, are afforded a

12    reasonable opportunity to deliberate various alternatives

13    prior to electing a course of action, their actions will be

14    deemed conscious-shocking if they were taken with

15    deliberate indifference toward the plaintiff's federally

16    protected rights.

17         Deliberate indifference is met where defendants were

18    aware of facts from which the inference could be drawn,

19    that their actions created a substantial risk of danger.

20         I'd like to now just go over the facts as they're

21    alleged against these city defendants in the complaint,

22    because they meet that standard.  They meet it clearly.

23         As was the case with Mr. Craig, we know, at least

24    according to the allegations in the complaint, that city

25    officials were aware in 2011 and certainly by 2013 that

1    Jackson was very seriously at risk of a major lead problem.

2    We know that because then, the then Mayor L Senior, along

3    with his Department Head Bell, they actually created a plan

4    to try and fix the problem, and they -- they created that

5    plan out of an awareness that the problem existed in the

6    first place.  And that plan included modifying a lime feed

7    that was being clogged because soda ash and lime ash was

8    being used in the water plant as opposed to a liquid lime.

9         All that's laid out in the complaint, but they

10   absolutely knew; the City of Jackson absolutely knew by

11   2013, if not two years sooner, that this was a major, major

12   problem, because they took steps and in fact budgeted

13   hundreds of thousands of dollars, as alleged in the

14   complaint, to fix the problem.

15        And then unfortunately, sadly, the mayor passed

16   away, and his vice mayor, Tony Yarber, who was also on the

17   council at the time, in a very quick, two-month election

18   managed to get elected to become mayor.  And he ousted

19   Mr. Bell from the position that he had in favor of

20   Ms. Powell -- in favor of Ms. Powell, and so suddenly you

21   have a new mayor and a new director of utilities.  It went

22   from Senior Lumumba to Yarber, and it went from Bell to

23   Powell.  And what did they do?  What does the complaint

24   alleged they did?  They removed the funding to do the fix.

25   They knew there was a problem, and they removed the funding

1    to do the fix.

2         THE COURT:  And you're saying that the city is -- I

3    mean, because I know these -- I don't want to mix the two,

4    because there are separate defenses as to each of the

5    individual actors I think.

6         MR. STERN:  Sure.

7         THE COURT:  Are you saying that the city is liable

8    because they did those things?

9         MR. STERN:  Absolutely.  The city is on the hook for

10   the acts of its employees.

11        THE COURT:  And have you sufficiently -- have you

12   raised a *Monell* claim?

13        MR. STERN:  We have, and they haven't actually made

14   any claims against the *Monell* claim.  They didn't move

15   against the *Monell* claim.  We -- we addressed it in our

16   brief out of an abundance of caution.  But the city never

17   moved to dismiss this lawsuit based on a failure to

18   properly plead *Monell*, and I don't think they can now.

19        THE COURT:  I mean, if they do, what would be your

20   response?  You just amend your complaint to add it or say

21   it's already there?

22        MR. STERN:  It's certainly already there.  These

23   were policy decisions that we've alleged that would bind

24   the city, and I think because of the way we've alleged it

25   is the reason why they didn't move against them.  I don't

1    think there are substantive issues to dismiss this case

2    that are centered on Monell.  I mean, I could be wrong, and

3    if I am, I stand corrected.  But nowhere in the motions

4    that were filed by any of the city defendants, and in

5    particular by the City of Jackson, was there a --

6         THE COURT:  A claim that Monell was not satisfied.

7         MR. STERN:  That Monell was not satisfied, that's

8    correct.

9         So just to go through these facts, and if the Court

10   will accept that the intent to do harm is not the standard,

11   but rather deliberate indifference, efforts regarding the

12   lead poisoning that Bell and Mayor Senior had undertaken,

13   they simply stopped.  Yarber got rid of Bell in -- in favor

14   of Powell.  Yarber and Powell were aware of Bell's

15   warnings.  They were aware of the report; they were aware

16   of this proposal; they were aware of the cost to repair.

17        First bad decision, Yarber deliberately -- and this

18   is what the complaint says.  Yarber deliberately withdrew

19   the funding for repairs.  Bell had previously advised the

20   city they had to be very, very careful about taking action

21   that would shock the water system.  He said this without

22   any information whatsoever, and in the face of the

23   information they had that the system needed to be fixed.

24        Second bad decision, the city switched 16,000

25   connections from the Maddox Road well system, which was

1    reasonably good water, to surface water which had high

2    rates of corrosivity and which passed through defunct

3    corrosive-control equipment.  That was a decision that they

4    made.  Instead of fixing the problem as outlined by Mayor

5    Senior and by Bell, they took affirmative steps to do

6    something that was much easier and cost much less money.

7        This decision was made and implemented without any

8    warning to the residents.  Nobody said anything to the

9    residents despite knowing, despite city employees knowing

10   earlier on that the water was bad; that there was no

11   corrosion control; that Jackson was going to be a hotbed

12   for lead poisoning.  They didn't warn the citizens

13   whatsoever that they were making a switch to a more

14   corrosive water system.  They didn't do any testing on the

15   new water system to determine corrosivity.  They didn't --

16       THE COURT:  So if that's true, do you believe that

17   that rises to a constitutional violation?

18       MR. STERN:  I think the combination of all of the

19   conduct that I'm about to describe does, because it's not

20   specific instances.  It's taken as a whole, so if I could

21   go even further with what these individuals did?

22       THE COURT:  Okay.

23       MR. STERN:  Almost immediately lead levels jumped

24   when the switch was made to about 15 parts per billion,

25   which is actionable under the safe water drinking act

1   (sic).  Lead levels were likely much higher, because the

2   testing was done in a poor manner.

3         Jackson continued to make missteps, and this is all

4   before January of 2016.  They didn't notify homeowners in

5   2015 of increased lead levels in June of 2015.  They just

6   stayed silent about it for seven months.  They didn't do a

7   single thing between learning about the high lead levels,

8   or for seven months to even try to mitigate slightly or to

9   control the lead levels now being reported.

10        The city was required to send notices of exceedances

11  to the -- to the Mississippi State Department of Health;

12  they didn't.  And so the city -- you asked earlier who does

13  the testing, very earlier on you were talking to

14  Mr. Mitchell, and if I could just step back for a minute.

15        The Environmental Protection Agency is the entity

16  that oversees federal regulations about how water should be

17  treated.  Oftentimes, if not always, the EPA grants what's

18  called "primacy" to states to monitor and control their own

19  compliance with federal regulations and sometimes state

20  regulations.  In Mississippi, that's what happened.  The

21  EPA granted primacy to the Mississippi Department of

22  Health, and then by state statute, the Mississippi

23  Department of Health is able to designate an employee to

24  take on that responsibility, which the Mississippi State

25  Department of Health did with regard to Mr. Craig.

1          The city is initially responsible for its own

2      testing and then reporting that testing to the Mississippi

3      State Department of Health.  Here, Mississippi -- the City

4      of Jackson, in Mississippi, was testing and realized it had

5      exceedances and never reported those exceedances to the

6      Mississippi State Department of Health in violation of the

7      safe water drinking act (sic).

8          THE COURT:  So I guess assuming -- and I know you've

9      got a long list of things, but assuming for purposes of

10     this, I'll have to assume that what you're saying is true,

11     12(b)(6), 12(c), whatever type of motion this is.  Assuming

12     that that is all true, at the end of the day -- I believe I

13     heard Mr. Webster say at the end of the day, we might have

14     violated some statutory regulation.  We might have violated

15     some tort principle.  We might have violated something, but

16     none of that rises to the level of a constitutional

17     violation.

18         What's your response to that?  I mean, the

19     constitution does not guarantee someone to have safe

20     drinking water, for example.

21         MR. STERN:  Well, it's a subjective standard first

22     to determine if it's deliberate indifference as opposed to

23     intentional harm.  In order to meet that standard, you have

24     to evaluate what the actors knew when they made the

25     decisions they made and what the consequences of those

1   decisions were.

2        And if that's not enough, if you look at the

3   complaint at Document 51, the amended complaint paragraphs

4   244, 245, 238, 247, 257, 85 to 90, 251 to 253, in January

5   of 2016, in contradiction to what they knew to be true,

6   Powell told residents that they did not need to stop

7   drinking water.

8        Opposing counsel wants you to believe, well, that's

9   not true.  Just because plaintiffs say it, that's not true,

10  but that's what the complaint says.  Powell stated it was

11  not a widespread issue in the city, and it was confined to

12  individual homes, knowing full well it was a widespread

13  issue.  Powell said that the water was safe, knowing full

14  well the water was not safe.  Powell essentially encouraged

15  residents to drink the water knowing the testing of the

16  lead exceeded federal guidelines.  Powell blamed internal

17  plumbing of the homes, knowing full well that the testing

18  was showing it wasn't specific to individual homes.

19       And Yarber admitted a month later in February of

20  2016 that 70 percent of the homes in Jackson were built

21  before there was any focus on lead plumbing affirming this

22  was a high-risk situation.  Yarber's concern was public

23  perception rather than public safety.  If you look at the

24  amended complaint at paragraphs 248 and 251 to 253, Yarber

25  stated -- he stated out loud he preferred not to discuss

 1  this despite knowing full well the gravity of the health

 2  effects.

 3       Despite the urging of city council, he refused to

 4  issue a declaration of a civil emergency, which would have

 5  required expanded testing and would have triggered federal

 6  resources.  He opposed the resolution denying that the

 7  system itself was an issue and continuing along this false

 8  narrative that this was isolated to individual homes.  And

 9  he chose to oppose it, and as he said was because he didn't

10  want the citizens of Jackson to believe that this was the

11  next Flint.

12       By the way, that in and of itself, if you look at

13  the complaint at paragraphs 29, 248, 249, and 251 -- I

14  think what the counsel for defendants thought was going to

15  happen today was I was going to stand up here and pound on

16  my chest and talk about *Guertin* and Flint, and say this was

17  fine.  I haven't said any of that.  I haven't said any of

18  it.  I haven't argued they were on notice because of

19  *Guertin*.  I haven't argued they were on notice because of

20  Flint.

21       But their own words in 2016 show that they, in fact,

22  were.  Powell reportedly downplayed the crisis in January

23  and February of 2016, saying this is no Flint.  Powell told

24  the public that the crisis was different than Flint,

25  because Flint had no corrosion controls.  Powell claimed

1    falsely that Jackson's lead levels were nowhere near as

2    high as Flint.  Yarber said, "We are not Flint."

3        And so to the extent that any defendant wants to get

4    up here and argue that they weren't on notice because

5    *Guertin* wasn't controlling and because Flint was its own

6    thing, they sure as heck in 2016 were talking about being

7    on notice by trying to distinguish everything that was

8    happening in Jackson from Flint.  That's not my words.

9    That's not my argument.  I'm not relying on the Sixth

10   Circuit case to convince Your Honor of that.  Those are

11   their words as pled in the complaint.

12       THE COURT:  But just because Flint was going on

13   doesn't mean that established the law in this circuit;

14   right?

15       MR. STERN:  It's not that they have to be aware.

16   There's actually a court decision on point.  They just

17   simply have to be aware that there's an issue that could

18   lead to a violation of a fundamental right.  And knowing

19   that in 2013 and 2011 that Jackson was going to be a hotbed

20   for lead poisoning, knowing that their predecessors in

21   government had made a plan, that was a solid plan, to

22   address that issue; knowing that once those individuals

23   died, they were going to withdraw funding in -- in either

24   an effort to do something cheaper or -- and we haven't

25   gotten into it -- the relationship that Mayor Yarber had

1    with Trilogy, which in and of itself as pled in the

2    complaint is pretty shady in terms of --

3         THE COURT:  But even here if we assume the Flint

4    case had some sort of notice or some sort of clearly

5    established law that you could rely on, it would not have

6    been clearly established until the date the Sixth Circuit

7    had ruled; right?  Not the District Court.

8         MR. STERN:  This isn't about -- you're correct.  But

9    the argument here is not and has never been that it was

10   clearly established by *Guertin*.

11        The argument here has been that the same underlying

12   United States Supreme Court cases that led the *Guertin*

13   court, the Sixth Circuit, to find it was a clearly

14   established right preexisted any of the conduct here.

15        There's this miscommunication somewhere because one

16   time, potentially on a Zoom call, I mentioned Flint, or

17   because people know that I represented plaintiffs in Flint

18   that somehow the argument is that *Guertin* put Jackson on

19   notice.  That is not the argument.

20        There's not a single case cited by the Sixth Circuit

21   or from the United States Supreme Court in *Guertin* that was

22   not on the books prior to what happened in Jackson

23   happening in Jackson.  The same rationale that the Sixth

24   Circuit undertook and relied on to find it was a clearly

25   established right in *Guertin* existed prior to what happened

1    in Jackson, so we should not be conflating the issues of

2    *Guertin* put Jackson on notice with what the underlying

3    cases in *Guertin* stood for.

4          THE REPORTER:  Slow down, please.

5          MR. STERN:  I'm sorry.

6          THE COURT:  It's okay.

7          MR. STERN:  Moving on, not only did -- did the city

8    actors Yarber and Powell fail to inform and misled through

9    some of their representations that either the water was

10   safe or it was limited to a specific place.

11         But in 2018, Mr. Miller, he told the public that

12   there's been no detecting of lead and copper in the water

13   supply.  At least according to the allegations in the

14   complaint, we know that that's false in 2018.

15         Then the city makes it worse.  If you look at

16   paragraph 289 to 290, 271, 276, 112, 279 to 282, paragraph

17   32, paragraph 283, they failed to adhere to compliance

18   plans, which required corrosion-control studies.  They

19   failed to maintain a constant PH, and low PH leads to high

20   lead levels.  And even as late as February of 2022, Jackson

21   continued to fail to meet the requirements of the LCR.

22         Now, if they didn't know any of the things that

23   happened in '11, in '13, in '16, in '15, maybe it's a

24   different conversation, but we're talking about 11 years

25   later.  Eleven years later, they are still deliberately

1  failing to comply with the regulations of the Lead and

2  Copper Rule.

3        And then we get into this whole

4  Yarber-Powell-Trilogy political ally.  Look at the

5  allegations in paragraphs 124 to 125, 158, 300 to 301, 298,

6  299, 302, 339, 307, 319 to 323, and 311 to 315.  They used

7  Trilogy, their political ally, as an excuse not to declare

8  an emergency.  The owner of Trilogy held a campaign event

9  for Yarber, and he's not even an engineer.

10        THE COURT:  Is that -- would that rise to the

11  level -- but with Trilogy, you know, they're not here for

12  all intents and purposes.  I mean, what we're talking --

13  what the city has narrowed in on is, what is the

14  constitutional violation with respect --

15        MR. STERN:  So I think what the city is honing in on

16  is what is the conduct that's required in order to make a

17  finding of a constitutional violation.  I don't think the

18  city is arguing at this point there's no right to bodily

19  integrity.

20        I do think that they're arguing that it wasn't

21  clearly established, and I've already addressed that by

22  pointing you to the underlying cases from the United States

23  Supreme Court that led the *Guertin* court to make its

24  decision.  But if we're focusing simply on the conduct,

25  it's telling that counsel stood up and is imploring you to

1    use an intent to do harm standard when that is not the

2    standard.  The standard is deliberate indifference.

3        And, again, in situations where the implicated

4    agents -- here, these are all the city officials -- are

5    afforded a reasonable opportunity to deliberate various

6    alternatives prior to electing on course of actions, their

7    actions will be deemed conscious-shocking.  Thus, their

8    actions will be deemed unconstitutional if they were taken

9    with deliberate indifference towards the plaintiff's

10   federally protected rights.

11       These allegations, the water is safe, telling people

12   it's safe.  Telling people that it's -- it's limited to

13   particular homes.  Telling people in 2018 that the testing

14   showed no high lead results, making a decision to not do

15   the project that took two years to create by Bell and Mayor

16   Senior in favor of let's just make the switch without even

17   testing, and then employ our friends at Trilogy, the owner

18   of which isn't even an engineer.  Those are absolutely

19   conscious shocking, especially when read in the light most

20   favorable to the plaintiffs.

21       And then finally when we get to Mayor Junior -- and,

22   again, it's Lumumba.  I don't want to mispronounce anyone's

23   name out of respect.  But one thing the Court -- I think it

24   may not be clear thus far from the argument.  The

25   allegations in the complaint don't start and stop in 2015

1    and 2016.  The allegations start based on what happened in

2    2015, and they continue for a long period of time.

3        The allegations against Mayor Lumumba Junior, are

4    not that in 2015, he was deliberately indifferent.  He

5    wasn't in a position of city power.  Same thing for 2016,

6    same thing for 2017.  But if you look at the allegations

7    contained in paragraph 327, 325 to 329, 331 to 334, 332,

8    341 to 344, in 2020, on March 27th, the Environmental

9    Protection Agency issued an administrative order to the

10   City of Jackson through Mayor Lumumba Junior for violations

11   of the Safe Drinking Water Act.  There's no dispute about

12   that.  It said the water system presented an imminent and

13   substantial endangerment to the persons served by the

14   system; that's in March of 2020.

15       He failed to alert the public or the council until

16   April of 2021, a year later.  The same mayor who received

17   notice from the Environmental Protection Agency of these

18   violations in March of 2020, literally didn't tell the

19   public or his city council for a year.  He knew that the

20   plant was understaffed; that's pled in the complaint.

21       Once he read the notice, not only did he know there

22   were violations, but that the plant was understaffed, and

23   he failed to do a single thing about it.  And in fact, as

24   recently as I think it was late 2021, I watched, and then

25   he went on television and said that there was no issue with

1    the water.  He actually accused me of being, you know, a

2    lawyer --

3        THE COURT:  That was after this lawsuit was filed,

4    though; right?

5        MR. STERN:  I don't know what the timing of it was.

6    It may have been.  It may have been.

7        THE COURT:  All right.

8        MR. STERN:  So just to put this all in perspective

9    as to the city, the Mississippi State Department of Health

10   called Jackson high risk in 2011 -- in 2011.  In 2013,

11   Public Works Director Bell provided a warning and a plan

12   for repairs and to install corrosion control as soon as

13   2013.

14       Eleven years later -- eleven years later, through

15   the actions that I just described and the inactions that I

16   just described and the statements that were made by all of

17   these officials, that never happened.  It never happened.

18   That, if that is not deliberate indifference, if that is

19   not conscious-shocking, then I don't know what is.

20       THE COURT:  All right.

21       MR. WEBSTER:  Judge, may I briefly respond?

22       THE COURT:  Yes, absolutely.

23       MR. WEBSTER:  Thank you, Judge.  May it please the

24   Court?  I don't know Mr. Stern very well, so I'm not going

25   to say that he did this intentionally.  But he completely

1    rewrote his complaint as he stood up here just a few

2    minutes ago.  He said the City of Jackson did this testing

3    in the summer of 2015 and didn't tell the state about it

4    until January.

5           His complaint, paragraph 129, on or about June 23rd

6    and 24th of 2015, officials from the Mississippi Department

7    of Health performed water testing in Jackson required by

8    the Safe Drinking Water Act.  He then cited the test

9    results, where he got them from.  He then says that all of

10   this relates to the State of Mississippi, not the City of

11   Jackson.

12          So then we jump over from paragraph 190 to paragraph

13   221, and he says despite finding seriously high lead, blah,

14   blah, blah, the state officials did not inform the City of

15   Jackson residents and water users at that time.  He does

16   not claim that the City of Jackson in this complaint --

17   now, he may have another complaint coming, but in this

18   complaint, he does not allege the City of Jackson got

19   notice of the lead exceedance until January of 2016.

20          And on the day the City of Jackson got notice of the

21   lead exceedance, they had a press conference that Kishia

22   Powell was at, and he quoted Kishia Powell as telling folks

23   the water was safe.  But his own exhibit showed that that

24   is not all she said.  She said that certain precautions had

25   to be taken.

1          He then mentions that Robert Miller made a mention

2     regarding the condition of the water.  He's referring to a

3     press release that he attached to his complaint.  On the

4     last page of that complaint is just what I told the Court

5     the city had been telling folks since 2016:  Running tap on

6     cold one to two minutes; households should never use hot

7     water for drinking or cooking; residents should clean out

8     their faucet aerator by unscrewing the aerator; any child

9     five years or younger and any pregnant woman should use

10    filtered water or bottled water for drinking and cooking;

11    baby formula should be --

12          THE REPORTER:  Slow down, please.

13          MR. WEBSTER:  I apologize.  I'm sorry.

14          But it is clear that since 2016 -- and plaintiffs

15    don't deny this.  Since 2016 when the city was first made

16    aware of a lead exceedance, it has been giving statements

17    that included clear warnings placing the city on notice of

18    -- excuse me -- on notice of precautions that need to be

19    taken when protecting -- when using the water.

20          Now, he mentions that I try to impose this

21    intentionality requirement in the Fifth Circuit, and I

22    don't have -- number one, I don't have to impose it; I can

23    just cite from the cases, that this was a case discussing

24    the Fifth Circuit case law.  Fifth Circuit case law in this

25    area is sparse.  The few cases that explore the

1  constitutional liberty interest in bodily integrity defines

2  this right as the right to be free from intentional injury

3  inflicted by a state actor.

4        In the Fifth Circuit case in 2015, *Pierce versus*

5  *Hearne*, it says the foundational question on a bodily

6  integrity claim is whether state actors deliberately

7  abused, restrained, threatened, or touched.  Now, what I

8  did say was --

9        THE COURT:  Give me the citation to that.  You said

10  Pierce?

11        MR. WEBSTER:  Yeah, this is *Pierce versus Hearne*

12  *Independent School District*; it is 600 F.App'x 194, page

13  198, and it's cited in our brief, Judge.

14        THE COURT:  Okay.

15        MR. WEBSTER:  But what I -- what I really said was

16  that plaintiffs don't claim that in any of the actions the

17  City of Jackson took, they intended to harm their citizens.

18  So in the absence of that allegation, the only way that

19  they can make a claim would be tantamount to the claim the

20  Sixth Circuit recognized in Flint, which is coercion or

21  taking away informed consent through a lie.  And that's not

22  present here.  That's all that I've said about the Flint

23  case.  That's all I've said about the standard, and not one

24  word I've said can be contradicted by either the law or

25  what plaintiffs filed in their complaint.

 1          Thank you.

 2          THE COURT:  Thank you, Mr. Webster.

 3          MR. STERN:  Your Honor, may I just make one comment?

 4          THE COURT:  You'll have an opportunity to make yours

 5    behind these other defendants being heard.

 6          MR. STERN:  That's fine.

 7          MR. HAWKINS:  Good afternoon, Your Honor.  John

 8    Hawkins for Mayor Lumumba and Mr. Miller, Robert Miller,

 9    the former public works director.

10          To put this in context, these two individuals,

11    Mr. Miller was with the city as public works director from

12    I believe October of '17 until July of '20.  Mayor Lumumba

13    who -- and I understand why it's tempting to call him

14    "Junior," but it's Mayor Antar Lumumba.  He's not a junior,

15    but in any event, he took office in June of 2017.

16          And so what I would ask the Court to recognize first

17    and foremost is, there's been no lead exceedance action

18    level finding since 2017.  The findings for action levels

19    that were exceedances that required some action to be taken

20    were the ones that were being discussed that came out of

21    the 2015 testing and the 2016 testing, so there have been

22    no exceedances since then.

23          The other thing I would like to point out is that

24    almost all of the conduct complained of by the plaintiffs

25    in this case precedes the dates that Mr. Miller worked for

1    the city and Mayor Lumumba took office.  All of the conduct

2    that he would complain of about Mayor Lumumba and

3    Mr. Miller, while there are very few allegations in the

4    complaint regarding those individuals, all of that took

5    place before *Guertin* was handed down.  So we would adopt

6    and agree with the prior arguments dealing with whether or

7    not there was a clearly established constitutional right

8    that would apply to the conduct at issue in this case or

9    that would have placed these officials on clear notice that

10   conduct they engaged in would violate a clearly established

11   constitutional rights.

12        Even, however, for the sake of discussion, should

13   the Court determine otherwise and follow some of the case

14   law that *Guertin* referenced in its decision, we would still

15   get to the question of whether or not the conduct at issue

16   here by the individuals is so conscious shocking that it

17   rises to the level of deliberate indifference for the

18   purposes of this constitutional analysis.

19        In the *Guertin* case, citing to Supreme Court

20   precedent and other Sixth Circuit law, it references

21   there's no allegation to defendants -- that defendants

22   intended to harm Flint residents.  Accordingly, the

23   question is whether the defendants acted with deliberate

24   indifference in the constitutional sense.  That's exactly

25   what we're arguing here.  As far as we know, there's no

1    allegation that any of the city defendants, the City of

2    Jackson, intentionally sought out to harm its residents.

3         So we're looking at the question of deliberate

4    indifference.  And, Judge, Kishia Powell said it:  It's not

5    Flint.  This is not Flint.  This is not even close to what

6    was going on in Flint.  And I would submit as passionate as

7    Mr. Stern is -- and I understand, I've been on this side of

8    cases before dealing with children I represented.  I don't

9    hold it against him.  But the fact is that this case is

10   nothing like Flint, so he doesn't want to talk about Flint.

11   And I submit to the Court there's a reason for that, and

12   that's because of the conduct that was at issue in Flint.

13        Judge, they made a switch there to a new water

14   source being the Flint River that they knew was harmful.

15   Once they made the switch, and it was determined that there

16   were Legionnaires outbreaks there, they claimed that that

17   Legionnaires' problem was the result of an outbreak at a

18   local hospital and specifically lied about the true nature

19   and the true source of the problem.  They lied about that

20   to the other officials, to the citizens up there.  There is

21   no allegation even close to that in this case.

22        When -- when the City of Jackson made the switch to

23   surface water, they did so at a time when the great

24   majority of the citizens of Jackson were already being

25   supplied with safe drinking water from that same source.

 1    This wasn't a brand-new source with known problems.

 2          The plaintiffs allege in their complaint --

 3          THE COURT:  I mean, the barometer, though, is not

 4    the -- I know we've been talking about the Flint case.  The

 5    barometer is not going to be the Flint case in this case;

 6    right?

 7          You compare two bad situations with each other and

 8    say one is worse than the other --

 9          MR. HAWKINS:  Judge, if --

10          THE COURT:  Hold on.  If you look at what happened

11    in Flint, 16 percent of the households were exposed to it.

12    In Jackson, more than 20 percent, 22 percent, so in that

13    sense, Jackson, if you believe these allegations, might be

14    worse.  If you do have elected officials misleading the

15    public about the safety of the water, safe to drink no

16    matter -- safe to drink with all the caveats that

17    Mr. Webster mentioned, what people hear is the water is

18    safe to drink.

19          MR. HAWKINS:  Yes, sir.

20          THE COURT:  So should Flint have set the standard?

21    I realize everybody's been talking about Flint.  Flint does

22    not set the standard; right?

23          MR. HAWKINS:  Judge, I would agree.  What I'm

24    submitting to the Court is there were certain defendants in

25    Flint that were denied qualified immunity, and I'm trying

1    to express to the Court why it is they were denied

2    qualified immunity.  And the reason is they engaged in,

3    according to the allegations there, in conscious-shocking,

4    deliberate indifferent conduct toward the rights of

5    citizens.  We don't have anything close to it here.

6         If I could just make a few comparisons, I'm not

7    saying that the Court ought to apply Flint.  I'm just

8    saying there's a reason they don't want to talk about it,

9    and it's because our city defendants, Mayor Lumumba and

10   Mr. Miller, didn't engage in conscious-shocking behavior,

11   anything akin to what was being dealt with up there in that

12   case.

13        City Manager Earley in that case, he forced a switch

14   of the water knowing that it was dangerous.  He knew that

15   the water was untreated.  There was no corrosion-control

16   system in place.  They lied to the EPA about whether there

17   was a control -- a corrosion-control system in place up

18   there.  They didn't do that here, Your Honor.

19        When Mr. Bell was talking about different things

20   that might be done with the system and budgetary issues

21   were being discussed and what to do, they were dealing with

22   the corrosion control problems.  There was a system in

23   place here.  The question was about lime feed or soda ash

24   or whether or not the pumps were working properly or

25   whether it could be afforded, and the attachments to their

1  complaint and the very allegations in their complaint show
2  the city officials here were dealing with those problems
3  and they were being transparent about it as they did it.
4      In Flint, Earley lied about this Legionnaires'
5  Disease.  Judge, I can't -- I can't overemphasize the
6  importance of this.  They knew that that outbreak of a
7  deadly disease was being caused by the Flint River and
8  caused by their switch.  Instead of switching back after
9  the public requested it, instead of switching back after
10  the city council up there voted on them to do that, they
11  doubled down, and they kept drawing their water from that.
12  And then lied saying the Legionnaires' Disease outbreak
13  came from the hospital and not the river.  There's nothing
14  like that alleged in this case.
15      Ambrose up there, the emergency manager, he was
16  offered a deal to reconnect back to the safer water.  He
17  said no to that.  The city council voted on it; he rejected
18  their vote.
19      Glasgow up there, he knew the plant wasn't ready and
20  decided to do it anyway.  He claimed the other officials
21  pressured him to make the switch knowing of the danger.  We
22  don't have that here.  The allegation we have here is that
23  there weren't sufficient testing done to know for certain
24  just how safe it would be, but we have a water source
25  that's already supplying a great majority of citizens.  And

1    that's acknowledged in their complaint.

2         They claim in Flint that they were providing

3    corrosion control; it was a lie.  We didn't lie about that

4    here.  We had problems with the corrosion control --

5         THE COURT:  What about the allegation in the

6    complaint, amended complaint, one of the complaints in

7    paragraph 265 somewhere that Mr. Miller says -- and I know

8    you had indicated almost all of the stuff -- I did hear you

9    say almost all of the allegations were pre Antar Lumumba

10   and Miller.  You said "almost all," so that suggested there

11   might have been some.

12        But in paragraph 265 of the amended complaint,

13   Miller gave a press conference saying there's been no

14   detecting of lead or copper in the water supply.

15        Now, I realize there might be something else that he

16   might have said that would be questioned about what did you

17   mean when you said that?  Were you looking back to the time

18   in which you've been here, or were you thinking back in

19   2015.  But if on its face there, that would not be a true

20   statement; right?  That there's been no detecting of lead

21   or copper in the water supply, a statement attributed,

22   according to the amended complaint, July 2018.

23        MR. HAWKINS:  Yes, Your Honor, that was in July of

24   2018 in response to issues that had come up.  And the city

25   was telling -- the city officials, including Mr. Miller and

1    Mayor Lumumba, were telling the citizens the problems with

2    the system, and in that commentary, they explained that the

3    city's drinking water does not test positive for lead.

4    That was true.  There were no lead exceedances at that

5    time.

6         THE COURT:  But I'm just looking at on its face,

7    what that clause says.  I think you might be able to

8    extrapolate and prove that point with discovery, right,

9    that this is what they mean.  This is what that sentence

10   means -- this is what it means.

11        He was standing up at a press conference, the

12   question was asked to him, and he was specifically talking

13   about, well, had we just tested the water a week ago?  No,

14   it tested, and there was no detection of lead or copper.

15        I don't know how it is.  But, again, Rule 12 tells

16   me that I need to sort of look at all these allegations and

17   presume they're true.

18        MR. HAWKINS:  That's true, Your Honor, and I concede

19   that.

20        THE COURT:  Okay.

21        MR. HAWKINS:  What I would ask, though, is for the

22   Court to also recognize that the attachments to their

23   complaint, including this press release, also has to be

24   read in full and -- and the conduct that's being alleged

25   here with a blanket statement -- there's no lead in the

1  water system -- leaves out a lot of other proof, or

2  allegations if you will, that are incorporated into the

3  plaintiff's complaint by virtue of this attached exhibit,

4  it's important to look at the specifics of this.

5          THE COURT:  Okay.

6          MR. HAWKINS:  And in this Public Works Director

7  Robert Miller says the City of Jackson was notified in July

8  of 2018 the city failed to consistently maintain the

9  minimum PH of 9.0 for drinking water from the O.B. Curtis

10  Water Treatment Plant, which is a violation of the city's

11  optimized corrosion-control plan during the months of

12  January 2018 to June of 2018.

13          He says the city also failed to consistently

14  maintain a PH of 8.6 in the monthly water distribution

15  system monthly samples.  He goes on to clarify, when I say

16  we failed to meet it consistently, we met the target

17  regularly, but there were occasions of hours where the PH

18  was below the level.

19          What he's doing there, Judge, is -- is -- I mean,

20  he's an expert, right, on these issues.  He's trying to

21  explain what's going on to the public.  He's not misleading

22  anyone.  He is saying the truth about what the city is

23  dealing with.  He goes on to say, we anticipate we may need

24  to replace the equipment.  Meanwhile, we've implemented

25  temporary chemical feed equipment that's having a better,

1    but not complete, success.

2        I would submit to Your Honor what this is, along

3    with what Mayor Lumumba says when he says we're dealing

4    with these issues.  He's the mayor, he doesn't know it on

5    this detailed level, but he's saying we're trying to deal

6    with these issues, too.  They're coming out and telling the

7    public about it.  This is transparency.  This is not

8    concealment.  This is not what was happening up in Flint,

9    Michigan.  This is -- this is a city trying to work through

10   their business issues.  This does not rise to the level of

11   conscious-shocking, deliberate indifference to the

12   citizens' rights.  It just doesn't.

13       THE COURT:  And that's what the Court would have to

14   find to get over the burden of qualified immunity with

15   respect to your clients?

16       MR. HAWKINS:  Yes, sir.

17       THE COURT:  Okay.

18       MR. HAWKINS:  There was another -- there was

19   another -- I would like to give the Court an example of

20   another notice that came out.  Well, let me leave it at

21   this:  When the notices were provided, the City of Jackson,

22   when they made statements to the public, they made

23   statements that were truthful, and they were dealing with

24   the problem.  And I would submit it's transparency, it's

25   not concealment.

1           They -- they had a notice come out in late April,

2      the 27th, from director of -- or the enforcement and

3      compliance assurance division of the EPA, and that was

4      April 27th of '21.  Now, Judge, at that time, the EPA

5      reminded the city that back in 2015 and 2016, you exceeded

6      the action levels, and, again, I would submit that there's

7      no allegation or proof to the contrary, there's been no

8      exceedance of the lead action level since then.

9           That's not to say there haven't been other issues

10     with the water.  I want to be careful I'm not -- I'm not

11     being crafty there with the Court.  I'm saying there were

12     no lead issues, and this is a lead case.

13          So this notice comes out and says, you know, you had

14     some problems with the action levels back then.  It says

15     the city conducted an optimal corrosion-control study,

16     which the city did, relied on engineers as we know in this

17     case.  The engineers provided a recommended treatment.  The

18     city provided that to the Mississippi State Department of

19     Health.  MSDH concurred with the recommended treatment and

20     provided a deadline to do some things.  And it is true the

21     city was not in full compliance with all of the technical

22     requirements of the plan to be implemented, but what's also

23     true is they were working the problem.  And they were doing

24     so at a time when they didn't have -- they didn't have the

25     ability to fix this problem overnight, and there are

1    arguments about it taking too long.  But these are not

2    actions that rise to the level of deliberate indifference.

3         They come out with a statement to the city several

4    days later, May 12, '21, so not -- about two weeks after

5    they'd gotten this notice, in which they say we routinely

6    sample the water.  In 2015, these tests showed lead levels

7    that were excessive.  It goes on to say during certain

8    monitoring periods -- '18, '19, '20, '21 -- we failed to

9    meet treatment technique requirements.

10        Again, that's true, and that's transparency.  That's

11   the city letting its citizens know what's going on.  They

12   say what should I do, or what should the citizens do?  They

13   explain to them again, here are the precautions you need to

14   take, because when the city told its citizens about issues

15   that came up, they told them time and again here are the

16   precautions you need to take.

17        What does this mean?  Well, typically, they talk

18   about what's going on with the leaching potential problem.

19   They talk about the system, what's being done, we're

20   inspecting it, we're working on it.  This is a city, I

21   would submit, being truthful with its citizens.  This is

22   not conscious-shocking deliberate indifferent behavior.

23        The allegations are very few as to Mayor Lumumba.

24   It says that he had a press release in 2018; we've talked

25   about that.  It says that at some point in later years when

1    there were not lead exceedances at issue, that the mayor

2    didn't budget for enough people to be working at the plant.

3    That's an allegation, but there's no proof or really any

4    allegation that that had a direct impact on lead levels.

5    Or more to the point, that the mayor somehow would have

6    known he was likely harming his citizens and misleading,

7    purposefully misleading citizens, and taking actions, as

8    Mr. Stern would say, to give them the sword.

9         That's not what these city officials were doing, and

10   I submit that they're entitled to qualified immunity, Your

11   Honor.

12        THE COURT:  All right.  Thank you, Mr. Hawkins.

13        Mr. Harris, I think you represent the last of the

14   individual defendants.

15        MR. HARRIS:  Yes, Your Honor.  May it please the

16   Court?  Terris Harris on behalf of former mayor Tony

17   Yarber, Kishia Powell, and Jarriot Smash.

18        And, Your Honor, I won't go over everything and

19   rehash all the things that have been argued before you

20   today.  First, I would start with Mr. Smash.  The complaint

21   is absolutely void of any allegations of what he did, and

22   based on that alone, the 12(b)(6) should be granted for him

23   without going into all the other arguments.  But I will

24   incorporate by reference all of the city arguments.

25        Now, as it relates to Mayor Yarber and Ms. Powell,

1  again, I won't -- I do not agree that there has been a

2  constitutional violation, and I would adopt the city's

3  argument.  But let's assume for a moment that the Court

4  finds that there was a constitutional violation, then still

5  with that, my individual defendants are still entitled to

6  qualified immunity.

7       As the Court knows in the qualified immunity

8  analysis, one of the prongs the Court has to look to

9  determine whether or not the right at issue was clearly

10  established at the time of the defendants' alleged

11  misconduct, and to be clearly established, the Court looks

12  to a couple of things.  As the learned judge wrote in

13  *Jamison versus McClendon*, for a law to be clearly

14  established, it must have been beyond debate when the

15  defendant broke the law.

16       Additionally, a public official like my client

17  cannot be held liable unless every reasonable public

18  official would understand that what he or she was doing

19  would violate the law.

20       Furthermore, as this Court has held and the Fifth

21  Circuit has consistently held, it does not matter that we

22  are morally outraged or the fact that our collective

23  conscious is shocked by the alleged conduct, because it

24  does not mean necessarily that the official should have

25  realized that the conduct violated a constitutional right.

1            That's very important, Your Honor, because at this

2    stage, qualified immunity, the plaintiff has to bring forth

3    controlling authority that there was some constitutional

4    violation.  If there's no controlling authority, the

5    plaintiff has to bring forth a concessive or persuasive

6    authority that defines what the right is to a high degree

7    of particularity.

8            Said differently, Judge, they're supposed to bring

9    forth clearly established law that is particularized to the

10   facts of this case.  To make it all the way simple, for

11   qualified immunity for my clients, here are the questions,

12   Your Honor.  Whether or not the cutting of a budget or the

13   reallocating of funds in the budget to address other

14   competing governmental interests has violated a

15   constitutional right.  There have been no cases where

16   they're controlling or persuasive to establish that to the

17   point where it's clearly established.

18           Additionally, they would have to have brought forth

19   some authority to say that when these public officials

20   carry out things that was done and planned in a previous

21   administration and switch a source for water from a well

22   water to a surface water violated a constitutional right.

23   We don't have that here, Your Honor.

24           Additionally -- which they tried to make a lot of

25   references back and forth with what happened in Michigan

1    with the statements that were made.  So now the next

2    question is whether or not there's any authority where they

3    can show that it's clearly established that a public

4    official who makes statements, and statements with

5    qualifiers, they may tend to be misinterpreted by a

6    citizen, violated the constitution.  I submit, Your Honor,

7    that there are not.

8         In the simplest form, that ends the qualified

9    immunity analysis, because they cannot show that that

10   occurred.  And what we have here, Your Honor, we have the

11   plaintiff arguing that all of these constitutional issue,

12   they are basically couched in terms of what we know really

13   is a tort claim.  And we have raised in our briefing that

14   under the Mississippi Tort Claims Act, obviously as

15   Mr. Webster stated is not timely, but even going beyond

16   that assuming that they were timely for my clients.  My

17   clients still should be dismissed, because under the

18   Mississippi Tort Claims Act, they were sued in their

19   individual capacities.  The Tort Claims Act says you can't

20   do that.

21        Now, interestingly as well, Your Honor, you asked

22   Mr. Stern about the individuals, and he said to the Court

23   that the city is responsible for the individual defendants,

24   because they were employed in the course and scope.  Well,

25   if that's the case, obviously in the course and scope of

1    the Mississippi Tort Claims Act, they're out.

2         But what's interesting about that, Judge, is this

3    Court still -- even though that when the Court finds and

4    should find that there's no constitutional violation, where

5    there was no constitutional right that was violated, the

6    Court can still dismiss the individual defendants and the

7    City of Jackson because there no was constitutional

8    violation.  But then when we get to the *Monell*, which it's

9    not my client, but if they say my clients did something,

10   there's no respondeat superior under *Monell*, anyway.

11        So he made some allegations and tried to intimate

12   that Mr. Yarber had done something inappropriate by hiring

13   Trilogy, because Trilogy's owner was not a professional

14   engineer.  That misses the point in that while the owner of

15   Trilogy is not a professional engineer, Mr. Yarber knew

16   obviously that there was a professional engineer who was

17   conducting the study for Trilogy.

18        Interestingly, Judge, who they relied on, Mr. Bell

19   who's supposed to be the whistleblower, he himself is not a

20   professional engineer.  Yet Kishia Powell is, and Kishia

21   Powell made the statements that she made with the

22   qualifiers, because she is a professional engineer.  And

23   Kishia Powell as a professional engineer knows that she

24   should retain a professional engineer to do the corrosive

25   study.  So, Judge --

 1          THE COURT:  Is there a whistleblower allegation in

 2    this complaint?

 3          MR. HARRIS:  Well, it's not, Your Honor.  They've

 4    tossed that word around to make it sexy for the media.  One

 5    would assume that Mr. Bell was fired because he told them

 6    that something was wrong.

 7          THE COURT:  But that's not in this complaint

 8    anywhere, is it?

 9          MR. HARRIS:  While he's referred to as a

10    whistleblower, there are no allegations that he was

11    terminated because he was -- there's no -- there's no cause

12    of action for that.  There's some allegations that he was

13    terminated because he blew the whistle.

14          Well, Your Honor, that's all I have, because that

15    qualified immunity analysis as articulated and as the Court

16    eloquently laid out in *Jamison versus McClendon*, as harsh

17    as it is, qualified immunity, at this point Mr. Yarber,

18    Mr. Smash, and Ms. Powell should be dismissed from this

19    action.  And I'll answer any question the Court may have of

20    me.

21          THE COURT:  That's all.

22          MR. HARRIS:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          Mr. Stern, you can make your point that you wanted

25    to make.

 1          MR. STERN:  Just I thank you, Your Honor, again for

 2     the opportunity to be here today.  I just want to go back

 3     to this issue about intent versus deliberate indifference,

 4     because this standard is being misstated significantly

 5     before Your Honor.

 6          The deliberate indifference standard as opposed to

 7     an intent to harm is sensibly employed when actual

 8     deliberation is practical.  If Your Honor finds that

 9     practical deliberation was -- was warranted here based on

10     the fact that these individuals knew as early as 2011 and

11     2013 that the water in Jackson could lead to lead

12     poisoning, then it shifts from this intentional-type

13     conduct to a deliberate indifference standard.  I'm just

14     saying that one more time so that Your Honor -- so that I

15     can be on record as articulating this standard as the Fifth

16     Circuit has in *Garza versus City of Donna*.

17          We've heard in the last several --

18          THE COURT:  Let me ask you this question --

19          MR. STERN:  Sure.

20          THE COURT:  -- from my notes.  Are there any

21     allegations against Mr. Smash?

22          MR. STERN:  Yes.

23          THE COURT:  In the complaint?

24          MR. STERN:  Yes.

25          THE COURT:  Okay.  Where?

```
1            MR. STERN:  They are on page -- at paragraph 402, A
2    through N.
3            THE COURT:  Okay.  Thank you.
4            MR. STERN:  I don't need to read them to you, but
5    it --
6            THE COURT:  You don't need to read them to me.  If
7    that's where you say they are, I'll find them.
8            MR. STERN:  There's also a distortion of what the
9    allegations are that lead to deliberate indifference as to
10   these city employees.  Here's what the complaint says.
11           The Jackson defendants -- this is paragraph 244.
12   The Jackson defendants, most prominently Yarber, Powell,
13   and official statements made on behalf of Jackson made
14   false statements.  This is the complaint, these are the
15   allegations either explicitly asserting or otherwise
16   implying that Jackson's water was safe to drink, when in
17   fact it was not.
18           Even though she acknowledged -- paragraph 245 --
19   there were issues with lead in Jackson's drinking water,
20   Powell nevertheless stated to the Jackson Free Press, "This
21   is not a situation where you have to stop drinking the
22   water."
23           Mr. Harris just explained that Ms. Powell was an
24   engineer.  This isn't just some elected city official who,
25   you know, she's got a desire to serve her community, and
```

1    for whatever reason has decided to run for city council.

2    This is an engineer who knows as early as 2011 but

3    certainly by 2013 that lead is a problem, telling a free

4    press "This is not a situation where you have to stop

5    drinking the water."  All of the allegations contain --

6         THE COURT:  So to the extent you cited a Free Press

7    article, a portion of it, the Court is obliged to look

8    at the --

9         MR. STERN:  A hundred percent, but you also need to

10   look at it in the light most favorable to the plaintiff as

11   if it was alleged in the complaint.

12        These -- these -- everybody here has been very kind.

13   I respect significantly the bar in Mississippi.  I

14   appreciate y'all having me.  I don't know how to respond

15   when it comes to Flint, because on the one hand, one of the

16   lawyers stood up and said there's a reason Mr. Stern

17   doesn't want to talk about it.  And then, respectfully, he

18   completely distorted the facts of the Flint litigation.

19        If anybody in here knows, I just tried a case for

20   seven months in Ann Arbor, seven months away from my

21   family.  In seven months, we've called 45 witnesses in the

22   Flint litigation, and it ended in a mistrial.  It ended in

23   a hung jury.  I know those facts better than anybody.  If I

24   thought it would be helpful to come here today and explain

25   to you how the facts in Flint mirrored the facts here and

1    that somehow that was persuasive, I would have done it.

2         In the same vein, by trying to distinguish the facts

3    here from Flint, it makes no sense, because Flint happened

4    around the same time this did.  The only import of the

5    Flint litigation and the only import of *Guertin*, Your

6    Honor, are the underlying cases cited by the Sixth Circuit

7    relying on Supreme Court precedence to make a determination

8    that there was a violation of bodily integrity.

9         And in terms of the whistleblower, Mr. Bell, there's

10   no allegations of whistle blowing.  There's no *Qui Tam* case

11   in -- in this complaint before the Court.  But there was an

12   allegation that he was fired because he was a whistleblower

13   in the sense that he was going to and starting to say

14   things that those in power didn't want him to say; that's

15   where the word "whistleblower" comes in.

16        It wasn't, as Mr. Harris said, to make the complaint

17   sexy.  Just like not talking about Flint wasn't because I'm

18   scared of distinguish the facts, which were actually

19   misstated significantly by counsel, and that's no one's

20   fault.  You know, unless you've lived it, it's hard to talk

21   about.

22        So we submit to the Court, Your Honor, there's a

23   clearly established right to bodily integrity under Supreme

24   Court precedence, let alone the Fifth Circuit.  It was

25   clearly established at the time.

 1          The conduct that's alleged in the complaint, not

 2     because someone made a decision to do this or made a

 3     decision to do that, but the lies, the misleading, the

 4     informing people that the water is safe knowing full well

 5     that it's not safe, requiring testing within your

 6     department that you know is going to yield false results

 7     for the purpose -- for the purpose of making sure that

 8     people don't know how bad the water is.  Those are all

 9     conscious-shocking under a deliberate indifference

10     standard.

11          And it's a deliberate indifference standard, not an

12     intentional standard, because there was significant time

13     for every state actor involved in this case, and as pled in

14     the complaint, to deliberate their own conduct, their own

15     words, and how they went forward.

16          Thank you, Your Honor.

17          THE COURT:  All right.

18          MR. HAWKINS:  Your Honor, could I bring just the

19     citations of the Flint cases to the Court's attention, so

20     that the Court can read those?

21          MR. STERN:  If we're going to do that, I would ask

22     to submit -- there's about 14,000 complaints --

23          THE COURT:  He was arguing -- his argument suggested

24     that there were some things that are different about the

25     cases, so he's entitled to tell me that support.

1          MR. HAWKINS:  I'm just concerned counsel said I've

2     completely misrepresented them, so I wanted the Court to

3     have the cites.  *In Re Flint Water, Waid versus Earley*, 960

4     F.3d 303, 2020, and *Guertin versus State*, 912 F.3d 907.

5          THE COURT:  Okay.  Thank you, Mr. Hawkins.

6          MR. HARRIS:  Your Honor, very briefly I just want to

7     point out for the Court as it relates to Jarriot Smash, the

8     plaintiffs' complaint, their statement of facts runs from

9     paragraph 76 through 396.  I've read that complaint over

10    and over.  I may have overlooked it, but Jarriot Smash is

11    not mentioned once in their statement of facts.

12         Counsel stood here and he said, yeah, he's mentioned

13    in paragraph 402.  Paragraph 402 is under the negligence

14    count, that's Count 3 of their complaint.  There are no

15    factual allegations whatsoever as it relates to Mr. Smash,

16    so under *Twombly* and its progeny, 12(b)(6) is most

17    appropriate for Mr. Smash.

18         Thank you.

19         THE COURT:  I see you looking, Mr. Stern, because

20    you did mention 400 --

21         MR. STERN:  No, 402 --

22         THE COURT:  402?  Speak into the microphone.

23         MR. STERN:  Your Honor is permitted at this stage to

24    read the allegations, wherever they are in the complaint,

25    to apply however Your Honor sees fit in the light most

1    favorable to the plaintiffs, so the allegations contained

2    in paragraph 402 are applicable to -- to Mr. Smash.

3         If Your Honor finds that they're not, or there's

4    some prerequisite that a statement of facts needs to

5    address what's alleged -- there are certain complaints that

6    get filed with no statement of facts.  All the facts are

7    included in the claims, and so there are --

8         THE COURT:  We need to know what facts apply to

9    which party, though; right?

10         MR. STERN:  We would stand on paragraph 402 as to

11    Defendant Smash.

12         THE COURT:  I would say thank you ladies and

13    gentlemen, but the only lady at the table did not

14    participate in the argument.  So thank you, gentlemen.  I

15    appreciate all the work you all have done to this point.

16         Obviously after the Court rules, if there are any

17    claims -- well, we know one party is in this lawsuit,

18    because they have not tried to withdraw themselves from the

19    lawsuit; that's Trilogy at least.

20         Once we figure out where we go from this point,

21    obviously the next phase of the process, if there are

22    claims remaining against any of the individual defendants,

23    then those parties would likely be directed to the

24    magistrate judge to get a case management order in place.

25         Assuming there's some issue with these notices and

1    whether people are going to have to refile or reserve and

2    then refile, obviously for the benefit of the plaintiffs,

3    if you're required to do that, you refile your complaint,

4    and you just need to make sure the civil cover sheet

5    suggests there's a related case.  Otherwise, it might get

6    assigned to somebody else, and the Court will have to go

7    through the process of getting it back here.

8         There's going to be one judge on this case.  It

9    might not be me, but it's going to be one judge -- well, I

10   ain't going anywhere; it's going to be me.  Let me not put

11   that out there.  Judge Reeves going somewhere; no, he

12   ain't.

13        So, again, I appreciate all the care and attention

14   that you've all put into this case, and as I tell every

15   party in every case:  It's in your hands to deal with.  It

16   could be resolved at any time on your terms, and the

17   parties should always be talking about how do we get to

18   some resolution that everyone can live with.

19        I don't expect that to happen real soon, but please

20   know and please understand that I tell people that in every

21   case at every phase, whether you're dealing with a motion

22   to dismiss, some other discovery order that has come down,

23   some other ruling.  Once we get to trial and something else

24   happens or whatever, at every phase of the litigation,

25   always figure out where you are at that point.  How has

1  that affected my clients, and always continue to always be

2  talking about how you might get this matter resolved.

3        There will be other issues that come up.  If this

4  case requires a lot of work, you know, one thing that the

5  Court will be considering, we have -- you know, there's one

6  magistrate judge assigned to this case who has another

7  400 cases or so that she's dealing with.  Some of whom are

8  just as large as these here.  And I'm going to put it out

9  there right now, if there is a management issue, the

10  parties need to already be thinking that this judge might

11  appoint a special master to deal with these things instead

12  of burdening the magistrate judge with all the discovery

13  disputes that will come along if we're talking about 2,000

14  plaintiffs, if we're talking about 1,500 plaintiffs.  You

15  know, what -- what written discovery might be allowed

16  first, how might that impact what depositions might be

17  taken next, what order we might want to get them in and all

18  that, who's going to be ruling on them.

19        So I do want you to already be thinking about the

20  possibility of a special master.  The Court may give the

21  parties an opportunity to make recommendations, but

22  obviously the parties know that it is fully within the

23  discretion of this Court who -- if it goes down that path,

24  it will be with this Court to determine who or what entity

25  or whatever that that might be.

1      So I'm saying all that while we're at the very

2   beginning of this case, and I know we're probably a long

3   way from it being resolved.  But y'all are going to work

4   with me to make sure we put it in the position of always

5   being in the position to be resolved.

6      So, again, thank you so much.  The Court is taking

7   these things under advisement, and I'll rule in due course.

8      And let me say this other thing.  I know the parties

9   had agreed about 30 days or so ago when I announced this

10  particular day, I know it conflicted with some of the

11  things that you had to do.  I did want to poll the lawyers

12  because this court, I put this day -- I set this hearing on

13  this day, because this is the only day I had.  So to the

14  extent -- you know, we have multiple parties on every side,

15  all different counsel, get everybody involved with your

16  clients, with these issues, because of course, we deal with

17  many other cases, many other things, and this was the one

18  day -- and I know these motions have been pending for

19  sometime.  This was the one day that I had practically for

20  this month to have this heard, so that's why the motion to

21  reset it and all was denied.  And I didn't hear a request

22  to reconsider or an alternative or anything else, so you

23  might -- it's not that I'm trying to be rude.  It's just

24  that I'm trying to make sure we can plug things in on the

25  times that I can be in court.

1       There may be instances in the future that we would

2  do some of these remotely, because I do spend a significant

3  amount of time on what they call "a second job" now.  So

4  I'm out in Washington quite a bit on that second job, so if

5  parties would agree to do things remotely, but I wanted you

6  to be present for this one here.  We may be able to

7  accommodate that in the future.

8       So to the extent it caused heartburn to anyone, I'm

9  just telling you that's why it was done, and that's

10  probably how we will be proceeding from this day forward

11  because we have too many different -- we have too many

12  lawyers involved -- not too many -- too many to coordinate

13  schedules, because I know each of you are representing

14  other clients in other courts and all of that.  If it does

15  not match your schedule, turn to your law partner, turn to

16  your associates, turn to somebody, and say you're going to

17  have to do this for me on this day here.  The Court needs

18  you there, the Court has set a hearing, and the Court is

19  only doing that so we can make things go forward.  So I

20  wanted to tell you that.

21       Thank you so much.  The Court is in recess until our

22  next matter.

23       MS. SUMMERS:  All rise.

24  **************************************************************

25

**CERTIFICATE OF COURT REPORTER**

I, Candice S. Crane, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically recorded by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 8th day of September, 2023.


/s/ Candice S. Crane, RPR, RCR, CCR

Candice S. Crane, RPR, RCR, CCR #1781
Official Court Reporter
United States District Court
Candice_Crane@mssd.uscourts.gov