IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

IN RE JACKSON WATER CASES                    CAUSE NO. 3:23-CV-614-CWR-LGI

THIS DOCUMENT RELATES TO ALL
PLAINTIFFS

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
ENTRY OF PRE-DISCOVERY ("*LONE PINE*") CASE MANAGEMENT ORDER

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL & PROCEDURAL BACKGROUND ........................................... 2

        A.    Plaintiffs' Common Allegations ................................................. 2

        B.    Exposure, Injury and Causation ................................................. 2

III.    LEGAL STANDARDS ........................................................................................ 8

        A.    This Court has the authority and discretion to enter the proposed pre-
              discovery *Lone Pine* CMO ..................................................... 8

        B.    The Fifth Circuit approved of pre-discovery *Lone Pine* case management
              orders in its leading authority, *Acuna v. Brown & Root, Inc.* .................... 9

        C.    The Fifth Circuit, District Courts in this Circuit, and Federal Courts across
              the country follow *Acuna* ....................................................... 14

IV.     PROPOSED LONE PINE CMO ...................................................................... 18

V.      CONCLUSION ................................................................................................... 21

CERTIFICATE OF SERVICE ...................................................................................... 24

## I.    INTRODUCTION

Defendants The City of Jackson, Mississippi, Mississippi State Department of Health, and Trilogy Engineering Services, LLC (collectively, Defendants) file this Motion for Entry of a Pre-Discovery ("*Lone Pine*") Case Management Order, in the form proposed as Exhibit 1. This order is based on the seminal case of *Lore v. Lone Pine Corp.*, 1986 WL 637507, No. L–33606–85 (N.J.Super.Ct.1986), as endorsed by the United States Court of Appeals for the Fifth Circuit in *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

*Lone Pine* orders are used to manage complex tort cases involving large numbers of plaintiffs. A *Lone Pine* order is a **pre-discovery** case management tool that requires plaintiffs to provide, via affidavit, *prima facie* information on topics including the following:

- **Exposure** to a substance (specifics as to when, where, how, and how long),

- Specific **injuries** from said exposure, with evidence of diagnoses by a health care provider as to each specific (non-generalized) injury listed, and

- **Causation** between said exposure and the identified injuries of the particular plaintiff.

This is information Plaintiffs must produce to establish any Defendant's alleged liability in this case. Entry of a *Lone Pine* CMO, therefore, does not alter Plaintiffs' burden of proof or increase Plaintiffs' cost of litigation. If Plaintiffs cannot satisfy these common requirements, courts entertain show cause orders or motions to dismiss, culling meritless claims before large-scale discovery begins in earnest. *See, e.g., Acuna*, 200 F. 3d at 340-41.

A pre-discovery *Lone Pine* case management order is warranted here. This litigation involves novel legal theories and factual averments, many of which are contradicted by publicly

available data demonstrating that the majority of City of Jackson houses did not experience excess lead levels during the timeframe in question.[1]

Given the large number of Plaintiffs, the claims asserted, and the procedural history of these cases, this litigation is especially well-suited for a **pre-discovery** *Lone Pine* CMO to ensure effective judicial economy and promote efficiency of the parties' resources. The proposed CMO is expressly provided for by the Federal Rules of Civil Procedure, is endorsed by the controlling authority of the Fifth Circuit, and is a widely accepted case management tool for precisely this type of litigation.

## II.    FACTUAL & PROCEDURAL BACKGROUND

### A.    Plaintiffs' Common Allegations

There are currently 2,139 Plaintiffs in this litigation.[2] All of the 2,139 Plaintiffs are alleged to be residents of Jackson, Mississippi, "or else regularly consumed drinking water provided by Jackson." *E.g.*, Case No. 3:23-CV-00614, Doc. 51 (Am. Compl., Master Docket), ¶57. All Complaints allege that, as a result of consuming water with excess lead levels in the 2015-2017 timeframe, each of the 2,139 Plaintiffs sustained personal injuries. *See id.* ¶59. All Complaints allege that each of the 2,139 Plaintiffs' injuries were "a direct and proximate result of Defendants' conduct." *E.g., id.* ¶¶35, 59, 356, 361, 373, 381.

### B.    Exposure, Injury and Causation

Plaintiffs' claims require testimony demonstrating, *inter alia*, proof of exposure to excess lead levels in City of Jackson water consumed during the relevant time period based on

---

[1] *See, e.g.*, Mississippi Department of Health Jackson Water Testing Information, available at https://apps.msdh.ms.gov/DWW/JSP/WaterSystemDetail.jsp?tinwsys_is_number=317&tinwsys_st_code=MS&wsnumber=MS0250008 (last visited Oct. 10, 2023), attached as Ex. 2.

[2] "Plaintiffs" refers to the minor Plaintiff on whose behalf the action was filed.

Defendants' conduct, as well as general and specific causation, injury and damages—for each Plaintiff. *E.g.*, *Herrington v. Leaf River Forest Prod., Inc.*, 733 So. 2d 774, 778–79 (Miss. 1999) Mississippi does not recognize tort claims for medical monitoring or the possibility of a future injury. *E.g., Paz v. Brush Engineered Materials, Inc.*, 949 So. 2d 1, 5 (Miss. 2007) (collecting cases).

Defendants and the Court have no appreciation of whether all, many, some, or just a few of the 2,139 Plaintiffs were in fact **exposed** to excess lead levels in their drinking water during the relevant timeframes based on Defendants' actions, *and* sustained personal **injuries** connected to those specific events and dates, *and* that their exposures and injuries were **caused** by Defendants' actions. Plaintiffs submitted pre-suit Mississippi Tort Claims Act (MTCA) Notices to only the City of Jackson and MSDH.[3] Those Notices include generalized allegations of exposure, causation and injury, but do not include *prima facie* information required by Mississippi law to show each Plaintiff's claims have threshold merit to justify taking the next step into mass-scale discovery.

1. **Exposure**

Each Plaintiff's Complaint alleges that Plaintiffs "ha[ve] been diagnosed with an elevated blood-lead level."[4] Yet the only information received to date (by the City of Jackson and MSDH,

---

[3] Co-defendant Trilogy Engineering, a private entity, would not have been served (nor was it served) with the Notices.  It only has access to the publicly available and redacted portions publicly available on the Court's docket.

[4] The Complaints plead "Plaintiff has been diagnosed with an elevated blood-lead level, meaning Plaintiff was lead-poisoned." These allegations were contained in each of the now-administratively closed complaints.  *See* Case No. 3:23-CV-00246, Doc. 1, ¶371; Case No. 3:23-CV-00243, Doc. 1, ¶378; Case No. 3:22-CV-00171, Doc. 1, ¶379; Case No. 3:21-CV-00667, Doc. 41, ¶ 378; Case No. 3:23-CV-00250, Doc. 1, ¶378; Case No. 3:21-CV-00663, Doc.  51, ¶371; Case No. 3:23-CV-00478, Doc. 1, ¶378. *See also* Case No. 3:23-CV-00614, Doc. 51 (Am. Compl. in newly formed Master Docket), ¶371 ("Plaintiff has been diagnosed with an elevated blood-lead level, meaning Plaintiff was lead-poisoned."). These allegations seem to contrast with statements suggesting that no medical professionals have drawn a link between *these Plaintiffs'* claimed exposure and any

not Trilogy) about Plaintiffs' exposure to lead in the drinking water (during the relevant timeframe, in the City of Jackson, and based on Defendants' alleged negligence) comes from their MTCA Notices.  These Notices list **Plaintiffs' residence(s) from 2014 until the filing of the notice**, and Plaintiffs' residences span a wide swath of geography including some areas beyond the greater Jackson area. Review of the Notices shows that a number of Plaintiffs do not list any residence in the City of Jackson.[5] And a number of those Plaintiffs do not list a residence in any area that is known to be served by the City of Jackson's public water supply. One therefore cannot assume that all 2,139 Plaintiffs in fact were in the City of Jackson water service area and/or in sufficient proximity to City of Jackson to regularly consume the water. Further, the Notices do not specifically describe the location of where each of the 2,139 Plaintiffs may have "regularly consumed" water with excess lead levels during the timeframe in question.

One also may not assume that each Plaintiff consumed water that contained excessive lead levels based solely on each Plaintiff's residence. Plaintiffs have consistently and inaccurately portrayed this litigation as involving excess lead levels in the drinking water of all of the approximate 170,000 City of Jackson water consumers. That is not accurate. For example, Plaintiffs allege that 58 test sites were tested for excess lead levels in the City of Jackson water system for the 2013-2015 compliance cycle.[6] Plaintiffs have not shown or pleaded that they

---

[5] *See*, *e.g.*, Case No. 3:21-cv-0663, Doc. 60-1 (Exemplar MTCA Notice of Claim Letter), attached as Ex. 3; *see generally* FN 1, *supra* (publicly available data from testing locations).

cognizable injury(ies). *See* Case No. 3:23-CV-00614, Doc. 141 (Sept. 8, 2023: Notice of Filing of Official Tr. of Mot. Proc. on Mar. 2, 2023) (release of transcript set for Dec. 7, 2023), Tr. at 72:9-76:3, 118:18-120:16.

[6] Although 58 samples were collected for lead testing, one was determined to be from a private well and was invalid for determining water quality of the City of Jackson water supply.

resided at any of the sites tested in that compliance cycle.[7] As an additional example, of the approximately 58 homes tested, only around a dozen homes showed levels exceeding the lead action level (15 ppb) promulgated in the EPA's Lead and Copper Rule (LCR). Plaintiffs' Amended Complaint cites to lead testing results concerning this testing, which show only 13 homes with lead levels over 15 ppb.[8] Plaintiffs further have admitted that all homes tested during this compliance sample testing cycle did not exceed the LCR action level: the Amended Complaint states that the "levels of lead in Jackson's drinking water exceeded the LCR's 15 ppb action threshold in 22% of Jackson homes, according to the sampling." Case No. 3:23-CV-00614 (Am. Compl., Master Docket), Doc. 51 ¶191.

Plaintiffs have also failed to provide meaningful information as to the duration—or, critically, the extent—of their exposure to lead in the drinking water exceeding LCR levels during the timeframe in question. Each of the 2,139 MTCA Notices contains a boilerplate response, often only stating that the Plaintiff was "injured" (not "exposed") in a date range, uniformly stated as being "from 2014 through the present" for every Plaintiff.

Plaintiffs bear the burden to show lead exposure caused by Defendants during the relevant time period. If any Plaintiff cannot be shown to have been exposed to elevated lead levels in their drinking water in the City of Jackson during the relevant timeframe *and* that such exposure came

---

[7] Case No. 3:23-CV-00614 (Am. Compl., Master Docket), Doc. 51-1 (SDWA-04-2020-2300 Emergency Admin. Order and findings), attached as Ex. 4; Ltr. From U.S. Environ. Prot. Agency to City of Jackson (Mar. 30, 2020) attaching NEIC Civil Invest. Rep., available at https://www.epa.gov/system/files/documents/2021-07/neic-civil-investigation-report_city-of-jackson-public-water-system.pdf (last visited Oct. 10, 2023), attached as Ex. 5.

[8] *See* Case No. 3:23-CV-00614 (Am. Compl., Master Docket), Doc. 51 at n. 36 (citing Lead Testing Results, June 2015: https://jacksonfreepress.media.clients.ellingtoncms.com/news/documents/2016/02/04/0250008_P B_2015_with_ReSample_Results_1.pdf (last accessed Oct. 9, 2023), attached as Ex. 6. In an abundance of caution, Defendants redacted the addresses.

from Defendants' alleged negligence, the claims should not proceed to the next stage. These are not burdensome or outlier requirements, but the basic information Plaintiffs must provide in this litigation to prove each has a claim against any Defendant. Obtaining that information under a *Lone Pine* CMO is a routine case management tool endorsed by this Circuit for complex litigation.

2.    <b>Injury</b>

Based on the alleged dates at issue in this litigation, it has now been seven to eight years since each of the 2,139 Plaintiffs was purportedly exposed to excess lead levels in their drinking water. If a Plaintiff sustained injury from that alleged exposure, the Plaintiff's injury would have manifested by now,[9] and there must be years' worth of blood testing, doctor visits, diagnoses, treatment history, and the like.

Yet the only information Plaintiffs have provided offers no meaningful insight into the claimed injury. Plaintiffs provide no blood testing data or any diagnoses from any medical professionals, instead offering only the following boilerplate response (based "upon information and belief") in *each* of the 2,139 Notices served on the City of Jackson and MSDH:

> **The extent of the injury:**
>
> Upon information and belief, Plaintiff has suffered injuries, including but not limited to: cognitive deficits, behavioral changes, memory and attention deficits, learning impairments, impaired emotional functioning, and visual-perceptional deficits. The full and precise extent of Plaintiff's injuries and future harm is currently unknown.

*See* Case 3:21-CV-00663-CWR-LGI, Document 60-1, attached as Ex. 3, at pg. 4.

---

[9] *See* Cleveland Clinic, Lead Poisoning (identifying that "symptoms [from lead exposure or lead poisoning] may develop over several weeks or months"), available at https://my.clevelandclinic.org/health/diseases/11312-lead-poisoning (last visited Oct. 10, 2023), attached as Ex. 7.

### 3.    Causation

There is no information for any of the 2,139 Plaintiffs regarding causation. It is not enough for Plaintiffs to point to what the World Health Organization or the Environmental Protection Agency has stated regarding possible effects of lead exposure to children, as asserted in Plaintiffs' Complaints. It is Plaintiffs' burden to show how the exposure of lead by each Plaintiff was caused by Defendants' acts in the relevant time period—and also that particularized injuries were caused by that exposure.[10]

Myriad examples show the fallacy of assuming exposure means injury and causation.[11] Many people have been exposed to a great amount of second-hand smoke. Not all of them have sustained any injury, let alone a chronic illness like cancer. Many people have been exposed to environmental hazards like asbestos or silica. Not all of them have contracted silicosis or asbestosis. Likewise, most everyone is exposed to lead, but it does not result in neurological and behavioral effects in everyone.[12]

There are untold additional examples, all of which support black-letter law: it is not enough that a person be exposed to a substance that could be hazardous, nor is it enough that such substance is capable of causing injury; there must be that additional critical link of general and

---

[10] As the CDC has explained, lead can be found throughout a child's environment, including in homes built before 1978 or located in proximity an airport, and consumer products (e.g., toys, jewelry, candies, traditional home remedies), soil, or other environmental factors. Centers for Disease Control and Prevention, Childhood Lead Poisoning Prevention, Sources of Lead Exposure, available at https://www.cdc.gov/nceh/lead/prevention/sources.htm (last visited Oct. 10, 2023), attached as Ex. 8.

[11] *E.g., Herrington,* 733 So. 2d at 779 ("*post hoc ergo propter hoc* (after this consequently by reason of this) is a misplaced argument in modern tort law.") (citations omitted).

[12] Agency for Toxic Substances and Disease Registry, Lead Toxicity: What Are Routes of Exposure to Lead?, available at https://www.atsdr.cdc.gov/csem/leadtoxicity/exposure_routes.html (last visited Oct. 10, 2023), attached as Ex. 9.

specific causation, meaning the exposure to that substance (in a specific dose/amount) not only could, but in fact did, cause the particular injury alleged (and not some other factor) based on the alleged actions of the defendants. Plaintiffs, at all times, bear that burden. And courts—including the Fifth Circuit—have recognized that plaintiffs must provide *prima facie* information before the case progresses into the discovery stage.

## III.   LEGAL STANDARDS

The rules and case law—especially here in the Fifth Circuit—strongly support the entry of a pre-discovery *Lone Pine* CMO.

### A.   **This Court has the authority and discretion to enter the proposed pre-discovery *Lone Pine* CMO.**

The Federal Rules of Civil Procedure are designed to "secure the just, speedy, and inexpensive determination of every action and proceeding." FED. R. CIV. P. 1. The rules reflect that some cases pose unique challenges to the procedures typically employed by federal courts. *See* FED. R. CIV. P. 16, Advisory Committee note ("the Committee felt that flexibility and experience are the keys to efficient management of complex cases"). Under Rule 16 and the authority enjoyed by federal district courts to efficiently manage their dockets, specially tailored case management orders satisfy multiple provisions under Rule 16. *See* FED. R. CIV. P. 16(a)(1)-(3), 16(c)(2)(A)-(P) (providing multiple examples of case management procedures). These provisions have been characterized as "best practices" for pretrial management. 6A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1525 (3d ed. 2012). The Manual for Complex Litigation similarly recognizes that "[d]iscovery control in complex litigation may take a variety of forms, including time limits, restrictions on scope and quantity, and sequencing." Manual for Complex Litig., 4th ed. 2004, §11.422 (providing examples including "phased, sequenced, or targeted discovery"—and noting "for effective discovery control, initial discovery

should focus on matters . . . that appear pivotal" because "this initial discovery may render other discovery unnecessary;" "[t]argeted discovery may be nonexhaustive, conducted to produce critical information rapidly on one or more specific issues."); *id.* § 11.423 (courts may tailor the timing and content of initial disclosures under Rule 26(a)(1) to the needs of a case); *see also* FED. R. CIV. P. 26(a)(2)(C) (the district court may determine when, and in what sequence, expert testimony must be provided).

B.    **The Fifth Circuit approved of pre-discovery *Lone Pine* case management orders in its leading authority, *Acuna v. Brown & Root, Inc.***

Consistent with the above rules, "*Lone Pine*" case management orders are frequently used, especially in mass torts. Named after *Lore v. Lone Pine*, L-33606-85, 1986 WL 637507 (N.J. Super. Ct. Div. Nov. 18, 1986), the procedure was affirmed by the Fifth Circuit in *Acuna v. Brown & Root, Inc.*, 200 F.3d 335 (5th Cir. 2000).

To this day, *Acuna* is the leading and controlling authority in this Circuit adopting and applying *Lone Pine*. Like here, *Acuna* involved thousands of plaintiffs. Like here, the *Acuna* plaintiffs brought tort claims (e.g., negligence). Like here, the *Acuna* plaintiffs asserted that they sustained personal injury and property damage. Like here, the *Acuna* plaintiffs alleged (1) exposure to toxic substances, (2) from various locations across a county and its surrounding area, (3) with a range of injuries and (4) varying durations and intensities of exposure. *See id.* at 337-38. Given *Acuna*'s similarity to this litigation, as well as the Fifth Circuit's approval of its *Lone Pine* case management procedures and courts' subsequent adoption of these orders to manage complex litigation, the history of *Lone Pine* orders in *Acuna* is detailed below.

1.    **The Magistrate Judge in *Acuna* entered a *Lone Pine* order to manage the litigation.**

*Acuna* was filed in state court in April 1996 and removed to federal court in May 1996. *Acuna v. Brown & Root, Inc.*, Docket No. 5:96-CV-0054 (W.D. Tex.), Doc. 1. After ruling on

early remand motions, the parties were ordered to file a "joint advisory" as the court "sought input from counsel as to the scheduling order because this is a mass-tort case involving [then] over 800 plaintiffs." *Acuna,* Order, Doc. 54 (Apr. 11, 1997), attached as Ex. 10.

The plaintiffs proposed a "normal" scheduling order, and the defendants proposed "an early deadline for plaintiffs to establish a prima facie case of causation using expert reports before defendants would be subject to the expense of discovery,"—i.e., a *Lone Pine* order. *See Acuna* Order, Doc. 54 at 1. Plaintiffs objected to a *Lone Pine* order, contending the proposed requirements "would work a great injustice on them to be required to produce expert reports to establish a *prima facie* case of causation for personal injury . . . without the benefit of disclosure and discovery," and the plaintiffs instead asked the Court to order "discovery as to a certain number of plaintiffs and proceed to trial with such finite number of plaintiffs." *Id.* at 2.

The Magistrate Judge rejected the plaintiffs' arguments: "[t]he balancing of the parties' competing interests by various courts in mass-tort cases has resulted in the requirement of a prima facie showing of causation to justify the enormous expense involved in defending such a case." *Acuna* Order, Doc. 54 at 5. It was "not simply the waste of resources" that warranted the case management order; "information regarding the operations of the defendants in the highly regulated industry of uranium mining is a matter of public record," disclosures concerning the nature and amount of products handled had been made to federal and state authorities, and "numerous inspections have been made" of the operations. *Id.* at 6. For instance, a report by the state department of health summarized findings related to the facilities' potential for elevated radiation levels or release of radioactive substances into the environment, and therefore, "the amount and nature of the public information that is currently available to plaintiffs largely undermines their claim of prejudice in not being able to conduct discovery prior to being required

to show causation." *Id.* at 6-7. *Acuna* observed that "the Court must assume that plaintiffs are already in possession of evidence to support their allegations of personal injuries," citing Federal Rule of Civil Procedure 11(b)(3)—i.e., the signature of the plaintiffs' attorney certified that the allegations in the complaint had factual support. *Id.* at 7.

The *Acuna* court entered a Scheduling Order that required each plaintiff to serve an expert affidavit that (1) listed all injuries, illnesses or conditions that, in the opinion of the expert, were caused by an alleged exposure to materials or substances from a facility or operation, (2) specified the material(s) or substance(s), that, in the opinion of the expert, caused each injury, illness or condition listed and identified the particular facility or operation alleged to be the source of the material(s) or substance(s), and (3) described, with specific dates, times, circumstances and incidents and exposure (i.e., ingestion, inhalation, dermal contact, etc.), how the plaintiff was exposed to the material(s) or substance(s) in question, how often, and in what dosages, and (4) stated the scientific and medical bases for the expert's opinions. *Acuna*, Order, Doc. 54 at 8-9.

2.    **The District Court affirmed use of a pre-discovery *Lone Pine* order.**

Plaintiffs later argued to the District Court that the Magistrate Judge abused his discretion by implementing the *Lone Pine* order in the first place. *Acuna,* Order Affirming Mag. Judge's Order Enforcing Sched. Order, Doc. 74 (Dec. 29, 1997), attached as Ex. 11.

The District Court rejected the plaintiffs' objections: *Lone Pine* provisions are a legitimate means by which the Court may supervise the progress of a case. *Acuna* Order, Doc. 74 at 12. *Lone Pine* orders are consistent with Federal Rule of Civil Procedure 16, which grants the Court broad powers in managing litigation. *Id.* at 11-12. The Court identified that "[t]he Manual for Complex Litigation endorses similar measures," and noted the amendments to the Federal Rules of Civil Procedure "lend[] even greater support for the Court's authority to require Plaintiffs to make an initial showing of causation early in the case." *Id.* at 12-13 & n. 10-11. The Court

11

explained that "Plaintiffs seem to argue that they should be entitled to discovery before they are required to do [comply with the *Lone Pine* order]. Yet, as the Magistrate Judge articulated in his order, Rule 11 negates that contention." *Id.* at 15. The Court pointed out that plaintiffs had never disclosed any specific information about their employment or residence for defendants to identify "which facility was at issue, much less how each plaintiff was exposed to a toxic substance." *Id.* at 17.

The Court concluded that use of *Lone Pine* was appropriate: "Plaintiffs have no 'entitlement' to a routine scheduling order. With more than 1,000 Plaintiffs in this case, the Magistrate Judge was entirely justified in considering how best to manage discovery. Inevitably, use of a *Lone Pine* provision shifts the initial costs of litigating this case from the Defendants, who would be otherwise faced with extensive discovery to determine the nature of Plaintiffs' claims, to the Plaintiffs, who presumably should be aware of how they were injured, by whom, and when that injury occurred." *Acuna* Order, Doc. 74 at 17-18.

3.    **Dismissal in *Acuna* based on noncompliance with the *Lone Pine* order.**

After the *Acuna* plaintiffs failed to comply with the *Lone Pine* order, the magistrate judge recommended dismissal. *Acuna v. Brown & Root*, No. 5:96-CV-00543, 1998 WL 35283825, at *7-9 (W.D. Tex. Feb. 2, 1998). In so ruling, the Magistrate Judge emphasized that proceeding without threshold causation information would cause unfair prejudice to defendants—and would waste judicial resources:

> If the case is allowed to proceed, then defendants will suffer great prejudice. **Defendants will be required to expend extensive time and money defending broad, unspecified claims as to which no preliminary showing of liability or damages has been made. If this case were to proceed to the discovery process, it is certain that defendants would request identification of each plaintiff's specific injuries, the specific cause of the injuries and the facilities or operations of the defendants that substantially contributed to the cause. If plaintiffs' experts are not able to provide that information, then plaintiffs' discovery responses will not facilitate a firm and reliable basis upon which**

**defendants can build their defens**e. Based upon plaintiffs' failure to provide the prima facie evidence at this stage, the Court has no reason to believe they will ever be able to produce that information. Therefore, the undersigned believes that the prejudice to defendants favors dismissal.

**Related to the factor of prejudice is the interference with the judicial process. If discovery were to proceed, defendants would most likely file motions to compel the identification of each plaintiff's specific injuries, the specific cause of the injuries and the facilities or operations of the defendants that substantially contributed to the cause. As there are approximately 1100 plaintiffs in this case, the effect on the judicial process would be enormous. At some point in this litigation process, the Court will be required to address the issue of whether plaintiffs have sufficiently identified each plaintiff's specific injuries, the specific cause of the injuries and the facilities or operations of the defendants that substantially contributed to the cause. Addressing this issue later in the litigation process will certainly consume more judicial resources**. Considering the demands of a mass-tort case upon the Court, in light of the information available to plaintiffs' experts, the undersigned believes that the **interference to the judicial process that would be caused by allowing this case to proceed to discovery favors dismissal for failure to comply with the scheduling order**.

*Acuna*, 1998 WL 35283825, at *9 (emphasis added). The District Court accepted the

recommendations. *Acuna v. Brown & Root, Inc.,* 1998 WL 35283824, at *3 (W.D. Tex. Sept. 30,

1998). In so ruling, the Court reiterated why the plaintiffs' "persistent" objections to the use of a

*Lone Pine* order were unfounded. *Id.* at *5-6.

### 4.    The Fifth Circuit affirmed the use of *Lone Pine*.

Plaintiffs appealed, arguing to the Fifth Circuit that "the pre-discovery [*Lone Pine*] orders

requiring expert support for the details of each plaintiff's claim imposed too high a burden for

that stage of litigation." *Acuna v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). The

Fifth Circuit rejected this argument. Recognizing the Court's "wide discretion . . . over the

management of discovery" under Rule 16, *Lone Pine* orders are "designed to handle the complex

issues and potential burdens on defendants and the court in mass tort litigation." *Id*. at 340.

In affirming, the Fifth Circuit pointed out that neither the defendants nor the District Court

was on notice from plaintiffs' pleadings "as to how many instances of which diseases were being

claimed as injuries or which facilities were alleged to have caused those injuries," and it was within the courts' discretion "to take steps to manage the complex and potentially very burdensome discovery that the cases would require." *Acuna*, 200 F.3d at 340. Like the Magistrate Judge and District Court had ruled, the Fifth Circuit confirmed that *before* filing suit, under Rule 11(b)(3), the plaintiffs should have had the information that was requested in the *Lone Pine* orders. *Id*.

C.    **The Fifth Circuit, District Courts in this Circuit, and Federal Courts across the country follow *Acuna*.**

Since *Acuna,* the Fifth Circuit has continued its approval of *Lone Pine* orders to manage complex cases. *See Steering Cmte. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 & n. 2 (5th Cir. 2006) (noting that "the district court has been careful to manage the litigation efficiently through the judicious use of consolidated summary judgments and other tools such as *Lone Pine* orders . . ."); *In re Vioxx Prods. Liab. Litig.*, 388 F. App'x 391, 398 (5th Cir. 2010). So too have Courts in this District. Magistrate Judge Parker entered *Lone Pine* case management orders to facilitate mass toxic-tort cases involving the same defendant (Hercules, Inc.). There, hundreds of plaintiffs alleged that contaminants from a chemical plant migrated onto their property through water, groundwater, soil and airborne pathways, causing property damage and mental anguish. *E.g.*, *Abner v. Hercules, Inc.*, No. 2:14-CV-63-KS-MTP, 2016 WL 11609574, at *1 (S.D. Miss. Jan. 13, 2016) (400 plaintiffs); *Ashford v. Hercules, Inc.*, No. 2:15CV27-KS-MTP, 2015 WL 6118387, at *1 (S.D. Miss. Oct. 16, 2015) (49 plaintiffs).

In *Abner*, the plaintiffs already knew the chemicals in issue, but they did not specify the contaminants on their parcels of property or the pathways that carried them from the Hercules site; instead, "plaintiffs essentially relied upon the proximity of the properties to the site and previous reports of contaminant locations." *Abner*, 2016 WL 11609574 at *1. The Court

explained that because plaintiffs would eventually be required to present scientific evidence of contaminants on their properties and the pathways by which those contaminants traveled from the site, the *Lone Pine* order would not increase Plaintiffs' cost of litigation; citing *Acuna,* the Court stated that "by filing the Complaint, Plaintiffs' counsel had certified to the Court that their 'factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support.'" *Id*. Likewise, "[e]ach Plaintiff should have at least some information regarding the nature of his injuries, the circumstances under which he could have been exposed to harmful substances, and the basis for believing that the named defendants were responsible for his injuries." *Id*.

After additional briefing by the plaintiffs, the Magistrate Judge reiterated that the "*Lone Pine* order did not impose any requirements on Plaintiff that they would not eventually be required to meet in order to prove their case, and that the cost of testing should not surprise them insofar as they chose to file a mass tort suit concerning almost five hundred different properties." *Abner*, 2016 WL 11609574, at *2, 4 ("the vast number of properties, dozens of alleged contaminants, and multiple alleged pathways underscored the need to more fully develop Plaintiffs' claims before opening full discovery" . . . "in the end, Plaintiffs had simply not provided the Court with sufficient data to determine an efficient and practicable method of moving forward with discovery or selecting representative Plaintiff groups for trial or other purposes.").

Judge Starrett affirmed the Magistrate Judge's use of *Lone Pine* orders. The Court reiterated that "[t]he Fifth Circuit has approved the use of *Lone Pine* orders," *Abner*, 2016 WL 11609574, at *4-5, which are case-specific pre-discovery orders "designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation. In the federal courts, such orders are issued under the wide discretion afforded district judges over the

management of discovery under Fed. R. Civ. P. 16." *Id.* at \*4 (citing *Acuna*). Whereas *Lone Pine*

orders should not be used as "pseudo-summary judgment motions," courts should strike a balance

in their use: "[t]he basic purpose of a *Lone Pine* order is to identify and cull potentially meritless

claims and streamline litigation in complex cases." *Id.* The Court "may 'demand that plaintiffs

come forward with some evidence concerning certain basic elements of their claims as a way of

organizing (and maybe bifurcating) the discovery process . . . . so that the Court may determine

the best way to proceed." *Id.* (citations omitted). The Court also noted that federal courts have

considered the following factors in determining whether a *Lone Pine* order is appropriate in a

given case: (1) the posture of the litigation, (2) the case management needs presented, (3) external

agency decisions that may bear on the case, (4) the availability of other procedures that have been

specifically provided for by rule or statute, and (5) the type of injury alleged and its cause. *Abner*,

2016 WL 11609574, at \*5. Applying those factors, the Court affirmed:

> Most importantly, **the *Lone Pine* order does not require Plaintiffs to produce anything they will not ultimately be required to produce in support of their claims.** Moreover, the Court is not requiring Plaintiffs to "provide expert reports sufficient to survive a *Daubert* challenge or even provide an expert who will testify at trial. Rather, **the Court is requiring Plaintiffs to make a minimal showing** consistent with Rule 26 that there is some kind of scientific basis" for their claims. As the Court has repeatedly emphasized, this is "information which plaintiffs should have ... before filing their claims pursuant to FED. R. CIV. P. 11(b)(3)."

*Abner*, 2016 WL 11609574, at \*6 (internal citations omitted; emphasis added). The Court was

"obligated 'to take steps to manage the complex and potentially very burdensome discovery' that

mass tort cases like this one require. As this case presently stands, no one – not even Plaintiffs or

their counsel – knows enough about Plaintiffs' properties or claims to craft a reasonably efficient,

cost-effective, and practicable plan to move forward with full discovery and toward trial." *Id.*;

*see also Ashford,* 2016 WL 6118387, at \*3-4 (affirming use of *Lone Pine* in related case).

Sister courts in this Circuit likewise use *Lone Pine* pre-discovery case management orders, requiring plaintiffs to show specific details regarding exposure, injuries and/or causation, in mass torts. *See, e.g., In re Oil Spill by the Oil Rig "Deepwater Horizon,"* No. MDL 2179, 2016 WL 614690, at *7 (E.D. La. Feb. 16, 2016) ("The United States Court of Appeals for the Fifth Circuit has looked favorably upon *Lone Pine* case management orders that are employed to 'handle the complex issues and potential burdens on defendants and the court in mass tort litigation.'"); *Matter of AET Inc.,* No. 1:10-CV-51, 2011 WL 13301617, at *3 (E.D. Tex. Dec. 14, 2011) ("*Lone Pine* orders have been approved by the United States Court of Appeals for the Fifth Circuit and are issued under the wide discretion afforded federal judges under Federal Rule of Civil Procedure 16."); *In re Vioxx*, 557 F. Supp. 2d 741, 743 (E.D. La. 2008), *aff'd*, 388 F. App'x 391 (5th Cir. 2010); *In re 1994 Exxon Chem. Plant Fire*, No. 05-1639, 2005 WL 6252312, at *1 (M.D. La. Apr. 7, 2005) (entering *Lone Pine* order where "plaintiffs broadly alleged that substances were released, they were exposed to the substances, and they were injured or otherwise suffered damages from the exposure"), *modified sub nom. In re 1994 Exxon Chem. Plant Fire Litig.*, No. 94-1668, 2005 WL 6252291 (M.D. La. Apr. 29, 2005).

The same is true for federal courts of appeal and district courts across the country, which have approved of the use of a *Lone Pine* order. *E.g., Hamer v. LivaNova Deutschland GmbH*, 994 F.3d 173, 178 (3d Cir. 2021) ("*Lone Pine* orders are routinely used by courts to streamline litigation in mass tort cases."); *In re Asbestos Prods. Liab. Litig.*, 718 F.3d 236, 240-242 & n.2, 246-47 (3rd Cir. 2013) (affirming *Lone Pine* order requiring plaintiffs to complete occupational and environmental exposure history); *Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 832-34 (9th Cir. 2011) (affirming *Lone Pine* order on exposure and causation in case where plaintiffs sought recovery for medical problems allegedly caused by release of chemicals); *Alvey*

*v. Gen. Elec. Co.*, No. 3:20-CV-263, 2021 WL 2012940, at *1-3 (S.D. Ind. Mar. 29, 2021) (entering *Lone Pine* order where plaintiffs' allegations of personal injuries were uncertain and indefinite, plaintiffs lacked information on a specific date or time that the contamination migrated to their properties, and the duration of each plaintiff's exposure to contaminants was not known).

In mass tort cases like this litigation, courts have considered and rejected objections by plaintiffs who believe—like the plaintiffs did in *Acuna*—that the requirements imposed too great a burden. *See also, e.g., Matter of AET Inc.*, 2011 WL 13301617, at *3 (rejecting the argument that a *Lone Pine* order is only appropriate if discovery "is at an advanced stage;" explaining that "the Fifth Circuit's characterization of such orders as '**pre-discovery**' case management devices lends weight to the conclusion that such orders are meant to be entered before the formal discovery process begins."); *see also id.* at 7-10 (rejecting additional arguments that a *Lone Pine* order was "tantamount to a summary judgment motion," that the claimants had insufficient time to gather information, that it was "logistically impossible" to complete the affidavits, and that medical providers lacked access to critical information needed to form accurate medical opinions because no discovery had taken place).

## IV.    PROPOSED LONE PINE CMO

The above law, in conjunction with the facts and procedural history, support a *Lone Pine* case management order in this litigation—before all parties and the Court begin an extensive discovery process. Even beyond case management and the need for a *prima facie* showing before discovery launches, proof of a concrete injury (at a minimum) is a burden Plaintiffs bear at all times: i.e., Plaintiffs must establish that this Court may exercise Article III standing over each of the 2,139 Plaintiffs on each of their claims "at all stages of litigation." *E.g.*, *Transunion LLC v. Ramirez*, 594 U.S. --, 141 S. Ct. 2190, 2208 (2021).

Without the pre-discovery submission of *prima facie* evidence showing a minimum of exposure, injury, and causation from excess lead exposure due to Defendants' alleged acts in the relevant timeframe, Plaintiff's case should not proceed further; to do so would waste judicial resources and result in unnecessary expenditure on Defendants, two of whom are public entities funded by taxpayer dollars.

The number of cases employing *Lone Pine* orders speaks volumes. And the factors that courts evaluate all favor a *Lone Pine* order in this litigation:

- There are currently 2,139 Plaintiffs, imposing a great burden on the Court and the parties to engage in case workup.

- The locations of exposure appear to vary widely.

- The extent of asserted injuries will vary widely and will be impacted by the extent and duration of alleged exposure.

- Plaintiffs' exposures occurred as far back as seven to eight years ago, but Defendants and the Court lack information about Plaintiffs' individual exposures, injuries, or causation of their asserted injuries.

- Plaintiffs have access to publicly available testing data to connect their alleged exposure(s) to their residences and/or locations of regular consumption of water in the relevant timeframe.[13]

- Plaintiffs have access to public and private health care professionals across the greater Jackson area. The *AET* Court, *supra*, used healthgrades.com to

---

[13] *See* FN 1, *supra* (Mississippi Dep't of Health Jackson Water Testing Information: https://apps.msdh.ms.gov/DWW/JSP/WaterSystemDetail.jsp?tinwsys_is_number=317&tinwsys_st_code=MS&wsnumber=MS0250008).

identify the estimated number of health care providers in a geographic area. Using that site, entering the phrase "Family Medicine" providers within 25 miles of Jackson, Mississippi, showed more than 300 listings.

- The testing for lead poisoning is a blood test.[14]

- Plaintiffs affirmatively represented in their Complaint that "Plaintiffs have been diagnosed with an elevated blood-lead level, meaning Plaintiff was lead-poisoned."[15]

The Court, here, cannot be expected to formulate a reasonable case management plan under the standard rules of procedure given the uncertainty as to exposure, injury and causation. It likewise cannot formulate a bellwether or discovery pool/trial plan without more information about who these Plaintiffs are, or where, when, and how long they were exposed to excess lead in their water, what their specific injuries are, or the alleged causes of their stated injuries. Plaintiffs, unlike Defendants, have the information—or should have secured it before filing suit. This includes the regulatory history, which Plaintiffs recited multiple times in Court filings and in the media. The facts and history here cry out for pre-discovery case management using the well-recognized pre-discovery *Lone Pine* CMO proposed here.

Defendants therefore request a pre-discovery *Lone Pine* CMO in the form proposed as Exhibit 1. The order includes, in part, the following requirements to be provided via affidavits:

---

[14] *See* Centers for Disease Control and Prevention, Childhood Lead Poisoning Prevention, Testing Children for Lead Poisoning, available at https://www.cdc.gov/nceh/lead/prevention/testing-children-for-lead-poisoning.htm (last visited Oct. 10, 2023), attached as Ex. 12.

[15] *See* FN 4, *supra* (citing, e.g., Case No. 3:23-CV-00614, Doc. 51 (Am. Compl., Master Docket), ¶371).

**Exposure:** all dates of exposure(s) to lead in City of Jackson public water during the relevant timeframe of this litigation which Plaintiff contends was caused by alleged actions of Defendants; and the specific location(s) of said exposure(s).

**Injury:** all diagnosed injuries or illnesses that Plaintiff claims were caused by exposure(s) to lead in City of Jackson public water during the relevant timeframe of this litigation which Plaintiff contend were caused by the alleged actions of Defendants. Include for each injury or illness the date(s) of diagnosis by a health care provider, name and address of said provider(s), and the date, location and results of any lead screening and/or blood testing in this format.

**Causation**: the scientific literature supporting any claim that the Plaintiff's injury could be caused, and was caused, by exposure(s) to lead in City of Jackson public water during the relevant timeframe of this litigation which Plaintiff contends were caused by the alleged actions of Defendants.

The proposed order also includes a stay of discovery, consistent with the Fifth Circuit's recognition that *Lone Pine* orders are a **pre-discovery** case management procedure.[16]

## V.    CONCLUSION

Based on the foregoing, Defendants request that the Court enter a pre-discovery *Lone Pine* CMO in the form proposed as Exhibit 1 and for all other relief to which they are entitled.

Respectfully submitted, this the 10th day of October 2023.

> **MISSISSIPPI STATE DEPARTMENT OF HEALTH**
>
> By:    */s/ Meade W. Mitchell*
> Meade W. Mitchell, MB #9649
> ONE OF ITS ATTORNEYS

OF COUNSEL:

Meade W. Mitchell, MB #9649
Orlando R. (Rod) Richmond, MB #9885
Edderek (Beau) Cole, MB #100444
Margaret Z.Smith, MB #104178
H. Barber Boone, MB #102266
BUTLER SNOW LLP

---

[16]   The Motion for Stay of Discovery will be separately filed.

1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi 39157
Post Office Box 6010
Ridgeland, Mississippi 39158-6010
Tel: 601-985-4560
Fax: 601-985-4500
Meade.Mitchell@butlersnow.com
Orlando.Richmond@butlersnow.com
Beau.Cole@butlersnow.com
Margaret.Smith@butlersnow.com
Barber.Boone@butlersnow.com

Charles F. Morrow, MB #10240
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Post Office Box 171443
Memphis, Tennessee 38187-1443
Tel:  (901) 680-7200
Fax: (901) 680-7201
Chip.Morrow@butlersnow.com

Gerald L. Kucia, MB #8716
Special Assistant Attorney
General
OFFICE OF THE ATTORNEY
GENERALCIVIL LITIGATION
DIVISION
Post Office Box 220
Jackson, Mississippi 39205-0220
Tel.: (601) 359-4072
Fax: (601) 359-2003
Gerald.kucia@ago.ms.gov

                                    **THE CITY OF JACKSON, MISSISSIPPI**

                          By:    _/s/ Clarence Webster, III_____
                                    Clarence Webster, III, MB #102111
                                    ONE OF ITS ATTORNEYS

OF COUNSEL:

Clarence Webster, III, MB #102111
Kaytie M. Pickett, MB #103202
Adam Stone, MB #10412
JONES WALKER LLP

190 E. Capitol Street, Suite 800
Jackson, Mississippi 39201
Tel: (601) 949-4900
Fax: (601) 949-4804
cwebster@joneswalker.com
kpickett@joneswalker.com
astone@joneswalker.com

TRILOGY ENGINEERING SERVICES, LLC

By:    */s/ Richard G. Daniels*
Richard G. Daniels, *Admitted Pro hac vice*
ONE OF ITS ATTORNEYS

OF COUNSEL:

Richard G. Daniels, *Admitted Pro hac vice*
Davide Macelloni, *Admitted Pro hac vice*
DANIELS, RODRIGUEZ, BERKELEY DANIELS & CRUZ, P.A.
4000 Ponce De Leon Boulevard, Suite 800
Coral Gables, Florida 33146
Tel: (305) 448-7988
Fax: (305) 448-7978
rdaniels@drdbc-law.com
dmacelloni@drbdc-law.com

D. Jason Childress, MB #103678
FLETCHER & SIPPEL LLC.
4400 Old Canton Road, Suite 220
Jackson, Mississippi 39211-5982
Tel: (601) 414-6010
jchildress@fletcher-sippel.com

**CERTIFICATE OF SERVICE**

I, Meade W. Mitchell, one of the attorneys for Defendant Mississippi State Department of Health, do hereby certify that I have this day served a true and correct copy of the above and foregoing document by filing it using the ECF system which sent notice of such filing to all counsel of record.

SO CERTIFIED, this the 10th day of October, 2023.

*/s/ Meade W. Mitchell*
MEADE W. MITCHELL