**BUTLER | SNOW**

EXHIBIT C

January 19, 2024

<u>VIA ELECTRONIC MAIL</u>

Hon. Lakeysha Greer Isaac
United States Magistrate Judge
501 E. Court Street, Ste. 6.150
Jackson, MS 39201
Isaac_chambers@mssd.uscourts.gov

      *Re:*   *In Re Jackson Water Cases*

      *J.W., a minor, et.al v. The City of Jackson, Mississippi, et. al.* Case No. 3:23-cv-00614 CWR-LGI, United States District Court, Southern District of Mississippi, Northern Division

**STATUS CONFERENCE REQUESTED**

Magistrate Isaac,

    This correspondence is submitted on behalf of all Defendants. In its December 19, 2023, Order [Dkt. 172], the Court requested that the parties submit "suggestions and protocols for organizations of the specifically tailored, modified case management order on or before January 19, 2024." Docket # 172. In accordance with that Order, Defendants submit their proposed CMO. Along with the CMO, Defendants also submit their proposed Plaintiff Fact Sheet and set of authorizations.

    After conferences between the parties, due to differences of opinion on most aspects of the CMO, Plaintiffs and Defendants agreed to submit their own versions of a proposed CMO to the Court. Defendants submit their version of the CMO is the most appropriate and, for many reasons, Plaintiffs' CMO is not. Defendants respectfully ask that the Court hold a status conference with the parties to discuss those differences, in the hope that the parties might agree on more with the aid of the Court.

*Post Office Box 6010*  
*Ridgeland, MS 39158-6010*

MEADE W. MITCHELL
601.985.4560
meade.mitchell@butlersnow.com

*Suite 1400*
*1020 Highland Colony Parkway*
*Ridgeland, Mississippi 39157*

T 601.948.5711 • F 601.985.4500 • www.butlersnow.com

BUTLER SNOW LLP

Magistrate Judge Isaac
January 19, 2024
Page 2

1. **Protocol for discovery in Master Case.**

   *Period of Time for Written Discovery*

   Defendants initially proposed staging discovery so a separate CMO could be entered after written discovery was substantially complete. Plaintiffs protested that this could take years and that the definition of "substantial completion" is nebulous. To accommodate Plaintiffs' concerns, Defendants revised their proposed CMO to contain a finite 150-day period before depositions can be noticed. This is an appropriate amount of time to allow considerable progress on written discovery. Plaintiffs' proposal of 60 days is not.

   The initial written discovery in this 2,138 Plaintiff case will be massive. This is not the type of document production that can be completed in 30 days – it will take many months. While Defendants are producing documents, Plaintiffs will be providing Plaintiff Fact Sheets, which is also a substantial task. As these productions progress, discovery issues may arise that require Court intervention, and it will be necessary to focus on these issues before depositions begin.

   Case efficiency dictates the parties work on these issues exclusively for a period before moving into (a) depositions, or (b) bellwether workup. The documents will guide the depositions. In mass tort litigation, there is traditionally a period for written discovery and document production, at least 120 days, before the parties move to depositions. Discovery was staged in the Flint, Michigan litigation. As such, Defendants propose that no depositions be noticed until 150 days after the entry of the CMO, which affords 5 months for dedicated written discovery.

   *Discovery Should be Reciprocal and Bounded by Some Limits*

   Plaintiffs' CMO contemplates that only Plaintiffs can serve written discovery. Defendants would receive only Plaintiff Fact Sheets (and only for 40 plaintiffs) and would be afforded no general liability related discovery. Defendants do not believe one-sided discovery is fair or proper.

   Plaintiffs' CMO also contains no limits on the discovery requests allowed. Though interrogatories are limited by the Federal Rules of Civil Procedure, Plaintiffs' CMO contemplates nearly limitless requests for production and requests for admission. Some limits should be set. Defendants propose 30 interrogatories, 30 requests for production, and 30 requests for admission (other than document authentication requests for admission). If Plaintiffs ultimately need more, they can ask the Court for this after serving their initial requests, just as in any other case.

   Further, every Plaintiff should not be able to serve discovery on every Defendant and every Defendant should not be allowed to serve discovery on every Plaintiff. Plaintiffs should collectively serve only one set of Master Discovery for each Defendant. Similarly, each Defendant should be permitted to propound a master set of discovery on Plaintiffs as a group on collective general liability issues. All Plaintiffs should also submit Plaintiff Fact Sheets (PFS), which should provide basic information on individual Plaintiffs to permit selection of a limited number of cases to form the initial bellwether case work-up pool. Then, Defendants should be permitted to serve tailored discovery to each Plaintiff in that case work-up pool – we proposed 10 interrogatories, 10

requests for production, and 10 requests for admission (not including document authentication requests for admissions). Each Plaintiff in the case work-up pool should be allowed to serve appropriately limited, tailored discovery on Defendants, too.

Plaintiffs also place no limits on the number of depositions that can be taken. Each party must be assigned a limited number of depositions, at least as to the number of present and former employees of Defendants who can be deposed. Only if more depositions are needed should the parties have to approach the Court.

### *Inspection of Land*

Plaintiffs' CMO request for entry, inspection, sampling, and testing of Defendants' properties/land is premature. It should not begin to take place until after written discovery and document production. Plaintiffs' order is also vague. It says Plaintiffs can sample and test land. Like product inspection protocols, there must be protocols for sampling and testing. The CMO Plaintiffs drafted would allow Plaintiffs to do whatever they desired without notice to Defendants. This is particularly an issue for the City of Jackson, whose treatment facilities are not currently under its control, but, instead, are within the control of a court-appointed receiver. Defendants propose that separate testing and sampling protocols be submitted and later entered by the Court.

### *Independent Medical Examinations*

Plaintiffs' CMO also has inadequate provision for Rule 35 medical examinations, which will be needed when a bellwether case pool is selected. Plaintiffs' CMO does not include protocols, but Defendants proposed that separate protocols be submitted and later entered by the Court.

### *Privilege Logs*

Plaintiffs' privilege log protocol is improper. Plaintiffs seem to be attempting to limit the parties' ability to assert the attorney-client and/or work-product privileges based on an unspecified filing date. There are multiple filing dates as there are multiple Complaints in this litigation which were recently consolidated. The Complaint filing date is not the first and only date. There must also be claw back provisions. Defendants' proposal addresses these issues.

### *FOIA Documents and Hold Letters*

Plaintiffs' CMO has no provisions for the parties to provide copies of documents that each have received through FOIA or similar requests under state law. Defendants' version does. Plaintiffs' proposal has no provision for Plaintiffs to send record hold notices to the many doctors that may have treated Plaintiffs. Given that this litigation may last years, that notice is important, and is included in Defendants' proposal.

Magistrate Judge Isaac
January 19, 2024
Page 4

*Deposition Protocol*

The deposition protocol of the Plaintiffs is lengthy, as is the subpoena protocol. Defendants have concerns with both. A poor deposition and/or subpoena protocol will only cause problems and issues for the Magistrate Judge and/or the Special Master. For example, page 12 of Plaintiffs' CMO states "…all depositions will be scheduled for two (2) days…", but page 17 states "Any deposition of a party shall not exceed eight (8) hours…." This is just one example of the inconsistent language that exists throughout Plaintiffs' CMO. Defendants' deposition protocol addresses these and other issues.

*Expert Issues*

The expert deposition rules in Plaintiffs' CMO have issues, as experts are not required to produce drafts under the Federal Rules. Defendants' version accounts for this issue.

*Dispute Procedures*

We disagree with Plaintiffs' provision for handling discovery disputes for several reasons, including the following: (1) It contains no provision for involvement of Special Master; (2) Plaintiffs' CMO makes no provision for formal filing/briefing as to any discovery-related dispute, which means no record and no ability to seek further review; (3) The schedule does not account for Magistrate/Special Master availability; and (4) It makes no provision for a stay of other, potentially related discovery proceedings while the discovery dispute is pending. Defendants' discovery dispute protocol addresses these issues.

**2. Protocol for Plaintiff Fact Sheet (PFS) and Bellwether Process**

The parties agree a PFS should be used in this litigation, but they disagree on how many Plaintiffs should complete the PFS and when.[1] The parties also fundamentally disagree on how the bellwether process should work.

Plaintiffs' proposed CMO suggests the Magistrate or Special Master would select at random only forty (40) Plaintiffs for potential consideration for bellwether case work-up and that only those Plaintiffs would be required to complete a PFS. Plaintiffs' proposal also contemplates that the group of forty (40) selected can only be only young Plaintiffs, i.e. of an age generally considered most susceptible to lead injury. No other Plaintiff is considered for inclusion in the first bellwether grouping. In short, Plaintiffs propose only their best class be the bellwether group, not a representative group of the Plaintiffs as a whole. From PFS submissions alone, not depositions or other discovery, eight (8) of these forty (40) Plaintiffs would be selected for trial. Then, Plaintiffs' CMO provides that all eight (8) of these Plaintiffs would be tried together.

---

[1] Plaintiffs have not proposed a PFS, though Defendants' proposal does include a PFS. Plaintiffs indicated they do not agree to the Defendants' PFS but have not yet proposed revisions to Defendants' version.

Magistrate Judge Isaac
January 19, 2024
Page 5

Defendants propose that all Plaintiffs must provide PFSs, the norm in MDL litigation, and that from the widespread characteristics of the entire Plaintiff pool be identified from those submissions.[2] Defendants propose that then a ten (10) person bellwether group be selected which is representative of the entire litigation. Defendants submit that after depositions, but before expert designations, that the ten (10) person group be reduced to four (4), and after expert motions, the trial group be reduced to one (1).

Plaintiffs' bellwether proposal is contrary to the premise underlying bellwether work-up and trials. It is inconsistent with the Manual for Complex Litigation and general mass tort litigation practice. Under Plaintiffs' proposal, Defendants would be provided no other information on **2,098** Plaintiffs in this litigation. A PFS has a dual purpose in traditional complex litigation practice. First, they are used to screen cases in which plaintiffs lack information to support a claim. Second, they are used to select bellwether cases.[3] *Manual for Complex Litigation, Fourth*, 2022 (the "*Manual*"), Appendix C, at 1022.

Concerning the bellwether process, forty (40) Plaintiffs is approximately 1.8% of the total Plaintiffs. Such a small percentage will not likely identify relevant characteristics of the whole, nor will it produce a reliable representative sample of cases. Defendants will not be able to evaluate the value of these cases as a whole without complete information. The *Manual* makes clear: "If individual trials, sometimes referred to as bellwether trials or test cases, are to produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases." *Manual*, at 22.315.

> Test cases should produce a sufficient number of representative verdicts and settlements to enable the parties and the court to determine the nature and strength of the claims, whether they can be fairly developed and litigated on a group basis and what range of values the cases have if resolution is attempted on a group basis. The more representative the test cases, the more dependable the information about similar cases will be. *Id.*

To accomplish this goal, the Court and the parties must determine what relevant characteristics exist within the cases currently before the Court that will allow for the selection of appropriate representative cases. For example: What are the age ranges for the minor plaintiffs?

---

[2] Defendants previously submitted orders from four different MDL proceedings requiring Plaintiff Profile Forms and/or Plaintiff Fact Sheets for every Plaintiff in the litigation as part of the bellwether process. In the Tylenol MDL, all Plaintiffs had to submit PFS within 60 days of the Court order. *In Re: Tylenol*, MDL No. 2436, Civil Action No. 2:13-MD-02436 (Docket 39). In the Ethicon MDL, all Plaintiffs had to provide Plaintiff Profile Forms within 60 days of the Court order. *In re: Ethicon, Inc.*, MDL 2327, Civil Action No. 2:12-MD-0237 (Docket 281). In the Pradaxa MDL, all Plaintiffs had to submit PFS within 60 days of the court order. *In re: Pradaxa*, MDL No. 2385, Civil Action No. 3:12-CMD-02385 (Docket 54). Last, in the Propecia MDL, all Plaintiffs had to provide a PFS within 135 days of the court order. *In re: Propecia*, MDL 2331, Civil Action No. 12-MD-2331 (Docket 128).

[3] This purpose is self-explanatory. Here, as Defendants noted in previous submissions, there are serious concerns as to whether all the Plaintiffs have sustained injury. Plaintiffs' proposal would leave that issue unresolved for 2098 Plaintiffs and any others to come for years.

Case 3:23-cv-00614-CWR-LGI   Document 176-3   Filed 01/19/24   Page 6 of 9

Magistrate Judge Isaac
January 19, 2024
Page 6

What are the injuries alleged? What exposure and/or duration of exposure did a particular plaintiff experience? Are there certain characteristics that distinguish one group of plaintiffs from another group—such as where they lived? "In litigation with numerous plaintiffs, the judge may direct the parties or a special master to identify relevant characteristic if the parties affecting pretrial organization, discovery, settlement, or trial." *Id*. at 22.316. Identifying the "relevant characteristics" is key to successful resolution of matters like the present case, and currently, Defendants would not have any of the needed information for 2,098 of the Plaintiffs under Plaintiffs' CMO. A PFS to each Plaintiff is the only way to determine these relevant characteristics.

One of the most common methods employed by courts and parties in mass tort ligation for the collection of data to determine relevant characteristics and to facilitate resolution by way of trial or settlement is the use of a PFS. A PFS allows the court and parties to categorize the types and extent of injuries and claims and obtain representative cases within a group of plaintiffs and to cull those plaintiffs without viable claims.

There are 2,138 Plaintiffs in this litigation. Plaintiffs submitted pre-suit notice of their claims, but that notice only provided an address and nothing more. Defendants know nothing about any of the Plaintiffs.[4] Yet, Plaintiffs want Defendants to select cases for bellwether work-up of from a tiny fraction of the Plaintiff pool. The group they propose would be composed only of a highly susceptible age group. From that narrow group, they propose a trial group of eight (8) be selected based only on a PFS. Trying only a select group of the most susceptible Plaintiffs is inconsistent with the premise of bellwether trials.

Unlike Plaintiffs' proposal, Defendants propose a PFS which collects critical information from all individual Plaintiffs and enables the Court and the parties to identify what relevant characteristics exist from the entire Plaintiff population. Collection of this information at the outset offers the Court and the parties the best opportunity to reveal those relevant characteristics from a broad spectrum of cases and determine what cases are, in fact, representative of the total. By way of example, how many of the current plaintiffs are aged six (6) years old and younger, which may indicate those plaintiffs may be more likely to have sustained some type of injury? How many of the plaintiffs have now reached the age of majority, indicating that those plaintiffs are less likely to have sustained any type of injury? How many of the plaintiffs resided in Jackson, Mississippi, at the time of the alleged exposure? What percentage of plaintiffs have sought treatment for their alleged injuries? What types of injuries are alleged?

Without this type of information, selection of "representative" cases for a bellwether trial is not possible, nor will the outcome of such trials produce reliable information on which the Court and the parties may value the claims in this litigation and evaluate whether certain classes cannot survive motion practice. Thus, Defendants request the Court to require all Plaintiffs complete a PFS.

---

[4] The Court and Defendants lack basic, but critical, information as to exposure, injuries, and causation of the Plaintiffs. Defendants and the Court have no appreciation of whether all, many, some, or just a few of the 2,138 Plaintiffs were in fact **exposed** to excess lead levels in their drinking water during the relevant timeframes based on Defendants' actions, including the **duration** of exposure, *and* sustained personal **injuries** connected to those specific events and dates.

Plaintiffs then propose that eight (8) Plaintiffs be tried at once. Defendants do not agree. Defendants do not agree that all exposures are the same – if there is any exposure, each home will be different based on the types of plumbing it has (lead containing or not); the alternate exposures to lead in paint, the soil, etc. will be different for each Plaintiff. Defendants do not agree that all injuries will be the same - they could be different for each Plaintiff. It would be unduly prejudicial for Defendants to be forced to try an eight (8) person bellwether trial.[5]

In deciding whether trial consolidation is appropriate, courts consider a number of factors, including:

> (1) whether the actions are pending before the same court, (2) whether common parties are involved in the cases, (3) whether there are common questions of law and/or fact, (4) whether there is a risk of prejudice or confusion if the cases are consolidated, and if so, is the risk outweighed by the risk of inconsistent adjudications of factual and legal issues if the cases are tried separately, (5) whether consolidation will conserve judicial resources, (6) whether consolidation will result in an unfair advantage, (7) whether consolidation will reduce the time for resolving the cases, and (8) whether consolidation will reduce the cost of trying the cases separately."

*Taylor v. Bucker*, 2016 WL 11612544, at *1 (S.D. Miss. Sept. 8, 2016). Put simply, although "consolidation is permitted as a matter of convenience and economy in administration," *Hall v. Hall*, 138 S.Ct. 1118, 1131 (2018), it "is improper if it would prejudice the rights of the parties," *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978, 989 (5th Cir. 1983). The majority of the factors discussed in *Taylor* counsel strongly against the consolidation of these cases for trial purposes.

**First**, Plaintiff-specific questions concerning causation and damages will predominate over any common questions of law or fact that may exist in these cases. This litigation involves claims of various personal injuries by thousands of Plaintiffs of different ages who allegedly consumed the City of Jackson's water from numerous sources over an extended period. Consolidation cannot relieve Plaintiffs of proving every element of their claims; each case must maintain its separate identity. Therefore, the trier of fact in a consolidated trial would still be required to consider each Plaintiff's unique medical history, pre-existing conditions, course of treatment, alleged injuries, and issues of alternate causation that will overwhelm any common issues concerning Defendants' operation or oversight of the City's water system.

**Second**, and relatedly, consolidating these cases for trial poses a significant threat of confusing the jury and prejudicing Defendants' rights. Resolving questions of specific causation and damages in a consolidated trial would require the jury to make separate determinations of each

---

[5] Trial groups in toxic tort cases have not been allowed in Mississippi in many years. This issue was litigated in Mississippi in toxic tort litigations, primarily in asbestos cases, and multi-plaintiff toxic tort trials are outdated in this state.

Plaintiff's injuries – which have not been specifically identified yet – based on the testimony of numerous treating physicians and a review of other Plaintiff-specific medical evidence. "[T]here is a substantial risk that the jury will be unable to compartmentalize the evidence as it relates to each individual patient. Even assuming that a consolidated trial would be more efficient, these considerations 'must yield to a paramount concern for a fair and impartial trial.'" *Crabtree v. Livanova, PLC*, 2022 WL 19517407, at *4 (E.D. La. Mar. 30, 2022) (denying plaintiffs' motion to consolidate cases, even though each plaintiff underwent similar surgeries involving the same medical device and experienced the same injuries, due to the risk of confusion caused by the presentation of case-specific medical evidence). And because each Plaintiff presumably has not suffered an identical injury, Defendants will likely need to call multiple expert witnesses from various specializations to rebut each Plaintiff's unique injury claims. Much, if not all, of this evidence will be inapplicable to the other Plaintiffs in a consolidated trial, which only increases the likelihood for juror confusion. *See Insolia v. Philip Morris Inc.*, 186 F.R.D. 547, 550-51 (W.D. Wis. 1998) ("Judicial resources are wasted, not conserved, when a jury is subjected to a welter of evidence relevant to some parties but not others."); *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 81 (D.N.J. 1993) ("Where the evidence in one case is not relevant to the issues in the other, consolidation would create a likelihood of prejudice by confusing the issues.").

**Third,** the clear prejudice to Defendants is not outweighed by any risk of inconsistent adjudications if the cases are tried separately. To the extent the parties have disputes that relate to the litigation, this Court can resolve those disputes in a way that applies to all cases, as it has already done with Defendants' motions to dismiss. (Doc. 110). On the other hand, case-specific disputes will need to be addressed separately regardless of whether these cases are tried together.

**Fourth**, consolidation will not meaningfully promote judicial economy or conserve resources. To the contrary, where, as here, a group of similar cases is being tried for the first time, judicial economy is better served by trying the cases separately, "as separate trials will help define the 'exact factual and legal contours' of the claims and defenses and may allow the parties to better assess the value and strength of remaining matters.'" *Crabtree*, 2022 WL 19517407, at *4, n. 68 (quoting *In re Injectafer Prod. Liab. Litig.*, 2021 WL 3145729, (E.D. Pa. July 26, 2021)); *see also In re Bristol-Myers Squibb Co.*, 975 S.W.2d 601, 603 (Tex. 1998) ("Until enough trials have occurred so that the contours of various types of claims within the…litigation are known, courts should proceed with extreme caution in consolidating claims."). While consolidation may cut down on the total number of trials in this litigation, each trial would be significantly longer than a single-plaintiff trial due to the need for case-specific evidence relating to multiple Plaintiffs. And as previously discussed, the parties will likely need to call multiple experts at each trial to address each Plaintiff's specific alleged injuries, meaning that consolidation would not have a significant impact on the number of experts called at each trial.

**Finally**, consolidation would give Plaintiffs an unfair advantage. The "lumping" together of multiple claims can create an air of "guilt by association" that in and of itself is prejudicial to Defendants. *Sidari v. Orleans Cty.*, 174 F.R.D. 275, 282 (W.D.N.Y. 1996). In other words, consolidation can inflate the perceived strengths and obscure the weaknesses of an individual Plaintiff's claims, making it "more likely that a defendant will be found liable and result[ing] in significantly higher damage awards." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir.

Magistrate Judge Isaac
January 19, 2024
Page 9

1996). Each Plaintiff's claims should stand or fall on their own merit, and the most logical way to ensure a fair trial for Defendants is to try each case separately.

      Thank you for consideration of this submission. Defendants respectfully ask that the Court set a conference so that the parties can further discuss their views on these differences with the Court and so that we can answer any questions or concerns the Court may have.

      Sincerely,

      BUTLER SNOW LLP

      Meade W. Mitchell

MWM/ms

85574373.v1